

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FTC CAPITAL GMBH, FTC FUTURES FUND
SICAV, and FTC FUTURES FUND PCC LTD., on
behalf of themselves and all others similarly situated,

                  Plaintiffs,

           - against -

CREDIT SUISSE GROUP AG, BANK OF AMERICA
CORPORATION, J.P. MORGAN CHASE & CO.,
HSBC HOLDINGS PLC, BARCLAYS BANK PLC,
LLOYDS BANKING GROUP PLC, WESTLB AG,
UBS AG, ROYAL BANK OF SCOTLAND GROUP
PLC, DEUTSCHE BANK AG, THE NORINCHUKIN
BANK and CITIBANK NA,

                  Defendants.

Docket No. 11 CIV 2613

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
APR 15 2011
U.S.D.C. S.D.N.Y.
CASHIERS

---

Plaintiffs FTC Capital Gmbh, FTC Futures Fund SICAV, and FTC Futures Fund PCC

Ltd (collectively "Plaintiff"), by its undersigned attorneys, brings this action against Defendants

pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. §§ 1, *et seq.* (the "CEA"),

Sherman Act, 15 U.S.C. § 1, and New York common law, on behalf of itself and all others who

transacted Libor-based contracts on the Chicago Mercantile Exchange ("CME") and the over-

the-counter ("OTC") market between 2006 and June 2009 (the "Class Period").

Plaintiff's allegations as to itself and its own actions are based upon personal knowledge

and as to all other allegations upon information obtained during the course of its attorneys'

investigation, including, but not limited to, the analysis and review of (a) public news reports

concerning pending investigations by the Securities and Exchange Commission, Department of

Justice, British regulatory authorities and the Japanese Financial Supervisory Agency of

manipulation in the London Interbank Offered Rate ("Libor"); (b) market data, price, open interest and volume information for Libor-based derivative contracts; (c) CME Eurodollar futures and options settlement practices; (d) fixed income market commentary; and (e) other public reports of the information alleged herein, and upon belief, as follows:

## SUMMARY OF ALLEGATIONS

1.  Libor is the interest rate used as the basis for the pricing of fixed income futures, options, swaps and other derivative products traded on the CME and in the OTC market. This action arises from the Defendants' unlawful and intentional misreporting and manipulation of – as well as their combination, agreement and conspiracy to fix – Libor prices and to restrain trade in the market for Libor-based derivatives during the Class Period in violation of Sections 4s(h), 9(a)(2) and 22(a) of the CEA, the Sherman Act, 15 U.S.C. § 1, and New York common law.

## JURISDICTION AND VENUE

2.  This action arises under Section 22 of the CEA, 7 U.S.C. § 25, Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and New York common law, respectively.

3.  This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), and 28 U.S.C. §§ 1331 and 1337.

4.  Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). Each of the Defendants transacted business in the Southern District of New York and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Defendants' unlawful acts manipulated the prices of Libor-based derivative products traded in this District.

## PARTIES

5.  Plaintiff FTC Capital GmbH ("FTC Capital"), an asset management company based in Vienna, Austria, purchased and sold Libor-based futures, options, swaps and other derivative products during the Class Period at artificial prices that Defendants caused, and was thereby injured in its property as a result of Defendants' unlawful conduct.

6.  Plaintiff FTC Futures Fund SICAV ("FTC SICAV"), a fund of FTC Capital based in Luxembourg, purchased and sold Libor-based futures, options, swaps and other derivative products during the Class Period at artificial prices that Defendants caused, and was thereby injured in its property as a result of Defendants' unlawful conduct.

7.  Plaintiff FTC Futures Fund PCC Ltd. ("FTC PCC"), a fund of FTC Capital based in Gibraltar, purchased and sold Libor-based futures, options, swaps and other derivative products during the Class Period at artificial prices that Defendants caused, and was thereby injured in its property as a result of Defendants' unlawful conduct.

8.  Defendant Credit Suisse Group AG ("Credit Suisse") is a Switzerland company headquartered in offices in Zurich, Switzerland. At all relevant times, Credit Suisse was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

9.  Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. At all relevant times, Bank of America was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

10. Defendant J.P. Morgan Chase & Co. ("JP Morgan") is a Delaware financial holding company headquartered in New York, New York. At all relevant times, JP Morgan was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

11. Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited

3

company headquartered in London, England. At all relevant times, HSBC was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

12. Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. At all relevant times, Barclays was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

13. Defendant The Norinchukin Bank is a Japan cooperative bank headquartered in Tokyo, Japan. At all relevant times, The Norinchukin Bank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

14. Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of HBOS plc ("HBOS") by Lloyds TSB Bank plc ("Lloyds TSB"). At all relevant times, both HBOS and Lloyds TSB were contributing members of the British Bankers' Association's U.S. dollar Libor panel.

15. Defendant WestLB AG ("WestLB") is a Germany joint stock company headquartered in Dusseldorf, Germany. At all relevant times, WestLB was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

16. Defendant UBS AG ("UBS") is a Switzerland company based in Basel and Zurich, Switzerland. At all relevant times, UBS was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

17. Defendant Royal Bank of Scotland Group plc ("Royal Bank of Scotland") is a United Kingdom public limited company headquartered in Edinburgh, Scotland. At all relevant times, Royal Bank of Scotland was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

4

18. Defendant Deutsche Bank AG ("Deutsche Bank") is a Germany financial services company headquartered in Frankfurt, Germany. At all relevant times, Deutsche Bank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

19. Defendant Citibank NA ("Citibank") is a wholly owned subsidiary of the United States financial services corporation Citigroup Inc., which is headquartered in New York, New York. At all relevant times, Citibank was a contributing member of the British Bankers' Association's U.S. dollar Libor panel.

20. Plaintiff alleges on information and belief that at all relevant times, Defendants John Does Nos. 1-10, inclusive, who performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of the prices of Libor-based futures, options, swaps and other derivative products. Plaintiff is presently unaware of the true names and identities of those Defendants sued herein as John Does Nos. 1-10. Any reference made to such Defendants by specific name or otherwise, individually or plural, is also a reference to the actions of John Does Nos. 1-10, inclusive.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   Overview of Libor

21. The London Interbank Offered Rate ("Libor") is a daily reference rate based on the interest rates at which banks borrow unsecured funds from other banks in the London wholesale money market (or interbank lending market.) Alternatively, Libor can be seen from the point of view of the banks making the offer, as the interest rate the banks will lend to each other – that is

5

offer money in the form of a loan for various time periods (maturities) and in different currencies. In this Complaint, reference to Libor specifically means Libor as a rate of reference for the US dollar.

22. Libor is calculated and published by Thomson Reuters on behalf of the British Bankers' Association ("BBA") after 11:00 am (and generally around 11:45 am) each day (London time). It is a trimmed average of inter-bank deposit rates offered by designated contributor banks, for maturities ranging from overnight to one year. Libor is calculated for 10 currencies. For the US dollar-denominated Libor, there are sixteen contributor banks (most of which are Defendants in this action) on the Libor panel, and the reported interest rate is the mean of the middle values (the interquartile mean). The rates are a benchmark rather than a tradable rate. The actual rate at which banks will lend to one another continues to vary throughout the day.

23. By market convention all Libor rates are quoted as an annualized interest rate. So, for example, if an overnight rate from a contributor bank is given as 2.00%, that means that the bank would expect to pay 2.00% divided by 365.

24. The BBA defines Libor as: "The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 London time." This definition is amplified as follows:

      a.  The rate at which each banks submits must be formed from that bank's perception of its cost of funds in the interbank market.

      b.  Contributions must represent rates formed in the London Money Market and not elsewhere.

      c.  Contributions must be for the currency concerned, not the cost of producing

6

one currency by borrowing in another currency and accessing the required currency via the foreign exchange markets.

d.  The rates must be submitted by members of staff at a bank with primary responsibility for management of a bank's case, rather than a bank's derivative book.

e.  The definition of "funds" is unsecured interbank case or cash raised through primary issuance of interbank Certificates of Deposit.

25. Libor therefore depends on the integrity of the contributor banks on the Libor Panel for its reporting accuracy.

B.    **Libor-Based Futures, Options, Swaps and other Derivative Products**

26. Libor is the primary benchmark for short-term interest rates globally.

27. According to the BBA, "the objectivity and accuracy of the [Libor] rates allowed derivatives to be created based on the data as a reference, and this has flourished to become an enormously successful cornerstone of business transacted in London and worldwide."

28. The integrity of Libor allows many derivative products to price based on Libor. To the extent that Libor is mispriced, these derivatives are also mispriced.

29. Many Libor-based futures, options, swaps and other derivative products trade on the CME. These contracts are traded in an open outcry form in Chicago and also electronically on the CME's GLOBEX platform.

30. The CME's Eurodollar contracts are based on three-month US dollar Libor rates. They are the world's most heavily traded short-term interest rate futures contracts and extend up to ten years. The most actively traded futures months for Eurodollars are March, June, September and December.

7

31. The ticker symbols for Eurodollars traded on the CME are: ED and GE depending on whether the contract is traded by open outcry or on the CME GLOBEX electronic platform. By convention, the months March, June, September and December are represented by the letters H, M, U and Z respectively. Thus, most Eurodollar futures contracts will have the following prefixes EDH or GEH, EDM or GEM, EDU or GEU, or EDZ or GEZ followed by the last two digits representing the year of expiration.

32. Thus, some typical ticker symbol for Eurodollar futures contracts are, for example:, EDH08 (eurodollar futures for March 2008); EDM08 (eurodollar futures for June 2008); EDU08 (eurodollar futures for September 2008); EDZ08 (eurodollar futures for December 2008).

33. Each Eurodollar futures contract is for a Eurodollar Interbank Time Deposit and has a principal value of $1,000,000 with a three-month term to maturity. Eurodollar futures terminate trading at 11:00 am London Time on the second London bank business day immediately preceding the third Wednesday of the contract's named month of delivery (*e.g.*, March, June, September or December).

34. The final settlement price of an expiring Eurodollar contract is 100 minus the three-month Eurodollar interbank time deposit rate determined at the BBA Libor fixing on the second London bank business day immediately preceding the third Wednesday of the contract's named month of delivery.

35. When Eurodollar traders hold open positions in a futures contract at the time of termination of trading in that contract, they must make payment to (if short the contract) or receive payment from (if long the contract) the CME's clearing house based on a settlement price equal to the final settlement price of Libor as discussed above.

36. Eurodollars thus are priced specifically on three-month Libor as reported by

Defendants to the BBA. If the rates that Defendants reported for Libor were artificially low, then at the time of expiration, the settlement price for Eurodollar futures would be artificially high. This is because the underlying value of the Eurodollar contract is inversely related to the interest rate. That is, the settlement price is 100 minus the three-month Eurodollar interbank time deposit rate. The lower the rate, the higher the settlement price. Defendants' artificial suppression of Libor would have caused higher Eurodollar futures contract settlement prices than would have otherwise occurred.

37. Only a small percentage of all futures contracts traded each year on CME and other exchanges results in actual delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a Eurodollar futures contract can cancel or offset his future obligation to the contract market/exchange clearing house by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

38. Traders who exit their positions before settlement are still affected by Libor mispricing because the Eurdollar futures contracts trade based on what Libor is expected to be in the future. To the extent that Libor is mispriced in the present, expectations of what Libor will be in the future will also be skewed.

39. In addition to Eurodollar contracts, the CME has other contracts that are based, at least in part, on Libor. Options on Eurodollar futures settle according to Eurodollar futures prices and therefore are derivatively based on Libor prices. There are two types of options, calls and puts. A call gives the holder of the Eurodollar option the right, but not the obligation, to buy the underlying Eurodollar futures contract at a certain price – the strike price. Conversely, the

put gives the holder the right, but not the obligation, to sell the underlying Eurodollar futures contract at the strike price. Puts are usually bought when the expectation is for neutral or falling prices; a call is usually purchased when the expectation is for rising prices. The price at which an option is bought or sold is the premium. The premium is affected by the underlying price of the Eurodollar futures contract, which, in turn, is directly affected by the reported Libor.

40. Interest rate swaps traded on the Chicago Mercantile for (5-, 7-, 10- and 30-year tenors) and options on interest rate swaps are also based on Libor. CME interest rate swaps are based on OTC plain vanilla swaps. In a plain vanilla interest rate swap, Company A and Company B choose a time frame, a principal amount, a single currency, a fixed interest rate, a floating interest rate and payment dates. On the specified payment dates for the duration of the time frame, Company A pays Company B a fixed rate of interest on the principal amount, and Company B pays Company A a floating interest rate on the principal amount. All payments are made in the same currency and only the net sum of each payment exchanges hands. The purpose of such an exchange might be to reduce interest rate risk.

41. For interest rate swaps traded on the CME, the settlement price is based on certain formulas. The final settlement value, measured in price basis points, will be determined as:

5-Year: $100 * [ 4/r5 + (1 - 4/r5)*(1 + r5/200)-10 ]$

7-Year: $100 * [ 4/r7 + (1 - 4/r7)*(1 + r7/200)-14 ]$

10-Year: $100 * [ 4/r10 + (1 - 4/r10)*(1 + r10/200)-20 ]$

30-Year: $100 * [ 4/r30 + (1 - 4/r30)*(1 + r30/200)-60 ]$

where $r5$, $r7$, $r10$, and $r30$ represent, respectively, ISDA Benchmark Rates for 5-Year, 7-Year, 10-Year and 30-Year U.S. dollar. (For example, if the ISDA Benchmark Rate is five and one quarter percent, then r is equal to 5.25.) ISDA Benchmark Rates derive, at least in part, from

Libor.

42. Interest rate swap traders would be harmed if Libor was artificially lowered, because they would have to pay back the Libor-based leg of the contract at artificially elevated prices. The interest rate swaps will be mispriced to the extent that Libor has been misrepresented.

43. Ticker symbols for CME interest rate swaps are: (1) for five year tenor, NGH or SAH, NGM or SAM, NGU or SAU, NGZ or SAZ; for seven-year tenor, 7IH, 7IM, 7IU, 7IZ; for 10-year tenor, NIH or SRH, NIM or SRM, NIU or SRU, NIZ or SRZ; and for 30-year tenor, NZH or I3H, NZM or I3M, NZU or I3U, NZZ or I3Z, followed by the last two digits representing a year.

44. In addition to Libor-based derivatives traded on the CME, over-the-counter swaps, including, but not limited to the plain vanilla swaps discussed above, are based on Libor.  This is because ISDA Benchmark rates, upon which this interest rate swaps settle, are based, at least in part, on Libor.  The interest rate swaps will be mispriced to the extent that Libor has been misrepresented.

## II.   Defendants Did Suppress and/or Maintain At Artificial, Manipulated Levels their Reported Libor During the Class Period

### A.   Defendants Suppressed Libor

45. Beginning as early as 2006 and extending into 2009, a portion of the contributing banks to the Libor panel, Defendants herein, individually artificially suppressed, and collectively agreed to artificially suppress, the Libor rate. In the early months of 2008, during the most significant financial crisis since the great depression, US dollar Libor rates submitted by contributor banks did not vary markedly, nor did they increase or decrease sharply.  This fact did not correspond to traditional market behavior because in times of severe uncertainty, banks would normally be reluctant to lend to one another on an unsecured basis without receiving a

higher risk premium. In a market not artificially suppressed, Libor rates should have increased significantly during this period. In addition, because different banks were experiencing different levels of severe stress, the banks should have been receiving markedly different borrowing rates. None of this was reflected in the Libor rates reported by Defendants.

46. When compared with other reliable measures of bank risk, such as federal funds trades (which require collateral) and the credit default market, the reported Libor rates of the contributing banks all were underpriced. For example, in 2008, the Federal Reserve auctioned off $50 billion in one-month loans to banks for an average annualized interest rate of 2.82% – 0.1% percentage point higher than the comparable Libor rate. However, because banks put up securities as collateral for the Federal Reserve loans, they should have received them for a lower rate than Libor, which is unsecured. Despite clear reasons why Libor should have been higher, the reported Libor did not reflect this market reality.

47. A 2008 Wall Street Journal examination of the borrowing costs submitted by the banks during the first four months of 2008 showed that banks reported remarkably similar costs despite the fact that the banks were facing different financial stresses. For the first four months of 2008, for example, the three-month borrowing rates reported by Defendant remained, on average, within a range of only 0.06 of a percentage point.

48. According to a Stanford University finance professor, these reported rates "[were] far too similar to be believed."

49. Economists from the Bank of International Settlements raised concerns that banks might report incorrect rate information. In a report, these economists said that banks might have an incentive to provide false rates to profit from derivative transactions. The report said that despite some protections, Libor rates can still "be manipulated if contributor banks collude or if a

sufficient number change their behavior."

50. Defendants had the opportunity to collude. When posting rates to the BBA, the 16 contributor banks' traders were able to phone brokers at firms such as Tullett Prebon PLC, ICAP PLC and Compagnie Financiere Tradition to get estimates of where the brokers perceived the loan market to be. It is through such communications, among others, that banks are able to communicate their intent to report a given Libor rate.

51. In addition to finding reported Libor rates were uncannily similar, the study by the Wall Street Journal of the 16 contributor banks to the Libor Panel found that the defendants reported Libor rates did not correspond to the banks' perceived health as that health is measured in the credit default market.

52. On the afternoon of March 10, 2008, for instance, investors in the credit default market were estimating that defendant WestLB, which was hit hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse Group, a Swiss bank that was perceived to be in better shape. Yet the next morning, for Libor purposes, WestLB reported the same borrowing rate as Credit Suisse.

53. Defendant Citibank's reported rates differed the most from what the credit default market suggested. On average, the rates at which Citibank said that it could borrow dollars for three months (i.e., its Libor rates) were about 0.87 percentage points lower than the rate calculated using default-insurance data. The difference was 0.7 percentage points for WestLB, 0.57 for HBOS, 0.43 for JP Morgan, and 0.42 for UBS. Defendants Credit Suisse, Deutsche Bank, Barclays, HSBC, Lloyds, and Royal Bank of Scotland also differed from their expected credit default market rates by about 0.3 percentage points.

54. The money market committee of The Bank of England in November 2007 and again

in April 2008 raised questions about the integrity of Libor. In November 2007, minutes of the meeting stated that, "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress." On April 3, 2008, minutes of the committee's discussions say that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates." Although BBA and at least some defendant banks were members of this committee, BBA later announced that Libor continued to be reliable even in times of financial crisis. BBA's conduct served to aid Defendants in fraudulently concealing their conduct.

55. In April 2008, Citibank interest-rate strategist Scott Peng raised questions about the integrity of Libor, writing that "Libor at times no longer represents the level at which banks extend loans to others." According to the Wall Street Journal, the BBA complained to Citibank and asked that the report be withdrawn.

56. On April 17, 2008, just days after the Wall Street Journal reported suspicious Libor rates, there was a sudden jump in dollar-denominated Libor. The benchmark dollar Libor rate for three-month borrowing hit 2.8175% Thursday, or about .08 percentage point more than the 2.7335% rate set on Wednesday. This move also came after a decision by the BBA to speed up an inquiry into the daily borrowing rates that banks provide to establish the Libor rate.

57. The move by the BBA came in response to the concerns among bankers and the financial media that their rivals were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash.

58. In a note to clients the day after Libor surged, UBS strategist William O'Donnell suggested that banks were responding to the heightened scrutiny, saying that the BBA's announcement of its inquiry was an attempt "to bring publicly posted rates back into line with the shadow interbank money rate market."

14

59. At that time, William Porter, credit strategist at Credit Suisse, said he believed the three-month dollar rate is 0.4 percentage points below where it should be. That echoed the view of Scott Peng, a Citigroup Inc. analyst who said that Libor understated banks' true borrowing costs by as much as 0.3 percentage points.

60. Although prior to the BBA investigation, reported Libor rates had remained clustered and low, on April 17, 2008, the dynamic changed. The highest quote of the morning was submitted by U.K. lender HBOS PLC (acquired in 2009 by Defendant Lloyds), which submitted a 2.86% rate for a three-month loan. That was up 0.10 percentage point from Wednesday. HSBC Holdings PLC posted a rate of 2.85%, up 0.12 percentage point from Wednesday. Bank of America Corp. submitted the lowest rate of 2.77%, up from 2.75% on Wednesday.

61. Suspiciously, other lending rates for other currencies fell or remained relatively flat at the time Libor surged, a sign that the dollar Libor rate was susceptible to manipulation.

62. Defendants had two motives for suppressing Libor. The first was to avoid having the market doubt their financial stability. During the height of the credit crisis during 2007-2008, Defendants were loath to disclose the risk premium that the market was attaching them. To have disclosed that the market was charging any individual bank a much higher interest rate than the others would have shown the market that the bank was at greater risk of default than the others. Defendant banks had a collective desire to avoid the market identifying them as risky.

63. The second reason Defendants had to misprice Libor was to take advantage of trading opportunities their inside information would provide in the Libor-based derivative market. Regulators are currently investigating Defendant Barclays, as well as other Defendants, for piercing the wall between derivative trading and treasury functions (through which Libor would normally be reported). To pierce this wall would be in violation to the dictates of the BBA which

requires that banks separate their Libor reporting functions from derivative trading. The reason for doing it would be to take advantage of reported Libor rates in Libor-based derivatives trading.

64. Defendants (or their affiliates) are registered swap dealers or major swap participants (as those terms are used in the CEA). Defendants had the motive and ability to use the information that they had about their reported Libor rates to trade advantageously in the Libor-based derivative markets, including the CME.

B.    **Governmental Investigations**

65. The artificial pricing of Libor during the Class Period has spurred investigations by several government regulatory agencies into the reporting practices of the banks on the BBA's U.S. dollar panel. Regulatory authorities are investigating Defendants Libor reporting practices for the period between 2006 and 2009. Their investigation is ongoing and reportedly is about a year old.

66. The fact of the investigations came to light on March 15, 2011 when UBS disclosed in its annual report that it had received subpoenas from the Securities and Exchange Commission, the Commodity Futures Trading Commission and the Department of Justice, as well as an information request from the Japanese Financial Supervisory Agency, relating to its interest rate submissions to the BBA. UBS's disclosure states that the focus of the investigations is "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."

67. A Financial Times article published the same day as UBS's disclosure reported that the three U.S. agencies, the Japanese agency and the United Kingdom's Financial Services Authority had also requested information, and had begun interviewing witnesses, connected to the Defendants for several months.

68. To date, UBS, Bank of America, Citibank and Barclays have received official subpoenas, but based on sources familiar with the investigations, the Financial Times reported that "[a]ll the panel members are believed to have received at least an informal request for information — an earlier stage in an investigation process before a subpoena."

## CLASS ACTION ALLEGATIONS

69. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP") on his own behalf and as representatives of a class ("Class") defined as all persons, corporations and other legal entities (other than Defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators) that transacted in Libor-based derivatives during the Class Period.

70. The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded CME Libor-based derivative contracts during the Class Period.

71. Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

        a. Whether Defendants' manipulation acts constituted a manipulative or unlawful act;

        b. Whether Defendants injected into Libor-based derivatives illegitimate forces of supply and demand;

        c. Whether Defendants manipulated Libor-based derivatives in violation of the CEA;

17

d.  Whether Defendants conspired to manipulate Libor-based derivatives in violation of the CEA;

e.  Whether Defendants combined, agreed, or conspired to suppress, fix, maintain, or stabilize Libor-based derivatives in violation of the antitrust laws;

f.  The character, extent, and duration of Defendants' manipulation of Libor-based derivatives;

g.  Whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

h.  Whether Defendants unjustly enriched themselves or are otherwise responsible for restitution under the common law;

i.  The fact and degree of impact on Libor-based derivatives prices from Defendants' course of unlawful conduct; and

j.  The appropriate measure of relief.

72. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

73. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation and class action litigation.

74. A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

75. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

76. By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to misreport and make artificial prices for Libor and Libor-based derivatives.

77. Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for Libor-based derivatives by, among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

78. As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and

19

self-concealing manipulative acts and could not have discovered same by the exercise of due diligence before it became publicly known that regulatory authorities were investigating defendants for the alleged misconduct.

79. As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff.

80. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

81. Contemporaneous sources show that the misconduct was concealed. Analysis and studies by industry groups, connected to Defendants, attempted to refute the claims made by market participants and the financial media that Libor was too low. These reports further served to conceal Defendants' misreporting.

### AS AND FOR A FIRST CLAIM FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT
(7 U.S.C. § 1, *et seq.*)

82. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

83. The CME has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7. CME submits to the CFTC various rules and regulations for approval through which CME designs, creates the terms of, and conducts trading in various Libor-based futures, options, swaps and other derivative products. CME is an organized, centralized market that provides a forum for trading Libor-based futures, options, swaps and other derivative products.

84. As to the CME Libor-based derivatives, by their intentional misconduct, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Libor-based derivative contracts to be artificial, including artificially inflated and/or maintained, during the Class Period.

85. Defendants' activities alleged herein constitute market power manipulation of the prices of CME Libor-based derivatives in violation of Sections 4s(h), 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 6s(h), 13(a) and 25(a).

86. Defendants' extensive manipulative conduct deprived Plaintiff and other traders of a lawfully operating market during the Class Period.

87. Plaintiff and others who transacted in CME Libor-based derivative contracts during the Class Period transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

88. Plaintiff and the Class are each entitled to damages for the violations of the CEA alleged herein.

### AS AND FOR A SECOND CLAIM FOR
### VICARIOUS LIABILITY FOR MANIPULATION

89. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

90. Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them.

## AS AND FOR A THIRD CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT
(15 U.S.C. § 1)

91. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

92. Defendants entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

93. During the Class Period, Defendants controlled what Libor rate would be reported and therefore indirectly controlled prices in the market for Libor-based derivative contracts.

94. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and/or made artificial prices for Libor-based derivative contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

95. Defendants' conspiracy, and resulting impact on the market for Libor-based derivative contracts, occurred in or affected interstate and international commerce.

96. As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

97. Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT AND RESTITUTION

98. Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

22

99. It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of Plaintiff and members of the Class.

100.   Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

101.   Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to Plaintiff and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)   For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representatives, and his counsel as Class counsel;

(B)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)   For a judgment awarding Plaintiff and the class damages against Defendants for their violations of the federal antitrust laws, in an amount to be trebled in accordance with such laws;

(D)   For a judgment awarding Plaintiff and the Class any and all sums of Defendants' unjust enrichment;

(E)    For an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on Defendants' unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

(F)    For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(G)    For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.


Dated: New York, NY
       April 15, 2011

                                KIRBY McINERNEY LLP

                    By:    _____
                                Roger Kirby, Esq.
                                David Kovel, Esq.
                                Daniel Hume, Esq.
                                825 Third Avenue
                                New York, New York 10022
                                Telephone: (212) 317-2300
                                Facsimile: (212) 751-2540

24

**MOTLEY RICE LLC**
Joseph F. Rice
William H. Narwold
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450

**STURMAN LLC**
Deborah Sturman
275 Seventh Avenue, 2nd Floor
New York, NY 10001
Telephone: (212) 367-7017
Facsimile: (917) 546-2544

*Attorneys for Plaintiff and the Proposed Class*