UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments          **MEMORANDUM AND ORDER**
Antitrust Litigation.
                                           11 MD 2262 (NRB)

THIS DOCUMENT RELATES TO: All Cases

----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I. Introduction

These cases arise out of the alleged manipulation of the London InterBank Offered Rate ("LIBOR"), an interest rate benchmark that has been called "the world's most important number." British Bankers' Ass'n, BBA LIBOR: The World's Most Important Number Now Tweets Daily (May 21, 2009), http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily. As numerous newspaper articles over the past year have reported, domestic and foreign regulatory agencies have already reached settlements with several banks involved in the LIBOR-setting process, with penalties reaching into the billions of dollars.

The cases presently before us do not involve governmental regulatory action, but rather are private lawsuits by persons who allegedly suffered harm as a result of the suppression of

LIBOR.  Starting in mid-2011, such lawsuits began to be filed in this District and others across the country.  On August 12, 2011, the Judicial Panel on Multidistrict Litigation transferred several such cases from other districts to this Court for "coordinated or consolidated pretrial proceedings."  In re Libor-Based Fin. Instruments Antitrust Litig., 802 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011); see also 28 U.S.C. § 1407 (2006).

On June 29, 2012, defendants filed motions to dismiss. Four categories of cases are subject to defendants' motions to dismiss: cases brought by (1) over-the-counter ("OTC") plaintiffs, (2) exchange-based plaintiffs, (3) bondholder plaintiffs, and (4) Charles Schwab plaintiffs (the "Schwab plaintiffs").  The first three categories each involve purported class actions, and each has a single lead action.  The lead action for the OTC plaintiffs is Mayor and City Council of Baltimore v. Bank of America (11 Civ. 5450); the lead action for the exchange-based plaintiffs is FTC Capital GmbH v. Credit Suisse Group (11 Civ. 2613), and the lead action for the bondholder plaintiffs is Gelboim v. Credit Suisse Group (12 Civ. 1025).  By contrast, the Schwab plaintiffs do not seek to represent a class, but rather have initiated three separate cases: Schwab Short-Term Bond Market Fund v. Bank of America Corp. (11 Civ. 6409), Charles Schwab Bank, N.A. v. Bank of

America Corp. (11 Civ. 6411), and Schwab Money Market Fund v. Bank of America Corp. (11 Civ. 6412).

Subsequent to defendants' filing of their motion to dismiss, several new complaints were filed. It quickly became apparent to us that information relating to this case would continue indefinitely to come to light, that new complaints would continue to be filed, and that waiting for the "dust to settle" would require an unacceptable delay in the proceedings.

Therefore, on August 14, 2012, we issued a Memorandum and Order imposing a stay on all complaints not then subject to defendants' motions to dismiss, pending the present decision. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MD 2262, 2012 WL 3578149 (S.D.N.Y. Aug. 14, 2012). Although we encouraged the prompt filing of new complaints, see id. at *1 n.2, we determined that the most sensible way to proceed would be to wait on addressing those cases until we had clarified the legal landscape through our decision on defendants' motions.

For the reasons stated below, defendants' motions to dismiss are granted in part and denied in part. With regard to plaintiffs' federal antitrust claim[1] and RICO claim, defendants' motions are granted. With regard to plaintiffs' commodities

---

[1] Because each amended complaint asserts only one federal antitrust claim, we will refer in the singular to plaintiffs' federal antitrust "claim." Similarly, because each of the Schwab amended complaints asserts one RICO claim and one Cartwright Act claim, we will refer in the singular to the Schwab plaintiffs' RICO "claim" and Cartwright Act "claim."

manipulation claims, defendants' motions are granted in part and denied in part. Finally, we dismiss with prejudice the Schwab plaintiffs' Cartwright Act claim and the exchange-based plaintiffs' state-law claim, and we decline to exercise supplemental jurisdiction over the remaining state-law claims.

## II. Background

Despite the legal complexity of this case, the factual allegations are rather straightforward. Essentially, they are as follows: Defendants are members of a panel assembled by a banking trade association to calculate a daily interest rate benchmark. Each business day, defendants submit to the association a rate that is supposed to reflect their expected costs of borrowing U.S. dollars from other banks, and the association computes and publishes the average of these submitted rates. The published average is used as a benchmark interest rate in financial instruments worldwide. According to plaintiffs, defendants conspired to report rates that did not reflect their good-faith estimates of their borrowing costs, and in fact submitted artificial rates over the course of thirty-four months. Because defendants allegedly submitted artificial rates, the final computed average was also artificial. Plaintiffs allege that they suffered injury because they held positions in various financial instruments that were negatively

affected by defendants' alleged fixing of the benchmark interest rate.

As one would expect, the parties' primary factual disagreement concerns whether defendants conspired to submit artificial rates and whether they in fact did so. Plaintiffs have included in their complaints extensive evidence that allegedly supports their allegations on these points, and defendants, were this case to proceed to trial, would surely present evidence to the contrary with equal vigor. However, our present task is not to resolve the parties' factual disagreements, but rather to decide defendants' motions to dismiss. These motions raise numerous issues of law, issues that, although they require serious legal analysis, may be resolved without heavy engagement with the facts. Therefore, we will set out in this section only those factual allegations necessary to provide context for our decision, and will cite further allegations later as appropriate. This section will begin by explaining what LIBOR is and will then discuss defendants' alleged misconduct and how it allegedly injured plaintiffs.

## A. LIBOR

LIBOR is a benchmark interest rate disseminated by the British Bankers' Association (the "BBA"), a "leading trade association for the U.K. banking and financial services sector."

OTC Am. Compl. ¶ 42 (quoting BBA, <u>About Us</u>, http://www.bba.org.uk/about-us (last visited Mar. 29, 2013)).[2] LIBOR is calculated for ten currencies, including the U.S. dollar ("USD LIBOR"). <u>Id.</u> ¶ 43. For each of the currencies, the BBA has assembled a panel of banks whose interest rate submissions are considered in calculating the benchmark (a "Contributor Panel"); each member of the Contributor Panel must be a bank that "is regulated and authorized to trade on the London money market." <u>Id.</u> ¶ 46. The Contributor Panel for USD LIBOR, the only rate at issue in this case, consisted at all relevant times of sixteen banks. The defendants here, or one of their affiliates, are each members of that panel.

Each business day, the banks on a given LIBOR Contributor Panel answer the following question, with regard to the currency for which the bank sits on the Contributor Panel: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" <u>Id.</u> ¶ 48. Importantly, this question does not

---

[2] The six amended complaints subject to defendants' motions to dismiss are essentially identical in their allegations regarding the background of this case and the misconduct that defendants allegedly committed. Therefore, in section A, providing background on LIBOR, and section B, discussing defendants' alleged misconduct, we will cite exclusively to the OTC Amended Complaint, with the understanding that parallel allegations are contained in most or all of the other amended complaints. By contrast, the primary areas in which the amended complaints differ are in their allegations of who the plaintiffs are, how they were allegedly injured, and what claims they are asserting against defendants. Accordingly, in Part C, when we discuss plaintiffs' alleged injury, we will explore the allegations particular to specific amended complaints.

ask banks to report an interest rate that they actually paid or even an average of interest rates that they actually paid; rather, it inquires at what rate the banks "predict they can borrow unsecured funds from other banks in the London wholesale money market." Id. ¶ 44. Each bank will answer this question with regard to fifteen maturities, or tenors, ranging from overnight to one year. Id.; Settlement Agreement Between Dep't of Justice, Criminal Div., and Barclays (June 26, 2012), Appendix A, ¶ 5, Ex. 3, Scherrer Decl. [hereinafter DOJ Statement]. The banks submit rates in response to this question ("LIBOR quotes" or "LIBOR submissions") each business day by 11:10 AM London time to Thomson Reuters, acting as the BBA's agent. OTC. Am. Compl. ¶ 47; DOJ Statement ¶ 3. Each bank "must submit its rate without reference to rate contributed by other Contributor Panel banks." DOJ Statement ¶ 6.

After receiving quotes from each bank on a given panel, Thomson Reuters determines the LIBOR for that day (the "LIBOR fix") by ranking the quotes for a given maturity in descending order and calculating the arithmetic mean of the middle two quartiles. OTC Am. Compl. ¶ 48; DOJ Statement ¶ 4. For example, suppose that on a particular day, the banks on the Contributor Panel for U.S. dollars submitted the following quotes for the three-month maturity ("three-month USD LIBOR"): 4.0%, 3.9%, 3.9%, 3.9%, 3.8%, 3.8%, 3.7%, 3.6%, 3.5%, 3.5%,

3.4%, 3.3%, 3.3%, 3.1%, 3.0%, and 3.0%.  The quotes in the middle two quartiles would be: 3.8%, 3.8%, 3.7%, 3.6%, 3.5%, 3.5%, 3.4%, and 3.3%.  The arithmetic mean of these quotes, 3.575%, would be the LIBOR fix for that day.

Thomson Reuters publishes the new LIBOR fix each business day by approximately 11:30 AM London time.  DOJ Statement ¶ 5. In addition to publishing the final fix, "Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks."  Id.  Therefore, it is a matter of public knowledge not only what the LIBOR fix is on any given business day, but also what quote each bank submitted and how the final fix was calculated.

LIBOR is "the primary benchmark for short term interest rates globally."  OTC Am. Compl. ¶ 44.  For example, market actors "commonly set the interest rate on floating-rate notes [in which the seller of the note pays the buyer a variable rate] as a spread against LIBOR," such as LIBOR plus 2%, and "use LIBOR as a basis to determine the correct rate of return on short-term fixed-rate notes [in which the seller of the note pays the buyer a fixed rate] (by comparing the offered rate to LIBOR)."  In short, LIBOR "affects the pricing of trillions of dollars' worth of financial transactions."  Id. ¶ 45.

### B. Defendants' Alleged Misconduct

According to plaintiffs, "Defendants collusively and systematically suppressed LIBOR during the Class Period," defined as August 2007 to May 2010. OTC Am. Compl. ¶ 2; see also id. ¶¶ 4-8; Exchange Am. Compl. ¶ 1. Defendants allegedly did so by each submitting an artificially low LIBOR quotes to Thomson Reuters each business day during the Class Period. OTC Am. Compl. ¶ 6.

Plaintiffs argue that defendants had two primary motives for suppressing LIBOR. First, "well aware that the interest rate a bank pays (or expects to pay) on its debt is widely, if not universally, viewed as embodying the market's assessment of the risk associated with that bank, Defendants understated their borrowing costs (thereby suppressing LIBOR) to portray themselves as economically healthier than they actually were." OTC Am. Compl. ¶ 5. Moreover, "because no one bank would want to stand out as bearing a higher degree of risk than its fellow banks, each Defendant shared a powerful incentive to collude with its co-Defendants to ensure it was not the 'odd man out.'" Id. ¶ 52. Second, "artificially suppressing LIBOR allowed Defendants to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors, including [plaintiffs], during the Class Period." Id. ¶ 5; see also id. ¶ 53.

Plaintiffs devote the bulk of their complaints to amassing evidence that LIBOR was fixed at artificially low levels during the Class Period. For one, plaintiffs offer statistical evidence showing that LIBOR diverged during the Class Period from benchmarks that it would normally track. First, each defendant's LIBOR quotes allegedly diverged over the Class Period from its probabilities of default, as calculated by experts retained by plaintiffs. OTC Am. Compl. ¶¶ 57-66. A bank's probability of default should correlate positively with its cost of borrowing, based on the basic principle that "investors require a higher . . . rate of return as a premium for taking on additional risk exposure." Id. ¶ 59. However, plaintiffs' experts found "a striking negative correlation between USD-LIBOR panel bank's LIBOR quotes and [probabilities of default] during 2007 and 2008." Id. ¶ 66. This suggests that defendants "severely depressed LIBOR during that time." Id.

Second, LIBOR diverged during the Class Period from another comparable benchmark, the Federal Reserve Eurodollar Deposit Rate (the "Fed Eurodollar Rate"). Eurodollars are defined as "U.S. dollars deposited in commercial banks outside the United States." Exchange Am. Compl. ¶ 200 (quoting CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_Fact_Card.pdf).

Like LIBOR, the Fed Eurodollar Rate "reflect[s] the rates at which banks in the London Eurodollar money market lend U.S. dollars to one another," OTC Am. Compl. ¶ 68, though because LIBOR is based on the interest rate that banks expect lenders to offer them (an "offered rate"), whereas the Fed Eurodollar Rate is based on what banks are willing to pay to borrow (a "bid rate"), "the Fed's Eurodollar rate should be less than LIBOR." Scott Peng et al., Citigroup, Special Topic: Is LIBOR Broken?, Apr. 10, 2008. However, plaintiffs' experts found that LIBOR was lower than the Fed Eurodollar Rate, and that individual defendants' LIBOR quotes were also lower than the Fed Eurodollar Rate, for most of the Class Period. OTC Am. Compl. ¶¶ 67-88. According to plaintiffs, this finding suggests not only that "suppression of LIBOR occurred during the Class Period," but also that defendants conspired to suppress LIBOR, as "[t]he sustained period during which the [Fed Eurodollar Rate] – LIBOR Spread fell and remained starkly negative . . . is not plausibly achievable absent collusion among Defendants." Id. ¶ 88.

     In addition to the above statistical analysis, plaintiffs cite "publicly available analyses by academics and other commentators" which "collectively indicate ILBOR was artificially suppressed during the Class Period." Id. ¶ 89. For instance, plaintiffs discuss studies that found "variance between [banks'] LIBOR quotes and their contemporaneous cost of

buying default insurance . . . on debt they issued during [the Class Period]." <u>Id.</u> ¶ 90; <u>see also</u> <u>id.</u> ¶¶ 90- 103.  Plaintiffs also note commentators' findings that defendants' LIBOR quotes "demonstrated suspicious 'bunching' around the fourth lowest quote submitted by the 16 banks," which "suggests Defendants collectively depressed LIBOR by reporting the lowest possible rates that would not be excluded from the calculation of LIBOR on a given day.  <u>Id.</u> ¶ 105; <u>see also</u> <u>id.</u> ¶¶ 105-13.

Plaintiffs further observe that "during 2008 and 2009 at least some of [defendants'] LIBOR quotes were too low in light of the dire financial circumstances the banks faced."  <u>Id.</u> ¶ 128.  For instance, the LIBOR submissions of Citigroup, RBS, and WestLB were suspiciously low given the financial troubles facing those banks during the Class Period.  <u>Id.</u> ¶¶ 128-38.

Finally, plaintiffs allege that they were not aware of defendants' manipulation "until March 15, 2011, when UBS released its annual report 20-F stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA."  <u>Id.</u> ¶ 205.  UBS had explained that these investigations addressed "whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR at certain times."  Plaintiffs

maintain that, even though several news articles had warned as early as spring 2008 that LIBOR was suspiciously low,[3] these warnings did not provide notice of defendants' alleged manipulation of LIBOR because they were counteracted by public statements from the BBA and individual defendants that provided alternative explanations for why LIBOR had failed to track comparable benchmarks.  Id. ¶¶ 192-204.

Following the filing of plaintiffs' amended complaints on April 30, 2012, several governmental agencies disclosed that they had reached settlements with Barclays with regards to Barclays' submission of artificial LIBOR quotes.  Although plaintiffs were not able to incorporate information from these settlements into their amended complaints, they have submitted to the Court, in the course of opposing defendants' motions to dismiss, settlement documents issued by the Criminal Division of the Department of Justice, the Commodities Futures Trading Commission (the "CFTC"), and the United Kingdom Financial Services Authority (the "FSA").  See DOJ Statement; CFTC Settlement Order (June 27, 2012) [hereinafter CFTC Order], Ex. 4, Scherrer Decl.; FSA Final Notice (June 27, 2012), Ex. 5, Scherrer Decl. [hereinafter FSA Notice].

---

[3] These articles will be discussed in detail below in the context of whether plaintiffs' commodities manipulation claims are time-barred.

These agencies found that Barclays had engaged in "wrongful conduct spann[ing] from at least 2005 through at least 2009," at times "on an almost daily basis." CFTC Order 2. Specifically:

> During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions . . . .

Id.  The agencies documented instances in which Barclays' LIBOR submitters had accommodated requests from traders for an artificially high LIBOR quote as well as instances where the LIBOR submitters had accommodated requests for an artificially low LIBOR quote.  See, e.g., id. at 7-11.  In addition to this manipulation to benefit daily trading positions, leading to either an artificially high or artificially low LIBOR quote, the agencies found that from "late August 2007 through early 2009," Barclays's LIBOR submitters, "[p]ursuant to a directive by certain members of Barclays' senior management," consistently submitted artificially low LIBOR quotes "in order to manage what [Barclays] believed were inaccurate and negative public and media perceptions that Barclays had a liquidity problem."  Id. at 3.

## C. Plaintiffs' Alleged Injury

As discussed above, the present motions to dismiss apply to the amended complaints of four groups of plaintiffs: the OTC, bondholder, exchange-based, and Schwab plaintiffs.   Each of these groups alleges that it suffered a distinct injury as a result of defendants' alleged misconduct.   We will address each group in turn.

### 1. OTC Plaintiffs

The lead OTC plaintiffs are the Mayor and City Council of Baltimore ("Baltimore") and the City of New Britain Firefighters' and Police Benefit Fund ("New Britain"). Baltimore "purchased hundreds of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR." OTC Am. Compl. ¶ 12.  New Britain "purchased tens of millions of dollars in interest rate swaps directly from at least one Defendant in which the rate of return was tied to LIBOR." Id. ¶ 13.  These plaintiffs seek to represent a class of "[a]ll persons or entities . . . that purchased in the United States, directly from a Defendant, a financial instrument that paid interest indexed to LIBOR . . . any time during the [Class Period]." Id. ¶ 34.  According to plaintiffs, they suffered injury as a result of defendants' alleged misconduct because their financial instruments provided that they would receive payments based on LIBOR, and when

defendants allegedly suppressed LIBOR, plaintiffs received lower payments from defendants.  See id. ¶¶ 8, 219.

## 2. Bondholder Plaintiffs

The lead bondholder plaintiffs are Ellen Gelboim ("Gelboim") and Linda Zacher ("Zacher").  Gelboim "is the sole beneficiary of her Individual Retirement Account that during the Class Period owned a . . . LIBOR-Based Debt Security issued by General Electric Capital Corporation."  Bondholder Am. Compl. ¶ 15.  Similarly, Zacher "is the sole beneficiary of her late husband's Individual Retirement Account that during the Class Period owned a . . . LIBOR-Based Debt Security issued by the State of Israel."  Id. ¶ 16.  These plaintiffs seek to represent the following class:

> [A]ll [persons] who owned (including beneficially in 'street name') any U.S. dollar-denominated debt security (a) that was assigned a unique identification number by the [Committee on Uniform Securities Identification Procedures] system; (b) on which interest was payable at any time [during the Class Period]; and (c) where that interest was payable at a rate expressly linked to the U.S. Dollar Libor rate.

Id. ¶ 1; see also id. ¶ 198.  This class excludes holders of debt securities to the extent that their securities were "issued by any Defendant as obligor."  Id.  Plaintiffs allege that they suffered injury as a result of defendants' alleged misconduct because they "receiv[ed] manipulated and artificially depressed

amounts of interest on [the] [d]ebt [s]ecurities they owned during the Class Period." Id. ¶ 14.

### 3. Exchange-Based Plaintiffs

In order to place the exchange-based plaintiffs' claims in context, we will first provide a brief overview of Eurodollar futures contracts. We will then summarize who plaintiffs are and how they allege they were injured.

### a. Eurodollar Futures Contracts

A futures contract "is an agreement for the sale of a commodity on a specific date (the 'delivery date')." In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 372 (S.D.N.Y. 2010). The seller of a futures contract, known as the "short," agrees to deliver the commodity specified in the contract to the buyer, known as the "long," on the delivery date. See id. However, in most cases, the commodity never actually changes hands; rather, "[m]ost investors close out of their positions before the delivery dates," id., such as by entering into offsetting contracts whereby the commodity delivery requirements cancel out and "[t]he difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss," Exchange Am. Compl. ¶ 208.

Although many futures contracts are based on an underlying commodity that is a physical good, such as copper, others are

not.   One such futures contract is a Eurodollar futures contract, which is "the most actively traded futures contract[] in the world."   Id. ¶ 201; see also DOJ Statement 4 ("In 2009, according to the Futures Industry Association, more than 437 million Eurodollar futures contracts were traded . . . ."). Eurodollar futures contracts, traded on the Chicago Mercantile Exchange (the "CME"), Exchange Am. Compl. ¶ 201, are based on an "underlying instrument" of a "Eurodollar Time Deposit having a principal value of USD $1,000,000 with a three-month maturity." CME Group, Eurodollar Futures: Contract Specifications, http://www.cmegroup.com/trading/interest-rates/stir/eurodollar_ contract_specifications.html (last visited Mar. 29, 2013). "Eurodollars are U.S. dollars deposited in commercial banks outside the United States."   CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_ Eurodollar_Futures_Fact_Card.pdf.

Eurodollar futures contracts do not require the seller actually to deliver cash deposits to the buyer, but rather provide that at the end of the contract, the "settlement date," the seller pays the buyer a specified price.   The price at settlement "is equal to 100 minus the three-month Eurodollar interbank time deposit rate," which rate is defined as the USD three-month LIBOR fix on the contract's last trading day.   CME Group,   Eurodollar Futures Final Settlement Procedure,

http://www.cmegroup.com/trading/interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf.   Like other futures contracts, Eurodollar futures contracts may be traded prior to settlement, and their trading price will reflect "the market's prediction of the [three]-month [USD] LIBOR on [the contract's last trading day]."  DOJ Statement ¶ 9.

Finally, options on Eurodollar futures contracts are also traded on the CME.  Exchange Am. Compl. ¶ 210.  A trader might purchase a "call," which gives him "the right, but not the obligation, to buy the underlying Eurodollar futures contract at a certain price - the strike price."  Id.  A trader could also purchase a "put," giving him "the right, but not the obligation, to sell the underlying Eurodollar futures contract at the strike price."  Id.  The price at which a Eurodollar option trades "is affected by the underlying price of the Eurodollar futures contract, which, in turn, is directly affected by the reported LIBOR."  Id.

### b. Plaintiffs and Their Alleged Injury

There are seven lead exchange-based plaintiffs.  Plaintiff Metzler Investment GmbH ("Metzler") is a German company that launched and managed investment funds which traded Eurodollar futures.  Exchange Am. Compl. ¶ 20.  Plaintiffs FTC Futures Fund SICAV ("FTC SICAV") and FTC Futures Fund PCC Ltd. ("FTC PCC") are each funds, based in Luxembourg and Gibraltar, respectively,

which traded Eurodollar futures.   Id. ¶¶ 21-22.   Plaintiffs Atlantic Trading USA, LLC ("Atlantic") and 303030 Trading LLC ("303030") are both Illinois limited liability companies with principal places of business in Illinois and which traded Eurodollar futures.   Id. ¶¶ 23-24.   Finally, plaintiffs Gary Francis ("Francis") and Nathanial Haynes ("Haynes") are both residents of Illinois who traded Eurodollar futures.   Id. ¶¶ 25-26.   These plaintiffs seek to represent a class of "all persons . . . that transacted in Eurodollar futures and options on Eurodollar futures on exchanges such as the CME [during the Class Period] and were harmed by Defendants' manipulation of LIBOR."   Id. ¶ 221.

Plaintiffs allege that they suffered injury from defendants' alleged manipulation of LIBOR.   According to plaintiffs, defendants' suppression of LIBOR caused Eurodollar contracts to trade and settle at artificially high prices.   Id. ¶¶ 215-16.   Plaintiffs purchased Eurodollar contracts during the Class Period, id. ¶ 214, and "the direct and foreseeable effect of the Defendants' intentional understatements of their LIBOR rate was to cause Plaintiffs and the Class to pay supracompetitive prices for [their] CME Eurodollar futures contracts."   Id. ¶ 217.

### 4. Schwab Plaintiffs

The last group of plaintiffs comprises the Schwab plaintiffs. As discussed above, these plaintiffs do not seek to represent a class, but rather have filed three separate amended complaints. First, the "Schwab Bank" amended complaint has three plaintiffs.[4] Plaintiff The Charles Schwab Corporation is a Delaware corporation with its principal place of business in California. Schwab Bank Am. Compl. ¶ 17. Plaintiff Charles Schwab Bank, N.A., is a national banking association which is a wholly-owned subsidiary of The Charles Schwab Corporation and is organized under the laws of Arizona, with its principal place of business in Nevada. Id. ¶ 18. Finally, Plaintiff Charles Schwab & Co., Inc., is a California corporation and a wholly owned subsidiary of The Charles Schwab Corporation, which through its division Charles Schwab Treasury, manages the investments of Charles Schwab Bank, N.A. Id. ¶ 19. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-19.

Second, the "Schwab Bond" amended complaint also has three plaintiffs.[5] Plaintiff Schwab Short-Term Bond Market fund is "a

---

[4] The "Schwab Bank" action is Charles Schwab Bank, N.A. v. Bank of America Corp. (11 Civ. 6411).

[5] The "Schwab Bond" action is Schwab Short-Term Bond Market Fund v. Bank of America Corp. (11 Civ. 6409).

series of Schwab Investments, an open-end, management investment company organized under Massachusetts law." Schwab Bond Am. Compl. ¶ 17. Plaintiff Schwab Total Bond Market Fund "is also a series of Schwab Investments." Id. ¶ 18. Finally, plaintiff Schwab U.S. Dollar Liquid Assets Fund is a fund managed in California and which is "a series of Charles Schwab Worldwide Funds plc, an investment company with variable capital, incorporated in Ireland." Id. ¶ 19. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-19.

Third, the "Schwab Money" amended complaint has seven plaintiffs.[6] Plaintiff Schwab Money Market Fund is "a series of The Charles Schwab Family of Funds, an open-end investment management company organized as a Massachusetts business trust." Schwab Money Am. Compl. ¶ 17. Plaintiffs Schwab Value Advantage Money Fund, Schwab Retirement Advantage Money Fund, Schwab Investor Money Fund, Schwab Cash Reserves, and Schwab Advisor Cash Reserves are each also "a series of The Charles Schwab Family of Funds." Id. ¶¶ 18-22. Finally, Plaintiff Schwab YieldPlus Fund is "a series of Schwab Investments, an open-end investment management company organized as a Massachusetts business trust." Id. ¶ 23. "Contingent interests of Schwab

---

[6] The "Schwab Money" action is Schwab Money Market Fund v. Bank of America Corp. (11 Civ. 6412).

YieldPlus Fund have passed to Plaintiff Schwab YieldPlus Fund Liquidation Trust." Id. Each of these plaintiffs "purchased or held LIBOR-based financial instruments during the [Class Period]." Id. ¶¶ 17-23.

Plaintiffs argue that they were injured as a result of defendants' alleged suppression of LIBOR, which "artificially depress[ed] the value of tens of billions of dollars in LIBOR-based financial instruments the [plaintiffs] held or purchased." Id. ¶ 194. These financial instruments included floating-rate instruments paying a rate of return directly based on LIBOR, id. ¶ 195, and fixed-rate instruments which plaintiffs decided to purchase by comparing the instruments' fixed rate of return with LIBOR, id. ¶ 197. Plaintiffs purchased both floating- and fixed-rate instruments directly from defendants, from subsidiaries or other affiliates of defendants, and from third parties. Id. ¶¶ 196, 198-99.

### III. Discussion

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Where plaintiffs have not "nudged their claims across the line from conceivable to plausible, their

complaint must be dismissed." Id.  In applying this standard, a court must accept as true all well-pleaded factual allegations and must draw all reasonable inferences in favor of the plaintiff.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).  The Court may also "properly consider 'matters of which judicial notice may be taken, or documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit.'"  Halebian v. Berv, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

In the case at bar, defendants have moved to dismiss all of plaintiffs' claims.  Our analysis will proceed in an order roughly based on the structure of the parties' briefing: (1) antitrust claims, (2) exchange-based claims, (3) RICO claim, and (4) state-law claims.

### A. Antitrust Claim

Each amended complaint asserts a cause of action for violation of section 1 of the Sherman Act.  OTC Am. Compl. ¶¶ 220-26; Bondholder Am. Compl. ¶¶ 205-11; Exchange Am. Compl. ¶¶ 245-49; Schwab Bond Am. Compl. ¶¶ 202-08; Schwab Bank Am. Compl. ¶¶ 201-07; Schwab Money Am. Compl. ¶¶ 214-20.  The Schwab plaintiffs have also asserted a cause of action for violation of California's antitrust statute, the Cartwright Act.  Schwab Bond

Am. Compl. ¶¶ 239-45; Schwab Bank Am. Compl. ¶¶ 238-44; Schwab Money Am. Compl. ¶¶ 251-57.  Defendants have moved to dismiss these claims on four grounds: (1) plaintiffs do not adequately plead a contract, combination, or conspiracy, (2) plaintiffs fail to allege a restraint of trade, (3) plaintiffs lack antitrust standing, and (4) indirect purchasers lack standing under Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977). Because we find that the third ground, that plaintiffs lack antitrust standing, is a sufficient reason to dismiss plaintiffs' antitrust claims, we need not reach the remaining grounds.

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1 (2006).  The private right of action to enforce this provision is established in section 4 of the Clayton Act:

> Except as provided in subsection (b) of this section [relating to the amount of damages recoverable by foreign states and instrumentalities of foreign states], any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Id. § 15.    Here, plaintiffs claim that they were injured by defendants' alleged conspiracy in restraint of trade, in violation of section 1 of the Sherman Act, and accordingly bring suit pursuant to section 4 of the Clayton Act.

To have standing under the Clayton Act, a private plaintiff must demonstrate (1) antitrust injury, and (2) "that he is a proper plaintiff in light of four 'efficient enforcer' factors" derived from the Supreme Court's decision in Associated General Contractors v. California State Council of Carpenters ("AGC"), 459 U.S. 519 (1983).    In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 688 (2d Cir. 2009).    Here, plaintiffs have not plausibly alleged that they suffered antitrust injury, thus, on that basis alone, they lack standing.    We need not reach the AGC "efficient enforcer" factors.

### 1. Antitrust Injury

#### a. Antitrust Injury Defined

As articulated by the Supreme Court in Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) ("ARCO"), "antitrust injury" refers to injury "attributable to an anti-competitive aspect of the practice under scrutiny."    Id.; see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful.   The injury should reflect the anticompetitive effect
either of the violation or of anticompetitive acts made possible
by the violation.").[7]   Although conduct in violation of the
Sherman Act might reduce, increase, or be neutral with regard to
competition, a private plaintiff can recover for such a
violation only where "the loss stems from a competition-<u>reducing</u>
aspect or effect of the defendant's behavior."   <u>ARCO</u>, 495 U.S.
at 344 (emphasis in original).   Moreover, it is not enough that
defendant's conduct disrupted or distorted a competitive market:
"Although all antitrust violations . . . 'distort' the market,
not every loss stemming from a violation counts as antitrust
injury."   <u>Id.</u> at 339 n.8.   Therefore, a plaintiff must
demonstrate <u>not only</u> that it suffered injury and that the injury
resulted from defendants' conduct, <u>but also</u> that the injury
resulted from the anticompetitive nature of defendant's conduct.
<u>See</u> <u>Nichols v. Mahoney</u>, 608 F. Supp. 2d 526, 543–44 (S.D.N.Y.
2009).   The rationale, of course, is that the Clayton Act's rich
bounty of treble damages and attorney's fees should reward only

---

[7] Here, plaintiffs have alleged that defendants violated the Sherman Act
through a horizontal price-fixing conspiracy.   The element of defendants'
alleged price fixing which makes it unlawful, as with any conduct in
violation of the antitrust laws, is its effect of restraining competition.
<u>See</u> <u>Arizona v. Maricopa Cnty. Med. Soc'y</u>, 457 U.S. 332, 345 (1982) ("The aim
and result of every price-fixing agreement, if effective, is the elimination
of one form of competition.   The power to fix prices, whether reasonably
exercised or not, involves power to control the market and to fix arbitrary
and unreasonable prices. . . . Agreements which create such potential power
may well be held to be in themselves unreasonable or unlawful restraints,
without the necessity of minute inquiry whether a particular price is
reasonable or unreasonable as fixed . . . ."   (quoting <u>United States v.
Trenton Potteries Co.</u>, 273 U.S. 392, 397–98 (1927))).

those plaintiffs who further the purposes of the Sherman and Clayton Acts, namely, "protecting competition." <u>Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 251 (1993).

### b. A Per Se Violation of the Sherman Act Does Not Necessarily Establish Antitrust Injury

Critically, even when a plaintiff can successfully allege a per se violation of section 1 of the Sherman Act, such as horizontal price fixing, the plaintiff will not have standing under section 4 of the Clayton Act unless he can separately demonstrate antitrust injury. <u>See</u> <u>ARCO</u>, 495 U.S. at 344 ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently." (quoting Phillip Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 334.2c, p. 330 (1989 Supp.))); <u>see also</u> <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006) ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." (quoting <u>Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 534 (1983)) (internal quotation marks omitted)). In other words, even though a defendant might have violated the Sherman Act and thus be subject to criminal liability, it is a separate question

whether Congress intended to subject the defendant as well to civil liability, in particular to the plaintiffs suing.

### c. California's Cartwright Act also Requires Antitrust Injury

The antitrust injury requirement also applies to claims pursuant to the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq. (West 2012). See Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc., 198 Cal. App. 4th 1366, 1378, 1380 (App. 2d Dist. 2011) ("[F]ederal case law makes clear that the antitrust injury requirement also applies to other federal antitrust violations [beyond anticompetitive mergers]. California case law holds that the requirement applies to Cartwright Act claims as well. . . . [T]he antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects."); Morrison v. Viacom, Inc., 66 Cal. App. 4th 534, 548 (App. 1st Dist. 1998) ("The plaintiff in a Cartwright Act proceeding must show that an antitrust violation was the proximate cause of his injuries. . . . An 'antitrust injury' must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful." (alteration in original) (quoting

Kolling v. Dow Jones & Co., 137 Cal. App. 3d 709, 723 (App. 1st Dist. 1982))); id. ("Appellants failed to allege antitrust injury . . . because they have failed to allege any facts to show they suffered an injury which was caused by restraints on competition."). The common antitrust injury requirement derives from the Cartwright Act's and Sherman Act's common purpose. See Exxon Corp. v. Superior Court, 51 Cal. App. 4th 1672, 1680 (App. 6th Dist. 1997) (citations omitted) ("The Cartwright Act, as the Sherman Antitrust Act, was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade.").

### 2. Defendants' Alleged Conduct Was Not Anticompetitive

#### a. The LIBOR-Setting Process Was Never Competitive

Here, plaintiffs do not argue that the collaborative LIBOR-setting process itself violates the antitrust laws, but rather that defendants violated the antitrust laws by conspiring to set LIBOR at an artificial level. See, e.g., OTC Compl. ¶¶ 217-26. According to plaintiffs:

> Defendants' anticompetitive conduct had severe adverse consequences on competition in that [plaintiffs] who traded in LIBOR-Based [financial instruments] during the Class Period were trading at artificially determined prices that were made artificial as a result of Defendants' unlawful conduct. As a consequence thereof, [plaintiffs] suffered financial losses and were, therefore, injured in their business or property.

Id. ¶ 219; see also Tr. 17-18.[8]

Although these allegations might suggest that defendants fixed prices and thereby harmed plaintiffs, they do not suggest that the harm plaintiffs suffered resulted from any anticompetitive aspect of defendants' conduct.   As plaintiffs rightly acknowledged at oral argument, the process of setting LIBOR was never intended to be competitive.   Tr. 12, 18. Rather, it was a cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs to the BBA each day to facilitate the BBA's calculation of an interest rate index.   Thus, even if we were to credit plaintiffs' allegations that defendants subverted this cooperative process by conspiring to submit artificial estimates instead of estimates made in good faith, it would not follow that plaintiffs have suffered antitrust injury.   Plaintiffs' injury would have resulted from defendants' misrepresentation, not from harm to competition.

### b. Plaintiffs Do Not Allege a Restraint on Competition in the Market for LIBOR-Based Financial Instruments

It is of no avail to plaintiffs that defendants were competitors outside the BBA.   Tr. 29-30.   Although there might have been antitrust injury if defendants had restrained

---

[8] References preceded by "Tr." refer to the transcript of the oral argument held on March 5, 2013.

competition in the market for LIBOR-based financial instruments
or the underlying market for interbank loans, plaintiffs have
not alleged any such restraint on competition.

First, with regard to the market for LIBOR-based financial
instruments, plaintiffs have not alleged that defendants'
alleged fixing of LIBOR caused any harm to competition between
sellers of those instruments or between buyers of those
instruments. Plaintiffs' allegation that the prices of LIBOR-
based financial instruments "were affected by Defendants'
unlawful behavior," such that "Plaintiffs paid more or received
less than they would have in a market free from Defendants'
collusion," Antitrust Opp'n 36, might support an allegation of
price fixing but does not indicate that plaintiffs' injury
resulted from an anticompetitive aspect of defendants' conduct.[9]

---

[9] Contra to plaintiffs' argument, the Ninth Circuit's decision in Knevelbaard
Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000), is not to the
contrary. Knevelbaard Dairies involved a claim by plaintiff milk producers
that defendant cheese makers had conspired to fix a low price for bulk
cheese, thereby depressing the price defendants paid plaintiffs for milk
because California regulators used the bulk cheese price to set the minimum
milk price. Plaintiffs had argued that defendants "did not compete," but
rather "collusively manipulate[ed] [bulk cheese] prices to levels lower than
would prevail under conditions of free and open competition." Id. at 984.
The Ninth Circuit held that plaintiffs had adequately alleged antitrust
injury. As quoted by plaintiffs, the Court reasoned:

> Since the plaintiffs allegedly were subjected to artificially
> depressed milk prices, the injury flows "from that which makes
> the conduct unlawful," i.e., from the collusive price
> manipulation itself. . . . When horizontal price fixing causes
> buyers to pay more, or sellers to receive less, than the prices
> that would prevail in a market free of the unlawful trade
> restraint, antitrust injury occurs.

Antitrust Opp'n 37 (quoting Knevelbaard Dairies, 232 F.3d at 987-88).
However, in the context of the claims before it, the Ninth Circuit clearly

In other words, it is not sufficient that plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have.  Yet here, undoubtedly as distinguished from most antitrust scenarios, the alleged collusion occurred in an arena in which defendants never did and never were intended to compete.

### c. Plaintiffs Do Not Allege a Restraint on Competition in the Interbank Loan Market

Second, there was similarly no harm to competition in the interbank loan market.  As discussed above, LIBOR is an index intended to convey information about the interest rates prevailing in the London interbank loan market, but it does not necessarily correspond to the interest rate charged for any actual interbank loan.  Plaintiffs have not alleged that defendants fixed prices or otherwise restrained competition in the interbank loan market, and likewise have not alleged that any such restraint on competition caused them injury.

---

intended to refer to collusive price manipulation in place of competition, and its reference to paying more or receiving less than the prices that would prevail in a market free of the unlawful trade restraint clearly contrasted prices in a market with such a restraint to a market operating under free competition.  Moreover, the Ninth Circuit explicitly recognized that "the central purpose of the antitrust laws, state and federal, is to preserve competition, " Knevelbaard Dairies, 232 F.3d at 988, and it quoted a leading antitrust treatise for the proposition that the harm to sellers from a price-fixing conspiracy by buyers "constitutes antitrust injury, for it reflects the rationale for condemning buying cartels – namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices," id. (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 375b at 297 (rev. ed. 1995)) (emphasis added).

Plaintiff's theory is that defendants competed normally in the interbank loan market and then agreed to lie about the interest rates they were paying in that market when they were called upon to truthfully report their expected borrowing costs to the BBA. This theory is one of misrepresentation, and possibly of fraud, but not of failure to compete.

### 3. Plaintiffs Could Have Suffered the Harm Alleged Here Under Normal Circumstances

The above analysis is confirmed by inquiring, as courts previously have in evaluating antitrust injury, whether plaintiff could have suffered the same harm under normal circumstances of free competition. For example, in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977), defendant was a manufacturer of bowling equipment that had purchased financially distressed bowling centers. Plaintiffs, operators of other bowling centers, brought suit against defendant pursuant to the Clayton Act, arguing that they had lost future income because the distressed bowling centers purchased by defendant would otherwise have gone bankrupt. The Supreme Court held that these allegations did not establish antitrust injury. Although defendants' actions might have violated the Sherman Act by bringing "a 'deep pocket' parent into a market of 'pygmies,'" plaintiffs did not suffer antitrust injury because their alleged harm bore "no relationship to the size of either the acquiring

company or its competitors." Id. at 487. Plaintiffs "would have suffered the identical 'loss' but no compensable injury had the acquired centers instead obtained refinancing or been purchased by 'shallow pocket' parents." Id. Therefore, even if respondents were injured, "it was not 'by reason of anything forbidden in the antitrust laws': while respondents' loss occurred 'by reason of' the unlawful acquisitions, it did not occur 'by reason of' that which made the acquisitions unlawful." Id. at 488.

In ARCO, the Court reaffirmed this approach in the context of price fixing. Defendant in that case was an integrated oil company that marketed gasoline both directly through its own stations and indirectly through dealers operating under its brand name. Facing competition from independent "discount" gas dealers, such as those operated by plaintiff, defendant allegedly conspired with its dealers to implement a vertical, maximum-price-fixing scheme. ARCO, 495 U.S. at 331-2. Many independent gas dealers could not compete with the below-market prices established by this scheme, and consequently went out of business.

Despite the harm that defendant's conspiratorial conduct had caused plaintiff, the Supreme Court held that plaintiff had not suffered antitrust injury. The Court reasoned that a competitor could establish antitrust injury only by

demonstrating predatory pricing, that is, pricing below cost in order to drive competitors out of business:

> When a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an "anticompetitive" consequence of the claimed violation.  A firm complaining about the harm it suffers from nonpredatory price competition "is really claiming that it [is] unable to raise prices." Blair & Harrison, Rethinking Antitrust Injury, 42 Vand. L. Rev. 1539, 1554 (1989). This is not antitrust injury; indeed, "cutting prices in order to increase business often is the very essence of competition." [Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986)].

Id. at 337-38 (footnote omitted).   In other words, cutting prices to a level still above cost is not merely consistent with competition – something that could be expected to occur under normal circumstances – but indeed is often "the very essence of competition" – something to be desired.   Because the harm plaintiffs suffered resulted from competitive, healthy conduct, it did not constitute antitrust injury.

As with the harm alleged in Brunswick and ARCO, the harm alleged here could have resulted from normal competitive conduct.   Specifically, the injury plaintiffs suffered from defendants' alleged conspiracy to suppress LIBOR is the same as the injury they would have suffered had each defendant decided independently to misrepresent its borrowing costs to the BBA. Even if such independent misreporting would have been fraudulent, it would not have been anticompetitive, and indeed

would have been consistent with normal commercial incentives facing defendants.  Those incentives, of course, are alleged on the face of plaintiffs' complaints: defendants allegedly had incentive (1) "to portray themselves as economically healthier than they actually were" and (2) "to pay lower interest rates on LIBOR-based financial instruments that Defendants sold to investors."  OTC Compl. ¶ 5.

In this respect, the present case contrasts with more traditional antitrust conspiracies, such as a conspiracy among sellers to raise prices.  Whereas in such a scenario, the sellers' supracompetitive prices could exist only where the sellers conspired not to compete, here, each defendant, acting independently, could rationally have submitted false LIBOR quotes to the BBA.  The reason why it would have been sustainable for each defendant individually to submit an artificial LIBOR quote is that, as discussed above, the LIBOR submission process is not competitive.  A misreporting bank, therefore, would not have been concerned about being forced out of business by competition from other banks.  In other words, precisely because the process of setting LIBOR is not competitive, collusion among defendants would not have allowed them to do anything that they could not have done otherwise.

This analysis would not change if we were to accept plaintiffs' argument that defendants could not, absent

collusion, have submitted the "clustered" rates that they submitted during the Class Period. The question is not whether defendants could have submitted independently the exact quotes that they in fact submitted, but rather whether they could have caused plaintiffs the same injury had they acted independently. As discussed above, the answer is yes: each defendant could have submitted, independently, a LIBOR quote that was artificially low. Further, whether the quotes would have formed a "cluster" or not is irrelevant: plaintiffs' injury resulted not from the clustering of LIBOR quotes, but rather from the quotes' alleged suppression.[10] In short, just as the bowling center operators in Brunswick could have suffered the same injury had the failing bowling centers remained open for legitimate reasons, and just as the gas dealers in ARCO could have suffered the same injury had defendant's prices been set through normal competition, the plaintiffs here could have suffered the same injury had each bank decided independently to submit an artificially low LIBOR quote.

Moreover, Brunswick and ARCO, which each held that plaintiffs did not suffer antitrust injury, involved more harm to competition than was present here. In Brunswick, defendant's

---

[10] Indeed, given that a bank's LIBOR quote represents the bank's expectation of its own costs of borrowing, and that different banks based in different countries could sensibly face significantly different borrowing costs, it would not be surprising for banks to submit LIBOR quotes that differed persistently over the course of several years.

conduct brought "a 'deep pocket' parent into a market of 'pygmies,'" altering the positions of competitors in the bowling center market in a manner that was potentially harmful to competition.  In ARCO, similarly, the prices set by defendants' conspiracy displaced prices set through free competition and thereby gave defendants' dealers a competitive advantage over other dealers in the retail gas market.  Here, by contrast, there is no allegation of harm to competition.  For one, LIBOR was never set through competition, even under normal circumstances.  While it is true that the prices of LIBOR-based financial instruments are set through competition, and that a change in LIBOR may have altered the baseline from which market actors competed to set the price of LIBOR-based instruments, competition proceeded unabated and plaintiffs have alleged no sense in which it was displaced.

Additionally, there is no allegation that defendants' conduct changed their position vis-à-vis their competitors.  At any given time, there is only one LIBOR, used by all actors throughout the relevant market.  Although defendants' alleged manipulation of the level of LIBOR might have had the distributive effect of transferring wealth between the buyers and sellers of LIBOR-based financial instruments, including between defendants and their customers, plaintiffs have not alleged any structural effect wherein defendants improved their

position relative to their competitors.  Because Brunswick and ARCO each involved more harm to competition than was present here, yet the Supreme Court held in each case that plaintiff had not suffered antitrust injury, it is even clearer here that antitrust injury does not exist.

### 4. Plaintiffs' "Proxy" Argument Is Unavailing

At oral argument, plaintiffs contended that LIBOR is a proxy for competition in the underlying market for interbank loans, and thus defendants effectively harmed competition by manipulating LIBOR.  According to plaintiffs, when defendants reported artificial LIBOR quotes to the BBA, they "snuff[ed] out . . . the proxy for competition" by "interdicting the competitive forces that set [defendants'] rates" and otherwise would have affected LIBOR and the price of LIBOR-based instruments.  Tr. 24, 27.  This argument was advanced in the context of Eurodollar futures contracts, which are based on the underlying market for interbank loans, but it also applies to other LIBOR-based financial instruments.  If LIBOR "interdict[ed]" competition that would otherwise have affected the market for Eurodollar futures contracts, it equally interdicted competition that would have affected the market for LIBOR-based financial instruments more broadly.

Although there is a sense in which this argument accurately characterizes the facts, the argument does not demonstrate that

plaintiffs suffered antitrust injury. It is true that LIBOR is a proxy for the interbank lending market; indeed, it is precisely because LIBOR was thought to accurately represent prevailing interest rates in that market that it was so widely utilized as a benchmark in financial instruments. It is also true that if LIBOR was set at an artificial level, it no longer reflected competition in the market for interbank loans and its value as a proxy for that competition was diminished, even "snuffed out." However, the fact remains that competition in the interbank lending market and in the market for LIBOR-based financial instruments proceeded unimpaired. If LIBOR no longer painted an accurate picture of the interbank lending market, the injury plaintiffs suffered derived from misrepresentation, not from harm to competition.

Contrary to plaintiffs' contention, Tr. 28, their "proxy" argument does not derive support from the line of cases finding an antitrust violation where a defendant manipulated one component of a price, both because those cases do not involve a proxy for competition and because they are distinguishable. Plaintiffs cite Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643 (1980), in which the Supreme Court held that beer wholesalers violated the Sherman Act by conspiring to discontinue a previously common practice of extending short-term interest-free credit to retailers. However, not only did

Catalano not involve a proxy for competition, but it also is plainly distinguishable: whereas the beer wholesalers in Catalano had previously competed over the credit terms they offered to retailers, such that the conspiracy to fix credit terms displaced an arena of competition, here there was never competition over LIBOR – a rate that, at any given time, is necessarily uniform throughout the market – and thus defendants' alleged conspiracy to fix LIBOR did not displace competition.

Plaintiffs also cite In re Yarn Processing Patent Validity Litigation, 541 F.2d 1127 (5th Cir. 1976), in which the Fifth Circuit considered a scheme whereby a manufacturer of yarn processing machines which also owned the patent in those machines conspired with other manufacturers to split the royalty income the patent holder received equally among all of the manufacturers.  The Court held that the scheme violated the antitrust laws because it fixed a portion of the prices that manufacturers received for the machines – prices over which the manufacturers competed.  Id.  Here, by contrast, the LIBOR-based financial instruments that defendants competed to sell had always contained LIBOR, a value uniform throughout the market, and thus defendants' conduct did not displace competition where it normally would have occurred.

Finally, plaintiffs cite Northwestern Fruit Co. v. A. Levy & J. Zentner Co., 665 F. Supp. 869 (E.D. Cal. 1986), which

considered a claim by cantaloupe purchasers that cantaloupe sellers had conspired to fix the cooling and palletizing charge added to the price of cantaloupe.   The Court held that the conspiracy violated the antitrust laws, even if cantaloupe sellers continued to compete on the underlying price, because fixing even a component of price is unlawful.   Id. at 872.   Our case is plainly distinguishable because the price of LIBOR-based financial instruments had always contained a "fixed" component – LIBOR – and thus defendants' alleged conspiracy, as discussed above, did not displace competition.

### 5. Plaintiffs' Remaining Cases Are Distinguishable

The other cases plaintiffs put forward as addressing arguably similar facts are also distinguishable because they involve harm to competition which is not present here.   To begin, plaintiffs read Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492 (1988), as establishing that "plaintiffs who lost business due to defendants' manipulation of a standard-setting process with persuasive influence on marketplace transactions were entitled to Sherman Act relief." Antitrust Opp'n 37.   However, not only did Allied Tube not rule on antitrust injury or liability, addressing instead the single question of whether defendants were immune from antitrust liability under Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); see Allied Tube, 486

U.S. 492, but to whatever extent it might provide persuasive authority regarding antitrust injury, it is distinguishable.  In Allied Tube, a manufacturer of plastic electrical conduit sued a manufacturer of steel conduit that had conspired with other members of a trade association to exclude plastic conduit from the association's safety standard, which standard was widely incorporated into local government regulations.  Allied Tube, 486 U.S. at 495-96.  Like the LIBOR-setting process, the process of forming the safety standard was a cooperative endeavor by otherwise-competing companies under the auspices of a trade association.  Critically, however, whereas the conspiracy in Allied Tube gave defendants a competitive advantage over plaintiff by shutting plaintiff's product out of the industry safety standard, here plaintiffs have not alleged that defendants' suppression of LIBOR gave them an advantage over their competitors.

Each of the other decisions plaintiffs cite involving defendants' failure to provide accurate information also involved a harm to competition beyond what is present here. See F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447 (1986) (dentists agreed not to submit x-rays to dental insurance companies, where dentists would otherwise have competed over their degree of cooperation with insurance companies); Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978)

(trade association of engineers adopted rule prohibiting the discussion of costs until the client had selected an engineer, thus prohibiting competitive bidding among engineers); <u>Woods Exploration & Producing Co. v. Aluminum Co. of America</u>, 438 F.2d 1286 (5th Cir. 1971) (defendant oil producers submitted artificially low sales forecasts to state regulator in order to lower the total production limit in an oil field in which both plaintiffs and defendants operated, where the regulator's formula for allotting production allowables favored plaintiffs and thus a decrease in the total production limit disproportionately harmed plaintiffs).

Similarly, plaintiffs' "list price" cases are distinguishable. For instance, the Ninth Circuit in <u>Plymouth Dealers' Ass'n of N. Cal. v. United States</u>, 279 F.2d 128 (9th Cir. 1960), considered a conspiracy among Plymouth car dealers to fix the list prices for cars and accessories. The Court held that the conspiracy violated the Sherman Act, despite the fact that dealers were free to bargain down from the list price. <u>Id.</u> Here, plaintiffs would have us follow similar reasoning, but the defect in the comparison is that list prices are a very different sort of benchmark than LIBOR. The Plymouth dealers' conspiracy to fix list prices "established as a matter of actual practice one boundary of 'the range within which . . . sales would be made,'" thus "prevent[ing] the determination of

(market) prices by free competition alone." Id. at 134 (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222-23 (1940)). By contrast, the price of LIBOR-based financial instruments can be set at any level above or below LIBOR, and thus defendants' alleged conspiracy to fix LIBOR did not constrain the free and competitive bargaining of actors in the market for LIBOR-based financial instruments.

Finally, plaintiffs' cases involving manipulation of indices are distinguishable for the same reason. Plaintiffs cite In re Rail Freight Fuel Surcharge Antitrust Litigation, 587 F. Supp. 2d 27, 593 F. Supp. 2d 29 (D.D.C. 2008), which addressed a conspiracy by major railroads to remove fuel costs from a cost escalation index that was published by a trade association and widely used in rail freight transportation contracts, and instead to implement a uniform fuel surcharge. The Court held that plaintiffs had established antitrust injury: "through their allegations identifying defendants' supra-competitive prices, plaintiffs here have alleged an injury to competition itself." 593 F. Supp. 2d at 42. Importantly, though, the Court clarified that defendants' collaboration in the industry association to publish the new cost escalation index was not necessarily anticompetitive by itself, but rather was anticompetitive when combined with defendants' other actions, notably imposing the uniform fuel surcharge. 587 F.

Supp. 2d at 35.   In our case, although defendants allegedly fixed a benchmark, LIBOR, published by a trade association, the BBA, they did not add a uniform charge, like the fuel surcharge in Rail Freight, to an otherwise competitively determined price. The other decisions cited by plaintiffs that found antitrust injury where defendants manipulated an index are also distinguishable because they each involved a failure of defendants to compete.   See, e.g., Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979 (9th Cir. 2000) (defendants failed to compete in the bulk cheese market and thus manipulated the government-mandated minimum price for milk, which was calculated using a formula that incorporated the price of bulk cheese); Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc., 253 F. Supp. 2d 262 (D. Conn. 2003) (same, except defendants failed to compete in the butter market, which also affected a minimum milk price).

### 6. Conclusion

For these reasons, plaintiffs' allegations do not make out a plausible argument that they suffered an antitrust injury. Plaintiffs, therefore, do not have standing to bring claims pursuant to the Clayton Act or the Cartwright Act.[11] Accordingly, plaintiffs' antitrust claims are dismissed.

---

[11] As discussed below, we assert supplemental jurisdiction over plaintiffs' Cartwright Act claim.

## B. Exchange-Based Claims

The Exchange-Based Plaintiffs have asserted causes of action for manipulation of Eurodollar futures in violation of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1-25 (2006), and vicarious liability for and aiding and abetting such manipulation. Exchange Am. Compl. ¶¶ 228-44. Defendants have moved to dismiss these claims on three grounds: (1) the claims involve an impermissible extraterritorial application of the CEA, (2) the claims are time-barred, and (3) plaintiffs fail to state a claim for manipulation under the CEA. For the reasons stated below, we find that, although plaintiffs' claims do not require an extraterritorial application of the CEA and do not fail to plead commodities manipulation, they are time-barred at least to the extent that they rely on contracts purchased from August 2007, the start of the Class Period, through May 29, 2008, the date by which plaintiffs were clearly on inquiry notice of their injury.

## 1. Extraterritoriality

Defendants first argue that plaintiffs' claims must be dismissed because the CEA does not apply extraterritorially, yet plaintiffs' claims rely exclusively on foreign commodities manipulation. As discussed below, although we agree that the

CEA does not apply extraterritorially, we find that the alleged manipulation nonetheless falls within the CEA's purview.

### a. Legal Standard

Both sides agree that Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), governs the question of whether plaintiffs' claims involve an impermissibly extraterritorial application of the CEA. Tr. 35; Exchange MTD 13-17. In Morrison, the Supreme Court reaffirmed the "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Morrison, 130 S. Ct. at 2877 (quoting EEOC v. Arabian Am. Oil Co. ("Aramco"), 499 U.S. 244, 248 (1991)) (internal quotation marks omitted). The Court observed that this principle is not a limit on Congress's authority to legislate, but rather "represents a canon of construction . . . [that] rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." Id.

The Court established a two-part test for deciding questions of extraterritoriality. First, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'" Id. (quoting Aramco, 499 U.S. at 248). "When a statute gives no clear

indication of an extraterritorial application, it has none." Id. at 2878. Second, if a statute applies only domestically, a court must determine which domestic conduct the statute regulates. The reason for this inquiry is that "it is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States," and thus the presumption against extraterritoriality, to have any meaning, must limit the statute's application to those domestic activities that "are the objects of the statute's solicitude," that "the statute seeks to 'regulate.'" Id. at 2884. To carry out this analysis, a court must ascertain "the 'focus' of congressional concern." Id. (quoting Aramco, 499 U.S. at 255).

Applying this framework to section 9(a) of the CEA, the provision under which plaintiffs assert their claims, we first observe that "neither the CEA nor its legislative history specifically authorizes extraterritorial application of the statute." CFTC v. Garofalo, 10 CV 2417, at *11 (N.D. Ill. Dec. 21, 2010) (citing Tamari v. Bache & Co., 730 F.2d 1103, 1107 (7th Cir. 1984)). Rather, "the statute is silent on this issue and shows neither a Congressional intent to apply the CEA to foreign agents nor a wish to restrict the statute to domestic activities." Id. (citing Tamari, 730 F.2d at 1107). Indeed, there is even less of an indication of extraterritorial application here than in section 10(b) of the Securities and

Exchange Act of 1934 (the "'34 Act"), 15 U.S.C. §§ 78a-78pp (2006 & Supp. IV 2010), as amended by the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (codified in scattered sections of the U.S. Code), which the <u>Morrison</u> Court held did not apply extraterritorially.  The Court reasoned in <u>Morrison</u> that even though one of section 10(b)'s terms, "interstate commerce," was defined to include foreign commerce, <u>see</u> 15 U.S.C. § 78c(a)(17), "[t]he general reference to foreign commerce in the definition of 'interstate commerce' does not defeat the presumption against extraterritoriality."  <u>Morrison</u>, 130 S. Ct. at 2882.  Here, "interstate commerce," as referenced in section 9(a) of the CEA, 7 U.S.C. § 13(a)(2), does not even include a reference to foreign commerce, <u>id.</u> § 1a(30).  Because section 9(a) of the CEA "gives no clear indication of an extraterritorial application, it has none."  <u>Morrison</u>, 130 S. Ct. at 2878.

Having concluded that section 9(a) of the CEA applies only domestically, we must still determine which domestic activities "are the objects of the statute's solicitude," which activities "the statute seeks to 'regulate.'"  <u>Id.</u> at 2884.  We therefore must determine "the 'focus' of congressional concern" in enacting section 9(a) of the CEA.  <u>Id.</u> (quoting <u>Aramco</u>, 499 U.S. at 255).

Section 9(a) makes it a crime for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2). This provision clearly focuses on commodities in interstate commerce and futures contracts traded on domestic exchanges. Such an interpretation of the statute's focus is consistent with the CEA's statement of purpose, see 7 U.S.C. § 5(b), as well as decisions interpreting the CEA, see, e.g. Tamari v. Bache & Co., 730 F.2d 1103, 1108 (7th Cir. 1984) ("[T]he fundamental purpose of the [CEA] is to ensure the integrity of the domestic commodity markets."); cf. CFTC v. Garofalo, 10 CV 2417, at *12 (ruling that sections 6c(a) and (b) of the CEA, prohibiting certain transactions in commodities future or option contracts, "are concerned with where the underlying options contracts were actually traded"). Accordingly, a claim is within the CEA's domestic application if it involves (1) commodities in interstate commerce or (2) futures contracts traded on domestic exchanges.

### b. The Present Allegations

Here, plaintiffs' claims plainly involve futures contracts traded on domestic exchanges. By manipulating LIBOR, defendants allegedly manipulated the price of Eurodollar futures contracts, which is directly based on LIBOR. Eurodollar futures contracts,

of course, are traded on the <u>Chicago</u> Mercantile Exchange. Indeed, defendants acknowledged at oral argument that Eurodollar futures contracts are within the scope of the CEA's manipulation provision.   Tr. 42.   Because plaintiffs' claims involve manipulation of the price of domestically traded futures contracts, they are not impermissibly extraterritorial.

According to defendants, plaintiffs "don't allege that the defendants . . . manipulated the futures contract with Chicago," but rather allege only that defendants manipulated the Eurodollar contract's underlying commodity.   <u>Id.</u> at 43. Defendants contend that "[t]here are all kinds of things one can do to manipulate futures contracts," but "[n]ot one of those things is alleged here."   <u>Id.</u>

We do not concur.   LIBOR was directly incorporated into the <u>price</u> of Eurodollar futures contracts, and by allegedly manipulating LIBOR, defendants manipulated the price of those contracts.   Moreover, as discussed further below, LIBOR cannot plausibly be understood as the commodity underlying Eurodollar futures contracts; the only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price is settled or traded at a value based on LIBOR.   This understanding of Eurodollar futures contracts limits which claims have been

adequately pleaded, but it also forecloses defendants' argument that the only thing plaintiffs have alleged is manipulation of Eurodollar contracts' underlying commodity.   In short, plaintiffs' claims clearly involve manipulation of the price of Eurodollar futures contracts, and manipulating the price of futures contracts traded on domestic exchanges is precisely the conduct that the CEA was designed to regulate.   Accordingly, plaintiffs' claims fall within the purview of the CEA.

### 2. Statute of Limitations

Defendants next argue that plaintiffs' claims are barred by the CEA's statute of limitations.   As discussed below, we find that certain of plaintiffs' claims are barred, certain are not, and others may or may not be, though we will not dismiss them at this stage.

### a. Legal Standard

A claim pursuant to the CEA must be brought "not later than two years after the date the cause of action arises."   7 U.S.C. § 25(c).   The CEA does not elaborate, however, on the circumstances that start the running of its statute of limitations.   Where a federal statute "is silent on the issue" of when a cause of action accrues, as the CEA is, courts apply a "discovery accrual rule" wherein "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock."   Koch v. Christie's Int'l PLC, 699 F.3d 141, 148-49 (2d

Cir. 2012) (quoting <u>Rotella v. Wood</u>, 528 U.S. 549, 555 (2000))
(internal quotation marks omitted) (interpreting the statute of
limitations for RICO claims, which requires plaintiffs to bring
suit no later than "[four] years after the cause of action
accrues," 28 U.S.C. § 1658(a)); <u>see also</u> <u>Premium Plus Partners,</u>
<u>L.P. v. Goldman, Sachs & Co.</u>, 648 F.3d 533, 536 (7th Cir. 2011)
(Easterbrook, C.J.) ("Section 25(c) of the Commodity Exchange
Act . . . says that suit must be filed within two years of 'the
date the cause of action arises.'   We have understood this to
mean the date on which the investor discovers that he has been
injured.").

Under Second Circuit precedent, courts apply an "inquiry
notice" analysis to determine when a plaintiff has discovered
his injury:

> Inquiry notice - often called "storm warnings" in the
> securities context - gives rise to a duty of inquiry
> "when the circumstances would suggest to an investor
> of ordinary intelligence the probability that she has
> been defrauded." In such circumstances, the imputation
> of knowledge will be timed in one of two ways: (i)
> "[i]f the investor makes no inquiry once the duty
> arises, knowledge will be imputed as of the date the
> duty arose"; and (ii) if some inquiry is made, "we
> will impute knowledge of what an investor in the
> exercise of reasonable diligence[] should have
> discovered concerning the fraud, and in such cases the
> limitations period begins to run from the date such
> inquiry should have revealed the fraud."

<u>Koch</u>, 699 F.3d at 151 (quoting <u>Lentell v. Merrill Lynch & Co.</u>,
396 F.3d 161, 168 (2d Cir. 2005)); <u>see also</u> <u>id.</u> at 153 ("[O]nce

there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred."). In short, we first ask at what point the circumstances were such that they "would suggest to [a person] of ordinary intelligence the probability that she has been defrauded." Id. at 151 (internal quotation marks omitted).  If plaintiffs do not then inquire within two years, they are deemed to have knowledge of their injury at the point at which the duty to inquire arose, and the period of limitations starts to run on that date.  Here, plaintiffs do not allege that they made any inquiry into their injury prior to March 15, 2011. See Exchange Am. Compl. ¶¶ 182-99.  Thus, if circumstances would have suggested to a person of ordinary intelligence the probability that he had been defrauded more than two years prior to March 15, 2011, that is, prior to March 15, 2009, then, to the extent plaintiffs' claims are based on Eurodollar contracts purchased through the date of inquiry notice, the claims are barred by the statute of limitations.

Contrary to plaintiffs' contention, the amount of public information necessary to start the period of limitations for commodities manipulation under the CEA is significantly less than the amount necessary to commence the period of limitations for securities fraud under the '34 Act.  The two-year limitations period for securities fraud begins to run upon "the

discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1) (2006). In Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010), the Supreme Court    held that "the 'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Id. at 1790 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)). The Court reasoned: "[T]his 'fact' of scienter 'constitut[es]' an important and necessary element of a § 10(b) 'violation.' A plaintiff cannot recover without proving that a defendant made a material misstatement with an intent to deceive — not merely innocently or negligently." Id. at 1796 (emphasis omitted). According to the Second Circuit, this analysis indicates that the Court "thought about the requirements for 'discovering' a fact in terms of what was required to adequately plead that fact and survive a motion to dismiss." City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 175 (2d Cir. 2011).

Plaintiffs argue that this pleading-based standard applies here, such that the statute of limitations did not begin to run until they could have adequately pleaded a claim for commodities manipulation. Exchange Opp'n 24-26. In support of this argument, plaintiffs rely on language in City of Pontiac in which the Circuit, considering "the basic purpose of a statute of limitations," reasoned that because the purpose is to prevent

plaintiffs from unfairly surprising defendants by bringing stale claims, and because a claim cannot be stale until it has "accrued," a statute of limitations cannot commence until a claim has "accrued." City of Pontiac, 637 F.3d at 175; see also Exchange Opp'n 25.   Further, "[o]nly after a plaintiff can adequately plead his claim can that claim be said to have accrued." City of Pontiac, 637 F.3d at 175.   Plaintiffs argue that this language applies to statutes of limitations generally, including in the CEA context.

However, despite this general discussion of the purposes of statutes of limitations, the fact remains that City of Pontiac interpreted only the statute of limitations of the '34 Act, which is different on its face than the statute of limitations of the CEA.   In Koch v. Christie's Int'l PLC, 699 F.3d 141 (2d Cir. 2012), the Circuit confirmed that the analysis in Merck, which was the basis for the pleading-based standard established in City of Pontiac, "does not apply outside the realm of the statute that it interpreted."   Id. at 150; see also Premium Plus Partners, L.P. v. Goldman, Sachs & Co., 648 F.3d 533, 536 (7th Cir. 2011) (Easterbrook, C.J.) ("The language of [the '34 Act's statute of limitations] . . . is hard to impute to [the CEA's statute of limitations."). "It remains the law in this Circuit that a RICO claim accrues upon the discovery of the injury alone." Koch, 699 F.3d at 150.   As discussed above, the CEA,

like RICO, is silent regarding when a cause of action arises.
Therefore, the Second Circuit's holding in <u>Koch</u> that the RICO
statute of limitations is based on a "discovery of the injury"
standard is controlling in the context of the CEA.

Moreover, the pleading-based standard applicable to
securities fraud claims is instructive here to the extent that
it sets an upper bound on the amount of information necessary to
commence the period of limitation for plaintiffs' commodities
manipulation claims.  As discussed below, a plaintiff seeking
damages for commodities manipulation must satisfy the following
four elements: "(1) that [defendant] had the ability to
influence market prices; (2) that [he] specifically intended to
do so; (3) that artificial prices existed; and (4) that the
[defendant] caused the artificial prices."  <u>DiPlacido v. CFTC</u>,
364 F. App'x 657, 661 (2d Cir. 2009) (quoting <u>In re Cox</u>, No. 75-
16, 1987 WL 106879, at *3 (C.F.T.C. July 15, 1987)).  In order
for the period of limitations to commence, however, a plaintiff
need not be able to make such a showing.  In particular,
plaintiffs here did not need to be able to allege "that
Defendants were knowingly colluding to suppress LIBOR."
Exchange Am. Compl. ¶ 197 (emphasis omitted).  Rather, it was
necessary only that "circumstances would [have] suggest[ed] to
[a person] of ordinary intelligence the probability that she
ha[d] been defrauded."  <u>Koch</u>, 699 F.3d at 151 (quoting <u>Lentell</u>

v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005)).
Specifically, plaintiffs here would have been on inquiry notice
of their injury if circumstances would have suggested to a
person of ordinary intelligence the probability that the LIBOR
fixes which affected the prices of plaintiffs' Eurodollar
contracts had been manipulated.   If inquiry notice was triggered
on a date prior to March 15, 2009, plaintiffs' claims based on
Eurodollar futures contracts purchased through the date of
inquiry notice are barred.

    Finally, we are mindful that "defendants bear a heavy
burden in establishing that the plaintiff was on inquiry notice
as a matter of law."   Newman v. Warnaco Grp., Inc., 335 F.3d
187, 194-95 (2d Cir. 2003) (quoting Nivram Corp. v. Harcourt
Brace Jovanovich, Inc., 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).
Nonetheless, "[d]ismissal is appropriate when the facts from
which knowledge may be imputed are clear from the pleadings and
the public disclosures themselves."   In re Ultrafem Inc. Sec.
Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000).

### b. Publicly Available Information Relating to LIBOR Manipulation

    By May 29, 2008, seven articles published in prominent
national news sources, along with one report referenced in
several of those articles, suggested that LIBOR had been at
artificial levels since August 2007, the start of the Class

Period.   As discussed below, these articles put plaintiffs on inquiry notice of their claims based on Eurodollar futures contracts purchased during that period.[12]

On April 10, 2008, Citigroup strategists Scott Peng, Chintan Gandhi, and Alexander Tyo published a research report entitled, "Special Topic: Is LIBOR Broken?" (the "Peng Report"). Scott Peng et al., Citigroup, Special Topic: Is LIBOR Broken?, Apr. 10, 2008.   The Report found that "[three-month] LIBOR probably understates real interbank lending costs by 20-30 [basis points]."[13]   Id.   To support this determination, the Report compared LIBOR with the three-month Eurodollar deposit rate calculated by the Federal Reserve.   "Because the Fed's data are based on the bid-side rate of interbank borrowing, the Fed's Eurodollar rate should be less than LIBOR (which, by definition, is an offered rate)."   Id.   Yet, the Report observed, "the Fed's bid-side rate is now 29 [basis points] higher than LIBOR's offered-side rate," and had generally been higher than LIBOR since August 2007.   Id.   This made "no economic sense."   Id. The Report concluded that the Federal Reserve Eurodollar deposit

---

[12] Plaintiffs argue in their opposition brief that the Barclays settlement documents suggest LIBOR manipulation extending as far back as 2005, and that they should, accordingly, be granted leave to amend their complaint to include allegations based on information derived from the Barclays settlements.   Exchange Opp'n 29-30.   As discussed below, we will grant plaintiffs leave to move to amend their complaints to include such allegations.

[13] One basis point is one-hundredth of a percentage point.

rate, which seemed reasonable, "may be a better gauge than LIBOR of short-term funding levels."  Id.

The Report also compared one-month LIBOR to the rate at which the Federal Reserve auctioned off collateralized short-term loans to banks under a program known as the Term Auction Facility ("TAF").  TAF loans had recently been auctioned at a rate higher than LIBOR, though "[g]iven that the TAF is a securitized borrowing rate as opposed to LIBOR, which is an unsecuritized lending rate, it seem[ed] counterintuitive for banks to pay a higher interest rate to borrow from the TAF than to borrow from the interbank market."  Id.  Something was off, and because the TAF rate appeared "entirely normal," the Report concluded that "the real issue lies in a much bigger arena – LIBOR."  Id.  The Report observed that a likely explanation for the unusual LIBOR rates was that banks were seeking to bolster the market's perception of their financial health: "[A]ny bank posting a high LIBOR level runs the risk of being perceived as needing funding.  With markets in such a fragile state, this kind of perception could have dangerous consequences."  Id.

According to a Bloomberg article published on May 18, 2009, the Peng Report "brought widespread attention to the possibility [that LIBOR] might be understating actual bank lending costs." Liz Capo McCormick, Citigroup's Head of Rates Strategy, Scott Peng, Leaves Firm, Bloomberg.com, May 18, 2009.

On April 16, 2008, the Wall Street Journal published an article entitled, "Bankers Cast Doubt on Key Rate amid Crisis." Carrick Mollenkamp, Bankers Cast Doubt on Key Rate amid Crisis, Wall St. J., Apr. 16, 2008.  The article commenced by explicitly observing that LIBOR might be inaccurate: "One of the most important barometers of the world's financial health could be sending false signals.  In a development that has implications for borrowers everywhere, . . . bankers and traders are expressing concerns that the London inter-bank offered rate, known as Libor, is becoming unreliable."  Id.  As evidence that LIBOR was diverging from its "true" level, the article included a graph comparing three-month LIBOR to the three-month Federal Reserve Eurodollar deposit rate, with the heading "Broken Indicator?" and the caption "Since the financial crisis began, the rate on three-month interbank loans has diverged at times from the comparable rate for dollars deposited outside the U.S." Id.  The article also discussed the Peng Report, noting that the Report had "compare[ed] Libor with [the TAF] indicator and others – such as the rate on three-month bank deposits known as the Eurodollar rate" to conclude that "Libor may be understated by 0.2 to 0.3 percentage points."  Id.

The article suggested that banks had several incentives to underreport LIBOR, notably the same incentives now alleged by plaintiffs: "Some banks don't want to report the high rates

they're paying for short-term loans because they don't want to tip off the market that they're desperate for cash," and "banks might have an incentive to provide false rates to profit from derivatives transactions." Id. Finally, the article reported that the BBA was investigating the LIBOR submission process in response to concerns from "bankers and other market participants," and that, "[i]n one sign of increasing concern about Libor, traders and banks are considering using other benchmarks to calculate interest rates." Id.

The next day, on April 17, 2008, the Wall Street Journal published another article raising questions about LIBOR's accuracy. Carrick Mollenkamp & Laurence Norman, British Bankers Group Steps up Review of Widely Used Libor, Wall St. J., Apr. 17, 2008. The article reported that the BBA, "[f]acing increasing questions about the reliability of [LIBOR]," had "fast-tracked an inquiry into the accuracy of the rate" and declared that "if banks are found to have submitted inaccurate figures, they would be removed from the panels that submit rates." Id. According to the article, "the credit crisis," commonly understood to have begun in August 2007, see Peng Report, "ha[d] highlighted gaps between Libor and other interest rates, and it ha[d] raised questions about whether banks are submitting rates that accurately reflect actual borrowing costs," Mollenkamp & Norman, supra. Bankers and traders "ha[d]

expressed concerns that some banks don't want to report the high rate they are paying for fear of creating the impression they are desperate for cash." Id. Significantly, "[t]he problems with Libor ha[d] also been a hot topic among traders in the market for Eurodollar futures." Id.

On April 18, 2008, the Wall Street Journal published its third article in as many days regarding questions over LIBOR. Carrick Mollenkamp, Libor Surges After Scrutiny Does, Too, Wall St. J., Apr. 18, 2008. The article observed that after the BBA announced on April 16, 2008, that it would fast-track its review of the LIBOR submission process, three-month USD LIBOR increased the next day by over eight basis points - "its largest jump since the advent of the credit crisis." Id. The increase, according to the article, might have been "a sign that banks could be responding to increasing concerns that the rate doesn't reflect their actual borrowing costs." Id. The article repeated the observations of the previous two that the BBA's move "came amid concerns among bankers that their rivals were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash." Id. Additionally, the article noted the belief of some analysts that LIBOR had still not fully corrected: a strategist at Credit Suisse believed that three-month USD LIBOR was too low by 40 basis points, while the Peng Report had found LIBOR to be low by

up to 30 basis points.  Id.

On April 21, 2008, the Financial Times published an article entitled, "Doubts over Libor Widen."  Gillian Tett & Michael Mackenzie, Doubts over Libor Widen, Fin. Times, Apr. 21, 2008. The article reported that "the credibility of Libor as a measure [was] declining," though this was "not entirely new: as the Financial Times first revealed [in 2007], bankers ha[d] been questioning the way Libor is compiled ever since the credit turmoil first erupted."  Id.  Regarding why LIBOR "ha[d] started to lag other, traded measures of market stress, such as the funding trends in the dollar deposit market," the article reported that although bankers thought it unlikely that there was collusion to suppress LIBOR, "there [was] a widespread belief that some banks ha[d] an incentive to keep their bids low."  Id.  Indeed, even though LIBOR is inherently a matter of guesswork, especially when interbank lending is at a depressed level, the article quoted an economist's observation that "'[i]t is not surprising that [the LIBOR panel banks] make guesses that avoid unwelcome publicity.'"  Id.

The next month brought three additional articles on the questions surrounding LIBOR.  On May 16, 2008, Reuters published an article providing background on the issue and summarizing various suggestions regarding how best to move forward. European, U.S. Bankers Work on Libor Problems, Reuters, May 16,

2008.   The article noted that "[t]hreats from the BBA in late April to expel any bank found acting improperly was the trigger for a surge in the daily fix[es] over the next couple of days." Id.   Further, the article reported "worries that some banks were understating how much they had to pay to borrow money in order to avoid being labeled desperate for cash and, as a result, vulnerable to solvency rumors."   Id.

On May 29, 2008, Bloomberg published an article that quoted a Barclays strategist's statement that "[b]anks routinely misstated borrowing costs to the [BBA] to avoid the perception they faced difficulty raising funds as credit markets seized up."   Gavin Finch & Elliott Gotkine, Libor Banks Misstated Rates, Bond at Barclays Says, Bloomberg.com, May 29, 2008.   The article also reported that LIBOR "show[ed] little correlation to banks' cost of insuring debt from default," despite the fact that, because lending rates and the cost of default insurance are both theoretically based on a bank's likelihood of defaulting on its debts, they should be correlated.   Id.  As an example, the article observed that, over the period from July 2, 2007, through April 15, 2008, UBS's default insurance costs rose over 900 percent, while its USD LIBOR quotes "were lower than its rivals on 85 percent of the days during that period."   Id. Finally, the article noted the unusual jump in three-month USD LIBOR after the BBA's April 16, 2008, announcement, and that

traders had been "resorting to alternative measures for borrowing costs as the BBA struggle[d] to maintain Libor's status." Id. Indeed, trading in Eurodollar futures declined by 7.5 percent from March to April 2008, while trading in alternative future contracts experienced significant increases. Id.

Also on May 29, 2008, the Wall Street Journal reported the findings of a study on LIBOR that the newspaper had conducted. Carrick Mollenkamp & Mark Whitehouse, Study Casts Doubt on Key Rate, Wall St. J., May 29, 2008. The Journal's analysis, based on data from January 23, 2008, through April 16, 2008, "indicate[d] that Citigroup Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG [were] among the banks that ha[d] been reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggest[ed] they should [have been]." Id. Over the period analyzed by the study, LIBOR and the cost of bank default insurance had diverged, "with reported Libor rates failing to reflect rising default-insurance costs." Id. Specifically, "the three-month and six-month dollar Libor rates were about a quarter percentage point [i.e. 25 basis points] lower than the borrowing rates suggested by the default-insurance market." Id. The Journal's methodology and findings were reviewed by "three independent academics," each of whom "said the approach was a reasonable way to analyze Libor." Id.

Indeed, one reviewer stated that "the [Journal's] calculations show 'very convincingly' that reported Libor rates are lower than what the market thinks they should be." Id.

The article also suggested that LIBOR was at an artificial level both before and after the study period. At a November 2007 meeting of a Bank of England money-market committee, concerns had emerged that "Libor wasn't high enough." Id. In late April 2008, moreover, after banks had reacted to the BBA's announcement, LIBOR remained 15 basis points too low. Id.

The article included the caveat that "[t]he Journal's analysis doesn't prove that banks are lying or manipulating Libor," given other possible explanations for the observed data, such as the guesswork inherent in calculating LIBOR and the fact that certain banks "have ample customer deposits and access to loans from the Federal Reserve." Id. Nonetheless, the article noted that "[i]f any bank submits a much higher rate than its peers, it risks looking like it's in financial trouble[, s]o banks have an incentive to play it safe by reporting something similar." Id. Indeed, a Stanford finance professor had determined that the observed three-month USD LIBOR quotes were "'far too similar to be believed,'" a conclusion buttressed by the fact that "[a]t times, banks reported similar borrowing rates even when the default-insurance market was drawing big distinctions about their financial health." Id. The article

concluded by observing that some traders had "beg[un] thinking about using other benchmarks," such as "the federal-funds rate – the rate at which banks loan to each other overnight."  <u>Id.</u>

These articles are summarized in Figure 1, below.



FIGURE 1: ARTICLES TIMELINE

### c. Inquiry Notice

Plaintiffs argue that despite all of these articles, they were not on inquiry notice until March 15, 2011, "when UBS released its annual report 20-F stating that it had received subpoenas from the Department of Justice, the SEC, the CFTC, as well as an information request from the Japanese Financial Supervisory Agency, all relating to its interest rate submissions to the BBA."  OTC Am. Compl. ¶ 205; see also Exchange Am. Compl. ¶¶ 197-98; Exchange Opp'n 24-30.  Plaintiffs offer three reasons for why the articles published in April and May 2008 failed to put them on inquiry notice: the articles "[1] did nothing more than speculate about possible LIBOR discrepancies, [2] did not even suggest that such discrepancies resulted from Defendants' intentional manipulation of their LIBOR submissions, and [3] were accompanied by denials from the BBA that the panel banks['] submissions represented anything other than their true borrowing costs."  Exchange Opp'n 26.

These arguments are unconvincing.  First, although it is accurate that none of the articles definitively established that LIBOR was being manipulated, they did not need to do so to place plaintiffs on inquiry notice.  Rather, they needed only to suggest to a person of ordinary intelligence the probability that LIBOR had been manipulated.  Accepting as true plaintiffs' allegations that they were injured by paying too high a price

for Eurodollar futures contracts and that the price at which
Eurodollar contracts trade is affected by existing LIBOR fixes,
Exchange Am. Compl. ¶¶ 209-17, it follows that if plaintiffs
were on notice that LIBOR had been set at artificial levels,
they were also on notice of their injury. As discussed above,
the Peng Report and the seven articles published in the ensuing
weeks reported that (1) since August 2007, LIBOR had diverged
from benchmarks with which it should have been correlated,
(2) independent experts had confirmed this comparative
methodology and concluded that LIBOR was too low, (3) the BBA
had accelerated its review of the LIBOR submissions process and
publicly declared that a bank submitting false rates would be
disqualified from the LIBOR panel, (4) LIBOR quotes jumped
abnormally on the day following the BBA's announcement, and (5)
market actors had begun to shift away from LIBOR-based
instruments toward instruments based on alternative benchmarks
because of their distrust of recent LIBOR fixes. Faced with
this information, and especially in light of the fact that it
was reported by five separate institutions, a person of ordinary
intelligence would clearly have been on notice that LIBOR was
probably being set at artificial levels and, consequently, that
Eurodollar futures contract prices had also been artificial.

Second, contrary to plaintiffs' argument, plaintiffs need
not have been aware that the artificiality in LIBOR fixes

"resulted from Defendants' intentional manipulation of their LIBOR submissions." Exchange Opp'n 26.   Unlike inquiry notice under the '34 Act, which requires plaintiffs to be able to plead a claim for securities fraud, including scienter, inquiry notice under the CEA requires only that plaintiffs be on inquiry notice of their injury.   In other words, plaintiffs need not have known that the artificial LIBOR levels resulted from intentional conduct by defendants; it is sufficient that plaintiffs knew that the LIBOR quotes defendants submitted did not reflect their actual expected borrowing rates, and thus that the prices of plaintiffs' Eurodollar contracts, based on LIBOR, were artificial.   For the reasons stated above, plaintiffs clearly had such knowledge.

Finally, the fact that defendants and the BBA consistently denied that LIBOR fixes were artificial does not necessarily defeat inquiry notice.   "[R]eassuring statements will prevent the emergence of a duty to inquire or dissipate such a duty only if an investor of ordinary intelligence would reasonably rely on the statements to allay the investor's concern." LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003); see also In re Ambac Fin. Group, Inc. Sec. Litig., 693 F. Supp. 2d 241, 276 (S.D.N.Y. 2010).

Here, plaintiffs could not have reasonably relied on the reassurances of defendants and the BBA.   A person of ordinary

intelligence would have understood that defendants each had a strong incentive to portray themselves as truthful and that the BBA had a strong incentive to maintain market confidence in LIBOR's integrity. This is not to say that plaintiffs could never have reasonably relied on assurances by defendants and the BBA, but rather that they should have been cautious about accepting such assurances. As discussed above, repeated news reports provided evidence that LIBOR was being fixed at artificial levels. Additionally, each defendant's LIBOR quotes, as well as comparable benchmarks, were available every business day, such that plaintiffs could feasibly have investigated LIBOR's accuracy. Therefore, defendants' and the BBA's assurances that all was well with LIBOR could not have been reasonably relied on by plaintiffs and thus do not excuse plaintiffs' failure to inquire.

The cases cited by plaintiffs are not on point. First, this case is distinguishable from Staehr v. Hartford Financial Services Group, Inc., 547 F.3d 406 (2d Cir. 2008). In Staehr, investors sued an insurance company in which they had purchased stock, alleging that they had purchased at inflated prices because they were unaware that the company's strong financial performance was actually the result of paying unlawful kickbacks to insurance brokers. The Circuit held that the investors were not placed on inquiry notice by newspaper articles which, like

the articles held not to trigger inquiry notice in <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161 (2d Cir. 2005), reported generally on "structural conflicts in [the insurance] industry" but did not contain information specific to the company at issue.  <u>Staehr</u>, 547 F.3d at 429.  Indeed, one article's failure to provide specific information was "a particularly important omission, since the writer acknowledged that not all insurers paid [kickbacks] to get business."  <u>Id.</u> at 419.  The Court distinguished <u>Shah v. Meeker</u>, 435 F.3d 244 (2d Cir. 2006), which held that plaintiff was placed on inquiry notice by an article in <u>Fortune</u> magazine that included a "specific description of the business practices <u>at the defendant company</u> . . . which served as the basis of the plaintiff's complaint against <u>that company</u>."  <u>Staehr</u>, 547 F.3d at 430 (citing <u>Shah</u>, 435 F.3d at 251).

Here, the notice afforded plaintiffs more resembles that in <u>Shah</u> than it does the notice in <u>Staehr</u> and <u>Lentell</u>.  To start, <u>Staehr</u> established a "sliding scale in assessing whether inquiry notice was triggered by information in the public domain: the more widespread and prominent the public information disclosing the facts underlying the fraud, the more accessible this information is to plaintiffs, and the less company-specific the information must be."  <u>Id.</u> at 432.  Here, the articles providing evidence that LIBOR was artificial were reported in "widespread and prominent" sources, such as the <u>Wall Street Journal</u> and the

Financial Times, and were presented in an accessible fashion, explaining their conclusions in clear English that a person of ordinary intelligence, without technical training, could understand. The required degree of specificity is therefore diminished.

In any event, the Peng Report and ensuing articles are sufficiently specific because they gave notice that plaintiffs had likely paid artificially high prices for their Eurodollar contracts. The specificity required to trigger inquiry notice is not necessarily specificity with regard to defendant, but rather specificity that notifies a plaintiff that he has been injured. For instance, the newspaper articles in Staehr failed to provide notice because they did not inform plaintiffs that the particular company plaintiffs had invested in had perpetrated an unlawful kickback scheme, and the articles in Lentell failed to provide notice because they did not inform plaintiffs that the particular research reports that plaintiffs had relied on were fraudulent. Here, by contrast, even though the Peng Report and ensuing articles mostly focused on LIBOR itself rather than the individual quotes of the panel banks,[14]

---

[14] That said, the May 29, 2008, Wall Street Journal article presenting the Journal's analysis of LIBOR did single out the submissions of individual panel banks. In its second paragraph, it reported: "The Journal analysis indicates that Citigroup Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for [LIBOR] than what another market measure suggests they should be." Mollenkamp & Whitehouse, supra. Additionally, it included a

plaintiffs were on notice that LIBOR had likely been suppressed and thus that the prices of Eurodollar contracts, including the contracts plaintiffs had purchased, were artificial.  Therefore, like in Shah and unlike in Staehr and Lentell, the published articles were sufficient to place plaintiffs on inquiry notice of their injury.

Additionally, to whatever extent plaintiffs needed notice of who was responsible for their injury, such notice existed. It was a matter of public knowledge which banks were on the USD LIBOR panel, what rate those banks submitted to the BBA each day, and how the final LIBOR fix was determined.  Plaintiffs, that is, knew which banks affected the final LIBOR fixes and precisely how they affected those fixes.[15]  Especially given that LIBOR is an average of the eight middle quotes, thus insulated to some extent from outlier quotes from individual banks, the fact that LIBOR persisted at a level that was likely artificial

---

chart that presented, for each USD LIBOR panel bank, "[t]he difference between banks' reported borrowing rates [i.e. LIBOR quotes] and rates computed by The Wall Street Journal, using information from the default-insurance market."  Id.

[15] Although, on any given day, only the middle eight quotes would be included in the computation to determine the LIBOR fix, all of the submitted quotes "affected" the ultimate fix.  For example, if a bank's "true" LIBOR quote would have been the tenth highest, within the middle eight, but the bank submitted instead an artificially low quote that was the fourteenth highest, outside the middle eight, the bank's quote would not be included in the computation to determine the LIBOR fix.  Nonetheless, the quote would have affected the fix by "bumping up" the quote that would have been in the thirteenth highest spot, excluded from the calculation, into the twelfth highest spot, included in the calculation.  Thus, on any given day, every LIBOR quote had some "effect" on the ultimate LIBOR fix.

should have raised serious doubts about all panel banks'
submissions. Moreover, it would have been feasible to
investigate each bank's submissions: plaintiffs could have
compared the submissions to the bank's cost of default insurance
– a comparison that, to some extent, had already been performed
and published in the May 29, 2008, Wall Street Journal article.
See Mollenkamp & Whitehouse, supra. The notice here is thus
stronger than when articles merely report general structural
issues in an industry or particular unlawful acts by other
companies within defendant's industry. Because the Peng Report
and the articles published in April and May 2008 indicated that
LIBOR was likely artificial, and LIBOR is affected by the
actions of each of the panel banks, plaintiffs had sufficient
notice of who was responsible for their injury, to whatever
extent this is necessary.

For similar reasons, this case is unlike In re Copper
Antitrust Litigation, 436 F.3d 782 (7th Cir. 2006). There, the
Seventh Circuit held, in the antitrust context, that although
copper purchasers were on inquiry notice that they had been
injured by one defendant, a trading company that allegedly fixed
the price of copper, there was insufficient publicly available
information to notify the purchasers that their injury was
attributable as well to another defendant, a bank that had
provided loans to the trading company. In light of the Second

Circuit decisions discussed above, holding that inquiry notice is triggered when the plaintiff discovers his injury, it is not clear that the Second Circuit would follow the Seventh Circuit in finding no inquiry notice with respect to a defendant when a plaintiff had discovered his injury but not that the particular defendant was responsible.  In any event, even if inquiry notice required plaintiffs to know who was responsible for their injury, the requirement would still be satisfied, for the reasons discussed above.

Plaintiffs also cite Anderson v. Dairy Farmers of America, Inc., Civil No. 08-4726 (JRT/FLN), 2010 WL 1286181 (D. Minn. Mar. 29, 2010).  In that case, a trader in milk futures sued a dairy marketing cooperative, alleging that the cooperative had purchased substantial quantities of cheese on the spot market not for normal business purposes, but rather to inflate artificially the price of milk futures, which incorporated the price of cheese.  The Court found that the trader's knowledge of the cooperative's cheese purchases was insufficient to trigger inquiry notice, given that those purchases could have been justified by legitimate commercial reasons.  The cooperative's purchases would constitute manipulation under the CEA only if there was "'something more,' some additional factor that cause[d] the dissemination of false or misleading information." Id. at *6 (quoting In re Amaranth Natural Gas Commodities

Litig., 587 F. Supp. 2d 513, 534 (S.D.N.Y. 2008)) (internal quotation marks omitted).  Under the circumstances, the question of when the trader was on inquiry notice turned on when he "knew or should have known of [the cooperative]'s alleged intent to cause artificial cheddar cheese and [milk] futures prices." Id.

Anderson is plainly distinguishable.  Whereas the cooperative's cheese purchases might have been legitimate, depending on the purpose they were intended to further, the present defendants' alleged submission of artificial LIBOR quotes was necessarily illegitimate, regardless of defendants' motives.  In other words, although purchasing large quantities of cheese is not inherently improper, submitting artificial LIBOR quotes is.  Therefore, plaintiffs' knowledge that LIBOR was likely artificial was sufficient to place plaintiffs on inquiry notice of their injury.

More broadly, our case is distinguishable from those in which the information necessary to place plaintiffs on inquiry notice of their injury is solely in the control of the defendants.  Here, not only were LIBOR and each bank's LIBOR submission publicly available on a daily basis, but benchmarks of general interest rates and each bank's financial health were also publicly available, and the Peng Report and the Wall Street Journal analysis compared the LIBOR fixes and quotes to these benchmarks to conclude that LIBOR was likely artificial.  In

other words, by May 29, 2008, plaintiffs' investigative work had already been done for them and had been published in the pages of the Wall Street Journal.

Relatedly, we cannot credit plaintiffs' argument that they were not on inquiry notice because their complaint rests on analyses created only after tremendous effort by "world-class financial and statistical experts." Exchange Opp'n 28. As discussed above, by May 29, 2008, several sophisticated analyses comparing LIBOR to relevant benchmarks had already been conducted, and their results were published in a plain-English format accessible to a person of "ordinary intelligence." Moreover, the conclusions of these analyses were supported by other reported evidence, such as the BBA announcement, the subsequent jump in LIBOR, and the decision by market actors to switch from LIBOR-based instruments to instruments based on more reliable indices. Thus, although plaintiffs are correct that the standard is not what would place an expert on notice but rather what would place a person of ordinary intelligence on notice, the fact is that a person of ordinary intelligence reading the information available as of May 29, 2008, would have been on notice of his injury.

Finally, plaintiffs argue that "the statute of limitations cannot bar CEA claims based on the conduct relating to the trading scheme described in Barclays settlements made public on

June 27, 2012 and not alleged in the Exchange Complaint." <u>Id.</u>
29.  The reason, according to plaintiffs, is that, "prior to
June 27, 2012, there was not a single public article or news
report even hinting at this day-to-day opportunistic
manipulation of LIBOR to benefit Barclays' and other banks'
traders, or that this misconduct began as early as 2005." <u>Id.</u>;
<u>see also</u> CFTC Order 2 ("The wrongful conduct spanned from at
least 2005 through at least 2009, and at times occurred on an
almost daily basis."). Plaintiffs request that they "be
permitted to amend the complaint to include these allegations."
Exchange Opp'n 30.

As discussed below, we are inclined to believe that at
least some potential claims based on day-to-day, trading-
motivated manipulation are not time-barred. Therefore, we will
grant plaintiffs leave to move to amend their complaint to
include allegations based on information derived from the
Barclays settlements, such motion to be accompanied by a
proposed second amended complaint. However, if plaintiffs
pursue such a motion, they should respond to the following
concerns.

As we see it, the question of whether plaintiffs' potential
claims based on day-to-day manipulation are time-barred presents
two issues: (1) whether the period of limitations has expired on
potential claims based on contracts purchased <u>prior</u> to August

2007, the start of the Class Period alleged in plaintiffs' amended complaint, and (2) whether the period of limitations has expired on potential claims based on contracts purchased <u>after</u> August 2007, given that the articles discussed above did not suggest the sort of manipulation alleged in the Barclays settlement papers.

With regard to the first issue, we are inclined to believe that plaintiffs' potential claims based on contracts purchased prior to August 2007 are not time-barred. Although the articles discussed above suggested that LIBOR was fixed at artificial levels starting in August 2007, they did not suggest artificiality in LIBOR levels prior to that time. Especially given that August 2007 is commonly recognized as the start of the financial crisis, and that banks' incentive to manipulate LIBOR, as reported in the articles, was related to that crisis, a person of ordinary intelligence could reasonably have thought that LIBOR manipulation started in August 2007, but no earlier. Therefore, it seems that the articles discussed above did not place plaintiffs on inquiry notice of their injury based on contracts purchased prior to August 2007; indeed, plaintiffs might not have been on inquiry notice of their injury until the Barclays settlements were made public on June 27, 2012, after plaintiffs' amended complaint was filed. Consequently, plaintiffs' potential claims based on this conduct are probably

not time-barred. Although we expect that claims based on contracts purchased prior to August 2007 will face even greater challenges with regard to loss causation than plaintiffs' other claims face, plaintiffs should have an opportunity to supplement their complaint with these allegations and to squarely address the issues those allegations raise.

By contrast, with regard to the second issue, we are inclined to think that the articles discussed above placed plaintiffs on inquiry notice of their injury based on _any_ sort of LIBOR manipulation, including both the persistent suppression alleged in plaintiffs' amended complaint and the day-to-day manipulation for trading advantage suggested by the Barclays settlements. As discussed below, plaintiffs can recover for their claims only to the extent that they suffered "actual damages" from defendants' conduct. 7 U.S.C. § 25(a)(1). Plaintiffs could have suffered actual damages only if the price of their Eurodollar contracts decreased over the period during which they owned the contracts; otherwise, plaintiffs would have either broken even or profited. To the extent that defendants are liable for the decrease in the price of plaintiffs' Eurodollar contracts, it must be because LIBOR increased over the time during which plaintiffs owned the contracts and the trading prices of Eurodollar contracts were correlated with the LIBOR fixes. In a basic sense, there are two scenarios in which

LIBOR could have increased over the time period that plaintiffs owned their contracts: (1) it started too low and then increased towards its "true" level, or (2) it started at its "true" level and then increased to an artificially high level. The "persistent LIBOR suppression" theory of plaintiffs' amended complaint is based on the first scenario, and the "day-to-day, up or down, manipulation for trading advantage" theory of the Barclays settlements adds the second scenario, at least for those days on which LIBOR was allegedly manipulated upward.

Critically, although these two scenarios differ in how plaintiffs' injury would be caused, the injury would be the same. Specifically, plaintiffs' injury would be that they lost money because the prices of their Eurodollar contracts decreased over the time that they owned them due to defendants' manipulation of those prices. Further, because plaintiffs were not in a position to know the "true" level of LIBOR, they could not have distinguished between injury caused, on the one hand, by LIBOR starting too low and approaching the "normal" level and, on the other, LIBOR starting at a "normal" level and being manipulated upward. Therefore, notice that the prices of plaintiffs' Eurodollar contracts likely decreased due to defendants' alleged manipulation of LIBOR would have been sufficient for inquiry notice, regardless of whether defendants allegedly caused the injury by setting LIBOR too high or too

low.  Moreover, as discussed above, plaintiffs were on inquiry notice of their injury by May 29, 2008, as the Peng Report and ensuing articles informed plaintiffs that they likely had been injured by defendants' submission of artificial LIBOR quotes starting in August 2007.

For these reasons, we are skeptical that potential claims based on day-to-day manipulation are timely to the extent they involve contracts purchased between August 2007 and May 29, 2008.  In any event, we grant plaintiffs the opportunity to move to amend their complaint to include allegations of day-to-day manipulation, with the expectation that any such motion will address the concerns presented here.

### d. Fraudulent Concealment

Plaintiffs additionally argue that the CEA's statute of limitations should be tolled due to defendants' fraudulent concealment of their unlawful conduct.  Exchange Opp'n 30-32. The statute of limitations may be tolled "if a plaintiff can show fraudulent concealment of the violation by a defendant." In re Natural Gas Commodity Litig. ("Natural Gas"), 337 F. Supp. 2d 498, 512 (S.D.N.Y. 2004).  To demonstrate fraudulent concealment, a plaintiff must plead, with particularity: "(1) that the defendant concealed the existence of the CEA violation; (2) that the plaintiff remained unaware of the violation during the limitations period; and (3) that the plaintiff's continuing

ignorance as to the claim was not a result of a lack of due diligence." Id. at 513; see also id. at 513-14; Fed. R. Civ. P. 9(b). The first element, the fact of concealment, may be demonstrated "by showing either [1] that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or [2] that the wrong itself was of such a nature as to be self-concealing." Natural Gas, 337 F. Supp. 2d at 513 (quoting New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)) (internal quotation marks omitted).

Here, plaintiffs have not adequately alleged fraudulent concealment. For one, they did not "remain[] unaware of [defendants'] violation during the limitations period," as they were on notice no later than May 29, 2008, that they had likely been injured. Moreover, because of this, they could not have reasonably relied on defendants' and the BBA's reassurances that LIBOR was accurate.

For the same reason, defendants' alleged manipulation was not self-concealing. Although plaintiffs cite Natural Gas for the proposition that "report[ing] false trade data to entities that collect that information for public dissemination" is "inherently self-concealing," id. at 513, the false reporting in Natural Gas was distinguishable from the allegedly false reporting here. In Natural Gas, the reporting was "designed to be concealed from the general public," and there was "no

explanation for how [defendants'] actions, if true, could or should have been discovered by the general public." Id.  Here, by contrast, Thomson Reuters published daily both the final LIBOR fix and the quotes from each of the panel banks.  A person of ordinary intelligence could have reviewed the submitted quotes along with numerous articles analyzing these quotes and explaining why they were likely artificial.  Under these circumstances, plaintiffs have not adequately alleged fraudulent concealment.

### e. Which Claims Are Barred

Having determined that plaintiffs were on inquiry notice of their injury no later than May 29, 2008, we must now determine which claims are barred by the statute of limitations.  We will present our conclusions by reference to Figure 2, below.



FIGURE 2: INQUIRY NOTICE TIMELINE

As discussed below, we find that some of plaintiffs' claims are barred and some are not, depending on when the contracts that are the basis for those claims were purchased. Specifically, claims based on Eurodollar contracts purchased during Period 1 are barred; claims based on contracts purchased during Period 3 are not barred; and claims based on contracts purchased during Period 2 may or may not be barred, though we will not dismiss them at this stage.

We begin with Period 1, the time from the start of the Class Period, August 2007, to the date of inquiry notice, May 29, 2008.  Plaintiffs have argued that the earliest they had notice of their claims is March 15, 2011, and they do not allege that they inquired into their claims any earlier than that date. Assuming that their inquiry in fact commenced on March 15, 2011, it would have been too late, as it would have been more than two years after the date of inquiry notice.  By May 29, 2008, any plaintiff who had purchased a Eurodollar contract would have been on notice of his injury, as he would have known that he had likely paid an artificial price for the contract.  Accordingly, plaintiffs' claims are barred to the extent that they are based on contracts purchased during Period 1, that is, from the beginning of the Class Period through May 29, 2008.

We next consider Period 3, the time between April 15, 2009, two years prior to the filing of plaintiffs' complaint, and May

2010, the end of the Class Period.  As a general matter, inquiry notice is based on a plaintiff's discovery of his injury, and a plaintiff cannot discover his injury until he has been injured. Here, even if plaintiffs who purchased Eurodollar contracts during Period 3 were aware of the articles published in April and May 2008, they could not have been on inquiry notice of their claims any earlier than the date on which they purchased their contracts.  Therefore, the claims of plaintiffs who purchased Eurodollar contracts on or after April 15, 2009, are not barred because the complaint was filed within two years of the date of inquiry notice.

Finally, Period 2 describes the time between May 30, 2008, the day after inquiry notice was triggered, and April 14, 2009, two years and one day before the filling of plaintiffs' complaint.  Plaintiffs who purchased Eurodollar contracts during this period, like plaintiffs who purchased during Period 3, could have been on inquiry notice no earlier than the date on which they purchased their contracts.  It is not clear, however, precisely when they were on notice.  We cannot necessarily charge these plaintiffs with knowledge of the articles published through May 29, 2008, as they had not purchased their contracts yet and may not have had reason to follow LIBOR-related news. However, other articles may have been published during Period 2 that would have put plaintiffs on notice.  We are aware of one

newspaper article published during this period that focused on LIBOR, albeit one-month USD LIBOR instead of the three-month rate on which Eurodollar contracts are based, Carrick Mollenkamp, Libor's Accuracy Becomes Issue Again, Wall St. J., Sept. 24, 2008, and there may be more.  In order to decide whether claims based on contracts purchased during this period are barred, we would need to determine (1) when inquiry notice was triggered, (2) whether plaintiffs actually inquired within two years of the date of inquiry notice, and, (3) if so, whether the complaint was filed within two years of the date on which a person of ordinary intelligence, "in the exercise of reasonable diligence," would have discovered his injury.  Koch, 699 F.3d at 151 (quoting Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005)).  At present, we are not in a position to address these questions.  Therefore, we cannot conclude that the statute of limitations bars the claims of plaintiffs who purchased Eurodollar contracts during Period 2, between May 30, 2008, and April 14, 2009.

In sum, the CEA's statute of limitations bars plaintiffs' claims based on contracts entered into during Period 1, between August 2007 and May 29, 2008, and does not bar claims based on contracts entered into during Period 3, between April 15, 2009, and May 2010.  Plaintiffs' claims based on contracts entered into during Period 2, between May 30, 2008, and April 14, 2009,

may or may not be barred, though we will not dismiss them at this stage.[16]   Finally, plaintiffs may move to amend their complaint to include allegations based on information derived from the Barclays settlements, provided that any such motion addresses the concerns raised herein and is accompanied by a proposed second amended complaint.

### 3. Pleading Commodities Manipulation

Finally, defendants argue that plaintiffs have inadequately pleaded their primary claim for commodities manipulation and their secondary claims for vicarious liability for and aiding and abetting commodities manipulation.   For the reasons discussed below, we disagree.

### a. Legal Standard

Section 9(a) of the CEA makes it a crime for any person "to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap . . . ."   7 U.S.C. § 13(a)(2).   In DiPlacido v. Commodity Futures Trading Commission, 364 F. App'x 657 (2d Cir. 2009), the Second Circuit established a four-part test for pleading manipulation under the

---

[16] On March 27, 2013, we received from plaintiffs two documents issued by the UK Financial Services Authority (the "FSA"): (1) the "FSA Internal Audit Report: A Review of the Extent of Awareness Within the FSA of Inappropriate LIBOR Submissions," dated March 2013, and (2) the "Management Response" to that report, also dated March 2013.   These documents do not alter our conclusions.

CEA: plaintiff must show "(1) that [defendant] had the ability to influence market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that [defendant] caused the artificial prices." Id. at 661 (quoting In re Cox, No. 75-16, 1987 WL 106879, at *3 (C.F.T.C. July 15, 1987)); see also In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011). "[T]o determine whether an artificial price has occurred, one must look at the aggregate forces of supply and demand and search for those factors which are extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market." In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (quoting In re Indiana Farm Bureau Coop. Ass'n, Inc., No. 75-14, 1982 WL 30249, at *39 n.2 (C.F.T.C. Dec. 17, 1982)) (internal quotation marks and emphasis omitted).

Whether plaintiffs are required to allege commodities manipulation with particularity depends on the facts alleged. As we observed in In re Crude Oil Commodity Litigation ("Crude Oil"), No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007), Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Id. at *5 (quoting Rombach v. Chang, 355 F.3d

164, 171 (2d Cir. 2004)) (internal quotation marks omitted).  In
that case, we held, in the context of a claim for commodities
manipulation, that because "the crux of plaintiffs' allegations
is that defendants misled the market with regard to supply and
demand at Cushing by concealing its capacity and its actions,
resulting in artificial prices," plaintiff's allegations sounded
in fraud and therefore were subject to Rule 9(b).  Id.
Similarly, here the crux of plaintiffs' claim is that they paid
too much for their Eurodollar contracts because their
expectation of the contracts' value was informed by existing
LIBOR fixes, which were artificial as a result of defendants'
submission of artificial quotes to the BBA.  In other words, the
claim is that defendants, by submitting artificial LIBOR quotes,
misled the market with regard to future levels of LIBOR, and by
extension future prices of Eurodollar contracts, and thus caused
Eurodollar contracts to trade at artificial prices.  Like the
allegations in Crude Oil, the present allegations sound in fraud
and thus must be pled with particularity.

However, courts generally relax Rule 9(b)'s requirements in
the context of manipulation claims, as such claims often
"involve facts solely within the defendant's knowledge."  ATSI
Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir.
2007).  In the securities context, the Second Circuit has held
that "a manipulation complaint must plead with particularity the

nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." Id. "This test will be satisfied if the complaint sets forth, to the extent possible, 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" Id. (quoting Baxter v. A.R. Baron & Co., Inc., No. 94 Civ. 3913 (JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)). This standard has also been applied in the context of commodities manipulation. See, e.g., In re Amaranth Natural Gas Commodities Litig. ("Amaranth I"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008).

Finally, the scienter element "may be alleged generally," Fed. R. Civ. P. 9(b), though plaintiffs must still allege facts that "give rise to a strong inference of scienter," In re Amaranth Natural Gas Commodities Litig. ("Amaranth II"), 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)). Plaintiffs may demonstrate scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Crude Oil, 2007 WL 1946553, at *8 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006)) (internal quotation marks omitted). "Sufficient motive

allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Amaranth II, 612 F. Supp. 2d at 383 (quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)) (internal quotation marks omitted).

In addition to alleging a violation of the CEA, plaintiffs must also show that they have standing to sue.  Section 22(a) of the CEA grants a private right of action to any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap."  7 U.S.C. § 25(a)(1)(D).  The manipulation must cause the plaintiff "actual damages," id. § 25(a)(1), which courts have understood to require a "net loss[]," In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 379 (S.D.N.Y. 2010).

### b. The Present Allegations

Here, plaintiffs have stated a claim for commodities manipulation.  There are two ways that plaintiffs' manipulation claims can be framed: (1) manipulation of the price of Eurodollar futures contracts, and (2) manipulation of the price of the commodity underlying Eurodollar futures contracts.  As discussed below, we find that plaintiffs state a claim for the first type of manipulation, but not for the second.

### i. Manipulation of the Price of Eurodollar Futures Contracts

Plaintiffs have stated a claim for commodities manipulation based on manipulation of the price of Eurodollar futures contracts.  With regard to the first element of the DiPlacido test, there is no question that defendants had the ability to influence the price of Eurodollar futures contracts.  At settlement, the price of Eurodollar contracts is set according to a formula that directly incorporates LIBOR.  Prior to settlement, Eurodollar contracts trade "based on what LIBOR is expected to be in the future," and "[t]o the extent that LIBOR is mispriced in the present, expectations of what LIBOR will be in the future will also be skewed."  Exchange Am. Compl. ¶ 209.  Each defendant, of course, had the ability to influence LIBOR through the quotes it submitted daily to the BBA.  Because each defendant had the ability to influence LIBOR and LIBOR affected the price of Eurodollar contracts, each defendant had the ability to influence the price of Eurodollar contracts.

With regard to the second element, plaintiffs' plausibly allege that defendants specifically intended to manipulate the price of Eurodollar futures contracts.  Plaintiffs' amended complaint alleges concrete benefits that defendants stood to gain from manipulating Eurodollar futures contract prices.  Specifically, plaintiffs allege that "subsidiaries or other

affiliates of Defendants . . . trad[ed] LIBOR-based financial instruments such as Eurodollar futures contracts at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of Defendants." <u>Id.</u> ¶ 43; <u>see also</u> <u>id.</u> ¶ 218 ("Defendants, through their broker-dealer affiliates[,] actively traded Eurodollar futures and options on those futures during the Class Period.").

Moreover, the Barclays settlement documents suggest that Barclays had a concrete economic interest in manipulating the price of Eurodollar contracts and, indeed, may have manipulated LIBOR for the express purpose of profiting on Eurodollar contracts. <u>See, e.g.</u>, CFTC Order 2 ("Barclays based its LIBOR submissions for U.S. Dollar . . . on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were <u>attempting to affect the official published LIBOR, in order to</u> <u>benefit Barclays' derivatives trading positions; those positions</u> <u>included swaps and futures trading positions</u> . . . .") (emphasis added); DOJ Statement ¶ 10 ("Barclays employs derivatives traders in New York, New York and in London, England who trade financial instruments tied to LIBOR and EURIBOR, including interest rate swaps and Eurodollar futures contracts . . . ."). These allegations do not describe merely a generalized interest in appearing profitable, but rather identify concrete economic

benefits that defendants stood to gain from manipulating the price of Eurodollar futures contracts.

As discussed above, scienter may be established by showing that defendants had both motive and opportunity.  See Crude Oil, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007).  Here, plaintiffs have adequately pleaded motive by alleging that defendants stood to gain concrete benefits from manipulating the price of Eurodollar futures contracts.  See Amaranth II, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009). Additionally, defendants undeniably had the opportunity to manipulate Eurodollar contract prices by submitting artificial LIBOR quotes.  Therefore, plaintiffs' allegations give rise to a strong inference of scienter.

The remaining two elements are also satisfied.  With regard to the third element, plaintiffs have adequately alleged that artificial Eurodollar futures contract prices existed.  The allegations in plaintiffs' amended complaint, together with the facts reported in the Barclays settlement documents, make plausible that LIBOR was set at an artificial level for significant portions of the Class Period.  As discussed above, if LIBOR was at an artificial level, the prices at which Eurodollar futures contracts traded and settled necessarily were, as well.  Although, as discussed above, LIBOR is set through a cooperative process rather than through supply and

demand, there is no question that the manipulation of LIBOR alleged in the amended complaint would be a factor that was "not a legitimate part" of how LIBOR was fixed or Eurodollar contracts were priced.  In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (quoting In re Indiana Farm Bureau Coop. Ass'n, Inc., No. 75-14, 1982 WL 30249, at *39 n.2 (C.F.T.C. Dec. 17, 1982)) (emphasis omitted).

Finally, with regard to the fourth element, plaintiffs have adequately alleged that defendants' conduct caused Eurodollar futures contracts to trade and settle at artificial prices. There is no question that defendants submitted LIBOR quotes to the BBA each day and these quotes collectively determined where LIBOR was fixed.  As discussed above, plaintiffs have adequately alleged that LIBOR was fixed at artificial levels for substantial parts of the Class Period and that the price of Eurodollar futures contracts is significantly influenced by existing LIBOR fixes.  Therefore, although, as discussed below, there are serious questions regarding whether defendants harmed plaintiffs, plaintiffs have adequately alleged that defendants caused the prices of Eurodollar futures contracts to be artificial.

Moreover, plaintiffs have satisfied Rule 9(b).  They have alleged "what manipulative acts were performed" - submitting artificial LIBOR quotes to the BBA - and "which defendants

performed them" – each defendant.  They have also alleged "when
the manipulative acts were performed": on all or a substantial
number of the business days during the Class Period, from August
2007 to May 2010.  Finally, plaintiffs have adequately alleged
"what effect the scheme had on the market for [Eurodollar
contracts]": LIBOR is directly incorporated into Eurodollar
futures contracts' settlement price and, because of that, also
strongly affects the trading price of Eurodollar contracts prior
to settlement.  In short, by allegedly submitting false LIBOR
quotes, defendants manipulated the price of Eurodollar
contracts.

Although plaintiffs have not identified precisely how each
LIBOR quote from each defendant on each day during the Class
Period was or was not artificial, they could not reasonably be
expected to do so at this stage of the litigation.  It is not a
matter of public knowledge what interest rate each bank
subjectively expected to pay to borrow U.S. dollars in the
London interbank lending market each day during the Class
Period, nor is it publicly known what interest rates each bank
paid in fact.  Because plaintiffs could not have known the
"true" level of any LIBOR quote, they could not have pleaded,
consistent with Rule 11, precisely which quotes were inaccurate
and by how much.  If anyone currently possesses this information
for each day during the Class Period, it is defendants, and in

such a situation, Rule 9(b)'s requirements are relaxed. <u>See</u> <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 102 (2d Cir. 2007).

What plaintiffs have provided are, <u>inter alia</u>, graphs showing how LIBOR as well as individual defendants' LIBOR quotes diverged during the Class Period from benchmarks that they should have tracked. These graphs, of course, are one way of presenting a series of data points that correspond to individual LIBOR quotes and corresponding benchmarks on each day during the Class Period, just as a chart would. However presented, this information describes, to the degree plaintiffs are able, which LIBOR quotes were likely artificial and by roughly how much. Moreover, even to the extent that plaintiffs have affirmatively alleged LIBOR manipulation not for each day, but only over a 34-month-long period, this does not necessarily mean that the allegations are insufficiently specific. <u>See, e.g.</u>, <u>In re Natural Gas</u>, 358 F. Supp. 2d 336, 344-45 (S.D.N.Y. 2005) (finding that plaintiffs had adequately pleaded a commodities manipulation claim where they had alleged that defendants engaged in manipulative acts "from June 1999 to February 2001" and "between March 2001 and December 2002"). In light of the limited information publicly available, plaintiffs have adequately alleged that defendants submitted artificial LIBOR

quotes during the Class Period and thereby manipulated the price of Eurodollar futures contracts.

Finally, plaintiffs have adequately demonstrated that they have standing to sue under the CEA.  Plaintiffs have plainly alleged that they purchased Eurodollars futures contracts during the Class Period.  They have also alleged that defendants manipulated the price of Eurodollar futures contracts.

Defendants dispute whether plaintiffs have alleged "actual damages."  7 U.S.C. § 25(a)(1).  The showing plaintiffs must make to demonstrate actual damages, understood, as discussed above, as a net loss, depends on the type of manipulation involved.  Where plaintiffs' injury results from isolated manipulative conduct by defendants, such as artificial stock purchases in the immediate aftermath of an initial public offering in order to drive up price, "allegations of artificial inflation are sufficient to plead loss causation because it is fair to infer that the inflationary effect must inevitably diminish over time."  In re Initial Public Offering Sec. Litig. ("IPO"), 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003).  In such a situation, "[i]t is that dissipation - and not the inflation itself - that caused plaintiffs' loss."  Id. at 675.

By contrast, where plaintiffs' injury results from defendants' dissemination of false information, "an inflated purchase price will not itself constitute or proximately cause

the relevant economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005). "Once a misstatement or omission infects the pool of available information, it continues to affect the stock price until contradictory information becomes available." IPO, 297 F. Supp. 2d at 674. A plaintiff who purchased at an inflated price might have sold his instrument before the false information had been corrected, thus not suffering a loss at all, or might have sold it at a loss but where the loss was caused by something other than the defendant's misrepresentation. See Dura, 544 U.S. at 342-43; see also Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 679 (7th Cir. 2009) (interpreting Dura to hold that "an allegation that the plaintiffs had bought securities at 'artificially inflated prices' did not state a claim that the plaintiffs had been injured by the inflation because, for all that appeared, the prices had remained at that level, or even a higher one, or the plaintiffs had sold before the price bubble burst"). In short, if the manipulation alleged here is analogous to isolated artificial stock purchases, we can presume that plaintiffs suffered damages based on an inflated purchase price. If, however, the manipulation is more akin to disseminating inaccurate information, plaintiffs need to show that they sold or settled their Eurodollar contracts at a loss.

In this case, the alleged manipulation is less like isolated manipulative activity and more like disseminating false information.    In  addressing  isolated  manipulative  activity, courts have justified their conclusion that the plaintiff only needs to show that he paid an inflated purchase price by reasoning that the price will presumably return to its normal level, and thus the plaintiff will presumably have suffered injury.  Here, by contrast, plaintiffs have alleged that LIBOR was at an artificial level for the duration of the Class Period, not returning to its "normal" level until after the Class Period had ended.  Exchange Am. Compl. ¶ 3 (alleging that defendants "systematically manipulated LIBOR rates . . . during the Class Period"); id. ¶ 13 (alleging that defendants' manipulation persisted "[t]hroughout the Class Period").  This is not to deny that, as plaintiffs allege, the degree of artificiality, or how many basis points LIBOR was "off" by, likely varied.  See Tr. 70 ("The degree of artificiality got much worse, particularly after Lehman Brothers [filed for bankruptcy protection, on September 15, 2008], and then had fluctuations, and then . . . , after the subpoenas, disappeared.  But it's varied."); Exchange Am. Compl. 22 (showing that the spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate varied over the Class Period).  However, because LIBOR never returned to its "normal" level within the Class Period, the mere fact that plaintiffs purchased

their Eurodollar contracts at an inflated price does not show that they suffered a loss on those contracts.

Rather, as in the "false information" scenario, plaintiffs may or may not have suffered a loss caused by defendants' manipulation, depending on what the price was when they sold their contracts and what else might have been responsible for the loss.  Although the manipulation alleged here is not perfectly analogous to disseminating false information, given that LIBOR was fixed anew every day and that the degree of artificiality likely varied, the two types of manipulation are similar in the important respect that the price remained at artificial levels, such that it is not clear that a contract purchased at artificial prices would have been sold at a loss.

In their amended complaint, plaintiffs have not identified each individual Eurodollar futures contract that they purchased, let alone these contracts' purchase price, sale date, and sale price.  Rather, they allege that they purchased Eurodollar contracts during the Class Period at prices that were artificially high as a result of defendants' manipulation of LIBOR, Exchange Am. Compl. ¶¶ 214-220, that the degree of LIBOR artificiality likely varied over the Class Period, id. ¶ 22, and that they "were harmed as a consequence of Defendants' unlawful conduct," id. ¶ 20; see also id. ¶¶ 21-26.  Defendants argue

that these allegations are insufficient to allege actual damages. Exchange MTD 23.

We disagree. Although plaintiffs will not be able to recover unless they prove that they sold or settled their contracts at a loss due to defendants' manipulation, they cannot be expected to have alleged with such precision in their amended complaint. To know which contracts were sold or settled at a loss because of defendants' conduct, plaintiffs would need to compare the spread between LIBOR's "true" level and its actual level at the time the contract was purchased and the time the contract was sold or settled. Plaintiffs would suffer loss only if the spread changed in a manner that resulted in a lower sale price. In other words, to have pleaded loss causation in the manner suggested by defendants, plaintiffs would have needed to know the "true" LIBOR level at the time they purchased and sold their contracts. Although this information might be in the possession of defendants, it could not be known by plaintiffs.[17] The benchmarks referenced by plaintiffs, though generally probative of when LIBOR was at an artificial level, do not indicate precisely at which level LIBOR should have been fixed

---

[17] Indeed, it may be that no one knows what LIBOR's "true" level was for any day during the Class Period. As discussed above, LIBOR is inherently a theoretical value, derived as it is from quotes that are not based directly on any objective data. Moreover, the challenge of determining LIBOR's "true" level would be compounded with respect to periods of time, such as the Class Period, during which the volume of actual interbank trading was at a significantly reduced level.

on any given day.  See, e.g., Mollenkamp & Whitehouse, supra (explaining that default insurance prices, though they provide a good long-term picture of "investors' assessment of the financial health of banks," are imperfect indicators when viewed individually because they are "based on dealers' quotes, which can be volatile and vary widely in times of market turmoil"); Peng Report (noting that the Federal Reserve Eurodollar Deposit Rate measures the "bid rate," or rate at which banks are willing to borrow, rather than the "offered rate," or rate at which banks are willing to lend).  Therefore, in contrast to a situation in which the defendant disseminated false information and the plaintiff can allege precisely when the false statements were made and what was false about them, here plaintiffs cannot reasonably be expected to know the spread between LIBOR's "true" value and its actual level on any given day, let alone how this spread changed over time.

In these circumstances, plaintiffs have adequately alleged actual damages by alleging that they purchased their contracts at an inflated price, that the degree of LIBOR artificiality later changed, and that they suffered damages as a result.  That said, in order to recover, plaintiffs will ultimately need to demonstrate that they sold or settled their Eurodollar contracts at a loss and that this loss resulted from defendants' misconduct.  We anticipate that meeting this burden might pose a

serious challenge for plaintiffs, especially with regard to Eurodollar contracts that were both purchased and sold within the Class Period.

In short, although we have doubts about whether plaintiffs will ultimately be able to demonstrate that they sold or settled their Eurodollar contracts at a loss as a result of defendants' conduct, we find that they have adequately alleged that defendants manipulated the price of Eurodollar contracts and that this manipulation caused them actual damages.

### ii. Manipulation of the Price of the Commodity Underlying Eurodollar Futures Contracts

By contrast, plaintiffs do not even have standing to bring suit for commodities manipulation when framed as defendants' manipulation of LIBOR as the commodity underlying Eurodollar futures contracts.[18]  As discussed above, section 22(a) of the CEA grants a private right of action to any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap."  7 U.S.C. § 25(a)(1)(D).  A "commodity" is

---

[18]  The implication of this conclusion is that, although plaintiffs will proceed on their commodities manipulation claims, they are precluded from pursuing those claims with regard to defendants' alleged manipulation of LIBOR qua commodity.  In order to recover, therefore, they will need to show that defendants specifically intended to manipulate the price of Eurodollar futures contracts, not merely LIBOR itself.  As a practical matter, we anticipate that this limitation might have significant repercussions for the relief that plaintiffs are ultimately able to recover.

broadly defined to include "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9).

If plaintiffs had a viable claim for manipulation of LIBOR qua commodity, the claim would be that defendants manipulated "the price of the commodity underlying [the] contract or swap" that plaintiffs purchased or sold.  Id. § 25(a)(1)(D)(ii).  The relevant question, therefore, is not whether LIBOR is a "commodity" in some freestanding sense, but rather whether LIBOR is the commodity underlying Eurodollar futures contracts.[19]

As discussed above, a Eurodollar futures contract is a futures contract whose "underlying instrument" is a "Eurodollar Time Deposit having a principal value of USD $1,000,000 with a three-month maturity."  CME Group, Eurodollar Futures: Contract Specifications, http://www.cmegroup.com/trading/interest-rates/ stir/eurodollar_contract_specifications.html (last visited Mar. 29, 2013).  "Eurodollars are U.S. dollars deposited in commercial banks outside the United States."  CME Group, Eurodollar Futures, http://www.cmegroup.com/trading/interest-rates/files/IR148_Eurodollar_Futures_Fact_Card.pdf.  At

---

[19] For this reason, we need not take a position on what degree of deference we owe, if any, to the CFTC statements cited by plaintiffs.  See, e.g., CFTC Order, at 27 ("Barclays' traders and submitters each specifically intended to affect the price at which the daily BBA LIBOR for U.S. Dollar, Sterling, and Yen (for particular tenors), and the EBF Euribor (for particular tenors), all commodities in interstate commerce, would be fixed.").

settlement, the price of a Eurodollar futures contract "is equal to 100 minus the three-month Eurodollar interbank time deposit rate," which rate is defined as the LIBOR fix on the contract's last trading day. CME Group, Eurodollar Futures Final Settlement Procedure, http://www.cmegroup.com/trading/ interest-rates/files/final-settlement-procedure-eurodollar-futures.pdf. Prior to settlement, "the price of a 3-month Eurodollar futures contract is an indication of the market's prediction of the 3-month Dollar LIBOR on [that] date." DOJ Statement ¶ 9.

The only plausible way to characterize the components of a Eurodollar contract is that the underlying commodity is a USD 1,000,000 deposit in a foreign commercial bank with a three-month maturity, and the price of the contract is settled or traded at a value based on LIBOR. In other words, Eurodollar contracts use LIBOR to represent the price of U.S. dollars deposited in commercial banks abroad. This makes sense because LIBOR, in theory, is an average of the rates at which banks lend U.S. dollars to each other in the London market.

Understood thusly, a Eurodollar futures contract is not fundamentally different from any other futures contract traded on the CME. For example, in a corn futures contract, the underlying commodity is 5000 bushels of corn of a specified grade. CME Group, Corn Futures, http://www.cmegroup.com/

trading/agricultural/grain-and-oilseed/corn_contract_
specifications.html (last visited Mar. 29, 2013). Because these
contracts require the "short" to deliver to the "long" the
specified quantity and quality of corn at the end of the
contract (even though traders may in reality enter into
offsetting contracts to avoid actual physical delivery, see Am.
Compl. ¶ 208), see CME Group, CBOT Corn Final Settlement
Procedure, http://www.cmegroup.com/trading/agricultural/files/
final-settlement-procedure-cbot-corn.pdf, the price of the corn
futures contract will track the price of physical corn, that is,
corn in the "spot" or "cash" market.  Indeed, as a general
matter, the prices in a given commodity's futures market and
cash market will be closely correlated.  See, e.g., Loeb Indus.,
Inc. v. Sumitomo Corp., 306 F.3d 469, 488 (7th Cir. 2002)
(finding that "the prices of cathode and cathode futures 'tend
to move in lockstep'"); Sanner v. Bd. of Trade of City of
Chicago, 62 F.3d 918, 929 (7th Cir. 1995) ("It is clear that
'[w]hen the futures market experiences a significant price
change, the prices of that commodity in the cash market will
usually experience a similar movement.'  The reason for this is
obvious: both markets involve the same commodities to be
delivered currently or in the future." (citation omitted)
(quoting I. Philip Johnson & Thomas Hazen, Commodities
Regulation § 104 (2d ed. 1989))).

In the context of Eurodollar futures, even though the "short" is not even nominally required to deliver the underlying cash deposit to the "long," the contract's pricing structure, which is what matters here, is the same as with corn futures. Just as in corn futures contracts, the underlying commodity is corn and the price of the contract tracks the price of corn, so in Eurodollar futures contracts, the underlying commodity is a deposit of U.S. dollars in a foreign commercial bank and the price of the contract is based on LIBOR, which represents the price of (i.e. interest on) that deposit. Indeed, plaintiffs have characterized LIBOR as "the reference price for the [Eurodollar] futures contract just as the physical prices of soybean or silver are the reference price for their respective futures contracts traded on exchanges." Exchange Am. Compl. ¶ 207.

Despite apparently acknowledging that the above understanding of Eurodollar contracts is correct, plaintiffs advance an alternative theory in their opposition brief. Specifically, plaintiffs maintain that the underlying commodity of Eurodollar futures contracts is LIBOR and the price of those contracts is "the level of LIBOR." Exchange Opp'n 10. This characterization strikes us as strained, at best. Indeed, if there is any meaningful distinction between the London Interbank Offered <u>Rate</u> and the "level of" that rate, it eludes us.

Therefore, LIBOR is not the commodity underlying Eurodollar futures contracts, and plaintiffs do not have standing to bring suit against defendants based on the manipulation of LIBOR as a commodity.

### c. Vicarious Liability

Plaintiffs also assert a cause of action for vicarious liability for commodities manipulation.  With regard to vicarious liability, section 2(a)(1) of the CEA provides:

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B).  "[T]o state a claim for vicarious liability, plaintiffs must allege that the principal manifested an intent to grant the agent authority, the agent agreed, and the principal 'maintain[ed] control over key aspects of the undertaking.'"  In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 546 (S.D.N.Y. 2008) (quoting Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A., 347 F.3d 448, 462 (2d Cir. 2003)).

Defendants argue, in a discussion confined to one footnote, that plaintiffs have failed to state a claim for vicarious liability.  According to defendants, "Plaintiffs have neither alleged any facts regarding any agent of any of the Defendants

nor identified any conduct allegedly taken by such agents within the scope of this principal-agent relationship to further the alleged violations of the CEA." Exchange MTD 29 n.27.

Defendants' argument is not convincing. In their amended complaint, plaintiffs have identified several "[i]ndividuals employed by the Defendants and their affiliates who have engaged in the illegal communications and conduct among Defendants to report artificially low LIBOR quotes." Exchange Am. Compl. ¶ 181. For instance, the complaint names Yvan Ducrot, "the Co-head of UBS's rates business," and Holger Seger, "the global head of short-term interest rates trading at UBS." Id. According to an article cited by plaintiffs, these persons were suspended by UBS in connection with investigations into the manipulation of LIBOR. The employees are clearly agents of UBS, and it is plausible that they contributed to the alleged manipulation of LIBOR within the scope of their employment.

Moreover, the Barclays settlement papers indicate that Barclays employees contributed to the manipulation of USD LIBOR within the scope of their employment. See, e.g., DOJ Statement ¶ 50 ("Barclays acknowledges that the wrongful acts taken by the participating employees in furtherance of this misconduct set forth above were within the scope of their employment at Barclays. Barclays acknowledges that the participating employees intended, at least in part, to benefit Barclays

through the actions decried above."). Therefore, although plaintiffs will only be able to recover on this claim with regard to those employees involved in the manipulation of USD LIBOR, not of other indices such as Yen LIBOR or TIBOR, we find that plaintiffs have adequately stated a claim for vicarious liability for commodities manipulation.

### d. Aiding and Abetting

Finally, plaintiffs assert a cause of action for aiding and abetting commodities manipulation. Under section 22(a) of the CEA, plaintiffs may bring suit against "[a]ny person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter." 7 U.S.C. § 25(a)(1). "[T]o state a claim for aiding and abetting a violation of the CEA, plaintiffs must allege that a defendant, [1] knowing of a principal's intent to manipulate the market and [2] intending to further that manipulation, [3] performed an act in furtherance of the manipulation." In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 541 (S.D.N.Y. 2008).

Defendants argue that plaintiffs fail to state a claim for aiding and abetting, both because they fail to state a primary violation of the CEA and because they fail to satisfy the elements set out above. Exchange MTD 28-29. At oral argument, defendants elaborated that even if each bank had an incentive to

improve the market's perception of its financial health, this incentive would have given the bank at most an interest in having a low LIBOR quote itself, not in there being a low LIBOR fix.   Tr. 78.   Indeed, defendants argued, each defendant would have wanted "to show [itself] as comparatively healthier than the next bank," and thus would not have had incentive to aid another bank in submitting a low LIBOR quote.   Id.

Although we are skeptical, as discussed below, that plaintiffs' aiding and abetting claim involves separate conduct from plaintiffs' primary claim for commodities manipulation, we find that plaintiffs have adequately stated a claim.   First, as discussed above, plaintiffs have adequately alleged that defendants committed the primary violation of manipulation of the price of Eurodollar futures contracts.   Second, although defendants are correct that no defendant would have had an incentive to make other banks' look financially healthier, this is not sufficient to dismiss plaintiffs' claim.   Given that the London interbank lending market involved lending between defendants, among other banks, it is plausible that each defendant was aware that other defendants' LIBOR quotes did not reflect the rate at which those banks actually expected to borrow.   Moreover, in light of the fact that Eurodollar futures contracts "are the largest and most actively traded futures contracts," Exchange Am. Compl. ¶ 218, each bank likely knew

that other banks had an interest in manipulating the price of Eurodollar contracts.

Additionally, plaintiffs have alleged that the affiliates of all or a substantial number of defendants traded Eurodollar contracts "to the direct benefit of Defendants." Id. ¶ 43; see also id. ¶ 218.   Thus, it is plausible that defendants had a common interest not only in LIBOR's being fixed at an artificial level, but also in the price of Eurodollar contracts being manipulated.   Even beyond this common interest, moreover, the Barclays settlement documents suggest that Barclays cooperated with other banks, including banks on the USD LIBOR panel, in ways that were not necessarily in the mutual interest of all parties involved.   For example:

> From at least approximately August 2005 through at least approximately May 2008, certain Barclays swaps traders communicated with swaps traders at other Contributor Panel banks and other financial institutions about requesting LIBOR and EURIBOR contributions that would be favorable to the trading positions of the Barclays swaps traders and/or their counterparts at other financial institutions.

DOJ Statement ¶ 23.   Although these allegations do not directly implicate specific defendants other than Barclays, they indicate that Barclays cooperated with other panel banks in a manner that each bank might not have if it were acting solely in its own interest.

Finally, it is plausible that each bank, by allegedly submitting artificial LIBOR quotes, furthered other banks' manipulation of the price of Eurodollar futures contracts. For one, as discussed above, each LIBOR quote influenced the final LIBOR fix, whether it was included in the final average or not, and thus influenced the price of Eurodollar futures contracts. Additionally, it is plausible that each defendant furthered other defendants' manipulation by submitting a quote that was roughly in line with ("clustered with") other quotes, thus decreasing the chance of detection. See Tr. 75; see also Mollenkamp & Whitehouse, supra (quoting Stanford finance professor's observation that the USD LIBOR quotes from January 2008 to April 2008 were "'far too similar to be believed'").

In short, plaintiffs have adequately alleged a claim for aiding and abetting defendants' manipulation of the price of Eurodollar futures contracts. That said, we have serious questions about whether this claim would support awarding plaintiffs any damages beyond those awarded based on the underlying manipulation claim. It appears that the only way a defendant could aid or abet another defendants' manipulation is by itself submitting an artificial LIBOR quote. Moreover, because an aiding and abetting claim would require the specific intent to further another defendant's manipulation of the price of Eurodollar futures contracts, it would seem that the scienter

element plaintiffs would need to satisfy for aiding and abetting would be the same as the scienter element for the primary CEA violation.   Therefore, it is hard for us to envision a scenario in which we would award plaintiffs any damages based on their aiding and abetting claim beyond what they would be awarded based on their underlying manipulation claim.   If, after discovery, it appears that the aiding and abetting claim is wholly duplicative of the primary claim, plaintiffs will not have the benefit of submitting both claims to the factfinder.

## C. RICO Claim

The Schwab plaintiffs assert a single cause of action for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (2006 & Supp. III 2009). Defendants have moved to dismiss this claim on six grounds: (1) the claim is barred by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); (2) the claim seeks an impermissible extraterritorial application of U.S. law; (3) plaintiffs lack standing; (4) plaintiffs fail to plead predicate acts of racketeering; (5) plaintiffs fail to plead a pattern of racketeering activity; and (6) to the extent plaintiffs assert a claim for conspiracy to violate RICO, plaintiffs fail to state a claim.   We find that each of the

first  two  grounds  is  sufficient  to  dismiss  plaintiffs'  RICO
claim.

## 1. RICO

Although  we  do  not  need  to  decide  whether  plaintiffs  have
adequately  pleaded  their  RICO  claim,  a  brief  overview  of  RICO
and  its  alleged  application  to  the  present  facts  is  necessary  to
provide  context  to  the  issues  we  do  need  to  decide.   Under  18
U.S.C. § 1962(c),  it  is  unlawful  for  "any  person  employed  by  or
associated  with  any  enterprise  engaged  in,  or  the  activities  of
which  affect,  interstate  or  foreign  commerce,  to  conduct  or
participate,  directly  or  indirectly,  in  the  conduct  of  such
enterprise's  affairs  through  a  pattern  of  racketeering
activity."   18  U.S.C. § 1962(c).   The  RICO  statute  grants  a
private  right  of  action  to  "[a]ny  person  injured  in  his  business
or  property  by  reason  of  a  violation  of  section  1962."   18
U.S.C. § 1964(c).   Plaintiffs  may  recover  treble  damages  and
attorney's  fees.   Id.

One  way  of  pleading  an  enterprise  is  to  allege  an
"association  in  fact,"  that  is,  "a  group  of  persons  associated
together  for  a  common  purpose  of  engaging  in  a  course  of
conduct."   Elsevier Inc. v. W.H.P.R., Inc.,  692 F. Supp. 2d 297,
305 (S.D.N.Y. 2010).   Under  Boyle v. United States,  556 U.S. 938
(2009),  "an  association  in  fact  enterprise  must  have  a
'structure'  exhibiting  three  features:  [1]  a  purpose,  [2]

relationships among the individuals associated with the enterprise, and [3] longevity sufficient to permit the associates to pursue the purpose of the enterprise." <u>Elsevier</u>, 692 F. Supp. 2d at 305-06 (citing <u>Boyle v. United States</u>, 556 U.S. at 946).

Racketeering activity includes, <u>inter alia</u>, wire fraud, mail fraud, and bank fraud. 18 U.S.C. § 1961(1). To state a claim for mail or wire fraud, a plaintiff must allege "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." <u>Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.</u>, 85 F. Supp. 2d 282, 301 (S.D.N.Y. 2000) (citing <u>S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.</u>, 84 F.3d 629, 633 (2d Cir. 1996)); <u>see also</u> 18 U.S.C. § 1341 (mail fraud); <u>id.</u> § 1343 (wire fraud). To state a claim for bank fraud, a plaintiff must allege that defendant executed or attempted to execute a scheme "to defraud a financial institution" or "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344.

A pattern of racketeering activity requires "at least two acts of racketeering activity" occurring within ten years of each other.  Id. § 1961(5).  "[T]o establish a 'pattern' of racketeering activity, plaintiffs 'must show [1] that the racketeering predicates are related, and [2] that they amount to or pose a threat of continued criminal activity." Jerome M. Sobel & Co. v. Fleck, No. 03 Civ.1041, 2003 WL 22839799, at *9 (S.D.N.Y. Dec. 1, 2003) (alteration in original) (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp., 327 F. Supp. 2d 159, 164 (E.D.N.Y. 2004) (quoting H.J. Inc., 492 U.S. at 240 (1989)).  The "continuity" element may be satisfied by, inter alia, "closed-ended" continuity, involving "a closed period of repeated conduct." H.J. Inc., 492 U.S. at 241.

Under 18 U.S.C. § 1962(d), it is also unlawful "for any person to conspire to violate" section 1962(c).  18 U.S.C. § 1962(d).  "To adequately plead a violation of § 1962(d) in the Second Circuit, a plaintiff need only allege that a 'conspirator intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense."

_Gulf Coast Development Group, LLC v. Lebror_, No. 02 Civ. 6949, 2003 WL 22871914, at *5 (S.D.N.Y. Dec. 4, 2003) (quoting _Baisch v. Gallina_, 346 F.3d 366, 376 (2d Cir. 2003)). Plaintiffs need not show an overt act in order to plead a violation of section 1962(d), though "injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation." _Hecht v. Commerce Clearing House, Inc._, 897 F.2d 21, 25 (2d Cir. 1990).

Here, plaintiffs claim that defendants violated both section 1962(c) and section 1962(d). With regard to section 1962(c), plaintiffs allege that all of the defendants were part of an association in fact, whose purpose was to "cause the BBA to set LIBOR artificially low" by each defendant's misrepresentation of its expected borrowing costs, and thereby to "allow[] Defendants to increase their net interest revenues by making artificially low payments to investors such as [plaintiffs]." Schwab Bank Am. Compl. ¶ 219. This enterprise allegedly lasted "[f]or at least four years before [plaintiffs'] Complaint[s were] filed." _Id._ ¶ 220. The enterprise's affairs, moreover, were allegedly conducted through a pattern of racketeering activity, namely mail fraud, wire fraud, and bank fraud. _Id._ ¶ 222. In addition to allegedly committing the above RICO violation, defendants allegedly conspired to violate RICO. According to plaintiffs, "[d]efendants organized and implemented

the scheme, and ensured it continued uninterrupted by concealing their manipulation of LIBOR from investors, including [plaintiffs]." Id. ¶ 232. Plaintiffs allege that they suffered direct and foreseeable injury from defendants' scheme by "unknowingly pa[ying] money to Defendants for LIBOR-based financial instruments that paid interest at a manipulated rate, and in fact collect[ing] less interest than they would have absent the conspiracy." Id. ¶ 234.

## 2. The PSLRA

Plaintiffs' RICO claim is barred by the PSLRA. In a provision that has become known as the "RICO Amendment," the PSLRA amended RICO to provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). This provision is interpreted "broadly," Eagletech Commc'ns Inc. v. Citigroup, Inc., No. 07-60668-CIV, 2008 WL 3166533, at *9 (S.D. Fla. June 27, 2008), and bars a RICO claim "even where a plaintiff cannot itself pursue a securities fraud action against the defendant," MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 277 (2d Cir. 2011); see also Gilmore v. Gilmore, No. 09 Civ. 6230, 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011). In other words, a plaintiff is prohibited from bringing a RICO claim not only when she, herself, could have brought a securities fraud claim based on

the RICO predicate acts, but also when the SEC could have brought such a claim.  See Eagletech, 2008 WL 3166533, at *14 (holding that "the PSLRA acts as a bar to Plaintiffs' RICO claims" because "the predicate acts are actionable as securities fraud and may be prosecuted by the SEC").  The question here, therefore, is whether the predicate acts of plaintiffs' RICO claim could have been the subject of a securities fraud action brought either by plaintiffs themselves or by the SEC.

### a. Securities Fraud

Under section 10(b) of the '34 Act, the provision criminalizing securities fraud:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange — . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Because the requirements for the SEC to bring suit for securities fraud are less stringent than the requirements for a private plaintiff to bring suit, see SEC v. Boock, No. 09 Civ. 8261, 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011), the dispositive inquiry is whether the alleged predicate acts could

form the basis for a securities fraud suit by the SEC, see Eagletech, 2008 WL 3166533, at *14.  The SEC may assert a cause of action for securities fraud if it alleges that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."  Boock, 2011 WL 3792819, at *21 (quoting SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)) (internal quotation marks omitted); cf. Gilmore, 2011 WL 3874880, at *4 (holding that a private plaintiff asserting a cause of action for securities fraud under section 10(b) would need to prove, in addition to the above three elements: (1) reliance by plaintiff on defendant's misrepresentation or omission, (2) economic loss, and (3) loss causation).

   To prove scienter, the SEC must demonstrate the defendant's "intent to deceive, manipulate, or defraud, or knowing misconduct."  Boock, 2011 WL 3792819, at *21 (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)) (internal quotation marks omitted).  To prove that the defendant's material misrepresentation or omission was made "in connection with the purchase or sale of securities," the SEC need only show that "the scheme to defraud and the sale of securities coincide[d]."  Seippel v. Jenkens & Gilchrest, P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (quoting SEC v.

_Zandford_, 535 U.S. 813, 820 (2002)) (internal quotation marks omitted).   The scheme to defraud and the sale of securities "coincide" when they are not "independent events," _id._ at 374 (quoting _Zandford_, 535 U.S. at 820), but rather "are 'less tangentially related,' or more closely dependent on each other," _id._ (quoting _Jacoboni v. KPMG LLP_, 314 F. Supp. 2d 1172, 1179 (M.D. Fla. 2004)).   In other words, although showing that the plaintiff purchased a security in reliance on a misrepresentation or omission by the defendant regarding the security's value would likely be sufficient to satisfy the "in connection with" element, such a showing would not be necessary. _See_ _id._ at 373.   Indeed, the "in connection with" element should be "construed not technically and restrictively, but flexibly to effectuate [the statute's] remedial purposes."   _Id._ at 372 (quoting _Zandford_, 535 U.S. at 819) (internal quotation marks omitted)."

### b. Application of the RICO Amendment

Plaintiffs concede that at least some of the LIBOR-based financial instruments they purchased from defendants were securities.   Schwab Opp'n 5-10.   At least with regard to these instruments, the conduct alleged by plaintiffs could have been the subject of a suit for securities fraud brought by the SEC.

First, defendants allegedly "made a material misrepresentation or a material omission as to which [they] had

a duty to speak." Boock, 2011 WL 3792819, at *21 (quoting SEC
v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)). In
their amended complaint, plaintiffs allege that defendants
mailed, in furtherance of their fraudulent scheme, "(i)
documents offering for sale LIBOR-based financial instruments
and (ii) correspondence regarding offerings of LIBOR-based
financial instruments." Schwab Bank Am. Compl. ¶ 223.
Defendants also allegedly transmitted by wire, in furtherance of
their fraudulent scheme, "documents offering LIBOR-based
financial instruments for sale." Id. ¶ 225. Both the mailings
and the wires were sent "for the purpose of obtaining money from
[holders of LIBOR-based financial instruments] through 'false or
fraudulent pretenses, representations, or promises.'" Id.
¶ 224; see also id. ¶ 225.

Plaintiffs argue that, despite these allegations, "the
mailings and wire transmissions that actually were directed to
Plaintiffs are not alleged to have been false or misleading."
Schwab Opp'n 9; see also Tr. 88. Rather, plaintiffs maintain,
"Defendants' misrepresentations were directed not at buyers of
specific securities, but at the BBA." Schwab Opp'n 9; see also
Tr. 88. This argument, however, is in irreconcilable tension
with plaintiffs' allegation that defendants sent them mailings
and wires for the purpose of obtaining money from them through
"false or fraudulent pretenses, representations, or promises."

Schwab Bank Am. Compl. ¶¶ 224-25.   Only through a contorted reading of this allegation could plaintiffs suggest that defendants' "false or fraudulent pretenses, representations, or promises" were made not in the mailings and wires to plaintiffs, but rather in wires to the BBA.   A more plausible reading of plaintiffs' allegations is that the misleading statements were made to plaintiffs in the offering materials they received from defendants.

Indeed, such a reading makes sense.   If the offering materials described how LIBOR was calculated by reference to the "proper" procedures rather than the manipulation that allegedly was occurring, they would contain a material misrepresentation. If they did not describe how LIBOR was calculated, they would still be omitting that LIBOR was being manipulated, surely a material omission.

The allegations in plaintiffs' original complaints confirm our conclusion that the offering materials defendants sent plaintiffs were misleading.   Those complaints asserted a cause of action for securities fraud in violation of section 10(b). See, e.g., Schwab Bank Compl. ¶¶ 138-47 (Aug. 23, 2011).   The securities fraud claim was withdrawn in the amended complaint, a decision that, according to plaintiffs' counsel, was not manipulative, but rather took account of their realization that they would not have been able to prove reliance on defendants'

misrepresentations.  Tr. 86-87.  Frankly, this explanation strikes us as a dubious position adopted in an effort by plaintiffs to disown their original complaint and thereby avoid dismissal of their RICO claim, a claim whose siren song of treble damages apparently proved irresistible.  Nonetheless, for purposes of the present analysis, we need not decide whether plaintiffs amended their complaint in good faith.  Even crediting plaintiffs' withdrawal of their securities fraud claim in their amended complaint, the factual allegations plaintiffs made in support of that claim remain relevant as party admissions.  See Austin v. Ford Models, Inc., 149 F.3d 148, 155 (2d Cir. 1998), abrogated on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) ("The amendment of a pleading does not make it any the less an admission of the party." (quoting Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 707 (2d Cir. 1989)) (internal quotation marks omitted)).

In their original complaint, plaintiffs clearly alleged that defendants made misleading statements in connection with the sale of securities.  Specifically, plaintiffs alleged that "Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the manipulation of

LIBOR." Schwab Bank Compl. ¶ 141. Further, defendants'
fraudulent conduct included:

> the making of, or participation in the making of,
> untrue statements of material facts and omitting to
> state material facts necessary to make Defendants'
> statements during the Relevant Period — including
> their representations that the rates of the securities
> Defendants sold to Plaintiffs were based on LIBOR — in
> the light of the circumstances under which they were
> made, not misleading.

Id. ¶ 142. In sum, defendants' conduct constituted a "deceit
upon the purchasers of the subject securities during the
Relevant Period, including Plaintiffs." Id.

While we acknowledge that some of these allegations track
statutory provisions, nevertheless, the allegations are of a
factual nature and must, of necessity, have been based on
factual positions. Fairly read, these allegations plainly
indicate that defendants made misleading statements to
plaintiffs, likely in the offering materials themselves but, at
any rate, certainly "in connection with" defendants' sale of
LIBOR-based securities to plaintiffs. While it is true that the
allegations are not conclusive admissions and thus may be
rebutted by plaintiffs, see Tran v. Alphonse Hotel Corp., 281
F.3d 23, 32 (2d Cir. 2002), overruled on other grounds by
Slayton v. Am. Express Co., 460 F.3d 215 (2d Cir. 2006),
plaintiffs' attempt to rebut them is unconvincing. Although
plaintiffs now assert that the offering materials did not

contain misrepresentations and generally were not misleading, they do not deny that the offering materials omitted the fact that LIBOR was being manipulated.  Indeed, for plaintiffs to deny this would be absurd: plaintiffs' argument that they "rel[ied] on the accuracy of LIBOR when [they] entered into the purchases," Tr. 87, requires the conclusion that the offering materials omitted the alleged material fact that LIBOR was being manipulated.

In light of the allegations in plaintiffs' original and amended complaints, it seems clear that the offering materials defendants sent plaintiffs contained either material misrepresentations or material omissions.  Moreover, the remaining two elements of securities fraud have also been alleged.  Without question, plaintiffs have alleged that defendants acted with scienter, or "intent to deceive, manipulate, or defraud, or knowing misconduct." SEC v. Boock, 2011 WL 3792819, at *21 (S.D.N.Y. Aug. 25, 2011) (quoting In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000)).  For instance, the amended complaint alleges that the offering materials were sent "for the purpose of obtaining money from [holders of LIBOR-based financial instruments] through 'false or fraudulent pretenses, representations, or promises.'" Id. ¶ 224; see also id. ¶ 225.  Finally, the material misrepresentations or omissions in the offering materials sent

to plaintiffs were clearly made in connection with the purchase or sale of securities.   Therefore, the mailings and wires by which defendants offered LIBOR-based securities to plaintiffs could, at a minimum, have been the subject of a securities fraud action brought by the SEC.

Additionally, all of defendants' misrepresentations to the BBA would likely be grounds for a securities fraud claim by the SEC.   First, plaintiffs allege that among the wire communications sent by defendant in furtherance of their fraudulent scheme were "phony statements about their costs of borrowing."   Schwab Bank Am. Compl. ¶ 225.   These statements, which apparently refer to the wires that defendants sent daily to the BBA, would clearly be material misrepresentations.   See Schwab Opp'n 9; Tr. 88.   Second, plaintiffs have explicitly alleged scienter.   Schwab Bank Am. Compl. ¶ 225.

Finally, defendants' "phony statements" to the BBA, under plaintiffs' own construct, would qualify as having been made "in connection with" the purchase or sale of securities.   Even if plaintiffs did not rely on each defendant's LIBOR quote in deciding to purchase LIBOR-based securities, it is sufficient that "the scheme to defraud and the sale of securities coincide[d]."   Seippel v. Jenkens & Gilchrest P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) (quoting SEC v. Zandford, 535 U.S. 813, 820 (2002)) (internal quotation mark omitted).   Far from

being "independent events," id. at 374 (quoting Zandford, 535
U.S. at 820), defendants' scheme to defraud and their sale of
securities to plaintiffs were "closely dependent on each other,"
id.   Indeed, one of the alleged reasons why defendants
"transmit[ted] phony statements about their costs of borrowing"
to the BBA was in order to "obtain[] money from holders of
LIBOR-based financial instruments through 'false or fraudulent
pretenses, representations, or promises' about LIBOR-based
financial instruments." Schwab Bank Am. Compl. ¶ 225; see also
id. ¶ 5 (alleging that one of defendants' "primary reasons" for
engaging in their fraudulent scheme was that "artificially
suppressing LIBOR allowed Defendants to pay lower interest rates
on LIBOR-based financial instruments that Defendants sold to
investors, including [plaintiffs], during the Relevant Period").

   Although defendants' misrepresentations to the BBA may have
been intended in part to facilitate defendants' sale of non-
security instruments, it remains the case, given that certain of
the LIBOR-based financial instruments that defendants sought to
sell to plaintiffs were securities, that a significant part of
the alleged reason for all of defendants' misrepresentations to
the BBA was to defraud purchasers of securities.  In short,
because defendants' alleged misrepresentations to the BBA were
allegedly made for the purpose of profiting unfairly from their
sale of securities to plaintiffs, defendants' misrepresentations

to the BBA were made "in connection with" the sale of securities.   Therefore, all of defendants' alleged misrepresentations to the BBA would be grounds for a securities fraud action brought by the SEC.[20]

Plaintiffs argue that even if their RICO claim may not rely on predicate acts that would have been grounds for a securities fraud suit, the claim should survive to the extent it involves predicate acts that would not have been actionable as securities fraud.   Schwab Opp'n 5-7.   Such predicate acts might include communications offering non-security financial instruments.

Plaintiffs' argument is inconsistent with how courts have consistently applied the RICO Amendment.   Specifically, where plaintiffs allege "a single scheme," courts have held that "if any predicate act is barred by the PSLRA it is fatal to the entire RICO claim."   Ling v. Deutsche Bank, No. 04 CV 45662005, 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005).

For example, in Gilmore v. Gilmore, No. 09 Civ. 6230, 2011 WL 3874880, at *4 (S.D.N.Y. Sept. 1, 2011), "[plaintiff]'s RICO claims [were] based on his allegations that [defendant] and

---

[20] It is of no avail to plaintiffs that they allege that they "do not base their RICO claim[] on any conduct that would have been actionable as fraud in the purchase or sale of securities." Schwab Bank Am. Compl. ¶ 227. First, this is a legal conclusion that we need not accept as true. Second, regardless of whether plaintiffs are correct that they could not have brought a private action for securities fraud based on the alleged RICO predicate acts, those predicate acts could, as discussed above, have been the basis for a securities fraud action brought by the SEC. This is sufficient for plaintiffs' RICO claim to be barred under the PSLRA's RICO Amendment.

[defendant's outside financial and investment advisor] engaged in a multi-year scheme to defraud him and his siblings by looting the family companies through self-dealing, fraudulent securities transactions, and overbilling." Id. at *2. The Court held that defendant's alleged plots to loot the family companies "count[ed] as a single scheme." Id. at *6. Therefore, "the securities aspects of the fraud [needed to] be aggregated with the non-securities aspects." Id. In other words, having alleged that defendant's acts "were part of a single fraudulent scheme[,] the [plaintiff] [could not] divide the scheme into its various component parts," as "such surgical presentation . . . would undermine the Congressional purpose" behind the RICO Amendment. Id. (quoting Seippel v. Jenkens & Gilchrest, P.C., 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004)). Because there was "no genuine dispute that components of Plaintiffs alleged action could have been brought under the securities laws," the Court dismissed plaintiff's RICO claims. Id.

Similarly, in Ling v. Deutsche Bank, 2005 WL 1244689, the Court dismissed RICO claims based on a fraudulent scheme to offer illegitimate tax strategy advice where "[f]or at least some of the[] individual Plaintiffs, the sale of securities was necessary to effectuate the tax strategy." Id. at *6. Because "the Plaintiffs contend[ed] the wrongful acts were committed as

part of a single fraudulent scheme, all of the components [needed to] be considered together for securities fraud purposes." <u>Id.</u> at *4.

Here, the PSLRA bars plaintiffs' RICO claim despite the fact that certain of the alleged predicate acts might not have been actionable as securities fraud. Plaintiffs have unambiguously alleged that defendants' conduct constituted a single fraudulent scheme. <u>See, e.g.</u>, Schwab Bank Am. Compl. ¶ 219 (alleging that defendants formed an association-in-fact enterprise with the "common purpose" of "using [their] false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues by making artificially low payment to investors such as [plaintiffs]"). Because they have done so, and because some of the alleged predicate acts could have been grounds at least for a securities fraud action brought by the SEC, plaintiffs' RICO claim, in its entirety, is barred by the PSLRA.

### 3. Extraterritoriality

Apart from being barred by the PSLRA's RICO Amendment, plaintiffs' RICO claim rests on an impermissible extraterritorial application of the RICO statute. This provides an independent basis for dismissing plaintiffs' RICO claim.

### a. RICO's Reach

As discussed above, Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), establishes a two-part test for deciding extraterritoriality questions.  First, "'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.'"  Id. at 2877 (quoting EEOC v. Arabian American Oil Co. ("Aramco"), 499 U.S. 244, 248 (1991)).  "When a statute gives no clear indication of an extraterritorial application, it has none."  Id. at 2878. With regard to RICO, the Second Circuit has established that "RICO is silent as to any extraterritorial application." Norex Petroleum Ltd. v. Access Indus., Inc., 631 F.3d 29, 32 (2d Cir. 2010) (citing N.S. Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir. 1996)) (internal quotation marks omitted); see also Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., 871 F. Supp. 2d 933, 937 (N.D. Cal. 2012) ("Since Morrison made it clear that the presumption against extraterritoriality is a canon of construction applicable to any statute, a half-dozen courts have applied its reasoning in the RICO context.  These courts have uniformly held that RICO is silent as to its extraterritorial application and that, under Morrison, it therefore has none.").  Therefore, RICO does not apply extraterritorially.[21]

---

[21] It is irrelevant whether the statutes prohibiting the alleged predicate

Second, if a statute applies only domestically, a court must determine which domestic conduct the statute regulates by reference to "the 'focus' of congressional concern." Morrison, 130 S. Ct. at 2884 (quoting Aramco, 499 U.S. at 255).   With regard to RICO, some courts have found that the statute focuses on the enterprise.   See, e.g. Cedeno v. Intech Group, Inc., 733 F. Supp. 2d 471, 474 (S.D.N.Y. 2010) ("[T]he focus of RICO is on the enterprise as the recipient of, or cover for, a pattern of criminal activity. . . . RICO does not apply where, as here, the alleged enterprise and the impact of the predicate activity upon it are entirely foreign."); see also Mitsui, 871 F. Supp. 2d at 938 ("[C]ourts have broadly agreed that . . . in the RICO context 'it is the "enterprise" that is the object of the statute's solicitude, and the "focus" of the statute.'" (quoting European Cmty. v. RJR Nabisco, Inc., No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011))).

By contrast, other courts have found that RICO focuses "on the pattern of racketeering activity and its consequences." Chevron Corp. v. Donziger, 871 F. Supp. 2d 229, 245 (S.D.N.Y. 2012); see also id. at 242 (reasoning that "foreign enterprises have been at the heart of precisely the sort of activities —

---

acts apply extraterritorially.   See Norex, 631 F.3d at 33 ("Morrison similarly forecloses [plaintiff]'s argument that because a number of RICO's predicate acts possess an extraterritorial reach, RICO itself possesses an extraterritorial reach.").

committed in the United States — that were exactly what Congress enacted RICO to eradicate," and concluding that Congress probably was concerned with "the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in this country and occurred here, either entirely or in significant part"). The Second Circuit has not decided this issue. See Cedeno v. Castillo, 457 F. App'x 35, 37 (2d Cir. 2012).

We agree with the Court in Cedeno that the focus of RICO is on the enterprise. In any RICO complaint, each of the predicate acts would be actionable independently, criminally and possibly also civilly. See 18 U.S.C. § 1961(1) (defining "racketeering activity"). The additional element that elevates isolated criminal acts to a RICO violation is the involvement of an enterprise, either as a passive victim of racketeering activity or as an active mechanism for perpetrating the racketeering activity. Indeed, the Supreme Court has held that the two primary purposes of RICO are to "protect[] a legitimate 'enterprise' from those who would use unlawful acts to victimize it," Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164 (2001) (citing United States v. Turkette, 452 U.S. 576, 591 (1981)), and to "protect[] the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . .

activity is committed,'" id. (quoting Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 259 (1994); see also European Cmty., 2011 WL 843957, at *5 (reasoning that RICO "does not punish the predicate acts of racketeering activity . . . but only racketeering activity in connection with an 'enterprise,'" and that the statute "seeks to regulate 'enterprises' by protecting them from being victimized by or conducted through racketeering activity"). As the Cedeno Court reasoned, "RICO is not a recidivist statute designed to punish someone for committing a pattern of multiple criminal acts[, but rather] prohibits the use of such a pattern to impact an enterprise." Cedeno, 733 F. Supp. 2d at 473. Therefore, we conclude that Congress's focus in enacting RICO was the enterprise. Under Morrison, a RICO enterprise must be a "domestic enterprise." European Cmty., 2011 WL 843957, at *5.

### b. The Location of the Alleged RICO Enterprise

To determine where an enterprise is located, courts have employed the "nerve center" test, adopted from the Supreme Court's use of that test in Hertz Corp. v. Friend, 130 S. Ct. 1181 (2010), to locate a corporation's principal place of business for purposes of diversity jurisdiction. See, e.g., European Cmty., 2011 WL 843957, at *5-6; see also Mitsui, 871 F. Supp. 2d at 940 ("The nerve center test provides a familiar, consistent, and administrable method for determining the

territoriality of RICO enterprises in cases such as the one at bar, which blend domestic and foreign elements."). As articulated in Hertz, the "nerve center" of a corporation is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." Hertz, 130 S. Ct. at 1192. In the RICO context, courts have found that although "RICO enterprises . . . may not have a single center of corporate policy," the test is nonetheless useful in focusing on the "brains" of the enterprise – where its decisions are made – as opposed to its "brawn" – where its conduct occurs. European Cmty., 2011 WL 843957, at *6.

Here, for obvious reasons, plaintiffs resist the most natural way to apply RICO to the factual circumstances, namely to identify the BBA as the enterprise and to allege that the BBA's LIBOR-setting process had been corrupted by defendants and used to carry out a pattern of racketeering activity. Because the BBA is plainly a foreign enterprise, such a construct would result in an impermissible extraterritorial application of RICO. Therefore, plaintiffs have alleged that the enterprise is an association in fact whose members are the BBA panel banks, and their affiliates, and whose purpose is to submit artificially low LIBOR quotes to the BBA so that LIBOR is fixed at artificially low levels and the defendants profit on LIBOR-based financial instruments. Tr. 95; Exchange Am. Compl. ¶ 219. This

strikes us as a strained attempt by plaintiffs to plead around an obvious defect in their theory.

Even evaluating plaintiffs' construct of an association-in-fact enterprise on its merits, the enterprise would be foreign. In locating the enterprise, the nerve center test, despite its usefulness in other cases, has little value here. The decisionmaking of the alleged enterprise likely occurred in several different countries, and might even have been located in each of the countries in which a defendant was headquartered. See Schwab Bank Am. Compl. ¶¶ 20-35 (identifying the countries of defendants' headquarters as the United States, England, Japan, the Netherlands, Switzerland, Germany, Canada, and Scotland). Plaintiffs have not alleged that defendants met in any one physical location in furtherance of their fraudulent scheme; rather, they have alleged that "Defendants used the mails and wires in conjunction with reaching their agreement to make false statements about their costs of borrowing, to manipulate LIBOR." Schwab Bank Am. Compl. ¶ 226. Indeed, if plaintiffs are correct that defendants joined together to fix LIBOR over the course of several years, it would seem highly improbable that defendants physically met in one location to discuss the scheme. Therefore, because the decisionmaking in furtherance of the alleged scheme would likely have occurred in

many countries, the "nerve center" test does not point us to a single location.

Given that the location of the enterprise's "brain" is indeterminate, we will consider the location of the enterprise's "brawn," or where the enterprise acted.  The alleged fraudulent scheme essentially comprised two parts: (1) the defendants' submission of artificial LIBOR quotes to the BBA, and (2) each defendant's sale of LIBOR-based financial instruments to its customers.  The first part involves joint action: the defendants allegedly agreed to coordinate their LIBOR submissions such that they would each submit an artificially low quote to the BBA each day.  Indeed, giving the formula for calculating LIBOR, the only way to have a significant effect on the final LIBOR fix is through coordinated, collective action.  The second part, by contrast, is independent: even if all of the defendants had a common interest in a low LIBOR fix, each defendant acted independently in selling LIBOR-based financial instruments to its customers.

In locating a RICO enterprise based on its activities, it makes sense to focus on activities done collectively.  As discussed above, the focus of Congressional concern in enacting RICO was the RICO enterprise; in the context of an association-in-fact enterprise, the focus is not each defendant's independent commission of predicate acts, but rather the

association of defendants together to commit predicate acts. Therefore, based on defendants' collective submission of false LIBOR quotes to the BBA, we find that the alleged RICO enterprise is located in England.   The defendants were each members of the BBA, an entity based in England, and participated in the affairs of the BBA by submitting quotes each day to the BBA.   In other words, the collective action of defendants centered on the BBA.  As the BBA is located in England, the most sensible place to locate the RICO enterprise is England.[22]

Because RICO applies only to domestic enterprises, and because the enterprise alleged here was located abroad, plaintiffs' claim involves an impermissible extraterritorial application of U.S law.  Accordingly, plaintiffs' RICO claim is dismissed.

### D. State-Law Claims

At least one state-law cause of action is asserted in the OTC amended complaint, the Schwab amended complaints, and the exchange-based plaintiffs' amended complaint.  For the reasons

---

[22] Even if we considered the second stage of the alleged fraud - each defendant's sale of LIBOR-based financial instruments to its customers - we would not necessarily locate the enterprise in the United States.   Contrary to plaintiffs' argument, Tr. 97, the fact that only U.S. customers have brought suit pursuant to RICO does not indicate that defendants in fact targeted their sale of LIBOR-based instruments at the U.S.   Because LIBOR is a reference point around the world, id., it seems likely that defendants, which are headquartered around the world, would have sold LIBOR-based financial instruments to plaintiffs around the world.   Consequently, even if we focused on where defendants sold LIBOR-based instruments, our analysis would not necessarily point to the United States.   Furthermore, given that the first stage of the alleged fraud clearly centered on England, the indeterminate location of the second stage reinforces our conclusion that the alleged RICO enterprise was located abroad.

stated below, we decline to exercise supplemental jurisdiction over the state-law claims in the OTC amended complaint and the Schwab amended complaints, with the exception of the Schwab plaintiffs' claim pursuant to the Cartwright Act. The Cartwright Act claim and the exchange-based plaintiffs' state-law claim are dismissed with prejudice.

### 1. OTC Amended Complaint

The OTC amended complaint asserts a cause of action for unjust enrichment and restitution, without stating which state's common law it seeks to apply. OTC Am. Compl. ¶¶ 227-30. The only other cause of action asserted the amended complaint is for violation of section 1 of the Sherman Act, id. ¶¶ 220-26, and, as discussed above, we are dismissing this claim for failure to allege antitrust injury. Thus, the question before us is whether we should exercise supplemental jurisdiction over the state common law claim in light of the fact that no federal causes of action remain.[23]

---

[23] Although it is conceivable that we could retain jurisdiction over this claim by virtue of diversity of citizenship, we need not consider this ground because plaintiffs have not pled it. "It is the plaintiff's burden to plead and prove subject matter jurisdiction." Moses v. Deutche Bank Nat. Trust Co., No. 11-cv-5002 (ENV) (VVP), 2012 WL 2017706, at *1 (E.D.N.Y. June 5, 2012) (citing Standard Chartered Bank Malaysia Holdings v. Lehman Bros. Asia Holdings Ltd., No. 08 CV 8152, 2008 WL 4355355, at *1 (S.D.N.Y. Sept. 22, 2008)). Here, plaintiffs have not pleaded that this Court has diversity jurisdiction over their state law claim, nor have they alleged facts that would support our exercise of diversity jurisdiction. Therefore, if we have jurisdiction over plaintiffs' state-law claim, it is not by virtue of diversity of citizenship.

Under 28 U.S.C. § 1367, "district courts may decline to exercise supplemental jurisdiction over a [state law claim] if - . . . (3) the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c) (2006). In <u>Kolari v. New York-Presbyterian Hosp.</u>, 455 F.3d 118 (2d Cir. 2006), the Second Circuit held that "[o]nce a district court's discretion is triggered under [section] 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity' in deciding whether to exercise jurisdiction." <u>Id.</u> at 122 (quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 (1988)) (internal citation omitted). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in [<u>Carnegie-Mellon University v. Cohill</u>, 484 U.S. 343,] that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" <u>Kolari</u>, 455 F.3d at 122 (alteration in original) (quoting <u>Cohill</u>, 484 U.S. at 350 n.7). Indeed, as the Supreme Court explained in <u>United Mine Workers of America v. Gibbs</u>, 383 U.S. 715 (1966), <u>superseded by statute</u>, 28 U.S.C. § 1367, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." <u>Id.</u> at 726.

Here, considerations of judicial economy, convenience, fairness, and comity suggest that we should decline to exercise supplemental jurisdiction over plaintiffs' as-yet-unspecified-state-law claim.   First, given that discovery has not yet commenced, it would not significantly compromise judicial economy for another court to start afresh on plaintiffs' state law claim.   Second, in light of the early stage of the proceedings, it would not be particularly inconvenient for plaintiffs to refile their amended complaint in state court. Third, considerations of fairness suggest that plaintiffs' state-law claim would best be decided in state court.   Finally, comity to the States counsels us not to decide unnecessarily a question of state law.   In sum, we find that in this case, as in "the usual case in which all federal-law claims are eliminated before trial," the Cohill factors "point toward declining to exercise jurisdiction over the remaining state-law claims." Kolari, 455 F.3d at 122 (quoting Cohill, 484 U.S. at 350 n.7) (internal quotation mark omitted).   Accordingly, we decline to exercise supplemental jurisdiction over the OTC plaintiffs' state-law claim.

## 2. Schwab Amended Complaints

The Schwab amended complaints assert four causes of action pursuant to California state law: (1) violation of the Cartwright Act, Schwab Bank Am. Compl. ¶¶ 238-44,

(2) interference with economic advantage, id. ¶¶ 245-49, (3) breach of the implied covenant of good faith, id. ¶¶ 250-55, and (4) unjust enrichment, id. ¶¶ 256-63.  With regard to each of these claims other than the Cartwright Act claim, the same considerations of judicial economy, convenience, fairness, and comity that counsel us to decline to exercise supplemental jurisdiction over the OTC plaintiffs' state-law claim also counsel us to decline to exercise supplemental jurisdiction here.[24]  In light of the early stage of the proceedings, there is no reason why a California court should not decide plaintiffs' California common law claims.

With regard to plaintiffs' cause of action for violation of the Cartwright Act, the Cohill factors suggest a different result.  As discussed earlier, California courts interpreting the Cartwright Act have required plaintiffs to satisfy the same antitrust injury requirement that federal courts have applied in the context of the Sherman and Clayton Acts.  See Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc., 198 Cal. App. 4th 1366, 1378, 1380 (App. 2d Dist. 2011) ("[F]ederal case law makes clear that the antitrust injury requirement also

---

[24] Like the OTC plaintiffs, the Schwab plaintiffs do not allege that we have diversity jurisdiction, nor do they allege facts that would support our exercise of diversity jurisdiction.  See Schwab Bank Am. Compl. ¶ 14; Schwab Money Am. Compl. ¶ 14; Schwab Bond Am. Compl. ¶ 14.  Therefore, we need not consider whether we have jurisdiction over plaintiffs' state-law claims by virtue of diversity.

applies to other federal antitrust violations [beyond anticompetitive mergers]. California case law holds that the requirement applies to Cartwright Act claims as well. . . . [T]he antitrust injury requirement means that an antitrust plaintiff must show that it was injured by the anticompetitive aspects or effects of the defendant's conduct, as opposed to being injured by the conduct's neutral or even procompetitive aspects."). Therefore, our decision that plaintiffs have failed to allege an antitrust injury applies equally to their Cartwright Act claims.

    In these circumstances, considerations of judicial economy, convenience, fairness, and comity suggest that we should exercise supplemental jurisdiction over plaintiffs' Cartwright Act claims. First, as a matter of judicial economy, because our analysis of antitrust injury in the federal context is also sufficient to dispose of plaintiff's Cartwright Act claims, there is no reason for another court to duplicate our efforts. Second, with regard to the parties' convenience, although it would be easy for plaintiffs to refile their claim in state court, it would also be an unnecessary burden for defendants to relitigate an issue that has already been decided here. Third, although fairness to the parties often suggests that issues of state law should be decided by courts of that state, there is nothing unfair about our deciding the issue of antitrust injury

in the context of the Cartwright Act given that this requirement is directly based on the federal antitrust injury requirement. Finally, because California has chosen to streamline its Cartwright Act jurisprudence with federal antitrust law to the extent that California courts have endorsed the federal requirement of antitrust injury, there are not strong considerations of comity here in favor of deferring to California courts.

Therefore, we will exercise supplemental jurisdiction over plaintiffs' Cartwright Act claims. As discussed above, plaintiffs must show an antitrust injury to recover under the Cartwright Act, yet here, plaintiffs have failed to do so. Accordingly, plaintiffs' Cartwright Act claims are dismissed.

### 3. Exchange-Based Plaintiffs' Amended Complaint

The exchange-based plaintiffs assert a cause of action pursuant to New York law for "restitution/disgorgement/unjust enrichment." Exchange Am. Compl. ¶¶ 250-53.[25] As discussed above, plaintiffs' CEA claims will, in part, survive defendants' motion to dismiss. Plaintiffs have alleged that their state-law claim is also properly before us pursuant to our diversity jurisdiction and supplemental jurisdiction, and defendants have

---

[25] Although the amended complaint does not specify which state's law the plaintiffs are seeking to apply, the parties have assumed for purposes of briefing that the claim is asserted pursuant to New York common law. Accordingly, we will analyze this claim under New York law.

not disputed this.  Defendants have, however, moved to dismiss plaintiffs' state-law cause of action for failure to state a claim.  Exchange MTD 29-31.

Under New York law, "'[t]he theory of unjust enrichment lies as a quasi-contract claim' and contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"  Georgia Malone & Co., Inc. v. Rieder, 19 N.Y.3d 511, 516 (2012) (quoting IDT Corp. v Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142 (2009)).  In order to state a claim for unjust enrichment, a plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered."  Id. (quoting Mandarin Trading Ltd. V. Wildenstein, 16 N.Y.3d 173, 182 (2011) (internal quotation mark omitted).

Given that unjust enrichment is a claim in quasi-contract, it requires some relationship between plaintiff and defendant: "while 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'"  Id. (quoting Sperry v. Crompton Corp., 8 N.Y.3d 204, 215-16 (2007)).  Where plaintiff and defendant "simply had

no dealings with each other," their relationship is "too attenuated." Georgia Malone, 19 N.Y.3d at 517–518.

Here, the relationship between plaintiffs and defendants, to the extent that there was any relationship, is surely too attenuated to support an unjust enrichment claim. Although plaintiffs have alleged that they "purchased standardized CME Eurodollar futures contracts" and that "Defendants . . . manipulated and directly inflated CME Eurodollar futures contract prices to artificially high levels," Exchange Am. Compl. ¶¶ 214–15, they have not alleged that they purchased Eurodollar contracts from defendants or that they had any other relationship with defendants.  In other words, even if plaintiffs are correct that "the direct and foreseeable effect of the Defendants' intentional understatements of their LIBOR rate was to cause Plaintiffs and the Class to pay supra-competitive prices for CME Eurodollar futures contracts," id. ¶ 217; see also Exchange Opp'n 36, this does not establish a relationship, of any sort, between plaintiffs and defendants. Cf. In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008) ("Plaintiffs have alleged that their losses were caused by defendants' market manipulations . . . . But they have not alleged any direct relationship, trading or otherwise, between themselves and [defendants]. The alleged link between plaintiffs and defendants - from defendants'

manipulations to the general natural gas futures market to plaintiffs' trades - is too attenuated to support an unjust enrichment claim.").

Because plaintiffs have not alleged any relationship between themselves and defendants, they fail to state a claim for unjust enrichment under New York law. Accordingly, plaintiffs' unjust enrichment claim is dismissed.

## IV. Conclusion

For the reasons stated above, defendants' motions to dismiss are granted in part and denied in part. First, defendants' motion to dismiss plaintiffs' federal antitrust claim is granted. Regardless of whether defendants' conduct constituted a violation of the antitrust laws, plaintiffs may not bring suit unless they have suffered an "antitrust injury." An antitrust injury is an injury that results from an anticompetitive aspect of defendants' conduct. Here, although plaintiffs have alleged that defendants conspired to suppress LIBOR over a nearly three-year-long period and that they were injured as a result, they have not alleged that their injury resulted from any harm to competition. The process by which banks submit LIBOR quotes to the BBA is not itself competitive, and plaintiffs have not alleged that defendants' conduct had an anticompetitive effect in any market in which defendants

compete.   Because plaintiffs have not alleged an antitrust injury, their federal antitrust claim is dismissed.

Second, defendants' motion to dismiss plaintiffs' commodities manipulation claims is granted in part and denied in part.   Contrary to defendants' arguments, plaintiffs' claims do not involve an impermissible extraterritorial application of the CEA, and plaintiffs have adequately pleaded their claims. However, certain of plaintiffs' claims are time-barred because numerous articles published in April and May 2008 in prominent national publications placed plaintiffs on notice of their injury.   Therefore, plaintiffs' commodities manipulation claims based on contracts entered into between August 2007 and May 29, 2008, are time-barred.   However, plaintiffs' claims based on contracts entered into between April 15, 2009, and May 2010 are not time-barred, and plaintiffs' claims based on contracts entered into between May 30, 2008, and April 14, 2009, may or may not be barred, though we will not dismiss them at this stage.   Additionally, because the Barclays settlements brought to light information that plaintiffs might not previously have been able to learn, we grant plaintiffs leave to move to amend their complaint to include allegations based on such information, provided that any such motion addresses the concerns raised herein and is accompanied by a proposed second amended complaint.

Third, defendants' motion to dismiss plaintiffs' RICO claim is granted.  For one, the PSLRA bars plaintiffs from bringing a RICO claim based on predicate acts that could have been the subject of a securities fraud action.  Here, the predicate acts of mail and wire fraud underlying plaintiffs' RICO claim could have been the subject of a claim for securities fraud.  Additionally, RICO applies only domestically, meaning that the alleged "enterprise" must be a domestic enterprise.  However, the enterprise alleged by plaintiffs is based in England.  For these reasons, plaintiffs' RICO claim is dismissed.

Finally, plaintiffs' state-law claims are all dismissed, some with prejudice and some without.  Plaintiffs' Cartwright Act claim is dismissed with prejudice for lack of antitrust injury.  The exchange-based plaintiffs' New York common law unjust enrichment claim is also dismissed with prejudice, as plaintiffs have not alleged any relationship between them and defendants.  With regard to the remaining state-law claims, we decline to exercise supplemental jurisdiction and therefore dismiss the claims without prejudice.

We recognize that it might be unexpected that we are dismissing a substantial portion of plaintiffs' claims, given that several of the defendants here have already paid penalties to government regulatory agencies reaching into the billions of dollars.  However, these results are not as incongruous as they

might seem. Under the statutes invoked here, there are many requirements that private plaintiffs must satisfy, but which government agencies need not. The reason for these differing requirements is that the focuses of public enforcement and private enforcement, even of the same statutes, are not identical. The broad public interests behind the statutes invoked here, such as integrity of the markets and competition, are being addressed by ongoing governmental enforcement. While public enforcement is often supplemented by suits brought by private parties acting as "private attorneys general," those private actions which seek damages and attorney's fees must be examined closely to ensure that the plaintiffs who are suing are the ones properly entitled to recover and that the suit is, in fact, serving the public purposes of the laws being invoked. Therefore, although we are fully cognizant of the settlements that several of the defendants here have entered into with government regulators, we find that only some of the claims that plaintiffs have asserted may properly proceed.

**SO ORDERED.**


Dated:  New York, New York
        March 29, 2013


NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE