UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
In re:

LIBOR-Based Financial Instruments                **MEMORANDUM AND ORDER**
Antitrust Litigation.

                                                     11 MD 2262 (NRB)

THIS DOCUMENT RELATES TO: All Cases

------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### INTRODUCTION

On March 29, 2013, we issued a Memorandum and Order granting in part and denying in part defendants' motions to dismiss plaintiffs'[1] complaints, which alleged that they suffered injury based on the defendants' manipulation of the London InterBank Offered Rate ("LIBOR").  In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("LIBOR I").  Among other determinations relevant to the pending motions, we dismissed exchange-based plaintiffs' claims under the Commodity Exchange Act ("CEA") to the extent that they were based on Eurodollar futures contracts entered into between August 2007 and May 29, 2008, but allowed those based on

---

[1] Currently, the plaintiffs in this case have been subdivided into four groups: (1) over-the-counter ("OTC") plaintiffs, (2) exchange-based plaintiffs, (3) bondholder plaintiffs, and (4) Charles Schwab plaintiffs. The motions now pending apply to only the first two groups.

contracts entered into between May 30, 2008 and May 2010 to proceed.[2]

On August 23, 2013, we issued a second Memorandum and Order in response to a series of additional motions addressed to the complaints.  In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("LIBOR II").  In LIBOR II, we made the following rulings: (1) denied exchange-based plaintiffs' motion to add allegations with respect to trader-based manipulation; (2) denied defendants' motion for reconsideration of our finding that plaintiffs had adequately pled scienter under the CEA, but did so without prejudice to defendants filing an additional motion that responded to specific concerns; (3) granted defendants leave to move to dismiss, on statute of limitations grounds, CEA claims arising out of contracts entered into between May 30, 2008 and April 14, 2009; (4) granted OTC plaintiffs' motion for leave to reassert their unjust enrichment claim and to add a claim for breach of the implied covenant of good faith and fair dealing; and (5)

_____

[2] Additionally, in LIBOR I, we dismissed plaintiffs' antitrust and RICO claims in full; we dismissed with prejudice the exchange-based plaintiffs' state-law claim for unjust enrichment; and we declined to exercise supplemental jurisdiction over the remaining state-law claims.

granted exchange-based plaintiffs leave to amend their complaint to add Société Générale ("SG") as a defendant.[3]

Presently before the Court are seven motions.  Six of these motions were contemplated by our decision in LIBOR II: (1) exchange-based plaintiffs' motion for reconsideration of our decision denying them leave to add allegations of day-to-day, trader-based manipulation; (2) exchange-based plaintiffs' motion for leave to amend their complaint to include new, heretofore unpled allegations of trader-based conduct; (3) defendants' motion for reconsideration of our finding that plaintiffs had pled scienter; (4) defendants' motion to dismiss exchange-based plaintiffs' claims based on contracts purchased between May 30, 2008 and April 14, 2009; (5) defendants' motion to dismiss OTC plaintiffs' claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing; and (6) defendant SG's motion to dismiss the complaint.  The seventh is defendants' motion to strike the declaration that exchange-based plaintiffs submitted in connection with its motion for reconsideration (the "Kovel Declaration").

For the reasons stated below, exchange-based plaintiffs' motion for reconsideration is denied, but their motion for leave

---

[3] In addition, we denied exchange-based plaintiffs' motion for interlocutory appeal, and we denied OTC, bondholder, and exchange-based plaintiffs' motions to replead antitrust claims that we dismissed in LIBOR I.

to amend their complaint to add certain allegations of day-to-day, trader-based manipulation is granted; defendants' motion for reconsideration of our holding that exchange-based plaintiffs have adequately pled scienter is denied; defendants' motion to dismiss claims based on contracts purchased between May 30, 2008 and April 14, 2009 is granted; defendants' motion to dismiss OTC plaintiffs' claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing is granted in part and denied in part; defendant SG's motion to dismiss is granted; and defendants' motion to strike the Kovel Declaration is granted.[4]

Because the facts underlying this case have been thoroughly discussed in LIBOR I and then elaborated upon in LIBOR II, we will proceed directly to our consideration of the pending motions.

---

[4] Local Civil Rule 6.3 prohibits the filing of affidavits in support of a motion for reconsideration "unless directed by the Court." Local Civ. R. 6.3; see also Williams v. Citigroup Inc., 659 F.3d 208, 214 n.3 (2d Cir. 2011). Here, exchange-based plaintiffs neither sought leave nor received permission to file the Kovel Declaration, which was therefore submitted in violation of the Local Civil Rule. This is reason enough to strike the Kovel Declaration. See Ferring B.V. v. Allergan, Inc., No. 12 Civ. 2650(RWS), 2013 WL 4082930, at *2 (S.D.N.Y. Aug. 7, 2013) (striking an unsolicited declaration pursuant to Local Civil Rule 6.3); Pegoraro v. Marrero, No. 10 Civ. 00051(AJN)(KNF), 2012 WL 3112331, at *3 (S.D.N.Y. Aug. 1, 2012) (refusing to consider unauthorized declaration in deciding motion under Local Civil Rule 6.3); Ramasamy v. Essar Global Ltd., No. 11 Civ. 3912(JSR), 2012 WL 1681763, at *1 n.1 (S.D.N.Y. May 8, 2012) (same). Moreover, we had no occasion to rely on the Kovel Declaration in deciding plaintiffs' motion for reconsideration. Accordingly, we grant defendants' motion to strike the Kovel Declaration.

**DISCUSSION**

I.   **Legal Standards**

A.   **Motion for Reconsideration**

"Reconsideration is appropriate only where a court has overlooked controlling decisions or facts presented in the underlying motion which, had they been considered, might reasonably have altered the result of the initial decision." In re Fosamax Prods. Liab. Litig., 815 F. Supp. 2d 649, 651–52 (S.D.N.Y. 2011) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)).  Because the remedy of reconsideration does not provide relief "where a party failed to present relevant factual or legal arguments," a party seeking reconsideration "may not advance new facts, issues or arguments not previously presented to the Court."  Id. (internal quotation marks omitted).  Reconsideration is "an extraordinary remedy to be employed sparingly," given "the interests of finality and conservation of scarce judicial resources."  Small v. Nobel Biocare USA, LLC, Nos. 05 Civ. 3225(NRB), 06 Civ. 683(NRB), 2012 WL 952396, at *1 (S.D.N.Y. Mar. 21, 2012) (quoting In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005)) (internal quotation marks omitted).  The decision to grant or deny a motion for reconsideration is within "the sound

discretion of the district court." Aczel v. Labonia, 584 F.3d 52, 61 (2d Cir. 2009) (internal quotation marks omitted).

**B.   Motion for Leave to Amend**

Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave" to a party to amend its complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Generally, a district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009) (quoting McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007)) (internal quotation marks omitted).   Ultimately, "the grant or denial of an opportunity to amend is within the discretion of the District Court." Foman v. Davis, 371 U.S. 178, 182 (1962); see also In re CRM Holdings Sec. Litig., No. 10 CIV 00975(RPP), 2013 WL 787970, at *7 (S.D.N.Y. Mar. 4, 2013) ("The grant or the denial of an opportunity to amend a complaint falls squarely within the discretion of a district court.").

**C.   Motion to Dismiss**

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's

favor.  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007). Nevertheless, a plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Once a court accepts all of the plaintiff's factual allegations as true, those allegations must demonstrate "more than a sheer possibility that a defendant has acted unlawfully" in order to pass muster under Rule 12(b)(6).  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  If a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570.

In the context of claims for commodities manipulation, such as those alleged by the exchange-based plaintiffs, a plaintiff must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  See LIBOR I, 935 F. Supp. 2d at 713–14; In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008) ("Amaranth I"); In re Crude Oil Commodity Litig., No. 06 Civ. 6677(NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) ("Crude Oil I").  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  "This pleading constraint serves to

provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)).  While courts generally relax Rule 9(b)'s requirements in the context of manipulation claims, "[a]llegations that are conclusory or unsupported by factual assertions are insufficient."  Id.

## II.  Trader-Based Conduct

### A.  Procedural Background

In LIBOR I, we addressed plaintiffs' argument that their claims properly related not only to alleged persistent suppression of LIBOR, but also to day-to-day, trader-based manipulation intended to benefit the banks' respective trading positions in the Eurodollar futures market.  Plaintiffs' assertions were based largely on the Barclays settlements made public on June 27, 2012, which included admissions of efforts to manipulate LIBOR by individual traders.  As a result, we granted plaintiffs leave to move to amend their complaint to include allegations of day-to-day manipulation derived from the Barclays settlements.  LIBOR I, 935 F. Supp. 2d at 709.  We also expressed our preliminary view that plaintiffs' potential claims based on contracts bought prior to the start of the Class Period

(pre-August 2007) were not time barred, whereas those based on contracts purchased after August 2007 were likely time barred, since those plaintiffs were on inquiry notice of their injury by May 29, 2008.[5]  Id.

On May 23, 2013, plaintiffs filed their motion for leave to amend their complaint to include claims based on day-to-day manipulation.  We addressed this motion in LIBOR II, finding that plaintiffs' proposed amendments failed to "adequately allege[] that they suffered an injury as a result of defendants' alleged trader-based conduct, and thus plaintiffs lack[ed] standing under the CEA to pursue such claims."  LIBOR II, 962 F. Supp. 2d at 619.  We also found that "although loss causation is not an element of a commodities manipulation claim, private plaintiffs must still plead actual damages in order to have standing to bring suit under the CEA," a requirement that plaintiffs in this case had not met.  Id. at 619 n.16.  In contrast to the persistent suppression claims, the trader-based

---

[5] The articles that placed plaintiffs on inquiry notice of their injury by May 29, 2008 -- as discussed in LIBOR I -- suggested that LIBOR was fixed at artificial levels beginning in August 2007, which coincided with the start of the financial crisis.  A person of ordinary intelligence reading those articles would therefore not have been on inquiry notice of his injury if he had purchased Eurodollar futures contracts prior to August 2007, as those articles did not indicate LIBOR's artificiality at that time; indeed, he would have likely been put on inquiry notice of his injury only after the publication of the Barclays settlements on June 27, 2012.  These facts lead to the somewhat counterintuitive conclusion that trader-based claims based on contracts purchased before August 2007 would not be time barred, but claims based on contracts purchased after August 2007 would be.  See LIBOR I, 935 F. Supp. 2d at 709.

claims alleged that LIBOR was manipulated in a way that was "episodic and varying in direction." Id. at 620. Plaintiffs therefore needed to plead that they suffered actual damages by plausibly alleging "(1) that they transacted in Eurodollar futures contracts on days on which Eurodollar futures contract prices were artificial as a result of trader-based manipulation of LIBOR, [and] (2) that their positions were such that they were injured." Id. at 620–21. Instead, plaintiffs only offered "broad allegations" that were "insufficient to allege actual damages." Id. at 621. Consequently, plaintiffs' motion for leave to amend their complaint to add allegations of trader-based manipulation of Eurodollar futures contracts was denied.

Plaintiffs then made two further motions. The first, filed on September 6, 2013, was a motion for reconsideration of "that portion of [LIBOR II] denying Exchange-Based Plaintiffs' motion to [amend their complaint] to include allegations based on trader-based manipulation during the period January 1, 2005 through the beginning of August 2007." Pls.' Notice of Mot. for Recons. of the Court's Aug. 23, 2013 Mem. & Order at 1. The second, filed on September 10, 2013, was a motion for leave to file an amended complaint that would include new allegations of

trader-based conduct from pre-August 2007.  Pls.' Sept. 10, 2013 Letter at 3.[6]

It was not until plaintiffs' reply brief on the reconsideration motion that plaintiffs furnished examples of specific dates when plaintiffs traded in Eurodollar futures and were allegedly harmed by artificial LIBOR fixes.  In order to fully explore this issue, we solicited further briefing from both parties, and those sur-replies were filed by October 22, 2013.  Then, while these motions were pending, defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") settled with various government regulators -- including the U.S. Department of Justice and the Commodity Futures Trading Commission -- for conduct relating to LIBOR manipulation.  Again, to ensure a full record, we granted plaintiffs leave to supplement their motion for reconsideration with information obtained from the Rabobank settlement documents.  We also permitted defendants to respond, which they did by January 21, 2014.

---

[6] More precisely, on September 10, 2013, plaintiffs submitted a letter requesting a pre-motion conference to seek leave to amend their operative complaint.  Defendants submitted an opposition letter, and plaintiffs submitted a reply.  In a letter to the parties dated October 8, 2013, we proposed that "given the obvious overlap between the plaintiffs' motion to reargue and the plaintiffs' request for leave to move for leave to amend their complaint," we would "treat the letters on the leave to amend motion as motion papers."  All parties assented to this approach.

To recap, plaintiffs filed in support of their motion for reconsideration a moving brief, a reply, a sur-reply, and a supplemental brief; defendants filed an opposition, a sur-reply, and a supplemental brief of their own. Also fully briefed is plaintiffs' motion for leave to amend their complaint. We address both motions concerning trader-based claims below.

**B.   Analysis**

    1.   Motion for Reconsideration

In LIBOR II, we denied plaintiffs' motion for leave to amend their complaint to include trader-based claims, finding that the claims asserted at that time "could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." LIBOR II, 962 F. Supp. 2d at 619 (quoting Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002)) (internal quotation marks omitted). Plaintiffs now assert that this Court erred in denying leave to add the proposed amendments because they can "address the deficiencies identified by the court and allege facts sufficient to support [their] claim[s]." Panther Partners Inc. v. Ikanos Commc'ns, Inc., 347 F. App'x 617, 622 (2d Cir. 2009). Plaintiffs further maintain that our finding of futility warrants reconsideration because we overlooked two cases from the Southern District of New York, including our own decision in

LIBOR I.   For the reasons stated below, we reject these arguments and deny plaintiffs' motion for reconsideration.

First, plaintiffs' reliance on Panther Partners is misplaced.  Panther Partners has been interpreted not "as an intervening change in the controlling law justifying reconsideration of the denial of leave to amend," but rather as an "affirm[ation] [of] the familiar rule that a district court always has discretion to grant leave to amend . . . ." In re CRM Holdings, 2013 WL 787970, at *8 (citations and internal quotation marks omitted).  Indeed, Panther Partners reiterates that "[g]ranting leave to amend is futile if it appears that plaintiff cannot address the deficiencies identified by the court and allege facts sufficient to support the claim." Panther Partners, 347 F. App'x at 622.  As we stated in LIBOR II, "despite the fact that plaintiffs indisputably have access to their own Eurodollar futures contract trading records, the [Proposed Second Amended Complaint] [was] devoid of any references to particular Eurodollar contracts." LIBOR II, 962 F. Supp. 2d at 621.  Given plaintiffs' access to this necessary information and their failure to incorporate it into their pleadings, it was reasonable for this Court to assume that plaintiffs would be unable to amend their complaint to include allegations of trader-based conduct that could survive a

12(b)(6) motion.    Therefore, <u>Panther Partners</u> is not an appropriate basis for reconsideration of our denial of leave to amend in <u>LIBOR II</u>.

Second, plaintiffs' argument that we failed to consider <u>LIBOR I</u> in reaching our decision in <u>LIBOR II</u> is meritless. Putting aside the absurd notion that this Court failed to consider an opinion that we had written mere months prior, our analysis of plaintiffs' claims has remained consistent: plaintiffs must plead actual damages to state a claim under the CEA.  <u>See</u> 7 U.S.C. § 25(a)(1); <u>LIBOR I</u>, 935 F. Supp. 2d at 714; <u>LIBOR II</u>, 962 F. Supp. 2d at 620.  Plaintiffs inexplicably fail to grasp, however, that claims based on defendants' persistent suppression of LIBOR require different allegations to survive than do those based on day-to-day, trader-based manipulation. In the former scenario, we can assume LIBOR's artificiality over a given time period, which in turn would necessarily impact the price of Eurodollar futures contracts purchased or sold in the relevant window.   In the latter scenario, since LIBOR was allegedly artificial only for discrete days during the Class Period, by their own reckoning, plaintiffs may have transacted on many days when LIBOR was "true."   Moreover, because the manipulation was allegedly varying in direction, there may be some days when plaintiffs were actually <u>helped</u>, rather than

harmed, by the alleged artificiality, depending on their position in the market. Thus, while plaintiffs' damages are "plausible" based on a persistent suppression theory, even without allegations of specific transactions, damages are merely "conceivable" -- and thus insufficiently pled -- if LIBOR was allegedly being manipulated in different directions on different days and plaintiffs fail to provide details of their own positions in the market. Twombly, 550 U.S. at 570 (2007). Notwithstanding plaintiffs' contentions to the contrary, in LIBOR II, we imposed the same requirement for plausible allegations of actual damages as we did in LIBOR I. Plaintiffs twice failed to meet that burden with regard to trader-based claims, a fact in no way obscured by their current attempt to mischaracterize our prior opinions. Such a manufactured contradiction shall not be the basis for reconsideration of our holding in LIBOR II.

Third, plaintiffs' assertion that we overlooked In re Crude Oil Commodities Futures Litigation, 913 F. Supp. 2d 41 (S.D.N.Y. 2012) ("Crude Oil II"), in reaching our decision in LIBOR II fails as well. As a threshold matter, Crude Oil II is not a controlling decision and is therefore an improper basis for granting a motion for reconsideration. See Analytical Surveys, Inc. v. Tonga Partners, L.P., 684 F.3d 36, 52 (2d Cir. 2012)

(quoting Shrader, 70 F.3d at 257) (internal quotation marks omitted) ("[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked."). Moreover, plaintiffs misapprehend the applicability of Crude Oil II to this case. It is true that the manipulation in Crude Oil II, like the alleged trader-based manipulation here, was varying in direction. See Crude Oil II, 913 F. Supp. 2d at 61 (noting that the manipulation alleged "increased and decreased prices at different times"). But the key difference is that the Crude Oil II manipulation was not episodic in the same way as the alleged manipulation here. Whereas in Crude Oil II the Court could reasonably assume that the plaintiffs transacted at artificial prices because "the artificiality lasted for months after the alleged misconduct ended," the same cannot be presumed here. Id.; see also In re Amaranth Natural Gas Commodities Litig., 269 F.R.D. 366, 380 (S.D.N.Y. 2010) (suggesting that "because plaintiffs transacted at artificial prices, injury may be presumed" (emphasis added)). In this case, traders' alleged manipulation of LIBOR operated on a day-to-day basis such that manipulation on any given day would have had no impact on the next day's published LIBOR, and LIBOR on some -- if not most -- days would have been unaffected by the alleged manipulation. Thus, as we indicated in LIBOR II, it was

necessary for plaintiffs to plead that they had transacted on specific days when LIBOR was manipulated, a requirement that is not abrogated by Crude Oil II.

In support of their motion for reconsideration, plaintiffs have relied on obviously flawed arguments, implausibly suggesting that this Court had forgotten its own opinions and that the requirements that we outlined in those opinions were unclear or inconsistent. But before having put pen to paper -- or, as it happens, fingers to keyboard -- in this most recent attempt to shift the blame away from themselves for their insufficient pleadings, plaintiffs' counsel would have done well to consider the words of William Shakespeare: "The fault . . . is not in our stars, [b]ut in ourselves . . . ." William Shakespeare, Julius Caesar act 1, sc. 2. The exchange-based plaintiffs' motion for reconsideration is hereby denied.

  2.   Motion for Leave to Amend

Although their motion for reconsideration must fail, plaintiffs have also made a parallel motion for leave to amend their pleadings to include allegations of trader-based conduct. They claim that they are now able, "under the reasoning of [LIBOR II], [to] identify specific Eurodollar futures trades on days" when plaintiffs can allege actual damages. Exchange-Based Pls.' Mem. of Law in Supp. of Their Mot. for Recons. of the

17

Court's Aug. 23, 2013 Mem. & Order ("Pls.' Trader-Based Mem.") at 4. While the "standard for granting a motion for reconsideration under Local Civil Rule 6.3 is strict," Tiffany (NJ) LLC v. Forbse, No. 11 Civ. 4976(NRB), 2012 WL 3686289, at *5 (S.D.N.Y. Aug. 23, 2012), "[i]t is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971); see also Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000) ("A district court has broad discretion in determining whether to grant leave to amend . . . .").

Given this broad grant of discretion -- as well as the fact that the exchange-based plaintiffs have attempted to plead day-to-day, trader-based manipulation just once before, after the publication of the Barclays settlements[7] -- we will evaluate plaintiffs' latest round of proposed amendments on the merits. See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig., Nos. 06 Civ. 643(GEL), 07 Civ. 8686(GEL), 07 Civ.

---

[7] The posture of this motion stands in sharp contrast to the pleading history of the antitrust claims when we denied plaintiffs leave to amend them. See LIBOR II, 962 F. Supp. 2d at 624-27. That denial followed numerous prior efforts to plead these claims. Thus, denial of leave to amend was appropriate "given the competition to become interim lead counsel, which revealed the experience of the competitors; the number of original complaints that had been filed; and, the obvious motivation to craft sustainable first amended complaints . . . [which] contained the strongest possible statement of plaintiffs' case based on the collective skills of plaintiffs' counsel." Id. at 626. Moreover, not only were the efforts to amend the complaint with regard to antitrust standing "wholly unwarranted," but leave was denied because such amendment would have been futile. Id. at 627.

8688(GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008)
(finding that "[t]o the extent that plaintiffs' submissions now
fill [the] lacuna" identified by the Court, "it would be
shortsighted not to take these developments into account").  As
we have maintained throughout this litigation, plaintiffs must
plead "(1) that they transacted in Eurodollar futures contracts
on days on which Eurodollar futures contract prices were
artificial as a result of trader-based manipulation of LIBOR,
[and] (2) that their positions were such that they were
injured."  LIBOR II, 962 F. Supp. 2d at 620-21.  We find that
finally, after numerous attempts, plaintiffs have met this two-
prong test, but their ability to plead trader-based claims is
nonetheless subject to significant limitations.

First, in light of the content of their most recent
submissions, plaintiffs may advance claims against only Barclays
and Rabobank.  Plaintiffs do not cite a single example from the
Rabobank settlements that implicate any other defendant banks.
With regard to the Barclays settlements, they reveal only that
"Barclays swaps traders communicated with swaps traders at other
Contributor Panel banks . . . about requesting LIBOR . . .
contributions that would be favorable to the trading positions
of Barclays swaps traders and/or their counterparts at other
financial institutions."  Settlement Agreement Between Dep't of

Justice, Criminal Div., and Barclays (June 26, 2012), Appendix A, ¶ 23; see also id. ¶ 24 ("Barclays swaps traders made requests of traders at other Contributor Panel banks for favorable LIBOR or EURIBOR submissions . . . [and] Barclays swaps traders received requests from traders at other banks for favorable LIBOR or EURIBOR submissions from Barclays rate submitters."). These statements provide no basis to impute Barclays's actual conduct to other particular defendants, and there is nothing in the settlement documents that indicate which defendant banks, if any, allegedly submitted manipulated rates along with Barclays. "In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement." Crude Oil I, 2007 WL 1946553, at *6. The bare allegations against the other defendant banks are therefore insufficiently particular to meet the pleading requirements of Twombly and Iqbal, and certainly those of Rule 9(b). Thus, plaintiffs may not, at this stage, amend their complaint to include allegations of day-to-day, trader-based manipulation against defendant banks other than Barclays and Rabobank.

Second, plaintiffs must do more than merely allege that they transacted on days when Barclays and/or Rabobank attempted to manipulate LIBOR. Although we have stated as much before, it bears repeating: as private actors, plaintiffs have a distinct and more demanding pleading burden than does the government. See LIBOR I, 935 F. Supp. 2d at 739 ("[T]here are many requirements that private plaintiffs must satisfy, but which government agencies need not."); LIBOR II, 962 F. Supp. 2d at 621 n.18 ("Whereas a CEA claim brought by the CFTC is focused wholly on defendants' conduct, such that the injury suffered by individual traders is irrelevant, a CEA claim brought by private plaintiffs pursuant to section 22 is focused both on defendants' conduct and on whether that conduct caused plaintiffs' injury." (emphasis in original)). Thus, it is not enough for plaintiffs to assert that Barclays and Rabobank submitted artificial quotes on certain dates; in addition, those quotes must have potentially had an impact on the published LIBOR fix because only then could plaintiffs have plausibly suffered damages.[8]

---

[8] For example, in their reply brief, plaintiffs cite multiple dates when Barclays allegedly submitted either a suppressed LIBOR figure that was ultimately discarded for being too high or submitted an inflated figure that was later discarded for being too low. Claims based on these dates are futile, as it is mathematically impossible for these submissions to have impacted the LIBOR fix. To illustrate: if a suppressed rate was among the four highest submissions and thus discarded, then that bank's "true" submission would have been even higher and therefore also discarded. In such a scenario, the manipulation had no impact, as the bank's submission was not factored into the calculation of LIBOR either way. Plaintiffs try to salvage these claims by maintaining that "if the submitters from other banks

Third, plaintiffs may not include claims for trader-based manipulation that fall outside the January 2005–August 2007 window, as they have repeatedly attempted to do.  See, e.g., Pls.' Trader-Based Reply at 4; Exchange-Based Pls.' Supplemental Mem. of Law Regarding Rabobank and in Further Supp. of Their Mot. for Recons. of the Court's Aug. 23, 2013 Mem. & Order ("Pls.' Rabobank Mem.") at 6; Tr. of Oral Arg. 10:21–11:16. Even putting aside the statute of limitations bars, see Part IV infra, the scope of the motion for leave to amend was limited to the time period before August 2007.  See Pls.' Sept. 10, 2013 Letter at 1, 3.  It would be manifestly unjust and contrary to established practice to allow plaintiffs to "shift the goalposts" and add amendments that fall outside the time period that was the focus of the initial motion.  Cf. Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").  Therefore, plaintiffs may amend their complaint to include claims of trader-based manipulation based only on conduct that allegedly occurred between January 2005 and August 2007.

---

manipulated LIBOR more aggressively" than Barclays or Rabobank on those dates, then the rate itself would have actually been impacted.  Exchange-Based Pls.' Reply Mem. of Law in Further Supp. of Their Motion for Recons. of the Court's Aug. 23, 2013 Mem. & Order ("Pls.' Trader-Based Reply") at 2 (emphasis added).  But any assertion that other defendants manipulated their submissions more aggressively than did Barclays or Rabobank is purely speculative and has no basis in the settlement documents.

Once we apply the foregoing restrictions to plaintiffs' proposed amendments, a limited number of examples of day-to-day, trader-based manipulation remain[9]:

---

[9] See Pls.' Trader-Based Reply at 3-5; Pls.' Sur-Reply of Oct. 15, 2013 ("Pls.' Sur-Reply") Ex. C; Pls.' Rabobank Mem. at 3, 5-7.

| Date | Bank | Direction of Alleged Request | Quartile Position | Plaintiff Harmed | Plaintiff Position[10] |
|---|---|---|---|---|---|
| 9/29/05 | Barclays | Upward | Upper | Atlantic Trading | Seller |
| 4/7/06 | Barclays | Downward | Lower | Atlantic Trading & 303030 Trading | Buyer |
| 6/30/06 | Rabobank | Upward | Inter-quartile | Atlantic Trading | Seller |
| 8/17/06 | Rabobank | Downward | Lower | Atlantic Trading | Buyer |
| 9/1/06 | Rabobank | Upward | Lower | Atlantic Trading & 303030 Trading | Seller |
| 10/26/06 | Barclays | Downward | Lower | Atlantic Trading | Buyer |
| 11/29/06 | Rabobank | Upward | Lower | Atlantic Trading | Seller |
| 12/22/06 | Barclays | Downward | Lower | Atlantic Trading | Buyer |
| 2/28/07[11] | Barclays | Upward | Upper | Atlantic Trading | Seller |
| 7/30/07 | Barclays | Upward | Upper | Atlantic Trading | Seller |
| 8/6/07[12] | Barclays | Upward | Upper | Atlantic Trading | Seller |

[10] On dates when LIBOR was allegedly manipulated upward, the price of Eurodollar futures contracts would have been suppressed and it would have been disadvantageous to be a seller; by contrast, if LIBOR was suppressed, then contract prices would have increased and a net buyer would be harmed.

[11] Defendants claim that plaintiffs fail to "allege that this purported request was ever relayed to any submitter." Defs.' Sur-Reply Mem. of Law in Further Opp'n to the Exchange-Based Pls.' Motion for Recons. ("Defs.' Sur-Reply") at 6 n.7. However, the complaint implies that this request to inflate LIBOR was heeded, as the recipient responded to the request by stating that he would relay the message "right away." Exchange-Based Pls.' Second Consolidated Am. Compl. ("Exchange-Based SAC") ¶ 243.

[12] Defendants concede that this date falls within the acceptable time period for plaintiffs' trader-based claims. See Defs.' Sur-Reply at 6.

As circumscribed, the proposed amendments meet the two-prong test articulated by this Court in LIBOR I.  First, these examples sufficiently demonstrate that plaintiffs traded on days when LIBOR was impacted by trader-based manipulation.  Although plaintiffs cannot be certain that LIBOR was artificial on the aforementioned dates, as Barclays and Rabobank are but two of sixteen submitters on a given day, it is certainly plausible that the published fix deviated from what otherwise would have been "true" LIBOR as a result of those banks' conduct.[13] Therefore, even if Barclays and Rabobank acted alone, plaintiffs have plausibly pled that their conduct impacted the rate. Second, on each of the dates listed, there is a named plaintiff whose activity in the Eurodollar futures market was such that it was plausibly harmed by the alleged manipulation.  As a result, based on the test for actual damages that we have maintained throughout this litigation, the addition of claims for trader-based manipulation that are as particular as the ones enumerated in the chart above would not be futile.  We therefore grant plaintiffs leave to add such claims to their complaint.

---

[13] For example, on the first date listed above, September 29, 2005, Barclays submitted a quote of 4.0700, the highest of any panel bank.  See Pls.' Sur-Reply Ex. A.  On that same date, according to the Barclays settlement, a trader requested an inflated submission.  Exchange-Based SAC ¶ 186.  Had Barclays instead submitted a rate that was the average of the other fifteen submissions, which we calculate to have been 4.0540, the published LIBOR would have been lower: 4.0536 as opposed to the actual published rate of 4.0544.  See Pls.' Sur-Reply Ex. A.

In reaching this conclusion, the Court has considered and rejected defendants' opposition arguments.  For instance, defendants assert that even if Barclays and Rabobank were able to alter LIBOR on a given date based on their individual submissions, the incremental change as a result of the manipulation would have been too small to actually impact the published rate.  See Defs.' Sur-Reply at 6 & n.11.  It is true that the minimum price increment for Eurodollar futures contracts is one quarter of an interest rate basis point, and none of plaintiffs' examples suggest that Barclays or Rabobank could have manipulated LIBOR one quarter of an interest rate basis point on their own.  See id.; Frederick Sturm, Eurodollar Futures:  The  Basics  at  2  (Sept.  2011),  available  at http://www.cmegroup.com/trading/interest-rates/files/eurodollar-futures-the-basics.pdf.  However, we find it plausible that manipulation of less than the Eurodollar futures contract price increment could have impacted the published LIBOR fix, and thus the contract price itself, because of the use of rounding in calculating the LIBOR fix.[14]  Thus, even if the magnitude of

---

[14] For example, if LIBOR on a given date was 4.0010, when rounded to the nearest one quarter of an interest rate basis point, it would become 4.0000, and the contract price pegged to LIBOR would be 100 - 4.0000 = 96.0000.  If LIBOR was manipulated upward in this example by merely one twentieth of an interest rate basis point (0.0005), then: LIBOR would be 4.0015; it would round to 4.0025; and the contract price would be 100 - 4.0025 = 95.9975.  If a plaintiff was a net seller on that date, the manipulation would have caused a loss, as it would have received a lower price for the contracts it sold.

Barclays's and Rabobank's alleged manipulation did not equal the Eurodollar futures contract price increment, plaintiffs may still have experienced a loss due to these defendants' conduct.

Defendants further argue that none of "the hypothetical minuscule changes to LIBOR" resulting from trader-based conduct could have possibly impacted plaintiffs' future behavior in such a way as to have resulted in actual damages. Defs.' Sur-Reply at 7. However, it would be too demanding, at this stage of the litigation, to require plaintiffs to plead all the ways in which an artificial LIBOR on a particular date caused them harm. Instead, it is sufficient for plaintiffs to plead that they were either net purchasers of contracts on days when LIBOR plausibly was suppressed, even by a small amount, or that they were net sellers on days when LIBOR plausibly was inflated -- put simply, plaintiffs may plead that they either paid too much for Eurodollar futures contracts on certain dates or earned too little by selling them. That is what plaintiffs have done for the dates listed above, and it is why we now find that the possibility that they sustained some actual damages rises "above the speculative level." Twombly, 550 U.S. at 555. Accordingly, claims based on plaintiffs' activity in the Eurodollar futures market that are pled with the level of specificity as those in the chart above would not be ripe for dismissal.

27

Although we have permitted plaintiffs to amend their complaint as specified, they still face many hurdles before recovery; chief among them, plaintiffs must demonstrate that they actually sustained damages as a result of defendants' improper conduct, a burden that "pose[s] a serious challenge." LIBOR I, 935 F. Supp. 2d at 719.  However, with their latest round of briefing, plaintiffs have finally articulated a claim that trader-based manipulation at least plausibly caused them actual injury.  Thus, plaintiffs' motion for leave to amend their complaint is granted insofar as they may add allegations, comporting with the standards outlined above, of day-to-day, trader-based manipulation against defendants Barclays and Rabobank based on conduct that occurred between January 2005 and August 2007.

**III. Scienter**

    **A.  Procedural Background**

In LIBOR I, we found that the exchange-based plaintiffs "adequately alleged that defendants manipulated the price of Eurodollar contracts and that this manipulation caused [plaintiffs] actual damages."  LIBOR I, 935 F. Supp. 2d at 719. To reach this conclusion, we applied the Second Circuit's four-part test for pleading manipulation under the CEA: a plaintiff must show "(1) that [defendant] had the ability to influence

market prices; (2) that [he] specifically intended to do so; (3) that artificial prices existed; and (4) that [defendant] caused the artificial prices." DiPlacido v. Commodity Futures Trading Comm'n, 364 F. App'x 657, 661 (2d Cir. 2009) (citation omitted). With regard to the second element -- scienter -- we determined that "plaintiffs plausibly allege[d] that defendants specifically intended to manipulate the price of Eurodollar futures contracts," as they were in a position to gain "concrete benefits" from the manipulation. LIBOR I, 935 F. Supp. 2d at 715. Further evidence of these potential concrete benefits emerged from the Barclays settlement documents, the contents of which "do not describe merely a generalized interest in appearing profitable, but rather identify concrete economic benefits that defendants stood to gain from manipulating the price of Eurodollar futures contracts." Id. Thus, based on plaintiffs' "showing that the defendants had both motive and opportunity" to manipulate the prices of Eurodollar futures contracts, we found that the scienter element of the manipulation test was satisfied.[15] Id.

---

[15] We also recognized that, while plaintiffs were required to satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b), the requirements were somewhat relaxed for their allegations of persistent suppression of LIBOR. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007). "Although plaintiffs ha[d] not identified precisely how each LIBOR quote from each defendant on each day during the Class Period was or was not artificial," we found that they could not have reasonably been expected to do so at this early stage of litigation. LIBOR I, 935 F. Supp.

In <u>LIBOR II</u>, defendants moved for reconsideration of our holding that plaintiffs had adequately pled scienter, and the authority that defendants cited "rais[ed] serious question[s] regarding whether plaintiffs' allegations [were] sufficient." <u>LIBOR II</u>, 962 F. Supp. 2d at 616.  In particular, we expressed concerns about plaintiffs' argument that motive, for scienter purposes, could be established at the pleadings stage based on defendants' holding significant positions in the Eurodollar futures market.  <u>Id.</u> at 616–17 (citing <u>In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.</u>, No. 11 Md. 2213(RPP), 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ("<u>Silver Futures I</u>");[16] <u>Crude Oil I</u>, 2007 WL 1946553).  Furthermore, we rearticulated our view that we did not "accept the notion that intentionally submitting false LIBOR quotes is tantamount to intending to manipulate Eurodollar futures contracts," especially given plaintiffs' allegations that "one of the primary goals of each defendant in submitting false LIBOR quotes was to protect the market's perception of that defendant's financial health." <u>Id.</u> at 616 n.8.

---

2d at 716.  Therefore, the relative lack of specificity was no impediment to pleading persistent suppression throughout the Class Period.

[16] The Second Circuit affirmed this decision.  <u>In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.</u>, No. 13-1416-CV, 2014 WL 1243851 (2d Cir. Mar. 27, 2014).

At that time, we denied defendants' motion for reconsideration without prejudice because there were issues that had not been adequately briefed. We advised defendants that, if they decided to refile, they should address three questions. First, we asked for more extensive briefing on whether plaintiffs had adequately pled scienter. Id. at 618. At the time, we understood this question to have two subparts: (1) whether plaintiffs' allegation that defendants held positions in the Eurodollar futures market was sufficient to plead scienter, and (2) given the multiple motives that plaintiffs had pled for defendants' actions in suppressing LIBOR, what burden did plaintiffs bear in pleading that defendants' actions were actually motivated by a desire to profit in the Eurodollar futures market. Id. at 618 n.13. Second, assuming that plaintiffs had failed to properly plead scienter, we asked whether plaintiffs' informational handicaps should have lessened their pleading burden. Id. at 618-19. And third, to the extent that both previous questions were answered in the negative, we sought briefing on whether this analysis should be applicable to all defendants. Id. at 619. Defendants then refiled their motion for reconsideration of the scienter issue on September 20, 2013, and the motion was fully briefed by October 17, 2013.

31

**B.   Analysis**

In their complaint, the exchange-based plaintiffs make two sets of allegations against defendants: (1) persistent suppression of LIBOR throughout the Class Period and (2) day-to-day, trader-based manipulation.  Both sets of claims are brought pursuant to the Commodity Exchange Act ("CEA"), which prohibits any person from "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce."  7 U.S.C. § 13(a)(2).  To state a claim for manipulation under the CEA, a plaintiff must plead that defendants "specifically intended" to cause the artificiality that existed in the relevant market.  In re Amaranth Natural Gas Commodities Litig., 730 F.3d 170, 183 (2d Cir. 2013).  This specific intent requirement, also known as scienter, "may be alleged generally," Fed. R. Civ. P. 9(b), though plaintiffs must still allege facts that "give rise to a strong inference of scienter," In re Amaranth Natural Gas Commodities Litig., 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) ("Amaranth II") (emphasis in original) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323 (2007)).  Plaintiffs may plead scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

32

recklessness." Crude Oil I, 2007 WL 1946553, at *8 (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006)) (internal quotation marks omitted); see also Laydon v. Mizuho Bank, Ltd., No. 12-cv-3419 (GBD), 2014 WL 1280464, at *5 (S.D.N.Y. Mar. 28, 2014) (same).

The first issue is whether plaintiffs' allegations that defendants held positions in the Eurodollar futures market are sufficient to plead scienter under either prong. We find that they are not. "[M]arket power by itself is not enough to establish a CEA violation." In re Commodity Exch., Inc. Silver Futures & Options Trading Litig., No. 13-1416-CV, 2014 WL 1243851, at *2 (2d Cir. Mar. 27, 2014) ("Silver Futures II"). A theory of scienter that consists of "stating that defendants had a large presence in the [relevant] market" amounts to only "a generalized motive . . . [which] is insufficient to show intent." Crude Oil I, 2007 WL 1946553, at *8. In order to create a strong inference of scienter, allegations of market presence must be coupled with pleading "specific actions which exhibited an actual intent to bring about" the manipulation at issue. Silver Futures I, 2012 WL 6700236, at *10, aff'd, Silver Futures II, 2014 WL 1243851. Thus, plaintiffs' allegation that defendants held positions in the Eurodollar futures market is

not, in and of itself, sufficient to plead the requisite
scienter under the CEA.

Having found it insufficient to plead merely that
defendants held positions in the Eurodollar futures market, we
next ask what burden plaintiffs bear in pleading that
defendants' LIBOR submissions were actually motivated by a
desire to profit from Eurodollar futures contracts. For their
claim to survive, plaintiffs must plead either: (1) that
defendants were motivated by their desire to profit in the
Eurodollar futures market and had the opportunity to influence
the price of contracts, or (2) that defendants consciously or
recklessly manipulated the price of Eurodollar futures contracts
through their LIBOR submissions.

We first consider whether plaintiffs have sufficiently
pled scienter via the motive and opportunity prong. The
complexity in applying this theory to the case at bar arises
because of plaintiffs' allegation that all defendants had two
coexisting motives for submitting artificially low LIBOR figures
to the British Bankers' Association ("BBA"): (1) to protect
their reputations and appear financially stable <u>and</u> (2) to
profit in the Eurodollar futures market. <u>See</u> Exchange-Based
Pls.' Second Consolidated Am. Compl. ("Exchange-Based SAC") ¶¶
73-78. We recognize that plaintiffs are entitled to plead in

the alternative or even inconsistently. Fed. R. Civ. P. 8(d)(2)-(3). However, the ability to plead in the alternative does not obviate the need for each of plaintiffs' motive allegations to be "plausible on its face." Twombly, 550 U.S. at 570; see also TechnoMarine SA v. Jacob Time, Inc., No. 12 Civ. 0790(KBF), 2012 WL 2497276, at *2 (S.D.N.Y. June 22, 2012) ("While a plaintiff may assert claims in the alternative, doing so does not relieve it of its burden to raise a reasonable expectation that discovery will reveal evidence of illegality for each claim asserted.") (internal quotation marks omitted); In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 406 (S.D.N.Y. 2001) (noting that the ability to plead in the alternative "cannot be construed as an invitation to incoherent, self-contradictory pleadings").

Put simply, plaintiffs' dual motive assertions as to all defendants are implausible. Throughout this litigation, the parties have consistently maintained that "defendants were competitors outside the BBA." LIBOR I, 935 F. Supp. 2d at 688; see also LIBOR II, 962 F. Supp. 2d at 627 ("[P]laintiffs have identified a market in which defendants are, in fact, competitors."). With this in mind, it is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period and that those

positions, in turn, motivated their daily LIBOR submissions. There may be a single defendant, or some subset of defendants, that held trading positions such that a suppressed LIBOR quote both aided its reputation and generated profit for the bank in the Eurodollar futures market. But the notion that all defendants were positioned in such a way as to benefit from the unidirectional movement of LIBOR at all times during the Class Period is belied by the fact that they were competitors. And if defendants held different positions, then it is implausible that their motives regarding the Eurodollar futures market were uniformly aligned. The far "more likely explanation[]" is that, to the extent all defendants engaged in parallel manipulation of LIBOR, the conduct was motivated by reputational concerns, not by the banks' positions in the Eurodollar futures market. Iqbal, 556 U.S. at 681. Thus, plaintiffs have failed to plead specific intent under the motive and opportunity prong.

Given the implausibility of plaintiffs' motive allegations, we now consider whether plaintiffs have adequately pled scienter through the conscious misbehavior or recklessness prong. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."

36

Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).  To plead scienter based on conscious misbehavior or recklessness, "plaintiffs must allege facts supporting an inference that defendants deliberately or recklessly engaged in illegal conduct . . . [or] conduct that is highly unreasonable and 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). "Thus, an express allegation of deliberate misconduct can be sufficient to plead scienter." Amaranth II, 612 F. Supp. 2d at 383.

In LIBOR II, we rejected plaintiffs' assertion that they had pled scienter through evidence of defendants' conscious misbehavior or recklessness. See LIBOR II, 962 F. Supp. 2d at 615 n.7 (finding that plaintiffs did not satisfy the conscious misbehavior or recklessness standard because the "only alleged action of defendants that might qualify as 'conscious misbehavior or recklessness' is their alleged submission of artificial LIBOR quotes to the BBA . . . [and] merely submitting artificial LIBOR quotes does not by itself indicate an intent to

manipulate Eurodollar futures contract prices"). However, upon further reflection, we now reach a different conclusion.

First, plaintiffs have more than adequately pled that defendants "consciously misbehaved" by submitting artificial LIBOR quotes to the BBA. See, e.g., Exchange-Based SAC ¶¶ 72-121 (documenting this conduct under the headline "Defendants Misreported LIBOR During The Class Period"). Second, plaintiffs have also pled that the "danger" of submitting artificial LIBOR quotes -- the manipulation of the price of Eurodollar futures contracts -- was either known to the defendant banks or so obvious that they must have been aware of it. See, e.g., id. ¶ 449 ("Each Defendant well knew, from its financial sophistication and its familiarity with CME Eurodollar futures contracts . . . that such contracts traded with reference, and settled to, USD-LIBOR."). We still find it implausible that all defendants acted with the common motive of profiting off Eurodollar futures contracts, but it is plausible that all defendants, regardless of their positions in the market, manipulated LIBOR for reputational purposes while knowing that such conduct would impact the price of Eurodollar futures. Therefore, we find that plaintiffs have adequately pled scienter based on a conscious misbehavior or recklessness theory.

38

Defendants argue that knowledge is not enough.  See Reply Mem. of Law in Further Supp. of Mot. for Recons. of Mar. 29, 2013 Order on Mot. to Dismiss at 4; Tr. of Oral Arg. 63:12-13 ("[M]ere knowledge of an effect is not enough to satisfy the intent requirement.").  We agree that "only intent, not knowledge, can transform a legitimate transaction into manipulation."  Amaranth I, 587 F. Supp. 2d at 539 (S.D.N.Y. 2008) (emphasis added); see also Silver Futures II, 2014 WL 1243851, at *2.  Such an intent requirement in that context makes sense: when a defendant's conduct is potentially legitimate, a plaintiff should have a greater burden in demonstrating that the conduct was actually manipulative.  But this case does not concern defendants' legitimate transactions.  Because the conduct alleged has no legitimate purpose,[17] plaintiffs need not demonstrate that defendants acted with bad intent to distinguish the complained of conduct from potentially lawful activity.  Rather, it may suffice for plaintiffs to allege that defendants knowingly engaged in unquestionably illegitimate conduct while fully comprehending the consequences in the market.  See In re Natural Gas Commodity Litig., 358 F.

---

[17] This Court has noted that the submission of false LIBOR quotes alleged by plaintiffs, regardless of the motive, is not legitimate activity.  See LIBOR I, 935 F. Supp. 2d at 716 ("[T]here is no question that the manipulation of LIBOR alleged in the amended complaint . . . was not a legitimate part of how LIBOR was fixed or Eurodollar contracts were priced.") (internal quotation marks omitted).

Supp. 2d 336, 344-45 (S.D.N.Y. 2005) (finding that allegations that defendants knowingly delivered false reports to trade publications were sufficient to state a CEA claim).

In sum, plaintiffs have pled that: (1) defendants knew that they were submitting inaccurate LIBOR quotes, (2) defendants understood the impact on Eurodollar futures contract prices from doing so, and (3) there is no conceivably legitimate purpose for submitting inaccurate LIBOR quotes. Taken together, these three factors demonstrate defendants' "conscious misbehavior or recklessness." As a consequence, plaintiffs have pled scienter as to all defendants under the CEA, and defendants' motion for reconsideration is denied.[18]

## IV. Statute of Limitations

The question of whether some of the exchange-based plaintiffs' CEA claims are barred by the applicable statute of limitations has been an issue since the earliest motions to dismiss, occupying forty pages of our opinion in LIBOR I. To summarize, at the outset, we determined that a "discovery accrual rule" was applicable to claims under the CEA wherein "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." Koch v. Christie's Int'l

---

[18] Because we find that plaintiffs have adequately pled scienter, we need not address the question of whether informational handicaps lessen plaintiffs' pleading burden.

PLC, 699 F.3d 141, 149 (2d Cir. 2012) (quoting Rotella v. Wood, 528 U.S. 549, 555 (2000)) (internal quotation marks omitted). Applying the corollary doctrine of "inquiry notice," a court must "ask at what point the circumstances were such that they 'would suggest to [a person] of ordinary intelligence the probability that she has been defrauded.'" LIBOR I, 935 F. Supp. 2d at 698 (quoting Koch, 699 F.3d at 151). After reviewing the numerous articles which suggested that LIBOR had been at artificial levels since the start of the Class Period, we concluded that the plaintiffs were on inquiry notice no later than May 29, 2008.

Utilizing that date and the applicable two-year statute of limitations under the CEA, we divided the Class Period into three segments: (1) the start of the Class Period until the date of inquiry notice, i.e. August 2007 to May 29, 2008 ("Period 1"); (2) the day after inquiry notice was triggered until two years and one day before the complaint was filed, i.e. May 30, 2008 to April 14, 2009 ("Period 2"); and (3) two years before the filing of the complaint through the end of the Class Period, i.e. April 15, 2009 to May 2010 ("Period 3"). We found that claims based on contracts entered into during Period 1 were time barred, having not been brought within two years of inquiry notice, whereas claims based on contracts purchased during

Period 3 had been brought within two years of inquiry notice and were therefore timely.[19]  Id. at 711-12.  As for those claims based on contracts purchased during Period 2, we stated that we could not reach a decision based on the information available to us at that time.  Our decision in LIBOR I also rejected exchange-based plaintiffs' claims that they could have reasonably relied on the reassurances of the BBA and defendants themselves to dissipate their duty of inquiry, as well as their assertion that the statute of limitations under the CEA should be tolled due to fraudulent concealment.  See id. at 705, 709.

In LIBOR II, we observed that defendants in their briefs seemed to argue that we should dismiss "persistent suppression" claims based on contracts entered into at times other than Period 1.  LIBOR II, 962 F. Supp. 2d at 624.  Thereafter, we granted defendants' request for leave to make a renewed motion to dismiss Period 2 claims.  That motion, to which we will soon turn, was filed on September 20, 2013.[20]

---

[19] Although inquiry notice was triggered on May 29, 2008, we found that because "a plaintiff cannot discover his injury until he has been injured," Period 3 plaintiffs "could not have been on inquiry notice of their claims any earlier than the date on which they purchased their contracts."  Id. at 712.  Thus, claims based on contracts purchased on or after April 15, 2009 were not time barred.

[20] In LIBOR I, we granted plaintiffs leave to add allegations from the Barclays settlement with respect to trader-based claims in the context of the statute of limitations issue.  LIBOR I, 935 F. Supp. 2d at 709-10.  The briefing on the current motion is not addressed to trader-based claims but to broader claims of persistent suppression of LIBOR.  Plaintiffs did not seek,

However, before we resolve the motion properly before the Court, we will address plaintiffs' attempt, without the support of a timely motion, to reargue our decision in <u>LIBOR I</u> on Period 1 claims.  Apart from any procedural flaw, of which there are several, plaintiffs' effort does not approach the substantive standard to sustain a motion to reargue.  At the outset, we have no intention of addressing plaintiffs' recycled arguments that we resolved in <u>LIBOR I</u>.  While they claim to have amended their pleading, again without leave, "to include many new allegations related to Period 1," plaintiffs, in reality, have proffered just three new articles for the Court's consideration.  Mem. of Law in Opp'n to Defs.' Renewed Mot. to Dismiss the Exchange-Based Pls.' Period 2 CEA Claims ("Pls.' Period 2 Opp'n") at 6.  These few articles do not change our calculus: despite plaintiffs' interpretations to the contrary, each of these articles references the ongoing questions about the reliability of LIBOR,[21] and they certainly would not, in the context of the

_____

and we did not grant, leave to reargue our decision from <u>LIBOR I</u> that claims arising from contracts purchased during Period 1 were time barred.

[21] Rosa M. Abrantes-Metz et al., <u>LIBOR Manipulation?</u>, Aug. 4, 2008, at 2 (noting that despite their conclusion that "the evidence found is inconsistent with an effective manipulation of [LIBOR]," "some questionable patterns exist with respect to the banks' daily Libor quotes"); Terry Belton et al., <u>The Outlook for Libor</u>, JPMorgan, May 16, 2008, at 1 (issuing a report for JPMorgan Chase which described LIBOR as a "besieged benchmark" and referencing the widely held belief that LIBOR was "too low relative to actual bank borrowing rates due to systemic bias on the part of contributors" to the LIBOR panel); Jacob Gyntelberg & Philip Wooldridge, <u>Interbank rate fixings during the recent turmoil</u>, BIS Quarterly Review, Mar. 3, 2008, at 59

surfeit of publicly available information suggesting LIBOR manipulation during Period 1, have dissipated an ordinary investor's duty of inquiry.  See LIBOR I, 935 F. Supp. 2d at 700-04 (reviewing the multitude of articles that triggered inquiry notice during Period 1).  There is, however, one aspect of plaintiffs' memorandum addressed to our decision in LIBOR I that is worthy of further discussion.

Apparently not fully appreciating the consequences for their case on the merits, plaintiffs suggest that the articles relied upon by this Court focused only on false LIBOR reports, rather than on manipulated Eurodollar futures contracts prices, and that those articles were therefore insufficient to place plaintiffs on inquiry notice.  Pls.' Period 2 Opp'n at 5 n.5. However, that the LIBOR fix directly impacts the price of Eurodollar futures contracts is not only a fact, but is also the centerpiece of plaintiffs' CEA claims.  See, e.g., Exchange-Based SAC ¶ 182 (citing evidence that several banks manipulated LIBOR with "the express purpose of manipulating Eurodollar futures"); id. ¶ 271 ("Each Defendant knew that such extensive misreporting [of LIBOR] was manipulating Eurodollar futures contract prices.").  Moreover, plaintiffs' complaint acknowledges that an ordinary investor would have made a direct

_____

(acknowledging that there were "questions about the reliability of rate fixings purported to represent conditions" in the interbank markets).

connection between LIBOR and the price of a Eurodollar futures contract.  See, e.g., id. ¶ 159 (claiming that a change in LIBOR would have communicated information to "the reasonable person of ordinary intelligence who was thinking of investing in Eurodollar futures").  Thus, plaintiffs' argument that defendants must produce articles that explicitly discuss Eurodollar futures manipulation and not simply possible LIBOR manipulation would, if accepted, undermine the claims asserted in the complaint and is utterly meritless for the purposes of our statute of limitation analysis.

In short, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case unless cogent and compelling reasons militate otherwise."  Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002)) (internal quotation marks omitted). Here, the arguments offered by plaintiffs are less than cogent and far from compelling.  Having not been persuaded that our decision in LIBOR I was incorrect, we reaffirm our decision that claims brought by plaintiffs based on contracts purchased during Period 1 are time barred under the CEA.

We turn now to the motion that is properly before this Court: whether exchange-based plaintiffs' claims arising out of

contracts purchased between May 29, 2008 and April 14, 2009 -- during Period 2 -- are timely.  Based on "the totality of the objective evidence," we find that they are not.  Woori Bank v. Merrill Lynch, 923 F. Supp. 2d 491, 497 (S.D.N.Y. 2013).

When we declined to dismiss Period 2 claims in LIBOR I, we assumed that Period 2 investors had not purchased contracts earlier than Period 2 and therefore "may not have had reason to follow LIBOR-related news."  LIBOR I, 935 F. Supp. 2d at 712. However, there is now some dispute as to whether there are actually any plaintiffs who purchased Eurodollar futures contracts during Period 2 who had not previously transacted during Period 1.  Defendants maintain that "all named Plaintiffs traded during Periods 1 and 2, and were thus on inquiry notice as of May 29, 2008."  Mem. of Law in Supp. of Defs.' Renewed Mot. to Dismiss the Exchange-Based Pls.' Period 2 CEA Claims at 9.  Defendants are correct that our analysis must hinge on whether there exists a named plaintiff, not merely a hypothetical or an unnamed plaintiff, that first transacted during Period 2.  See In re Initial Public Offering Sec. Litig., 214 F.R.D. 117, 122–23 (S.D.N.Y. 2002) ("If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim.") (emphasis in

46

original) (citation and internal quotation marks omitted). Plaintiffs counter that "several individual funds, which assigned their claims to [named] Plaintiff Metzler, only transacted in Eurodollar futures contracts after May 2008." Pls.' Period 2 Opp'n at 22; see also Tr. of Oral Arg. 29:3–15. We need not resolve the factual question of whether there are, in fact, any named plaintiffs who first transacted during Period 2 since, in any event, all claims based on contracts purchased during Period 2 would be time barred.

We address first those plaintiffs who purchased Eurodollar futures contracts in Period 2 after also having done so during Period 1. We begin with the proposition that it would be nonsensical to assume that the minds of Period 1 purchasers -- who were on inquiry notice -- were wiped clean and became blank slates before they transacted against during Period 2. See Shah v. Meeker, 435 F.3d 244, 252 (2d Cir. 2006) (finding that it was unreasonable for a plaintiff to rely on the price of stock after he was already on inquiry notice of the company's fraudulent practices). Thus, for their claims to survive, plaintiffs who purchased contracts in Period 1 have the burden of demonstrating that their duty to inquire dissipated; defendants are not required to prove that the information made public during Period 2 reached some critical mass to create inquiry notice anew.

47

To determine whether plaintiffs' duty to inquire dissipated during Period 2, we examine (1) the significance of the disclosed problems, (2) how likely it is that those problems are of a recurring nature, and (3) how substantial are the reassurances announced to avoid their recurrence.  LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 155 (2d Cir. 2003).  Each of these prongs supports the conclusion that inquiry notice did not dissipate.  First, there is no question that the alleged problems were significant: as plaintiffs themselves plead in their complaint, "given the vast universe of financial instruments LIBOR impacts, 'even a small manipulation' of the rate 'could potentially distort capital allocations all over the world.'"  Exchange-Based SAC ¶ 12 (quoting Rosa M. Abrantes-Metz & Albert D. Metz, How Far Can Screens Go in Distinguishing Explicit from Tacit Collusion?  New Evidence from the Libor Setting, CPI Antitrust Chronicle, March 2012).  Second, as illustrated below, much of the information published during Period 2 suggested the problems with LIBOR that had emerged during Period 1 would likely be "of a recurring nature" because financial authorities were doing very little to prevent the continued manipulation of the rate:

| Author | Title[22] | Publication | Date |
|---|---|---|---|
| Michael Mackenzie & Gillian Tett | "Libor Remarks Fail to Put Unease to Rest" | Financial Times | June 2, 2008 |
| Gavin Finch & Ben Livesey | "Libor Overhaul May Fail to Restore Confidence in Rate" | Bloomberg | June 11, 2008 |
| Laurence Norman | "Changes to Libor Rejected -- U.K. Bankers Group Sticks to Definition of Rate Benchmark" | Wall Street Journal | August 6, 2008 |
| Justin T. Wong | LIBOR Left in Limbo; A Call for More Reform | North Carolina Banking Institute[23] | February 22, 2009 |

Third, to the extent that there were any reassurances, they were not substantial enough to assuage the concerns of an ordinary investor. In addition to the aforementioned articles, all of which criticized the inaction of the BBA in addressing the potential ongoing manipulation of LIBOR, other articles

---

[22] There are numerous quotes in these articles referencing the inaction of key actors in preventing ongoing LIBOR manipulation, but we believe that the titles of these articles sufficiently convey this point.

[23] While we recognize that the North Carolina Banking Institute is not as readily available a news source as is the Financial Times, Bloomberg, or the Wall Street Journal, we cite it here because plaintiffs quote the above-mentioned article from that journal in their complaint. See Exchange-Based SAC ¶¶ 125, 149. In the article, the author asserts that "[t]he BBA's recent revisions to LIBOR did not fundamentally change its calculation and do not address lingering questions about contributing banks' incentives to provide false information." Justin T. Wong, LIBOR Left in Limbo; A Call for More Reform, 13 N.C. Banking Inst. 365, 383 (2009).

expressed serious doubts that the calculation of the rate was going to change in a significant way:

| Author | Title | Publication | Date |
|---|---|---|---|
| Carrick Mollenkamp & Laurence Norman | "British Group Largely Maintains Libor Procedures" | Wall Street Journal | May 31, 2008 |
| Adam Bradbery | "Libor Revamp Is Urged by Money-Market Group" | Wall Street Journal | July 11, 2008 |
| Laurence Norman & Deborah Lynn Blumberg | "2nd UPDATE: BBA Rejects Key Proposals For Libor Process Change" | Dow Jones International News | August 5, 2008 |

Despite the existence of these articles, plaintiffs argue that inquiry notice dissipated due to "the BBA's numerous, specific protestations of innocence" and defendants' "own statements of reassurance." Pls.' Period 2 Opp'n at 14-15. This argument is unavailing. The popular press during Period 2 recognized that these reassurances rang hollow in light of the BBA's continued failure to implement meaningful changes to the management of LIBOR, and there is no reason to believe that a reasonable investor during Period 2 would have given the statements any credence. Plaintiffs' selective citations to statements by the BBA and defendants do not obscure the fact that, when confronted with the BBA's inaction, an ordinary

investor's concerns about the accuracy of LIBOR would not have dissipated, but endured.

Furthermore, plaintiffs' contention that their situation is "virtually identical" to that of the plaintiffs in In re SCOR Holding (Switzerland) AG Litigation, 537 F. Supp. 2d 556 (S.D.N.Y. 2008), is unpersuasive.  Pls.' Period 2 Opp'n at 23; see also Tr. of Oral Arg. 31:23-32:23.  In SCOR Holding, the plaintiffs were found to have been put on inquiry notice of the alleged under-reserving practices of Converium Holding AG ("Converium"), a reinsurance company, on November 19, 2002.  See In re Converium Holding AG Sec. Litig., No. 04 Civ. 7897(DLC), 2006 WL 3804619, at *17 (S.D.N.Y. Dec. 28, 2006).  The defendants in that case argued that all individuals who purchased Converium stock after the inquiry notice date should have been excluded from the proposed plaintiff class because they could no longer have reasonably relied on the company's representations of financial health.  See SCOR Holding, 537 F. Supp. 2d at 581-82.  However, the court found that a "flood of reports" had indicated to the market that Converium had "address[ed] the problems" which had given rise to inquiry notice for the pre-November 19, 2002 stock purchasers.  Id. at 582.  As a result, later investors could have reasonably relied on the company's representations to the market.  Id. at 582-83.

Here, there is no such "flood of reports."  To the contrary, the publicly available information during Period 2 reinforced the notion that LIBOR was subject to manipulation. In addition to all the articles previously listed, in June 2008, Dow Jones published an article indicating that 82% of banks, brokers, and traders surveyed by The Financial Markets Association agreed with the view that LIBOR did not reflect actual money market rates.[24]  A few months later, in September 2008, the Wall Street Journal reported that "Libor's reliability became an issue again" as LIBOR dipped well below other financial benchmarks.[25]  And thereafter, as the financial crisis deepened and LIBOR spiked, news outlets continued to report that LIBOR was "stabilizing at rates that can't in any way be considered normal."[26]  While the SCOR Holding plaintiffs were confronted with convincing reports that could have quelled their distrust of the defendants, an ordinary investor here would have begun Period 2 as a skeptic who thereafter encountered articles that only increased his doubts.  Thus, exchange-based plaintiffs' reliance on SCOR Holdings is misplaced, and based on

---

[24] Adam Bradbery, Market Participants Doubt Libor Rates Reflect Market Rates, Dow Jones & Co., June 19, 2008.

[25] Carrick Mollenkamp, Libor's Accuracy Becomes Issue Again -- Questions on Reliability of Interest Rate Rise Amid Central Banks' Liquidity Push, Wall St. J., Sept. 24, 2008.

[26] David Gaffen, Stabilization, Not Normalization, For the Historically High Libor, Wall St. J., Nov. 18, 2008.

the three-part test of <u>LC Capital Partners</u>, the duty to inquire for Period 2 plaintiffs who were also purchasers during Period 1 did not dissipate.

To the extent that there are named plaintiffs who first transacted during Period 2 -- a disputed proposition, see <u>supra</u> -- the same analysis would apply.  While Period 2 plaintiffs "may not have had reason to follow LIBOR-related news" during Period 1, they nevertheless would have been confronted with information suggesting the probability of LIBOR's continued artificiality after May 29, 2008.  <u>LIBOR I</u>, 935 F. Supp. 2d at 712.[27]  The publicly available information during Period 2 referenced the fact that LIBOR's accuracy had come into question during Period 1, so later purchasers would have been aware of the preexisting issues with the rate.[28]  When this information about probable artificiality during Period 1 is combined with the chorus of articles discussing the BBA's general inaction during Period 2, the logical conclusion for an ordinary Period 2

---

[27] Our observations in <u>LIBOR I</u> regarding the timing of plaintiffs' awareness of LIBOR-related news were made in broad strokes given the stage of this litigation.  To be sure, it is quite possible that sophisticated entities considering the purchase of Eurodollar futures contracts worth approximately $1,000,000 each would have conducted research in advance of purchase.  As such, a Period 2 purchaser may have been expected to follow LIBOR trends and news articles during Period 1.

[28] <u>See, e.g.</u>, Alistair Osborne, <u>Former MPC Man Call for Libor to Be Replaced</u>, Telegraph, Sept. 11, 2008 (referencing the fact that suggestions that "some lenders may have understated borrowing costs" first emerged in March 2008); Mollenkamp, <u>Libor's Accuracy Becomes an Issue Again</u>, <u>supra</u> note 25, ("Earlier this year, Libor appeared to be sending false signals.").

purchaser was that LIBOR remained subject to manipulation. Furthermore, during Period 2, the spread between LIBOR and the Federal Reserve Eurodollar Deposit Rate, a number which was publicly available, became increasingly and uncharacteristically negative. This is the same data on which plaintiffs rely in their complaint to support their conclusion that the banks were collectively suppressing LIBOR. See Exchange-Based SAC ¶¶ 90-99 & figs. 3-19. This spread would have provided additional evidence to a Period 2 purchaser that LIBOR was being manipulated.

At oral argument, plaintiffs proffered three articles in particular that they contend should dissuade us from finding a limitations bar despite the foregoing evidence. See Tr. of Oral Arg. 33:8-10, 34:12-19, 44:12-14. However, all of these articles contain elements that undermine their value to plaintiffs. Two of the articles explicitly acknowledge that they were published at least partially in response to the widespread belief that LIBOR was artificial.[29] As for the third article, its very title -- "Recent Concerns Regarding LIBOR's

---

[29] Metz et al., LIBOR Manipulation?, supra note 21, at 2 (framing the paper as an extension of the study published in the Wall Street Journal on May 29, 2008, which alleged the "reporting [of] unjustifiably low borrowing costs for the calculation of the daily Libor benchmark"); International Monetary Fund, Global Financial Stability Report, Oct. 2008, at 76-77 (noting that "the integrity of the U.S. dollar LIBOR fixing process has been questioned" and that "[m]arket observers have been expressing concerns that some LIBOR contributors submit rates that are too low").

Credibility" -- contradicts plaintiffs' contention that they were not on inquiry notice.[30]  Moreover, this third article was published on May 20, 2008; this date falls at the end of Period 1, the time when the drumbeat of suggestions that LIBOR was artificial had grown the loudest.  See LIBOR I, 935 F. Supp. 2d at 700 (detailing the many "articles published in prominent national news sources" around this time which suggested that LIBOR was at artificial levels).  When considered in the context of the other literature published at the time, plaintiffs' proffered articles would have been insufficient to change the view of an ordinary investor that LIBOR was probably being set at artificial levels.

In sum, we acknowledged in LIBOR I, on the basis of the record then before us, that we were not in a position to determine whether the claims of plaintiffs who purchased Eurodollar futures contracts during Period 2 were time barred. In order to decide, we needed three questions answered: (1) when was inquiry notice triggered, (2) whether plaintiffs actually inquired within two years of the date of inquiry notice, and (3) whether the complaint was filed within two years of the date on which a person of ordinary intelligence, in the exercise of

---

[30] Samuel Cheun & Matt Raskin, Recent Concerns Regarding LIBOR's Credibility, Federal Reserve Bank of New York, May 20, 2008.

reasonable diligence, would have discovered his injury. Id. at 712. Now, the answers to these questions are clear. First, for plaintiffs who initially purchased contracts during Period 1, inquiry notice never dissipated, and their duty to inquire was therefore triggered on May 29, 2008. For anyone who first transacted during Period 2, the publicly available literature at the time of purchase would have made clear that LIBOR was, in all probability, still artificial. Thus, inquiry notice was triggered for these purchasers before April 15, 2009, i.e. more than two years before exchange-based plaintiffs filed their complaint. Second, there is no indication that any plaintiff actually inquired within two years of the time when his duty to do so arose. And third, the complaint was filed on April 15, 2011, more than two years after any Period 2 plaintiff would have discovered his injury had he exercised reasonable diligence. Therefore, all CEA claims arising from purchases made by plaintiffs during Period 2 are time barred, and defendants' motion to dismiss those claims is granted.

## V. Contract and Unjust Enrichment Claims

### A. Procedural Background

In LIBOR I, we decided that "considerations of judicial economy, convenience, fairness, and comity suggest that we should decline to exercise supplemental jurisdiction over

plaintiffs' as-yet-unspecified-state-law claim." LIBOR I, 935 F. Supp. 2d at 735.  However, by the writing of LIBOR II, both parties asserted that this Court had jurisdiction over OTC plaintiffs' state-law claims under the Class Action Fairness Act of 2005, and we agreed.  LIBOR II, 962 F. Supp. 2d at 628.  OTC plaintiffs then sought leave to reassert their unjust enrichment claim and to plead a new claim for breach of contract based on defendants' alleged breach of the implied duty of good faith and fair dealing.  Id.

We granted plaintiffs leave to amend their pleadings to include both unjust enrichment and contract-based claims under state law, with the understanding that this grant did not preclude defendants from moving to dismiss these claims once asserted.  See id. at 631, 635.  Plaintiffs amended their complaint accordingly on September 10, 2013, and defendants responded with the instant motion to dismiss the contract and unjust enrichment claims on November 26, 2013.

**B.  Analysis**

OTC plaintiffs' complaint lists five defendant banks that entered into LIBOR-based contracts with named plaintiffs: UBS, Deutsche Bank, Barclays, Citibank, and Credit Suisse.  See OTC Pls.' Second Consolidated Am. Compl. ("OTC SAC") ¶¶ 378–87. Although only these five banks were counterparties to contracts

57

entered into by named plaintiffs, OTC plaintiffs brought breach of contract and unjust enrichment claims against all defendant banks.   See id. ¶¶ 388-98.   We find that plaintiffs have sufficiently pled their claims as against those defendant banks with which named plaintiffs directly transacted ("counterparty banks"), but that claims against those banks with which named plaintiffs did not transact ("non-counterparty banks") must be dismissed.   Thus, defendants' motion to dismiss is granted in part and denied in part.

    1.   Non-Counterparty Banks

     Plaintiffs endeavor to state contract and quasi-contract claims against non-counterparty banks (1) by asserting that a transactional relationship between the parties is unnecessary, (2) by relying on conspiracy allegations, and (3) by conflating class standing with Article III standing.   None of plaintiffs' arguments are persuasive.   We will address them each in turn.

     The fundamental infirmity with plaintiffs' contract-based and unjust enrichment claims against banks with which they did not transact is that there is an inadequate nexus between named plaintiffs and those non-counterparty banks.   We cannot be certain if plaintiffs conceded this point with regard to their

contract claims,[31] but in any event, it is clear that the law requires an agreement between the parties for a defendant to be liable for a breach of contract.   See MBIA Ins. Corp. v. Royal Bank of Can., 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) ("It is well established that, generally, a party who is not a signatory to a contract cannot be held liable for breaches of that contract."); see also Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (listing "the existence of an agreement" as the first prong a plaintiff must satisfy in stating a breach of contract claim).   Here, no agreements exist between named plaintiffs and those banks with which they did not contract. Therefore, plaintiffs cannot state a claim against non-counterparty banks on a breach of contract theory.

A similar analysis applies to plaintiffs' unjust enrichment claims.   "The 'essence' of [an unjust enrichment] claim 'is that one party has received money or a benefit at the expense of another.'"   Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (quoting City of Syracuse v. R.A.C. Holding, Inc.,

---

[31] In their brief, plaintiffs state that while they "agree that under New York law they may only state a claim for breach of contract against the defendants with whom they contracted, they suffered a personal injury to their contracts at the hands of each defendant."   Pls.' Brief in Opp'n to Defs.' Mot. to Dismiss Consolidated Second Am. Compl. ("OTC Pls.' Opp'n") at 6 (emphasis in original).   Plaintiffs then maintain that this common injury provides named plaintiffs with "class standing" to assert contract-based claims against all defendants, not just those with which they transacted.   See id. at 7-11. However, this theory relies on a misinterpretation of Second Circuit precedent that is discussed in greater detail infra.

685 N.Y.S.2d 381, 381 (App. Div. 1999)).[32]   While parties need
not be in privity with one another to sustain an unjust
enrichment claim, a plaintiff must still plead that it had <u>some</u>
relationship with a defendant.   See <u>In re Canon Cameras Litig.</u>,
No. 05 Civ. 7233(JSR), 2006 WL 1751245, at *2 (S.D.N.Y. June 23,
2006) (noting that a direct relationship is not necessary, but
still requiring a "sufficient connection between the parties to
support a claim for unjust enrichment"); <u>Jet Star Enters., Ltd.</u>
<u>v. Soros</u>, No. 05 CIV. 6585(HB), 2006 WL 2270375, at *5 (S.D.N.Y.
Aug. 9, 2006) (finding that "plaintiff must have had direct
dealings or some sort of quasi-contractual relationship with
each defendant" to sustain a claim for unjust enrichment);
<u>Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC</u>, 317 F. Supp.
2d 301, 334 (S.D.N.Y. 2003) (requiring plaintiffs to allege at
least a "prior course of business dealings" between the parties
to plead unjust enrichment claims adequately).

　　　　Here, it makes little sense to conclude that a particular
defendant bank somehow improperly obtained profits intended for
a certain plaintiff when those two parties never transacted or
otherwise maintained a business relationship at all.   "Where

---

[32] "To establish a defendant's liability for unjust enrichment, the plaintiff
must [demonstrate] that '(1) defendant was enriched, (2) at plaintiff's
expense, and (3) equity and good conscience militate against permitting
defendant to retain what plaintiff is seeking to recover.'" <u>Schatzki v.</u>
<u>Weiser Capital Mgmt., LLC</u>, No. 10 Civ. 4685, 2014 WL 347396, at *1 (S.D.N.Y.
Jan. 29, 2014) (quoting <u>Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.</u>, 373
F.3d 296, 306 (2d Cir. 2004)).

plaintiff and defendant 'simply had no dealings with each other,' their relationship is 'too attenuated'" to support an unjust enrichment claim.   LIBOR I, 935 F. Supp. 2d at 737 (quoting Georgia Malone & Co., Inc. v. Rieder, 973 N.E.2d 743, 747 (N.Y. 2012)); see also Laydon v. Mizuho Bank, Ltd., No. 12-cv-3419 (GBD), 2014 WL 1280464, at *13 (S.D.N.Y. Mar. 28, 2014) (holding that "Plaintiff's conclusory assertions that Bank Defendants financially benefited from the unlawful manipulation and that these unlawful acts caused Plaintiff to suffer injury . . . fail to satisfy Plaintiff's pleading burden" for unjust enrichment claims) (alterations, citations, and internal quotation marks omitted).   Thus, the lack of a sufficient nexus between the named plaintiffs and non-counterparty banks is fatal for both their breach of contract claims and their unjust enrichment claims against those defendants.

Plaintiffs' attempt to plead that all defendant banks were part of a conspiracy to suppress LIBOR does not save their contract and quasi-contract claims against non-counterparty banks.[33]   Even if a conspiracy between the banks did exist, an

---

[33] Both parties spend significant portions of their briefs debating whether plaintiffs have adequately pled the existence of a conspiracy. See Mem. of Law in Supp. of Defs.' Mot. to Dismiss OTC Pls.' Second Consolidated Am. Compl. ("Defs.' OTC Mem.") at 12-15; OTC Pls.' Opp'n at 12-20.   However, because the existence of a conspiracy does not cure the deficiencies in plaintiffs' claims against non-counterparty banks, and because plaintiffs' claims against counterparty banks do not depend on a finding that there was, in fact, a conspiracy, we do not decide here whether plaintiffs have

allegation of conspiracy would not eliminate plaintiffs' requirement to plead the existence of some relationship between the parties.  See Lehman v. Garfinkle, No. 08 Civ. 9385(SHS), 2009 WL 2973207, at *7 (S.D.N.Y. Sept. 16, 2009) ("To the extent Plaintiff is attempting to argue that these defendants should be liable on contracts to which they were not parties, on the ground that all Defendants were co-conspirators, this argument would fail, as New York law does not recognize such a theory of liability."); see also Spagnola v. Chubb Corp., 264 F.R.D. 76, 85 n.9 (S.D.N.Y. 2010) (noting that, under New York law, "[t]here is no substantive tort of civil conspiracy; thus, there cannot be any cause of action for conspiracy to breach [a] contract" (quoting Smith v. Fitzsimmons, 584 N.Y.S.2d 692, 695 (App. Div. 1992)) (internal quotation marks omitted)).  As discussed above, OTC plaintiffs have not pled the existence of a relationship between named plaintiffs and non-counterparty banks.  Thus, irrespective of any conspiracy, the contract and quasi-contract claims against those banks must fail.

Moreover, plaintiffs' conspiracy theory rests on what would appear to be a logical inconsistency.  We have

sufficiently pled a conspiracy in their complaint.  To the extent that a finding of conspiracy might have evidentiary import, it is an issue to be addressed only, if ever, at a later state of this litigation.  See Farris v. Cnty. of Camden, 61 F. Supp. 2d 307, 326 (D.N.J. 1999) (explaining that the existence of a civil conspiracy, which is not an independent cause of action under New Jersey law, may still be used as a mechanism to allow for the admission into evidence of hearsay statements by coconspirators).

consistently maintained, and plaintiffs have not disputed, that defendants competed with one another to secure the contracts with OTC plaintiffs that, when allegedly breached, unjustly enriched the counterparty bank.  See LIBOR I, 935 F. Supp. 2d at 689 ("Plaintiff's theory is that defendants competed normally in the interbank loan market and then agreed to lie about the interest rates they were paying in that market when they were called upon to truthfully report their expected borrowing costs to the BBA.").  It would therefore be counterintuitive to assert that non-counterparty banks -- the defendants who lost the business -- were somehow enriched at plaintiffs' expense.  Thus, not only are allegations of a conspiracy insufficient to salvage plaintiffs' claims against non-counterparty defendants, but the actual conspiracy theory itself rests on faulty premises.

Having failed to establish that no transactional relationship was necessary or that a conspiracy pleading was sufficient to overcome the lack of such a relationship, plaintiffs' final attempt to state a claim against non-counterparty banks hinges on their reading of the Second Circuit's decision in NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145 (2d Cir. 2012).  Because that reading is a misinterpretation, this attempt, too, is unsuccessful.

In *NECA*, members of the plaintiff class purchased mortgage-backed certificates all underwritten by defendant Goldman Sachs & Co. and issued by defendant GS Mortgage Securities Corp. *Id.* at 149. The certificates were sold in seventeen different offerings, but pursuant to the same shelf registration statement. *Id.* NECA, the named plaintiff, purchased certificates issued from only two of the offerings, but asserted class claims on behalf of defendants who had purchased certificates from all seventeen offerings on the basis that the offerings were all made pursuant to the common registration statement, which was allegedly false and misleading. *Id.* The Circuit determined that NECA had "class standing" to bring these claims on behalf of other purchasers because it plausibly alleged "(1) that [it] personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Id.* at 162 (citations and internal quotation marks omitted).

Before evaluating the question of "class standing," however, the *NECA* Court first analyzed whether the named plaintiff had Article III standing and statutory standing to sue

defendants "in its own right." Id. at 158.  In applying NECA, courts in this district have recognized that the Second Circuit considers the questions of Article III, statutory, and class standing as distinct.  See, e.g., Policemen's Annuity & Benefit Fund of Chi. v. Bank of Am., NA, No. 12 Civ. 2865(KBF), 2013 WL 5328181, at *4 (S.D.N.Y. Sept. 23, 2013) ("'Class standing' -- the doctrine governing whether a named plaintiff may represent the interests of a class -- is different from Article III standing.  In the class action context, the Second Circuit has held that it is possible to have one and not the other."); Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n, 291 F.R.D. 47, 58 (S.D.N.Y. 2013) ("The Second Circuit Court of Appeals has recently drawn a distinction between Article III standing of a plaintiff to pursue a claim against a defendant and class standing."); N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653(PAC), 2013 WL 357615, at *2 (S.D.N.Y. Jan. 23, 2013) ("The Second Circuit separated its standing analysis into three parts -- Article III, statutory, and class standing -- and addressed each in turn.").  Thus, "before asking whether a named plaintiff has standing to represent absent class members" based on the two-prong NECA test, we "must first determine that the plaintiff satisfies traditional Article III criteria 'in its own right.'"  In re Harbinger Capital Partners

Funds Investor Litig., No. 12 Civ. 1244(AJN), 2013 WL 7121186, at *3 n.2 (S.D.N.Y. Dec. 16, 2013) (quoting NECA, 693 F.3d at 158).

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To demonstrate Article III standing, a plaintiff must allege (1) an injury in fact, (2) fairly traceable to the challenged actions of defendants, which (3) would likely be redressed by the requested relief. Id. at 560-61. "[T]o establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." NECA, 693 F.3d at 159 (quoting Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007)) (emphasis added); see also Policemen's Annuity & Benefit Fund, 2013 WL 5328181, at *4 ("[E]ven if a named plaintiff has a case or controversy, that does not mean that he or she may represent the interests of a class."); Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co., 862 F. Supp. 2d 322, 331 (S.D.N.Y. 2013) ("For each claim asserted in a class action, there must be at

66

least one class representative (a named plaintiff or a lead plaintiff) with standing to assert that claim.").

As discussed above, named plaintiffs lack standing to sue each of the named defendants "in their own right" under Article III.  The only defendants against which named plaintiffs may assert claims are those with which they contracted.  For the banks with which named plaintiffs did not contract, the relationship between the parties is too attenuated to support claims for breach of contract or unjust enrichment.  To the extent that any named plaintiff experienced an injury, it may be fairly traced to the defendant that allegedly breached the contract and was then unjustly enriched, not to the non-counterparty bank with which plaintiff maintained no relationship.  Therefore, using the framework articulated in NECA, plaintiffs' claims against non-counterparty banks do not meet the threshold Article III standing requirements, and those claims are hereby dismissed.

2.   Counterparty Banks

Although we have found that plaintiffs' claims against non-counterparty banks must be dismissed, there still remain breach of contract and unjust enrichment claims against counterparty banks UBS, Deutsche Bank, Barclays, Citibank, and Credit Suisse.  For the reasons discussed below, we find that

plaintiffs have adequately stated these claims, and defendants' motion to dismiss them is therefore denied.

Turning first to the contract-based claims, the complaint's allegations against counterparty banks meet the plausibility requirements of the Federal Rules. "Twombly does not impose a probability requirement at the pleading stage. It simply requires factual allegations sufficient to raise a reasonable expectation that discovery is likely to generate evidence of liability." Keiler v. Harlequin Enters. Ltd., No. 13-1753-cv, 2014 WL 1704474, at *6 (2d Cir. May 1, 2014) (citing Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)). Plaintiffs' factual allegations against the five counterparty banks meet this burden. See, e.g., OTC SAC ¶ 188 & figs. 6, 7, 13, 14, and 17 (demonstrating the negative spread between LIBOR and the Federal Reserve's Eurodollar Deposit Rate during the Class Period for the five counterparty banks, which plaintiffs allege provides evidence of LIBOR suppression); id. ¶ 193 ("[E]ach Defendant bank misreported its LIBOR submissions literally hundreds of times during the Class Period . . . .").

Defendants argue that plaintiffs' allegations are too general because they do not focus on the particular tenors of LIBOR that applied to the parties' contracts, and that "this Court has previously noted [that] tenors of USD LIBOR are not

interchangeable: Conduct alleged with respect to one tenor cannot simply be imputed to the other." Defs.' OTC Mem. at 19. However, we drew that conclusion in the context of considering exchange-based plaintiffs' request to add trader-based claims to their complaint. The proposed allegations concerning trader conduct suggested that manipulation was episodic, varying in direction, and targeted to particular positions in the market. These allegations therefore required specificity with regard to tenor in order to demonstrate injury. By contrast, the breach of contract claims asserted by OTC plaintiffs claim that LIBOR was systematically suppressed across all tenors, and that this suppression led to plaintiffs receiving interest rate payments that were too low. This is a coherent theory, and plaintiffs' more generalized allegations of persistent LIBOR suppression across tenors is sufficient to meet its pleading burden for breach of contract claims against counterparty banks.

In terms of pleading intent for the contract-based claims, plaintiffs' allegations against counterparty banks also pass muster. We have previously noted that stating a claim based on a breach of the implied covenant of good faith requires "some showing of intent to harm the other contracting party or a reckless disregard of it." LIBOR II, 962 F. Supp. 2d at 634 (quoting Paul v. Bank of Am. Corp., No. 09-CV-1932 (ENV)(JMA),

2011 WL 684083, at *6 (E.D.N.Y. Feb. 16, 2011)).  We found in
LIBOR II that OTC plaintiffs had "plausibly alleged that
defendants' alleged manipulation of LIBOR was at least in
reckless disregard of the detriment to plaintiffs, with whom
[counterparty] defendants were in direct contractual privity."
Id.  In the latest version of their complaint, OTC plaintiffs
have again adequately alleged that defendants' alleged
manipulation of LIBOR was at least in reckless disregard of the
potential harm to OTC plaintiffs, see OTC SAC ¶¶ 44, 78, 133,
and defendants have offered no new argument or authority that
undermines our earlier conclusion.  Thus, plaintiffs have pled
the requisite intent for their breach of implied covenant of
good faith claims.

        Plaintiffs' unjust enrichment claims may also proceed
against counterparty defendants.  Under New York law, "where the
parties have entered into a contract that governs the subject
matter" of their dispute, a plaintiff is unable to proceed on an
unjust enrichment theory.  Pappas v. Tzolis, 982 N.E.2d 576, 580
(N.Y. 2012) (quoting Cox v. NAP Constr. Co., Inc., 891 N.E.2d
271, 278 (N.Y. 2008)) (internal quotation marks omitted).  In
terms of what constitutes the "subject matter" of this dispute,
defendants urge a broad interpretation, "focused on whether the
services provided by the defendant and remedy sought by the

plaintiff were traceable to a contract, not whether the contract specifically and expressly contemplated the factual scenario alleged to exist."  Defs.' OTC Mem. at 25.

However, the law counsels otherwise.  "[T]he predicate for dismissing quasi-contract claims is that the contract at issue 'clearly covers the dispute between the parties.'"  Union Bank, N.A. v. CBS Corp., No. 08 Civ. 08362(PGG), 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009) (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987)); see also IDT Corp. v. Morgan Stanley Dean Witter & Co., 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.") (emphasis added).  We reiterate our conclusion from LIBOR II:

> "[A]lthough the swap contracts clearly required defendants to pay plaintiffs the prescribed floating rate of return using the LIBOR reported by the BBA, the contracts did not 'clearly cover[ ]' the subject matter now at issue, namely whether defendants were permitted to manipulate LIBOR itself and thereby depress the amount they were required to pay plaintiffs."

LIBOR II, 962 F. Supp. 2d at 630.  Moreover, we note that even if the contract did govern the subject matter at issue, at this stage of the litigation, plaintiffs may plead breach of contract and unjust enrichment in the alternative.  See, e.g.,

71

Dragushansky v. Nasser, No. 12 CV 9240(TPG), 2013 WL 4647188, at *8 (S.D.N.Y. Aug. 29, 2013); Usov v. Lazar, No. 13 Civ. 818(RWS), 2013 WL 3199652, at *5 (S.D.N.Y. June 25, 2013). Thus, plaintiffs' unjust enrichment claims against counterparty banks are not barred by the existence of the contracts.[34]

## VI.  Defendant Société Générale ("SG")

Beginning in mid-2011, private lawsuits began to be filed in this District and in others across the country relating to the alleged manipulation of LIBOR.  One such action was Jeffrey Laydon v. Credit Suisse Group AG, et al., No. 11 Civ. 02824 (N.D. Ill. Apr. 27, 2011).  Laydon sought to represent a class of persons and entities who transacted in exchange-traded, LIBOR-based derivatives (such as Eurodollar futures contracts) between January 1, 2006 and December 31, 2009.  Laydon Compl. ¶ 66.  SG was named as a defendant in that action.  Id. ¶ 25.

---

[34] In a letter to the Court dated April 17, 2014, OTC plaintiffs requested permission to add Yale University as a class representative.  Defendants have not identified any prejudice that they would experience based on the addition of Yale to the complaint, and as we established above, the addition of Yale would not be futile, because the university may assert claims against those banks with which it transacted directly.  The Court also has no reason to believe that OTC plaintiffs' request "has been delayed unduly" or "is sought for dilatory purposes or . . . in bad faith." Lee v. Regal Cruises, Ltd., 916 F. Supp. 300, 303 (S.D.N.Y. 1996).  In any event, given the six-year statute of limitations for asserting a breach of contract claim in New York, if we were to deny plaintiffs' request, Yale would have ample time to commence its own individual action against those banks with which it transacted.  See N.Y. C.P.L.R. § 213(2).  Given that this Court will continue to manage this entire multidistrict litigation moving forward, Yale's individual action would be assigned to this Court and proceed in parallel with that of the OTC plaintiffs.  Thus, adding Yale as a class representative for is minimally different from allowing it to file a separate action.  Therefore, we grant plaintiffs' request to add Yale as a named plaintiff.

On August 12, 2011, the Judicial Panel on Multidistrict Litigation transferred Laydon to this Court for "coordinated or consolidated pretrial proceedings" with other LIBOR-related actions.  Transfer Order, In re LIBOR-Based Fin. Instruments Antitrust Litig., 802 F. Supp. 2d 1380, 1381 (Mem.) (J.P.M.L. 2011).  In late-2011, Laydon's claims were consolidated with those of the other exchange-based plaintiffs in this MDL.

On April 30, 2012, exchange-based plaintiffs filed their First Consolidated Amended Complaint ("FAC"), which superseded the previous complaints of the class members -- including the Laydon complaint -- and was legally operative.  See In re Refrigerant Compressors Antitrust Litig., 731 F.3d 586, 591 (6th Cir. 2013) (finding that a consolidated class complaint filed in an MDL "superseded any prior individual complaints").  The FAC did not name SG as a defendant, and the Class Period asserted was August 2007 to May 2010.  FAC ¶¶ 1, 27–42.  It was not until May 2013 that exchange-based plaintiffs sought leave to amend their complaint to include SG.[35]   In LIBOR II, we granted exchange-based plaintiffs leave to amend their complaint to name SG as a defendant, which they did by September 10, 2013.  LIBOR

---

[35] There is some debate as to whether the relevant date here is May 17, 2013 or May 23, 2013.  See Reply Mem. of Law in Further Supp. of Def. Société Générale's Mot. to Dismiss at 3 & n.3 (discussing the disagreement between the parties).  Because our analysis does not depend on this six-day difference, we decline to resolve this question of fact.

II, 962 F. Supp. 2d at 624.  Defendant SG then filed a motion to dismiss, which was fully briefed by January 28, 2014.

In considering SG's motion to dismiss, we begin with two key propositions.  First, inquiry notice is not a defendant-specific determination.  In LIBOR I, we wrote: "The specificity required to trigger inquiry notice is not necessarily specificity with regard to [each] defendant, but rather specificity that notifies a plaintiff that he has been injured." LIBOR I, 935 F. Supp. 2d at 706.  The fact that SG did not join the LIBOR panel until February 2009 and that SG's role on the panel was not discussed especially in the press is of no import. Therefore, we reject plaintiffs' suggestion that we should evaluate inquiry notice on a defendant-by-defendant basis.

Second, there is nothing to suggest that inquiry notice had dissipated for plaintiffs during Period 3.  It was not necessary for us to address this issue in either LIBOR I or LIBOR II, as the operative complaint was filed on April 15, 2011, and claims based on transactions during Period 3 -- between April 15, 2009 and May 2010 -- clearly fell within the CEA's two-year statute of limitations.  But here, plaintiffs did not move to add SG until May 2013, so the question of when Period 3 plaintiffs were on inquiry notice is relevant.

74

Given our decision that Period 1 and Period 2 purchasers were on inquiry notice, as well as the fact that plaintiffs have not identified any purchasers who transacted during only Period 3, plaintiffs have the "burden of demonstrating that their duty to inquire dissipated in order for their claims not to be time barred." Part IV supra. They have plainly failed to meet this burden. In fact, plaintiffs have not cited a single article or event during Period 3 that would have dissipated their duty to inquire.[36] As we have previously stated, it is nonsensical to believe that plaintiffs who purchased throughout the Class Period could have simply wiped their minds clean before conducting their later transactions. This is especially true considering the lack of any credible information suggesting that the BBA or other regulators had enacted meaningful reforms designed to ensure the accurate calculation of LIBOR. Thus, plaintiffs were on inquiry notice of their claims against SG not only during Period 1 and Period 2, but also during Period 3.

---

[36] In their brief, plaintiffs assert that they actually did inquire before filing their complaint, claiming to have been "diligen[t] in investigating claims against [SG]." Mem. of Law in Opp'n to Def. Société Générale's Mot. to Dismiss at 15. However, these assertions have not been substantiated in any way or even referenced before this brief; as a result, the Court will not give these statements any analytic weight. See Simpson v. Putnam Cnty. Nat'l Bank of Carmel, 20 F. Supp. 2d 630, 635 (S.D.N.Y. 1998) (declining to "read assertions of diligence into plaintiff's complaint" when plaintiff's opposition papers contained claims of diligent investigation that were absent from the complaint itself).

Considering that the Class Period ended in May 2010, exchange-based plaintiffs needed to assert CEA claims against SG by May 2012 -- within the two-year statute of limitations -- to be timely.  It is undisputed that they did not do so until May 2013.  Consequently, absent some tolling, plaintiffs' claims against SG would be time barred.  Plaintiffs attempt to salvage these claims by maintaining that the statute of limitations should have been tolled pursuant to American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974).  Under American Pipe, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action."  Id. at 554.

We agree with plaintiffs that American Pipe tolling is applicable to this case.  However, only "asserted members of the class who would have been parties had the suit been permitted to continue as a class action" may have their claims tolled.  Id.; see also Matana v. Merkin, 957 F. Supp. 2d 473, 488 (S.D.N.Y. 2013) (finding that "to take advantage of the toll, a plaintiff must have been a member of the purported class"); In re Direxion Shares ETF Trust, 279 F.R.D. 221, 237 (S.D.N.Y. 2012) (noting that American Pipe "only tolls the limitations period for claims of 'asserted' class members").  Therefore, only those exchange-

based plaintiffs who were also members of the Laydon class may have their claims tolled.  As discussed above, the Laydon class period ended on December 31, 2009, and the claims were not asserted against SG until approximately three years, four months, and three weeks after that date (mid- to late-May 2013).  Thus, for American Pipe tolling to save these plaintiffs' claims, it must have tolled them for all but two years of that time gap: approximately one year, four months, and three weeks.

American Pipe does not toll plaintiffs' claims sufficiently to keep them from being time barred.  If the toll were to begin on April 27, 2011 -- the date when Laydon was filed -- it would end on April 30, 2012, the date when exchange-based plaintiffs filed the FAC that did not name SG as a defendant.  See In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2004 WL 555697, at *6 (S.D.N.Y. Mar. 19, 2004) (finding that American Pipe tolling applied in the context of claims against particular defendants in a consolidated class action only for the time between when those defendants were named in an original, individual class action complaint and when those defendants were not named in a consolidated class action complaint).  This is a one-year-and-three-day toll, which is well short of the tolling required to save plaintiffs' claims.  Thus, American Pipe

tolling does not render claims against SG timely, and claims against that defendant under the CEA must be dismissed.

There are also some exchange-based plaintiffs who transacted after December 31, 2009 -- the Class Period runs until May 2010.  However, these late purchasers were not part of the Laydon class, and as a result, they are not eligible to receive the benefit of American Pipe tolling.  Therefore, the last date for any of these plaintiffs to have asserted CEA claims against any defendant bank, including SG, would have been in May 2012, two years after the end of the Class Period.  Since exchange-based plaintiffs did not move for leave to amend their complaint to add SG until May 2013, one year late, claims against SG based on contracts purchased between January 1, 2010 and May 2010 are also time barred.

In sum, whether or not plaintiffs were a party to the Laydon action, all CEA claims asserted against SG are time barred.  We therefore grant SG's motion to dismiss.

### CONCLUSION

For the reasons stated above, exchange-based plaintiffs' motion for reconsideration of our ruling on trader-based claims is denied, but their motion for leave to amend their complaint is granted; defendants' motion to dismiss CEA claims on scienter grounds is denied; defendants' motion to dismiss CEA claims

78

arising out of contracts purchased between May 30, 2008 and April 14, 2009 is granted; defendants' motion to dismiss OTC plaintiffs' contract and unjust enrichment claims is granted in part and denied in part; and defendant Société Générale's motion to dismiss the exchange-based plaintiffs' complaint is granted.

It has been nearly two years since defendants first moved to dismiss plaintiffs' consolidated amended complaints. Since then, this Court has issued three major opinions and the parties have submitted hundreds, if not thousands, of pages of briefing materials, all in an attempt to resolve the threshold question of any litigation: what claims, if any, have plaintiffs adequately pled?

Now, at long last, there is clarity. OTC plaintiffs may state claims for breach of the implied covenant of good faith and fair dealing, and claims for unjust enrichment, but only against those defendant banks with which OTC plaintiffs transacted directly. Exchange-based plaintiffs may state claims under the CEA based on contracts purchased between April 15, 2009 and the end of the Class Period, based on a theory that defendants' alleged persistent suppression of LIBOR caused them damages; however, no such claim may lie against Société Générale, as those claims are time barred. Exchange-based plaintiffs may also state claims against Barclays and Rabobank

based on the alleged day-to-day, trader-based manipulation that occurred between January 1, 2005 and August 2007.

This Memorandum and Order resolves docket entry nos. 396, 418, 428, 453, 507, and 516.

**SO ORDERED.**

Dated:    New York, New York
          June 23, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

80