UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments                    **MEMORANDUM AND ORDER**
Antitrust Litigation.
                                                      11 MDL 2262 (NRB)

----------------------------------------

This document applies to:

INDIVIDUAL CASES LISTED IN APPENDIX.

----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## LIBOR V

### TABLE OF CONTENTS

I. General Introduction.................................... 3
II. Background.......................................... 4
  1. Facts .......................................... 4
    1.1. Student Plaintiffs .............................. 5
      1.1.1. Nathan Weglarz and Jerry Weglarz.............. 5
      1.1.2. Stephanie Nagel.............................. 6
      1.1.3. Theory of Damages............................ 7
    1.2. Lender Plaintiffs .............................. 8
    1.3. Mortgagor Plaintiffs ............................ 8
    1.4. OTC Plaintiffs ................................ 10
      1.4.1. TCEH.......................................... 10
      1.4.2. SEIU.......................................... 10
      1.4.3. Highlander.................................... 11
  2. Procedural History........................... 12
    2.1. Prior Rulings ................................. 12
      2.1.1. Consolidation................................ 12
      2.1.2. Merits Holdings.............................. 14

2.2. Pending Motions ................................. 15

III. Pleading Standards................................. 15

IV. Student Loan Plaintiffs............................. 17

   1. Personal Jurisdiction............................ 17

   2. Fraud........................................... 18

   3. LIBOR As a Valid Interest Rate .................. 20

   4. Conclusion...................................... 23

V. Lender Plaintiffs.................................... 23

   1. Personal Jurisdiction............................ 23

   2. Damages ......................................... 25

   3. Scope of Expected Reliance ...................... 30

   4. Justifiable Reliance ............................ 31

   5. Statute of Limitations .......................... 32

     5.1. Government Development Bank of Puerto Rico ...... 32

     5.2. Directors Financial Group ...................... 34

   6. Conclusion ...................................... 35

VI. Mortgagor Plaintiffs................................ 36

   1. Personal Jurisdiction............................ 36

   2. Fraud Claims Against Bank of America ............. 39

     2.1. Pleading ....................................... 39

     2.2. Preemption ..................................... 39

   3. Fraud Claims Against Other Panel Banks ........... 45

   4. Statute of Limitations .......................... 45

   5. Conclusion ...................................... 46

VII. OTC and Exchange-Based Plaintiffs.................. 46

   1. Personal Jurisdiction............................ 46

     1.1. Waiver of Personal Jurisdiction Arguments ....... 46

     1.2. OTC Plaintiffs ................................. 49

     1.3. Exchange-Based Plaintiffs ...................... 50

   2. New OTC Plaintiffs .............................. 54

     2.1. TCEH .......................................... 54

       2.1.1. Statute of Limitations..................... 54

       2.1.2. Counterparty Requirement and Agency Pleading. 56

     2.2. SEIU .......................................... 58

       2.2.1. Statute of Limitations..................... 58

        2.2.2. Counterparty Requirement and Agency Pleading. 60

     2.3. Highlander Realty ............................... 61

     2.4. Jennie Stuart ................................... 63

     2.5. Miami Children's Hospital ....................... 66

  XIII. Conclusion......................................... 66

## I. GENERAL INTRODUCTION

This consolidated multi-district litigation (MDL) arises from allegations that over a dozen major banks manipulated the London Interbank Offer Rate (LIBOR), a set of interest-rate benchmarks that underlie trillions of dollars of financial instruments, in order to profit in their own trading and to maintain their reputations for creditworthiness.[1]  This MDL involves U.S. Dollar LIBOR only.  Cf. Laydon v. Mizuho Bank, Ltd., No. 12-cv-3419 (GBD) (S.D.N.Y.) (Yen LIBOR and the Tokyo Interbank Offer Rate); Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG, No. 15-cv-871 (SHS) (S.D.N.Y.) (Swiss Franc LIBOR).

In four earlier opinions,[2] we tested the legal sufficiency of complaints filed by three putative classes and several individual

---

[1] We emphasize that the allegations against defendants are nothing more than allegations.  Even where we omit to use a word such as "alleged" in reference to claims against defendants, nothing in this opinion should be taken as a finding that any defendant manipulated LIBOR, that any defendant committed any other form of wrongdoing, or that any plaintiff suffered injury.

[2] In re LIBOR-Based Fin. Instrs. Antitrust Litig. (LIBOR IV), ___ F. Supp. 3d ___, 2015 WL 6243526, 2015 U.S. Dist. LEXIS 147561 (S.D.N.Y. Oct. 20, 2015), ECF No. 1222; In re LIBOR-Based Fin. Instrs. Antitrust Litig., (LIBOR III), 27 F. Supp. 3d 447 (S.D.N.Y. 2014), ECF No. 568; In re LIBOR-Based Fin. Instrs. Antitrust Litig. (LIBOR II), 962 F. Supp. 2d 606 (S.D.N.Y. 2013), ECF No. 389; In re LIBOR-Based Fin. Instrs. Antitrust Litig. (LIBOR I), 935 F. Supp. 2d 666 (S.D.N.Y. 2013), ECF No. 286, appeals dismissed, Nos. 13-3565 (L), 13-3636

plaintiffs.   Our key holdings sustained some fraud, contract, unjust enrichment, and Commodities Exchange Act[3] claims, while rejecting antitrust and RICO[4] claims.

In this, our fifth extensive opinion, we focus on the legal sufficiency of complaints filed on behalf of three putative classes.[5] We also address the OTC Plaintiffs motions to add new plaintiffs to their consolidated complaint and defendants' motion to dismiss the complaints of the New Classes, the new OTC Plaintiffs, and the Exchange-Based Plaintiffs for lack of personal jurisdiction.[6]

## II. BACKGROUND

### 1. Facts

The facts underlying this case have been thoroughly discussed in LIBOR I, 935 F. Supp. 2d at 677–85, and elaborated upon in

---

(Con), 2013 WL 9557843 (2d Cir. Oct. 30, 2013), rev'd as to plaintiff Gelboim sub nom. Gelboim v. Bank of Am. Corp., 574 U.S. ___, 135 S. Ct. 897 (2015), and motion to recall mandate denied sub nom. Schwab Money Mkt. Fund v. Bank of Am. Corp., 2015 WL 756248 (2d Cir. Feb. 10, 2015), cert. denied, 83 U.S.L.W. 3857, 2015 WL 2234318 (U.S. Oct. 5, 2015) (No. 14-1350), and successive appeal from District Court docketed, No. 15-432 (Con) (2d Cir. Feb. 10, 2015).

[3] 7 U.S.C. §§ 1-25 (2012).

[4] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68.

[5] We refer to these classes collectively as the "New Classes," and separately as the "Student Plaintiffs" (Nagel v. Bank of Am., N.A., No. 13-cv-260 (W.D. Wis.), transferred to No. 13-cv-3010 (NRB) (S.D.N.Y.), and Weglarz v. JP Morgan Chase Bank, N.A., No. 13-cv-684 (N.D. Ill.), transferred to No. 13-cv-1198 (NRB) (S.D.N.Y.)), the "Mortgage Plaintiffs" (Payne v. Bank of Am. Corp., No. 12-cv-6571 (N.D. Cal.), transferred to No. 13-cv-598 (NRB) (S.D.N.Y.)), and the "Lender Plaintiffs" (Berkshire Bank v. Bank of Am. Corp., No. 12-cv-5723 (NRB) (S.D.N.Y.)).

[6] The consolidated complaints of the "Exchange-Based Plaintiffs" (Metzler Inv. GmbH v. Credit Suisse Grp. AG, No. 11-cv-2613 (NRB) (S.D.N.Y.)) and the "OTC Plaintiffs" (Mayor & City Council of Balt. v. Bank of Am. Corp. (Baltimore), No. 11-cv-5450 (NRB) (S.D.N.Y.)) were the subjects of LIBOR I, II, and III.

LIBOR II, III, and IV.  Here, we assume familiarity with LIBOR and with allegations of LIBOR manipulation, and we present only the new allegations set forth by the New Classes.

### 1.1. Student Plaintiffs

#### 1.1.1. Nathan Weglarz and Jerry Weglarz

Nathan Weglarz took out, and Jerry Weglarz co-signed, a student loan in 2007 at an interest rate tied to LIBOR.  First Consol. Compl. ("Student Loan Complaint") ¶¶ 64-65, ECF No. 835. The loan was issued by JPMorgan Chase Bank, N.A., and is currently held by the National Collegiate Student Loan Trust 2007-1 (the "NCSLT").  Student Loan Compl. ¶¶ 12, 64, 69.

Attached to the Student Loan Complaint is a "Note Disclosure Statement" from 2007 that appears to match the Student Loan Complaint's description of the loan, see Student Loan Compl., Ex. E., but plaintiffs have advised us that this loan document is not in fact the one upon which they are suing.[7]  Oral Arg. Tr. ("Tr.") 89:15-19, ECF No. 1199.  Accordingly, we rely only on the text of the Student Complaint.

Both Weglarzes are now Illinois residents, and we presume that they were Illinois residents when they signed Nathan Weglarz's loan.

---

[7] The correct loan documentation is not in the pleadings.  Plaintiffs blame a collection agent for their failure to attach their loan to their original complaint in February 2013 or their amended complaint in November 2014, but it is plaintiffs' own duty to set out the facts that they believe entitle them to relief, including their own loan documents.

### 1.1.2. Stephanie Nagel

Stephanie Nagel took out a student loan from Bank of America, N.A., in either 2004 or 2008 at an interest rate tied to LIBOR. See Student Loan Compl. ¶¶ 75–76 (stating that Nagel borrowed from Bank of America in 2004); Loan Request/Credit Agreement ("2008 Nagel Loan Agreement"), Student Loan Compl., Ex. F (loan with Bank of America, N.A., disbursed Jan. 9, 2008); Non-Negotiable Credit Agreement ("2004 Nagel Loan Agreement"), Student Loan Compl., Ex. F (loan with Bank One, N.A., signed Aug. 3, 2004).[8]  The agreement may call for the application of federal and California law, see 2008 Nagel Loan Agr. ¶ L.1., even though Nagel appears to have been a Wisconsin resident at the time.  See 2008 Nagel Loan Agr. at Signature Page (listing Nagel's employer as Wisconsin Public Service); Student Loan Compl. ¶ 8 (alleging that Nagel is currently a Wisconsin resident); Student Loan Compl. ¶¶ 120–22 (alleging that Bank of America engaged in trade and commerce within Wisconsin); but cf. Student Loan Compl. ¶ 79 (stating, apparently

---

[8] The Student Loan Complaint states that a loan agreement from 2004 with Bank of America is attached as Exhibit F, but no such document exists.  That exhibit contains a 2008 agreement with Bank of America, N.A., and a 2004 agreement with Bank One, N.A.  There is no allegation that Bank One, N.A., is affiliated with Bank of America, N.A., and so we ignore Nagel's Bank One loan documents.  We assume at this stage that either (1) Nagel is suing under the 2008 agreement with Bank of America, N.A., or (2) Nagel is suing under a 2004 agreement with Bank of America, N.A., which closely resembles the exhibited 2008 agreement.  Cf. Student Loan Compl. ¶ 77 ("The loan was prepared on standard form documents.").

in error, that Nagel's loan calls for application of Rhode Island law).

### 1.1.3. Theory of Damages

The Student Loan Plaintiffs are borrowers and, as such, were not harmed by the persistent suppression of LIBOR.[9]  Nor have they attempted to plead injury from sporadic trader-based manipulation, although their complaint is replete with allegations of trader-based Yen LIBOR manipulation.  Instead, the Student Loan Plaintiffs argue that their LIBOR-based loans are unconscionable or invalid under state laws that forbid a lender from controlling a loan's floating interest rate.  Student Loan Compl. ¶¶ 112, 119.  Because they view the floating-rate portions of their interest payments as unlawful, they seek to reform their loan agreements so that only the fixed portion of their interest rate accrues.  See Tr. 93:14–21.  The Student Loan Plaintiffs also bring common law fraud claims on the theory that issuers "specif[ied] a rate indexed to LIBOR at a time when [they were] manipulating such rate," and "represent[ed] that such rate was objective and outside the control of the lender."  Student Loan Compl. ¶¶ 127–28.

Separately, the Student Loan Complaint states that the National Collegiate Student Loan Trust 2007-1 (the "Trust"), which

---

[9] The Student Loan Plaintiffs have not advanced a theory of damages akin to the Mortgagor Plaintiffs (see infra at 8-9), and could not have done so, because at least some of their borrowing occurred before August 2007.

currently holds the Weglarzes' loan, "took the loans tainted by the fraud of JP Morgan Chase Bank, N.A." Student Loan Compl. ¶ 131.

## 1.2. Lender Plaintiffs

The Lender Plaintiffs are three institutions, The Berkshire Bank ("Berkshire"), the Government Development Bank for Puerto Rico ("GDB"), and Directors Financial Group ("Directors"). Consol. Second Am. Class Action Compl. ("Lender Complaint") ¶¶ 12–14, ECF No. 836.  Berkshire is a bank chartered in New York. Lender Compl. ¶ 12.  GDB is a Puerto Rican bank that loans money to private and public entities and serves as the "fiscal agent and financial advisor for the Puerto Rican Government." Lender Compl. ¶ 13.  Directors is a "finance lender." Lender Compl. ¶ 14.  Each lent money at interest rates tied to LIBOR, and each alleges receiving artificially low interest payments.

The Lender Complaint does not reveal when the plaintiffs extended loans, to whom, or for what purposes.  Counsel represented at oral argument that the plaintiffs "issu[ed] and purchas[ed] mortgage loans" "[o]r other loans," and that "I think . . . the Puerto Rico Government Development Bank does loans beyond mortgages." Tr. 71:7-8, 71:10-12.

## 1.3. Mortgagor Plaintiffs

The Mortgagor Plaintiffs are four individuals, Carl Payne, Kenneth Coker, Carlito Rivera, and Philip Maresca, who each

obtained adjustable-rate mortgages tied to LIBOR.  The Mortgagor Plaintiffs allege that banks set adjustable-rate margins in inverse relation to the benchmark rate that exists at the time a loan is offered, so that the bank may expect to achieve a certain targeted cash flow independent of the choice of benchmark.  All else equal, a loan that uses a higher reference rate will have a lower margin, while a loan that uses a lower reference rate will have a higher margin.  Thus, when the Mortgagor Plaintiffs received loans referencing a suppressed benchmark during the persistent suppression period, their margins were set artificially high.  These margins remained artificially high even after persistent suppression ended, leaving the Mortgagor Plaintiffs to pay artificially high payments based on their inflated margins.

Coker and Payne obtained their loans on May 31, 2007, and August 8, 2007, respectively, and Maresca received an "Approval Notice" stating his mortgage terms on August 7, 2007.  First Am. Compl. ("Mortgagor Complaint") ¶¶ 226, 230, ECF No. 844; Letter from Daniel Alberstone at 1–2, ECF No. 1186.  Thus, the mortgage terms for these three plaintiffs were fixed before August 9, 2007, the date when LIBOR suppression plausibly began.  See LIBOR IV, ___ F. Supp. 3d at ___ n.143, 2015 WL 6243526, at *115 n.143, 2015 U.S. Dist. LEXIS 147561, at *389–90 n.143.  This fact is fatal to these three plaintiffs, as their theory of damages depends on the existence of temporary LIBOR suppression at the time when their

interest rates were determined.   Accordingly, plaintiffs Coker, Payne, and Maresca are dismissed.

The remaining plaintiff, Rivera, obtained his loan on November 29, 2007, from Bank of America, N.A.   Mortgagor Compl. ¶¶ 234, 281–82.   The interest rate was 6.50% until December 2012, and LIBOR plus 2.25% thereafter.   Mortgagor Compl. ¶¶ 235–36.

### 1.4. OTC Plaintiffs

#### 1.4.1. TCEH

Texas Competitive Electric Holdings (TCEH) entered into master swap agreements with several banks in 2007.   As relevant here, these included one with Credit Suisse International (CSI), an affiliate of Credit Suisse Group AG (CSGAG).   See Proposed Third Am. Compl. ("Third OTC Complaint") ¶ 389, ECF Nos. 627-1 to 627-3.

#### 1.4.2. SEIU

In late 2006, the SEIU Pension Plans Master Trust (SEIU) purchased corporate bonds issued by Credit Suisse (USA), Inc. (CSUSA), an affiliate of CSGAG.   See Third OTC Compl. ¶ 398.   SEIU purchased these bonds directly from a non-party affiliate of Credit Suisse.   See id.   At oral argument, we questioned whether SEIU, as a bondholder, properly belongs in the same putative class as other plaintiffs, who traded swaps with defendants.   Tr. 38:8-10. Plaintiffs' counsel argued that SEIU's claims are similar to swap claims in that SEIU dealt directly with Credit Suisse and is suing

Credit Suisse in its capacity as a counterparty.  Tr. 38:14-39:4. As class certification is not before us, we express no view as to whether SEIU belongs in the same putative class as swap traders.

### 1.4.3. Highlander Realty

Highlander Realty, LLC ("Highlander Realty" or "Highlander") presents itself as an OTC Plaintiff that was exposed to LIBOR suppression by trading an interest rate swap with Citizens Bank of Massachusetts ("Citizens Bank"), an affiliate of the Royal Bank of Scotland.  The reality is more complex.  In 2006, Highlander entered into what is known as a "synthetic fixed-rate loan," meaning that it simultaneously took out a floating-rate loan from Citizens Bank and used an interest rate swap to exchange its floating-rate obligations for fixed-rate obligations.[10]  See Third OTC Compl. ¶ 399; Commercial Loan Promissory Note, ECF No. 968-1 (floating-rate note dated October 25, 2006); Interest Rate Swap Confirmation CED14314, ECF No. 968-2 (swap confirmation dated October 26, 2006)).  We discuss the terms of Highlander Realty's agreements in greater detail below, in connection with our conclusion that Highlander did not suffer injury from manipulation of LIBOR.

---

[10] This device apparently provides some utility for the borrower in comparison with an ordinary fixed-rate loan, although neither party could explain at oral argument precisely wherein the advantage lies.

### 1.4.4. Jennie Stuart

Jennie Stuart Medical Center Inc. ("Jennie Stuart") seeks to join the OTC case.  Jennie Stuart entered into two swap contracts with Bank of America, N.A, Third OTC Compl. ¶¶ 394-95, but has conceded that one of these transactions does not reference LIBOR. Letter from William Christopher Carmody at 4, ECF No. 1202.

## 2. Procedural History

### 2.1. Prior Rulings

#### 2.1.1. Consolidation

Shortly after receiving this MDL, we set out to organize the putative class actions.[11]  These early orders have been the subject of some recent confusion, so we explain them in detail here.  In our Memorandum and Order of November 29, 2011, we appointed interim class counsel for all OTC and Exchange-Based class actions.  Mem. & Order at 8, 9, ECF No. 66.  We also consolidated all pending and future class actions pursuant to Federal Rule of Civil Procedure 42(a).  Mem. & Order at 10.  In light of the November 29 Order, the newly-appointed lead counsel for the OTC and Exchange-Based classes proposed a Pretrial Order No. 1, which we signed on December 22, 2011.  See ECF No. 90.  This Pretrial Order No. 1 listed the cases that were consolidated into Baltimore (No. 11-cv-5450) and FTC Capital (No. 11-cv-2613, now captioned Metzler),

---

[11] We note that we have not yet certified any classes and nothing in this opinion should be understood as indicating that any classes will or will not be certified.

and directed the Clerk to close the remaining OTC and Exchange-Based class actions.

We later recognized that both the November 29 Order and Pretrial Order No. 1 were in error to the extent that they consolidated class actions for all purposes pursuant to Rule 42(a), because an MDL court may not assign itself out-of-district cases without the consent of all parties. LIBOR IV, ___ F. Supp. 3d at ___ & n.38, 2015 WL 6243526, at *22 & n.38, 2015 U.S. Dist. LEXIS 147561, at *143–44 & n.38 (citing Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 28 (1998)). Accordingly, on July 18, 2012, we ordered that the OTC and Exchange-Based class actions were consolidated for pre-trial purposes only. See Mem. & Order, ECF No. 187. Although the July 18 Order only explicitly displaced the November 29 Order, its effect was to overrule Pretrial Order No. 1 as well, to the extent that Pretrial Order No. 1 purported to consolidate cases for all purposes.

Thus, the present posture is this. The cases listed in Pretrial Order No. 1 are consolidated for all pretrial purposes and are, for the time being, closed on this Court's docket. However, at the conclusion of pretrial proceedings, both Baltimore and Metzler will, absent further procedural realignment,

dissociate into their constituent cases, and each case will return to its district of origin.[12]

### 2.1.2. Merits Holdings

We reviewed our prior rulings exhaustively in <u>LIBOR IV</u>, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *7-11, 2015 U.S. Dist. LEXIS 147561, at *103-12, and will not repeat that exercise here. Of particular note is that <u>LIBOR I</u>, <u>II</u>, and <u>III</u> each addressed the merits of the OTC and Exchange-Based class actions but did not consider personal jurisdiction.

While we considered the merits of the OTC and Exchange-Based class complaints, the remaining actions—both non-class actions and class actions that had not been consolidated—were subject to a stay.  <u>See</u> Memorandum & Order, ECF No. 205; Memorandum, ECF No. 309; <u>LIBOR II</u>, 962 F. Supp. 2d at 635.  This stay included the <u>Highlander Realty</u>[13] and <u>SEIU</u>[14] cases that are the subject of pending motions.

---

[12] The parties may wish to consider whether to transfer and consolidate the pending Exchange-Based class actions for all purposes, although such consolidation would require a "<u>Lexecon</u> waiver" from all parties.  The parties may also wish to consider a motion to consolidate the OTC class actions that were listed in Pretrial Order No. 1, each of which was filed in this district. However, a consolidation order could not apply to future cases transferred from outside this district.

[13] <u>Highlander Realty v. Citizens Bank of Mass.</u>, No. 13-cv-10668 (D. Mass.), <u>transferred to</u> No. 13-cv-2343 (NRB) (S.D.N.Y.).

[14] <u>SEIU Pension Plans Master Trust v. Bank of Am. Corp.</u>, 13-cv-1456 (NRB) (S.D.N.Y.).

## 2.2. Pending Motions

The outstanding motions are (1) defendants' motions to dismiss the New Classes' complaints (ECF Nos. 966, 969),[15] (2) defendants' motion to dismiss the complaints of the New Classes, the OTC Plaintiffs, and the Exchange-Based Plaintiffs on jurisdictional grounds (also ECF No. 966), (3) certain defendants' objections to elements of the OTC Plaintiffs' most recent proposed amended complaint (ECF Nos. 958, 964, 971), (4) the Exchange-Based Plaintiffs' request to amend their complaint in order to name several new defendants (ECF No. 1159), (5) a motion to reargue portions of LIBOR IV (ECF No. 1178), and (6) the Lender Plaintiffs' request to amend in order to state their claim more precisely (ECF No. 1191).   This opinion resolves all but the Exchange-Based Plaintiffs' request and the motion to reargue.

## III. PLEADING STANDARDS

When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009); Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  Nevertheless, a plaintiff's "[f]actual allegations must be enough to raise a

---

[15] A separate motion by Société Générale to dismiss Payne (ECF No. 950) is moot because the Mortgagor Plaintiffs have voluntarily dismissed Société Générale. See Notice of Voluntary Dismissal, ECF No. 1096.

right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The well-pleaded factual allegations must demonstrate "more than a sheer possibility that a defendant has acted unlawfully" in order to pass muster. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570.

In the context of these Rule 12(b)(6) motions, we consider only the pleadings, exhibits to the pleadings, documents referred to within the pleadings, and documents subject to judicial notice. See, e.g., Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006); Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088, 1092 (2d Cir. 1995). As we have implicitly done before, we take judicial notice of LIBOR-related news articles discussed in LIBOR I, not for the truth of the articles, but for the existence of the articles and their content.[16] See Staehr v. Hartford Fin. Servs. Grp., Inc.,

---

[16] The Student Loan Plaintiffs ask us to take judicial notice of the facts alleged in the complaints in Federal Deposit Insurance Corp. v. Bank of America Corp. (FDIC), No. 14-cv-1757 (NRB) (S.D.N.Y.) and National Credit Union Administration Board v. Credit Suisse Group AG (NCUA), No. 13-cv-2497 (D. Kan.), transferred to No. 13-cv-7394 (NRB) (S.D.N.Y.). We may, of course, take judicial notice of the fact that these complaints exist and contain certain allegations. Cf. LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *152-55, 2015 U.S. Dist. LEXIS 147561, at *472-84 (describing contents of class action complaints in the context of evaluating tolling arguments based on those complaints). However, we have no basis to assume the truth of one plaintiff's allegations in the course of evaluating another plaintiff's complaint. The Student Loan Plaintiffs had an opportunity to file an amended complaint of their own after the FDIC and NCUA filed their operative complaints. Compare Student

547 F.3d 406, 424–26 (2d Cir. 2008); In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 581–82 (S.D.N.Y. 2011).  As to the Highlander Realty action, we consider both the swap agreement and its associated loan agreement, which are both integral to the allegations.

### IV. STUDENT LOAN PLAINTIFFS

**1. Personal Jurisdiction**

The Student Loan Plaintiffs rely on the existence of loans from two defendant banks.  The Weglarzes, Illinois residents who sued in the Northern District of Illinois, allege that they borrowed from JPMorgan Chase Bank, N.A.  Nagel, a Wisconsin resident who sued in the Western District of Wisconsin, alleges that she borrowed from Bank of America, N.A.  Defendants argue that there is no specific personal jurisdiction as to these banks because the loans "have nothing to do with the 'suit-related conduct,' which is the alleged manipulation of LIBOR."  Joint Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Putative Class Actions for Lack of Pers. Jurisd. ("Defs.' PJ Mem.") at 13 (citation omitted), ECF No. 978.  Although the Student Loan Plaintiffs did not specifically oppose this argument in their brief, counsel argued at oral argument that, where a defendant

---

Loan Compl., Nov. 13, 2014, ECF No. 835, with Am. Compl., FDIC, Oct. 7, 2014, Individual Case ECF No. 23, and Am. Compl., NCUA, Oct. 6, 2014, ECF No. 662. If the Student Loan Plaintiffs wished to include the FDIC's and NCUA's allegations within their own complaint, then they could have done so, subject to the obligations of Federal Rule of Civil Procedure 11(b).

entered into a loan in the state of a plaintiff's residence, the defendant is subject to personal jurisdiction in that state.  See Tr. 102:17-103:3.  We agree, and conclude that a prima facie case of personal jurisdiction in Illinois and Wisconsin exists for the Student Loan Plaintiffs' statutory and common-law claims relating to the student loans they received from defendants in their home state.  Accordingly, the motion to dismiss on jurisdictional grounds is denied as to the Student Loan Plaintiffs' complaint.

**2. Fraud**

Turning to the merits, we begin with the fraud claim.  The Student Loan Plaintiffs' complaint fails to allege with particularity any representation by the issuers regarding the nature of LIBOR.  Likewise, the loan documents submitted by plaintiffs do not make any representation regarding LIBOR.  Under Rule 9(b), this is enough to warrant dismissal of the fraud claim.

Furthermore, the complaint fails to allege that any manipulation increased plaintiffs' loan payments.  Persistent suppression (which the complaint actually fails to allege) would not have increased plaintiffs' payments, and no incident of trader-based inflation is offered as a source of damages.  As actual damages are an element of fraud in both Illinois and Wisconsin, this failure too warrants dismissal of the fraud claim.  See Collins-Hardin v. WM Specialty Mortg., LLC, No. 12 C 50099, 2015 WL 3505188, at *6, 2015 U.S. Dist. LEXIS 71394, at *16-17 (N.D.

Ill. June 3, 2015); Connick v. Suzuki Motor Co., 174 Ill. 2d 482, 496, 675 N.E.2d 584, 591 (1996); Iverson v. Schnack, 263 Wis. 266, 268-69, 57 N.W.2d 400, 401 (1953).

For much the same reasons, the Student Loan Plaintiffs cannot maintain statutory "consumer fraud" claims, which merely re-characterize the same facts as "unfair and deceptive" rather than "fraudulent." See, e.g., Duran v. Leslie Oldsmobile, Inc., 229 Ill. App. 3d 1032, 1039, 594 N.E.2d 1355, 1361 (2d Dist. 1992) (holding that damages are necessary element of claim under Illinois's Consumer Fraud Act). As to Nagel's claims, Wisconsin law does not even apply, as Nagel fails to allege that Bank of America either sent a solicitation into Wisconsin or received a writing from Nagel in Wisconsin. Wis. Stat. § 421.201(1)-(2).

The complaint also states conclusorily that the National Collegiate Student Loan Trust 2007-1 (the "Trust"), which currently holds the Weglarzes' loan, "took the loans tainted by the fraud of JP Morgan Chase Bank, N.A." Student Loan Compl. ¶ 131. Even if the loan were, in fact, "tainted by . . . fraud," no allegation even hints that the Trust was aware of any defect when the Trust purchased the loan. This omission distinguishes cases cited by the Student Loan Plaintiffs in which a successor to a loan agreement was at least aware of the loan originator's fraud. Cf. Callner v. Greenberg, 376 Ill. 212, 218, 33 N.E.2d 437, 440 (1941) ("At law, it has been held that a knowing beneficiary of a

fraud may be held liable with the perpetrator."); <u>Moore v. Pinkert</u>, 28 Ill. App. 2d 320, 334–35, 171 N.E.2d 73, 79 (1st Dist. 1960) ("There is sufficient in the record to raise a strong imputation of Dvorak's knowledge of Kotas' conduct . . . . [I]f it is proved that Dvorak had knowledge thereof he is liable for the money paid to him on account of the mortgage.").  Because plaintiffs concede that no statutory action lies against the Trust, <u>see</u> Student Loans Pls.' Response to Mots. to Dismiss at 13 n.2, ECF No. 1109, the action is dismissed against the Trust.

**3. LIBOR As a Valid Interest Rate**

Illinois law provides as follows:

> With respect to interest-bearing loans: . . . (3) Loans must be fully amortizing and be repayable in substantially equal and consecutive weekly, biweekly, semimonthly, or monthly installments.  Notwithstanding this requirement, rates may vary according to an index that is independently verifiable and <u>beyond the control</u> of the licensee.

205 Ill. Comp. Stat. Ann. 670/15(e) (emphasis added); <u>cf.</u> 12 C.F.R. § 34.22(a) (providing that the interest rate for a national bank's adjustable loan must be "beyond the control of the bank"). According to the Weglarzes, the floating-rate component of their LIBOR-based loan was unlawful because LIBOR was within the "control" of their lender, JPMorgan Chase Bank, N.A.

This claim fails at the threshold because Illinois's Consumer Installment Loan Act, of which section 670/15 is part, "does not

apply to any [entity] doing business under and as permitted by any law . . . of the United States relating to banks." 205 Ill. Cons. Stat. Ann. 670/21.  JPMorgan Chase Bank, N.A., is indisputably a national bank chartered by the (federal) Office of the Comptroller of the Currency, and so section 670/15 simply does not apply.  The Weglarzes advance a back-up argument that the common law of contracts in Illinois incorporates section 670/15 as indicative of public policy.  See Tr. 98:14–19.  We disagree.  The Illinois General Assembly placed clear bounds around its consumer loan regulations.  The most straightforward interpretation of this choice is that the General Assembly, for whatever reason, intended to regulate lenders other than banks and to leave banks free to offer loans subject to their own set of regulations.  It is not our role to second-guess whether banks were worthy of this trust, and so we will not apply section 670/15 beyond the bounds set by the General Assembly.[17]

Even if section 670/15 applied directly to the Weglarzes' transaction, it is far from clear that LIBOR was within the "control" of JP Morgan Chase.  The language of section 670/15 (and

---

[17] Before 1998, the same provision would have applied to JPMorgan Chase.  The statute formerly stated that chartered banks "shall comply with other provisions of this Act [i.e., provisions other than licensure provisions] when contracting for or receiving charges on loans regulated by this Act."  1997 Ill. Legis. Serv. 90-437 (West) (quoting deleted language enacted in 1963 Ill. Laws 3526).  That the Illinois General Assembly affirmatively deleted this "shall comply" proviso is powerful evidence that the Legislature no longer wishes to apply the substance of section 670/15 to banks.

similar statutes in other states) has typically been applied to a situation in which an interest rate was entirely subject to a lender's whim or where a loan disclosure completely failed to identify the index.  See Hubbard v. Fidelity Fed. Bank, 824 F. Supp. 909, 917 (C.D. Cal. 1993), rev'd in part, 91 F.3d 75 (9th Cir. 1996); Preston v. First Bank of Marietta, 16 Ohio App. 3d 4, 6-7, 473 N.E.2d 1210, 1214-15 (1983).  Here, the index was well-known and easily verified.  Furthermore, JPMorgan Chase exerted limited influence over the LIBOR index because it was only one of sixteen panel banks, of whose quotes only eight were counted on any given day.

We also do not think that the Illinois General Assembly (or the Comptroller of the Currency in adopting similar regulations) intended to bar the use of so common a benchmark as LIBOR, yet this is the conclusion that logically follows from the Student Loan Plaintiffs' argument.  Plaintiffs attempt to avoid this extraordinary conclusion by reading into the statute a rule that a bank may "control" an interest rate so long as the "control" is not exercised in an illicit or unreasonable manner.  See Tr. 95:21-96:5.  This does not follow from the statute.  Regardless of whether a lender exerts control over an interest rate, the interest rate either is or is not "beyond the control" of the lender.

Finally, we reject the notion that the use of LIBOR as a benchmark for student loans is inherently unconscionable.  There

is no suggestion that any defendant imposed a LIBOR-based interest rate on the Student Loan Plaintiffs, and such a pleading would be implausible given the widespread availability of fixed-rate student loans.  Furthermore, it is not substantively unreasonable to incorporate LIBOR into a floating-rate loan.  Whatever LIBOR's deficiencies may have been, LIBOR was, at the time of Plaintiffs' transactions, considered to be a sufficiently reliable benchmark that even highly sophisticated borrowers willingly incorporated it into their loans.

## 4. Conclusion

The Student Loan Plaintiffs' claims are dismissed.  Having dismissed these claims, we have no need to address other issues raised by the parties.

<u>V. LENDER PLAINTIFFS</u>

## 1. Personal Jurisdiction

The Lender Plaintiffs, who each filed suit in New York against panel banks, assert a fraud theory not associated with any particular relationship between themselves and the defendants.  In LIBOR IV, we held that, where plaintiffs state a substantively viable claim against panel banks for fraud, personal jurisdiction exists "only where the LIBOR submission was determined or transmitted," or, in the context of trader-based manipulation, "in the location of the person who requested the submitter to engage in manipulation."  LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL

6243526, at *38, 2015 U.S. Dist. LEXIS 147561, at *189–90.   We adhere to this conclusion.   Accordingly, as with the cases considered in LIBOR IV, the parties to this action are "direct[ed] . . . to confer and provide us with a spreadsheet containing a list of claims [against banks and affiliated defendants] that, in accordance with [our general rulings], are dismissed on jurisdictional grounds."   Id., ___ F. Supp. 3d at ___, 2015 WL 6243526, at *37, 2015 U.S. Dist. LEXIS 147561, at *186.[18]

Alone among the LIBOR V plaintiffs, the Lender Plaintiffs assert claims against the BBA and related entities.   In LIBOR IV, we concluded that "[t]o the extent that . . . the BBA purposefully directed communications about LIBOR to plaintiffs in a given state, those contacts can in principle support personal jurisdiction over claims that those communications were fraudulent," but that such fraud claims fail on the merits.   ___ F. Supp. 3d at ___, 2015 WL 6243526, at *30, 2015 U.S. Dist. LEXIS 147561, at *164.   Moreover, we rejected personal jurisdiction over the BBA on other bases, concluding that "[p]laintiffs have not alleged that the BBA evaluated the accuracy of panel banks' submission in the United States, that BBA employees in the United States made the decision

---

[18] As in LIBOR IV, "[i]f the parties disagree as to how any ruling applies to a particular defendant in a particular case, each side may provide a brief summary of its position . . . ."   ___ F. Supp. 3d at ___, 2015 WL 6243526, at *37, 2015 U.S. Dist. LEXIS 147561, at *186.   "To the extent that plaintiffs are unable to complete such a spreadsheet in accordance with our rulings, they should describe with particularity the information that they require and that is not in their possession."   Id. at n.63.

to publish false data, that the BBA calculated LIBOR in the United States, or that the BBA's distribution of LIBOR in the United States was a but-for cause of plaintiffs' injuries." ___ F. Supp. 3d at ___, 2015 WL 6243526, at *38, 2015 U.S. Dist. LEXIS 147561, at *190 (footnote omitted).  We reaffirm this conclusion that the claims against the BBA defendants fail because of a combination of lack of personal jurisdiction and failure to state a claim.

**2. Damages**

Of all the New Classes, the Lender Plaintiffs have the most straightforward theory of damages.  They held loans whose interest rates were tied to LIBOR.  Thus, if LIBOR was persistently suppressed, the interest payments on the loans were lower than the payments would have been if the payments had been calculated from "true LIBOR."

At oral argument, defendants compared the Lender Plaintiffs' claims to the federal securities claims of Schwab that we dismissed in LIBOR IV.  See Tr. 81:18-82:9; LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *70, 2015 U.S. Dist. LEXIS 147561, at *277-80.  The comparison is inapt because the Lender Plaintiffs propound a different factual theory than did Schwab.  It is nonsensical to claim, as Schwab did, that LIBOR suppression artificially inflated the price of LIBOR-based bonds.  But Lender Plaintiffs maintain, much more plausibly, that their interest payments were artificially depressed.  This factual theory was

unavailable to Schwab under federal law, which only addresses fraud in the "purchase and sale" of securities, Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b), but is available at common law.

Defendants also argue that Berkshire Bank has pleaded no cognizable damages under New York law because Berkshire Bank's "lost profits" do not represent an out-of-pocket loss on any transaction.

Both parties rely on Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 422, 668 N.E.2d 1370, 1374 (1996). In Lama Holding, the plaintiff had engaged in a stock transaction in reliance on faulty tax advice. Nevertheless, the plaintiff sold its shares at a clear profit. On these facts, the Court of Appeals held that the plaintiff could not maintain a fraud claim. Plaintiffs read Lama Holding narrowly as holding that lost-profit damages are unavailable when the lost profits are "undeterminable and speculative." Id. While it is true that the Court of Appeals characterized the plaintiff's ostensible damages in this manner, the Court's reasoning was considerably broader. The fairest reading of Lama Holding is that New York's law of fraud recognizes only "out of pocket" losses.

Typically, the measure of damages is the difference between the amount that the plaintiff paid for some property and the true value of the property. See Continental Cas. Co. v. PricewaterhouseCoopers, LLP, 15 N.Y.3d 264, 271, 933 N.E.2d 738,

742 (2010).  However, this measure does not readily apply here, where there is no fraud in the inception of Berkshire Bank's mortgages and other loans.  As the Court of Appeals has observed, "[v]arying circumstances must logically require variation in the application of [the] measure of damages."  Hotaling v. Leach & Co., 247 N.Y. 84, 88, 159 N.E. 870, 871 (1928).  We therefore consider other New York cases involving bonds and similar securities.

In Continental Insurance Co. v. Mercadante, 222 A.D. 181, 225 N.Y.S. 488 (1st Dep't 1927), the court found that a holder of bonds had suffered damages when the holder, relying on defendant's misrepresentations, retained the bonds instead of selling the bonds as the holder had earlier planned.  By contrast, in Starr Foundation v. American International Group, 76 A.D.3d 25, 901 N.Y.S.2d 246 (1st Dep't 2010), the court found, over a dissent, that a holder of AIG stock had not suffered damages when the holder, in similar circumstances, retained its stock.  The majority in Starr Foundation distinguished Continental Insurance by observing that the bondholder in Continental Insurance lost much of its original investment, while the shares at stake in Starr Foundation retained value at least equal to what the plaintiff originally spent.  Id., 76 A.D.3d at 33, 901 N.Y.S.2d at 252-53.  This explanation is in some tension with Continental Insurance's own reasoning that "[t]he gravamen of the action is for fraud in

inducing, not the purchase of the bonds, but their retention after purchase." 222 A.D. at 183, 225 N.Y.S. at 490. If the theory of Continental Insurance is to be taken seriously, then the proper measure of damages, like the fraud itself, has nothing to do with the investor's fortuitous purchase price, and a "holder claim" can exist even when the plaintiff recouped his initial investment. The better explanation for the outcome in Starr Foundation is that plaintiff's ability to sell its stock at a high price was just as artificial as the public information that the plaintiff allegedly received. The lost opportunity was entirely illusory because, if the defendant corporation had properly revealed the truth about its finances, then its stock price would never have been inflated at all. See Starr Found., 76 A.D.3d at 29, 901 N.Y.S.2d at 250. By contrast, it is not clear that the bonds at stake in Continental Insurance traded in an efficient market, or that the plaintiff relied upon public information in retaining its bonds. Thus, the Continental Insurance plaintiff plausibly gave up a genuine opportunity to sell bonds at a high price in reliance on the defendant's false representations. Together, these cases demonstrate that the measure of damages in a fraud case depends critically upon comparing a plaintiff's investment with the alternatives that would have existed were it not for the defendant's fraud.

The employment opportunity cases cited by Berkshire Bank are consistent with this approach.  In each one, the court compares the specific opportunity that the plaintiff gave up with the one that the plaintiff received.  See, e.g., Stewart v. Jackson & Nash, 976 F.2d 86, 88 (2d Cir. 1992); Doehla v. Wathne Ltd., No. 98-cv-6087 (CSH), 1999 WL 566311, at *1, 1999 U.S. Dist. LEXIS 11787, at *1-2 (S.D.N.Y. Aug. 3, 1999); but cf. Pasternak v. Dow Kim, 961 F. Supp. 2d 593, 597-98 (S.D.N.Y. 2013) (damages based on potential bonus payments unavailable where plaintiff had not given up an alternative employment opportunity).

In cases involving bonds or loans, it is often proper to compare the cash flows received with those that would have been received if the plaintiff had invested in a hypothetical interest-bearing deposit.  For example, in Hotaling, 247 N.Y. at 84, 159 N.E. at 870, the Court of Appeals approved the lower court's assessment of damages as (1) the amount paid for the bond, adjusted for interest, minus (2) interest payments received on the bond, and minus (3) principal paid on the bond.  This is the approach that we would apply to Berkshire Bank's investments.[19]  However, Berkshire Bank has not pleaded information about any specific

---

[19] Arguably, one might pick a different comparator for LIBOR-based mortgages, such as fixed-rate mortgages or floating-rate mortgages based on some other index.  However, in the absence of any pleading that Berkshire Bank forwent some such specific investment opportunity in favor of issuing or purchasing a LIBOR-based mortgage, the risk-free interest rate is the most appropriate neutral comparator.

investment, so we cannot assess whether Berkshire Bank suffered any net loss on any mortgage or other loan.  Accordingly, we dismiss Berkshire Bank for failure to plead damages.

### 3. Scope of Expected Reliance

In LIBOR IV, we held that a broad range of LIBOR-based investors were within the class of persons who were intended to rely on LIBOR.  See ___ F. Supp. 3d at ___, 2015 WL 6243526, at *62-65, 2015 U.S. Dist. LEXIS 147561, at *255-65.  We observed further that the panel banks may be liable in fraud regardless of whether they had specific intent to defraud a particular investor or class of investors.  See id., ___ F. Supp. 3d at ___, 2015 WL 6243526, at *64, 2015 U.S. Dist. LEXIS 147561, at *262-63; cf. id., ___ F. Supp. 3d at ___, 2015 WL 6243526, at *80-82, 2015 U.S. Dist. LEXIS 147561, at *302-06 (discussing scienter requirement for tortious interference).

In this context, it is plausible that mortgages were within the scope of transactions for which LIBOR was intended to be used, and consequently that mortgage investors may have claims.  On the basis of counsel's representation that each of the Lender Plaintiffs held mortgages, we conclude that each of the Lender Plaintiffs are plausibly so situated.[20]

---

[20] We do not know from the pleadings what other kinds of loans plaintiffs issued, and therefore cannot decide at this time the extent to which LIBOR may have been intended for use in other transactions.  We also do not decide whether other kinds of loans are sufficiently similar to mortgages so as to warrant certification of a single class.

**4. Justifiable Reliance**

Our doubts about the reasonableness of reliance are even stronger as to the Lender Plaintiffs than in other contexts, especially for mortgages that the Lender Plaintiffs themselves issued.  The pleadings do not tell why a mortgage lender, who normally dictates terms to a mortgagor, could not have simply chosen a different interest rate.

Nevertheless, the Lender Plaintiffs' claims survive as to loans that the plaintiffs issued or purchased before warning signs of manipulation emerged.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *68, 2015 U.S. Dist. LEXIS 147561, at *272-73 ("[J]ustifiability is measured at the time that plaintiff committed to rely on LIBOR. . . .  [P]laintiffs may have relied on LIBOR to calculate particular payments years after committing to do so.  If the commitment at the time of executing a [transaction] was reasonable, then the reliance that necessarily followed, even years later, is actionable.").  Furthermore, at least for loans that the Lender Plaintiffs purchased, it is plausible that the secondary mortgage market was so dominated by LIBOR-based loans that it would have been difficult in practice for the plaintiffs to restrict their investments to non-LIBOR-based loans, even after signs of manipulation began to emerge.

## 5. Statute of Limitations

We apply New York's limitations law to all three plaintiffs, including New York's "borrowing rule," N.Y. C.P.L.R. 202 (Consol. 2008), which provides that the out-of-state claim of an out-of-state plaintiff must be timely under both New York's limitations law and the limitations law of the place where the action accrued. In this MDL, we have applied the usual rule that a financial tort accrues where the plaintiff is domiciled.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *118–19, 2015 U.S. Dist. LEXIS 147561, at *398–401.

Berkshire Bank is domiciled in New York, so its claims must be timely only under New York law.  GDB is domiciled in Puerto Rico and Directors in California, and so their claims must, in addition, be timely under Puerto Rico and California law respectively.

Defendants do not argue that any claims are untimely under New York law.  Thus, we consider only whether GDB's claims are timely under Puerto Rico law and whether Directors' claims are timely under California law.

### 5.1. Government Development Bank of Puerto Rico

GDB alleges persistent suppression during a period ending May 31, 2010.  As GDB first stated its claims on November 21, 2012, its claims are time-barred under Puerto Rico's one-year statute of

limitations absent some discovery rule or tolling doctrine.  See P.R. Laws Ann. tit. 31, §§ 5141, 5298(2).

Puerto Rico's discovery rule provides that the limitations period runs "from the time the aggrieved person had knowledge" of a fraud claim.  P.R. Laws Ann. tit. 31, § 5298(2).  "Knowledge" is fairly understood to encompass constructive knowledge, see, e.g., Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 14 (1st Cir. 2005), from which we discern that Puerto Rico applies some form of an inquiry notice rule.  We assume without deciding that Puerto Rico would apply a "weak inquiry notice" rule that the limitations period does not commence until a reasonable inquiry would have discovered the fraud.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *126, 2015 U.S. Dist. LEXIS 147561, at *417-18 (categorizing discovery rules).

In order to apply such a rule, we must first determine whether GDB was on inquiry notice.  We have previously imputed knowledge of news articles about LIBOR to exchange traders but not to long-term investors in LIBOR-based securities.  We reasoned that any competent exchange-based trader would have sought out news concerning the subject of his day-to-day trading, while an investor who held a passive swap or bond position might reasonably have ignored news that pertained to a technical detail of his investment.  A frequent lender such as GDB (or the other Lender Plaintiffs) is much closer to the exchange-based trader on this

spectrum.   A lender decides each day how to price adjustable mortgages in relation to LIBOR, and therefore has every reason to follow news about LIBOR.   Therefore, we consider GDB to have been on inquiry notice by May 29, 2008 (or the date of its investment, whichever is later).

As GDB was on inquiry notice of all its claims by the end of May 2010, a diligent inquiry would have enabled GDB to plead fraud by May 2011.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *135, 2015 U.S. Dist. LEXIS 147561, at *434-35.   GDB failed to file within one year of May 2011, and so its fraud claim is time-barred.[21]

### 5.2. Directors Financial Group

Directors filed its complaint on February 13, 2013, which we measure against California's three-year limitations period for fraud.  See Cal. Civ. Proc. Code § 338(d).   At least some of DFG's claims—those asserting fraud on or after February 13, 2010—are timely.   Furthermore, as we discussed in LIBOR IV, California does not recognize "constructive" inquiry notice through widely disseminated news articles.   ___ F. Supp. 3d at ___, 2015 WL 6243526, at *127, 2015 U.S. Dist. LEXIS 147561, at *421.   It follows that, at this stage, none of Directors' claims can be

---

[21] GDB cannot benefit from the doctrine of fraudulent concealment, see LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *137-38, 2015 U.S. Dist. LEXIS 147561, at *440-41; LIBOR I, 935 F. Supp. 2d at 710-11, and cannot benefit from class-action tolling because GDB was not within the original Berkshire Bank class.  See Compl. ¶ 76, Berkshire Bank, Individual Case ECF No. 1.

dismissed as untimely.   Nevertheless, we are skeptical that a "finance lender" such as Directors would be unaware of <u>Wall Street Journal</u> articles dealing with a major part of its business.   <u>Cf.</u> <u>LIBOR IV</u>, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *165, 2015 U.S. Dist. LEXIS 147561, *510 ("It is difficult to believe that an institutional entity tasked with purchasing . . . residential mortgages did not inform itself of readily available information regarding a critical ingredient of many of the adjustable-rate mortgages in its portfolio.").

**6. Conclusion**

GDB's claims are untimely, and Berkshire Bank has failed to plead damages under New York law.   Furthermore, various claims fail for the reasons stated in <u>LIBOR IV</u>: fraud based on panelists' statements about LIBOR, fraud based on the BBA's statements about LIBOR, fraud by omission for failing to reveal manipulation publicly, and conspiracy to commit persistent suppression. Nevertheless, Directors' pleading of "false data" fraud survives against the panel banks, despite our strong doubts about the timeliness of most of Directors' claims.

Because the claims of plaintiff Directors will go forward, we grant leave for Directors to amend in order to state more specifically the nature of its holdings and its injury.   Plaintiff Berkshire Bank made no attempt to amplify its pleading in response to defendants' arguments regarding damages, and so we have no basis

upon which to assess whether an amended pleading would be futile. Accordingly, Berkshire Bank may not amend without first moving for leave to do so.

We remind the parties that <u>Berkshire Bank</u> and <u>Directors Financial Group</u> have been consolidated for <u>all</u> purposes (Mem. & Order at 8, ECF No. 692), so that there is a "strong presumption," <u>Hageman v. City Investing Co.</u>, 851 F.2d 69, 71 (2d Cir. 1988), that this order is not a final judgment as to any Lender Plaintiff.

## VI. MORTGAGOR PLAINTIFFS

### 1. Personal Jurisdiction

Each of the Mortgagor Plaintiffs is a California resident who alleges the existence of a LIBOR-based adjustable rate mortgage loan in connection with his purchase of real estate in California. <u>See</u> Mortgagor Compl. ¶¶ 17-20, 226, 230, 234, 238. To the extent that a defendant knowingly entered into a mortgage in California with a California plaintiff, such a "counterparty" arrangement is sufficient to state a <u>prima facie</u> case of personal jurisdiction over that defendant for claims related to that mortgage. In particular, a California court has jurisdiction over plaintiff Rivera's loan from Bank of America, N.A.[22]  <u>See</u> <u>id.</u> ¶¶ 280-281.

---

[22] Because the other Mortgagor Plaintiffs' claims fail on the merits, <u>see</u> <u>supra</u> at 9-10, we do not decide whether plaintiff Payne's contract with Washington Mutual supplies a basis for jurisdiction over defendant JPMorgan Chase & Co. or what to make of plaintiff Maresca's allegation, stated for the first time in his briefing, of a contract with "HSBC."

However, the Mortgagor Plaintiffs do not provide a prima facie case for personal jurisdiction against defendants with whom they did not transact.  With respect to claims against these other defendants, the Mortgagor Plaintiffs rely on the "tortious effects" doctrine and concede that "the claim-specific contacts with California are limited to the effects felt within the state." Pls.' Opp. To Defs.' Mot. To Dismiss Pls.' First Am. Compl. Pursuant to Fed. R. Civ. 12(b)(2) ("Payne Mem.") at 11, ECF No. 1066.  Citing Calder v. Jones, 465 U.S. 783 (1984), the Mortgagor Plaintiffs argue that defendants' alleged LIBOR manipulation was "expressly aimed" at California "because they knew California had the bulk of mortgaged units, thus home loans, and they knew th[at] rigging U.S. Dollar LIBOR index would have a potentially devastating impact in California."  Payne Mem. at 10.

However, as we held in LIBOR IV, "personal jurisdiction exists where a defendant took 'intentional, and allegedly tortious actions . . . expressly aimed at the forum.'" ___ F. Supp. 3d at ___, 2015 WL 6243526, at *32, 2015 U.S. Dist. LEXIS 147561, at *173 (quoting In re Terrorist Attacks on Sept. 11, 2001 (Terrorist Attacks), 714 F.3d 659, 674 (2d Cir. 2013)).  Plaintiffs' assertion that panel banks expressly aimed their allegedly manipulative conduct at California because of their supposed awareness that harm would be felt disproportionately in California fails as a matter of law, because it improperly equates the foreseeability of

harm in a forum with the defendants' intent to aim their conduct at a forum.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *32, 2015 U.S. Dist. LEXIS 147561, at *173 ("It is bedrock law that merely foreseeable effects of defendants' conduct do not support personal jurisdiction." (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295 (1980), and Terrorist Attacks, 714 F.3d at 674).  Moreover, that the plaintiffs foreseeably suffered injury in California as a result of defendants' actions elsewhere does not by itself support personal jurisdiction in California.  See Adv. Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 802 (7th Cir. 2014) ("[T]here can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.'" (quoting Walden v. Fiore, 571 U.S. ___, ___, 134 S. Ct. 1115, 1122 (2014))).[23]

Accordingly, the moving defendants' Rule 12(b)(2) motion is granted except with respect to the Rivera claims against Bank of America, N.A.[24]

---

[23] The Mortgagor Plaintiffs do not suggest, and it has never been suggested in this litigation, that any misconduct related to LIBOR manipulation took place in California.

[24] Defendants' halfhearted Rule 12(b)(4) and 12(b)(5) motions against the Mortgagor Plaintiffs' complaint are denied.  Those rules countenance dismissal of a complaint for "insufficient process" and "insufficient service of process," but not for failure to file proof of service.  Although a plaintiff bears the ultimate burden of proving adequate service of process upon a defendant, see Burda Media, Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005), "[f]ailure to prove service does not affect the validity of service," Fed. R. Civ. P. 4(l)(3); see King v. Best Western Country Inn, 138 F.R.D. 39, 43 (S.D.N.Y. 1991).  "[A]n objection to service of process 'must be specific and must point out in what manner the plaintiff has failed to satisfy the requirements of the service

## 2. Fraud Claims Against Bank of America

### 2.1. Pleading

The Mortgagor Complaint provides no particularized allegations of affirmative falsity, and does not attach plaintiff Rivera's mortgage documents. As a result, we treat Rivera's fraud claim as essentially one for fraud by omission. We also view Rivera's UCL claim[25] as essentially duplicative of his fraud claim. To the extent that the use of LIBOR was not deceitful, the use of LIBOR was not unfair.

### 2.2. Preemption

Bank of America argues that Rivera's fraud and UCL claims are preempted by the National Bank Act, which regulates lending by national banks such as Bank of America, N.A. The Office of the Comptroller of the Currency has published regulations pursuant to the National Bank Act, which carry the same preemptive force as the statute itself. See Martinez v. Wells Fargo Home Mortg., Inc., 598 F.3d 549, 555 (9th Cir. 2010) (citing Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982)).

These regulations state:

> A national bank may make real estate loans
> . . . without regard to state law limitations

---

provision utilized.'" Koulkina v. City of New York, 559 F. Supp. 2d 300, 312 (S.D.N.Y. 2008) (quoting Photolab Corp. v. Simplex Specialty Co., 806 F.2d 807, 810 (8th Cir. 1986)). Accordingly, although defendants observe that the Mortgagor Plaintiffs have failed to file proofs of service as required by Fed. R. Civ. P. 4(*l*)(1), such failure is not by itself cause for dismissal. Plaintiffs state in their memorandum of law that defendants were properly served, and it is conspicuous that defendants do not contend otherwise.
[25] Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 (West 2008).

concerning . . . (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in . . . credit-related documents.

12 C.F.R. § 34.4(a).

State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in <u>Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.</u>, 517 U.S. 25 (1996): . . . (2) Torts[.]

12 C.F.R. § 34.4(b).

The National Bank Act does not preempt the entire field of banking or of real estate lending. Instead, it preempts only those regulations that "significantly interfere with [a] national bank's exercise of its powers." <u>Barnett Bank of Marion Cty., N.A. v. Nelson</u>, 517 U.S. 25, 33 (1996). Courts have usually held that regulations addressed to specific banking activities are preempted while laws of general applicability, such as tort law and consumer protection law, are not, although this line is sometimes difficult to draw with precision. <u>See</u> <u>SPGGC, LLC v. Blumenthal</u>, 505 F.3d 183, 191–92 (2d Cir. 2007) (concluding that Connecticut's policy against expiration dates on gift cards may have interfered with national banks' powers, but that Connecticut's policy against inactivity fees did not); <u>Martinez</u>, 598 F.3d at 555 (citing <u>Watters v. Wachovia Bank, N.A.</u>, 550 U.S. 1, 11, 13 (2007)). For example,

in Gutierrez v. Wells Fargo Bank, NA, 704 F.3d 712 (9th Cir. 2012), the Ninth Circuit rejected the plaintiffs' contention that California law could require a national bank to disclose the order in which it would post transactions to a customer's checking account.  Because the National Bank Act permitted a national bank to "exercise its deposit-taking powers without regard to state law limitations concerning . . . disclosure requirements," 704 F.3d at 726 (citation and quotation marks omitted), the contrary California rule was preempted.  However, California's general prohibition on misleading statements was not preempted, even to the extent that California's prohibition affected the national bank's deposit-taking practices.  See id. at 726–27.

This principle is consistent with more general presumptions regarding preemption.  The National Bank Act ordinarily preempts banking regulations because of the federal government's long history of regulating national banks.  See Barnett Bank, 517 U.S. at 32 (Courts historically interpret "grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law.").  But federal law, including the National Bank Act, is presumed not to preempt general tort law, which is the traditional domain of state authority.  See Baldanzi v. WFC Holdings Corp., No. 07-cv-9551, 2008 WL 4924987, at *2 (S.D.N.Y. Nov. 14, 2008) ("In contrast to findings of federal preemption in

cases involving specific state regulations that conflict with the NBA, causes of action sounding in . . . consumer protection statutes and tort have repeatedly been found . . . not to be preempted."); cf. Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) ("[W]e 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947))). Moreover, this principle is consistent with the Comptroller of the Currency's own explicit pronouncements regarding preemption.  See 12 C.F.R. § 34.4(b)(2).  The Comptroller has even cited California's UCL as an example of a general law that is not preempted in most of its applications.  See OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *2 n.2 (Mar. 22, 2002).

We must then classify Rivera's remaining claim.  This surviving claim (whether characterized as a tort or as a violation of the UCL) is essentially one of fraud by omission.  Bank of America allegedly offered a loan that appeared to be a standard adjustable-rate mortgage with a reliable benchmark, but privately knew through its superior access to information about LIBOR and inter-bank credit markets that the benchmark was, at the time, suppressed.

Stated thus, Rivera's claim falls squarely on the "generally applicable" side of the divide. Rivera does not insist upon a California-specific disclosure rule that a bank must explain the nature of a benchmark that it selects; such a rule would certainly be preempted. Rather, Rivera seeks to apply a general principle of tort law, applicable equally to a bank's mortgage terms as to a cockroach-infested house or a diseased herd of cattle. Thus cabined, there is no risk that Rivera's claim would subject Bank of America to fifty incompatible disclosure requirements, because the common law is similar everywhere: special knowledge imports a duty of disclosure, particularly as to information that is as fundamental to a transaction as the interest rate is to a mortgage.

Bank of America presses a distinction between fraud of commission and fraud of omission. Compare Murr v. Capital One Bank (USA), N.A., 28 F. Supp. 3d 575, 583 (E.D. Va. 2014) ("[T]he parties are in agreement that omission claims are preempted but misrepresentation claims are not."), with Ellis v. J.P. Morgan Chase & Co., 950 F. Supp. 2d 1062, 1082–85, 1091–92 (N.D. Cal. 2013) (holding that fraud-related UCL claims are not preempted, and characterizing some fraud claims as relying upon a "duty to disclose"). This distinction is often illusory, and the law does not generally treat the two kinds of fraud differently. See Morse v. Fusto, No. 13-4074, ___ F.3d ___, ___, 2015 WL 5294862, at *8, 2015 U.S. App. LEXIS 16154, at *24–25 (2d Cir. Sept. 11, 2015)

43

(declining to distinguish between affirmative misstatements and omissions alone, and concurring with the district court that the law "make[s] no legal distinction between misleading statements or omissions and affirmative falsehoods") (citation and quotation marks omitted).  Furthermore, this distinction does not reach the heart of the preemption analysis——whether a state law significantly interferes with national banking.  The rule against fraud by omission, if properly circumscribed by traditional common law principles, does not interfere with national banking any more than does the rule against fraud by commission, and there is no reason to believe that Congress or the Comptroller of the Currency intended to provide national banks with a defense against traditional common law claims.

Martinez, 598 F.3d at 549, relied upon by defendants, held that a so-called "fraud by omission" claim was preempted. Specifically, the plaintiffs in Martinez claimed that a bank was required to disclose its own costs for certain services in addition to the fees that the bank charged.  Although presented as a "fraud by omission" claim, this claim was nothing of the sort, because tort law has never required a business to reveal its own costs to consumers.  In reality, the Martinez plaintiffs proposed an unusual bank-specific rule that would have required novel disclosures on all real estate loans in California.  Thus, the claim in Martinez was properly held to be preempted.

Here, Rivera seeks to hold Bank of America to account for alleged misconduct that is proscribed by traditional common law. The National Bank Act does not preempt such a suit.

### 3. Fraud Claims Against Other Panel Banks

Rivera also seeks to hold non-counterparty panel banks liable on the theory that their persistent suppression of LIBOR distorted the interest rate that Rivera relied upon.  This theory of reliance is fundamentally no different from the theories that we characterized as "fraud on the market" in LIBOR IV.  See ___ F. Supp. 3d at ___, 2015 WL 6243526, at *65, 2015 U.S. Dist. LEXIS 147561, at *264-65.  We dismiss Rivera's claims against defendants other than Bank of America, as California has rejected the "fraud on the market" theory of reliance.  See Mirkin v. Wasserman, 5 Cal. 4th 1082, 1100-08, 858 P.2d 568, 579-84 (1993).

### 4. Statute of Limitations

In LIBOR IV, we declined to hold that sophisticated OTC swap traders were on inquiry notice of fraud in early 2008, because we considered it unclear whether investors with static holdings would have been attuned to news regarding LIBOR.  See ___ F. Supp. 3d at ___, 2015 WL 6243526, at *134, 2015 U.S. Dist. LEXIS 147561, at *432.  We have even less reason to think that Rivera, apparently an unsophisticated homeowner, was on inquiry notice.  Therefore, we do not dismiss his claim on limitations grounds at this stage.

**5. Conclusion**

We conclude that plaintiff Rivera's claim of fraud by omission (and his associated UCL claim) survive against his counterparty, Bank of America, N.A.  All other claims are dismissed.

## VII. OTC AND EXCHANGE-BASED PLAINTIFFS

**1. Personal Jurisdiction**

### 1.1. Waiver of Personal Jurisdiction Arguments

The OTC and Exchange-Based Plaintiffs argue that, because this Court previously considered Rule 12(b)(6) motions to dismiss brought by moving defendants, those defendants have waived their right to move to dismiss.  See Fed. R. Civ. P. 12(h).  We are unpersuaded.

"[A] party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, especially when it does raise the objections as soon as their cognizability is made apparent." Holzsager v. Valley Hosp., 646 F.2d 792, 796 (2d Cir. 1981).  Under this principle, a party does not waive an argument by failing to make it at a time when it "would have been directly contrary to controlling precedent in this Circuit."  Hawknet, Ltd. v. Overseas Shipping Agencies, 590 F.3d 87, 92 (2d Cir. 2009).  Recently, in Gucci America, Inc. v. Li, 768 F.3d 122 (2d Cir. 2014), the Second Circuit concluded that because Daimler, the Supreme Court's most recent expression of the law of general personal jurisdiction,

overruled previously "controlling precedent . . . that a foreign bank with a branch in New York was properly subject to general personal jurisdiction here," such a foreign bank had not waived its personal jurisdictional argument by failing to argue to the district court, before Daimler was decided, that it was not subject to personal jurisdiction in New York. See Gucci, 768 F.3d at 135–36.

In LIBOR IV, we rejected the argument of the Schwab Plaintiffs, who had filed a second complaint in California state court after our LIBOR I decision dismissing their federal claims and declining to exercise supplemental jurisdiction over most of their state-law claims, that the defendants in that case had forfeited their objection to personal jurisdiction by not joining it with their prior Rule 12(b)(6) motions.  Following Gucci, we reasoned in part that "[t]he change in the law of general personal jurisdiction" created by Daimler "mean[t] that it is not unfair to afford the Schwab defendants an opportunity to oppose jurisdiction." LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *36, 2015 U.S. Dist. LEXIS 147561, at *185.

Although this analysis is instructive, the posture of the OTC and Exchange-Based Cases is somewhat different from the Schwab case because the defendants are moving to dismiss the same claims in the same actions.  Instead, the posture is more akin to that in 7 West 57th Street Realty Company, LLC v. Citigroup, Inc., No. 13-

cv-981 (PGG), 2015 WL 1514539, 2015 U.S. Dist. LEXIS 44031
(S.D.N.Y. Mar. 31, 2015).  There, defendants moved in December
2013 to dismiss the complaint for failure to state a claim, and
then in October 2014 the foreign defendants sought leave to make
a second motion to dismiss for lack of personal jurisdiction based
on the January 2014 Daimler decision and the September 2014 Gucci
decision.  The court granted leave to make a second motion to
dismiss, reasoning that a defendant does not waive its objection
to personal jurisdiction by failing to make it in its first Rule
12(b) motion when the objection was not available at the time of
the motion.  See 7 W. 57th St., 2015 WL 1514539, at *5-7, 2015
U.S. Dist. LEXIS 44031, at *18-24.  The court also observed that
Rule 12's partial prohibition on successive motions to dismiss
only applies by its terms to "a defense or objection that was
available to the party but omitted from its earlier motion."  Fed.
R. Civ. P. 12(g)(2); see 7 W. 57th St., 2015 WL 1514539, at *5,
2015 U.S. Dist. LEXIS 44031, at *18-19.

We agree with the 7 West 57th Street approach.  Here, as
there, the defendants who previously moved against the OTC and
Exchange-Based Plaintiffs' complaints did so before Daimler and
Gucci made new personal jurisdictional defenses available to
foreign banking enterprises with United States branches.  In light
of the change in the law of personal jurisdiction as applied to
foreign banks under Daimler and Gucci, and finding no prejudice to

plaintiffs from a successive motion, we do not consider defendants'
Rule 12(b)(2) motion improper or inappropriate.

### 1.2. OTC Plaintiffs

Only two defendants move on personal jurisdiction grounds in
the OTC cases:  Credit Suisse Group AG and the Royal Bank of
Scotland Group PLC.[26]  Plaintiffs' purported basis for jurisdiction
over both of these defendants is a theory of agency: when CSI and
CSUSA entered into LIBOR-related transactions with TCEH and SEIU,
CSI and CSUSA acted as CSGAG's agents, and when Citizens Bank
entered into a LIBOR-related transaction with Highlander, Citizens
Bank acted as RBS's agent.  We reject TCEH's argument for personal
jurisdiction over CSGAG because TCEH has not plausibly pleaded
that CSI acted as CSGAG's agent when CSI executed swaps with TCEH.
See infra at 56-58.  However, to the extent that CSUSA acted as
CSGAG's agent in issuing Credit Suisse bonds to SEIU, see infra at
60-61, we may assert personal jurisdiction over CSGAG as well as
CSUSA.  We need not reach Highlander's argument as to RBS because,
for the reasons discussed below, see infra at 61-63, Highlander
has failed to allege injury.  See LIBOR IV, ___ F. Supp. 3d at
___, 2015 WL 6243526, at *20, 2015 U.S. Dist. LEXIS 147561, at

---

[26] Schedule A to defendants' motion identified three other defendants who moved
in part on personal jurisdiction grounds.  However, in their reply brief,
defendants withdraw the motion to the extent that it is brought on behalf of
those three defendants.  See Joint Reply Mem. of Law in Further Support of
Defs.' Mot. to Dismiss the Putative Class Actions for Lack of Pers. Jurisd. at
6 n.6, ECF No. 1124.

*138 (holding that the court may "dismiss claims on the merits in cases 'with multiple defendants——over some of whom the court indisputably has personal jurisdiction——in which all defendants collectively challenge the legal sufficiency of the plaintiff's [claims]'" (quoting Chevron Corp. v. Naranjo, 667 F.3d 232, 246 n.17 (2d Cir. 2012))).

### 1.3. Exchange-Based Plaintiffs

Only foreign defendants move against the Exchange-Based Plaintiffs' complaint on personal jurisdictional grounds. All of the moving defendants contest the sufficiency of their contacts with the United States[27] to support personal jurisdiction.[28]

---

[27] The Exchange-Based Plaintiffs assert claims under the Commodity Exchange Act. We reiterate our prior holding that, because the CEA contains a nationwide service provision, the jurisdictionally relevant contacts are the contacts defendants made with the United States as a whole, rather than any particular forum state. See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *23, 2015 U.S. Dist. LEXIS 147561, at *147–48.

[28] Although defendants do not formally move to dismiss pursuant to Rule 12(b)(3) for improper venue, three of the moving defendants (Credit Suisse Group AG, Lloyds Bank Group plc, and HBOS plc) argue that plaintiffs may only rely on the CEA's nationwide service provision in a judicial district where venue is proper. In defendants' sole authority for this proposition, the court noted that the parties before it had not cited authority directly on point and simply "adopt[ed] the parties' [shared] assumption" that the CEA's nationwide service provision was contingent upon venue. Premium Plus Partners, L.P. v. Davis, No. 04 C 1851, 2005 WL 711591, at *8 (N.D. Ill. Mar. 28, 2005). Defendants also rely by analogy on Daniel v. American Board of Emergency Medicine, 428 F.3d 408 (2d Cir. 2005), which addressed the relationship between venue and personal jurisdiction under the Clayton Act. We are unpersuaded that the syntax of the CEA's provision for venue and process, 7 U.S.C. § 25(c), is akin to that of the Clayton Act's venue provision, 15 U.S.C. § 22. Instead, we stand by our statement in LIBOR IV that the "the service provision of the CEA substantially tracks that of the Securities Exchange Act, which the Second Circuit has interpreted to express Congress's intent to extend personal jurisdiction to the outer limit of the Due Process Clause of the Fifth Amendment." LIBOR IV, ___ F. Supp. 3d at ___ n.41, 2015 WL 6243526, at *24 n.41, 2015 U.S. Dist. LEXIS 147561, at *147 n.41 (citing In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 526 & n.70 (S.D.N.Y. 2008) ("Amaranth I"), aff'd, 730 F.3d 170 (2d Cir. 2013) ("Amaranth II")). Accordingly, we reject defendants' contention that the CEA's nationwide service provision is contingent on proper venue.

In LIBOR IV, we rejected the contention of the plaintiffs in
Amabile, who asserted claims under the Commodity Exchange Act,
that personal jurisdiction existed in the United States because
the defendants' manipulative actions had a foreseeable effect on
the Eurodollar futures contract prices.  We explained that LIBOR
manipulation is distinguished "from the typical commodities or
securities manipulation case, in which defendant's conduct is
intended to affect the prices of commodities or securities listed
in, for example, New York or Chicago."  LIBOR IV, ___ F. Supp. 3d
at ___ n.55, 2015 WL 6243526, at *32 n.55, 2015 U.S. Dist. LEXIS
147561, at *174 n.55.

We reaffirm that conclusion.  As we explained in LIBOR III,
scienter is a requirement of a claim under the Commodity Exchange
Act.  See LIBOR III, 27 F. Supp. 3d at 466 (citing DiPlacido v.
CFTC, 364 F. App'x 657, 661 (2d Cir. 2009)).  Although we agreed
with defendants that the Exchange-Based Plaintiffs had failed to
plead intent to manipulate the market in Eurodollar futures
contract, we concluded that, because there was "no legitimate
purpose" for defendants' manipulative LIBOR submissions, the
plaintiffs had pleaded scienter under the lesser pleading standard
of "conscious misbehavior or recklessness."[29]  See LIBOR III, 27

---

[29] The specific allegations supporting this conclusion are that: "(1) defendants
knew that they were submitting inaccurate LIBOR quotes, (2) defendants
understood the impact on Eurodollar futures contract prices from doing so, and
(3) there is no conceivably legitimate purpose for submitting inaccurate LIBOR
quotes."  LIBOR III, 27 F. Supp. 3d at 470.

F. Supp. 3d at 470.  While such conscious misbehavior or recklessness may suffice to state a CEA claim, it does not logically imply that a defendant has purposefully directed its allegedly wrongful activities toward the United States. Accordingly, we stand by our conclusion in LIBOR IV that, in this highly atypical commodity manipulation case, the scienter necessary, as a matter of substantive law, to plead a violation of the CEA does not rise to the level of purposeful direction by the defendants of their allegedly wrongful conduct to the United States.

The cases on which the Exchange-Based Plaintiffs principally rely do not require a different result.  In Amaranth I, the court upheld personal jurisdiction over a Canadian trader whose alleged actions were "unmistakably" made with the knowledge that the "trades would affect the price of natural gas futures within the United States," thus "constitut[ing] purposeful availment of the United States," but denied as to a corporation which had "never allegedly directed any activity toward the United States" and thus had not "purposefully availed itself of this forum." 587 F. Supp. at 536-37.  In the Cotton Futures case, the court upheld personal jurisdiction over a foreign corporation that had aided and abetted an individual co-defendant in a scheme to "manipulate the cotton futures market." In re Term Commodities Cotton Futures Litig., No. 12-cv-5126 (ALC), 2013 WL 9815198, at *20, *28-31, 2013 U.S.

Dist. LEXIS 184374, at *66-68, *90-99 (S.D.N.Y. Dec. 20, 2013), reconsideration granted on other grounds, 2014 WL 5014235, 2014 U.S. Dist. LEXIS 145955 (S.D.N.Y. Sept. 30, 2014).  These cases are consistent with the general rule that a defendant is only subject to specific personal jurisdiction in a given forum on the basis of the in-forum effects of allegedly wrongful out-of-forum conduct where the defendant purposefully directed its conduct into that forum.[30]  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *32, 2015 U.S. Dist. LEXIS 147561, at *173-74 (citing World-Wide Volkswagen, 444 U.S. at 295, and Terrorist Attacks, 714 F.3d at 674).  We have also received unredacted copies of the letters filed by the parties, Letter from Joel Kurtzberg, ECF No. 1207; Letter from Christopher Lovell and David E. Kovel, ECF No. 1209, as well as plaintiffs' supplemental declaration, Suppl. Decl. of David E. Kovel in Supp. of the Exchange-Based Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Putative Class Actions for Lack of Pers. Jurisd., ECF No. 1210, and they do not cause us to alter our opinion in any way.

---

[30] Moreover, a defendant's unrelated contacts with the forum "may bolster an argument for specific personal jurisdiction on the basis of a claim arising out of a defendant's forum-related contacts, but cannot create specific personal jurisdiction over a claim that is wholly unrelated to the forum."  LIBOR IV, ___ F. Supp. 3d at ___ n.50, 2015 WL 6243526, at *30 n.50, 2015 U.S. Dist. LEXIS 147561, at *166 n.50.  Thus, the Exchange-Based Plaintiffs' reliance on the moving defendants' various other United States-directed contacts and activities is misplaced, as they have failed to show that the CEA claim arises out of those defendants' United States contacts.

Accordingly, as with the LIBOR IV parties and the Lender Plaintiffs, we direct the Exchange-Based Plaintiffs to confer with the moving defendants and to "provide us with a spreadsheet containing a list of claims that, in accordance with [our general rulings], are dismissed on jurisdictional grounds." ___ F. Supp. 3d at ___, 2015 WL 6243526, at *37, 2015 U.S. Dist. LEXIS 147561, at *186; supra at 24.

## 2. New OTC Plaintiffs

### 2.1. TCEH

Plaintiff TCEH alleges that it traded a swap with Credit Suisse International (CSI), and that persistent suppression lasted through May 2010. Second Consolidated Amended Compl. ¶¶ 1, 386, ECF No. 406. TCEH's claims against CSI were added to the OTC Plaintiffs' Second Amended Complaint on September 10, 2013.

Both CSI and Credit Suisse Group AG (CSGAG) now oppose TCEH's claims. CSI argues that TCEH's unjust enrichment claim is time-barred under Texas and New York law. CSGAG argues that only TCEH's counterparty, CSI, can be liable for breach of contract or unjust enrichment.

#### 2.1.1. Statute of Limitations

TCEH's claim against CSI does not relate back to the complaint against CSGAG because nothing in the original complaint indicates that TCEH sued CSGAG instead of CSI by "mistake." Fed. R. Civ. P. 15(c)(1)(C)(ii).

As TCEH is based in Texas and filed in New York, New York's borrowing rule requires that TCEH's claims be timely under both New York and Texas law.  Texas applies a two-year limitations period to unjust enrichment claims, with a rule that an action does not accrue until the action is ascertainable.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *133, 2015 U.S. Dist. LEXIS 147561, at *429.  However, as with the other OTC Plaintiffs, see infra at 60, we do not yet have cause to find that TCEH was on inquiry notice prior to filing the complaint and thus cannot conclude that its claim is untimely under Texas law.

As to New York law, we have previously declined to recognize claims for the imposition of a constructive trust and have applied a three-year limitations period to unjust enrichment claims seeking money damages.  See LIBOR IV, ___ F. Supp. 3d at ___ n.186, ___ n.201, 2015 WL 6243526, at *163 n.186, *175 n.201, 2015 U.S. Dist. LEXIS 147561, at *506 n.186, *535-36 n.201.  Further, New York does not apply a discovery rule to unjust enrichment.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *132, 2015 U.S. Dist. LEXIS 147561, at *428 ("Plaintiffs do not argue that a discovery rule applies to any of their non-fraud claims in New York.").  While New York recognizes cross-jurisdictional class-action tolling, id., ___ F. Supp. 3d at ___, 2015 WL 6243526, at *145-46, 2015 U.S. Dist. LEXIS 147561, at *457-59, no earlier

complaint placed CSI on notice of TCEH's claim, and thus TCEH's claim against CSI is untimely under New York law.

### 2.1.2. Counterparty Requirement and Agency Pleading

We have previously held that only a counterparty may be liable for breach of contract or unjust enrichment.  LIBOR III, 27 F. Supp. 3d at 482.  To avoid this holding, TCEH proposes that CSI acted as an agent of whichever parent entity was a member of the LIBOR panel.[31]

General allegations of corporate ownership, combined marketing, shared board membership, and so forth are insufficient to establish a principal-agent relationship between corporate entities.  See Fletcher v. Atex, Inc., 68 F.3d 1451, 1459-62 (2d Cir. 1995).  However, a subsidiary may be an agent of its parent when

> [a]t a minimum, . . . the parent has manifested its desire for the subsidiary to act upon the parent's behalf, the subsidiary has consented to so act, the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.

---

[31] TCEH names Credit Suisse Group AG (CSGAG) as the panel bank, while Credit Suisse asserts that Credit Suisse AG (CSAG) was the panel bank.  If the misidentification of the panel bank were the only defect in TCEH's pleading, we would freely give leave for TCEH to replace CSGAG with CSAG.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *157, 2015 U.S. Dist. LEXIS 147561, at *490-91.

Transamerica Leasing, Inc. v. República de Venezuela, 200 F.3d 843, 849 (D.C. Cir. 2000) (citing Restatement (Second) of Agency § 1).

Here, TCEH alleges that CSI is "controlled" by CSGAG, that the two entities use the same brand and logo, that Credit Suisse presents itself as an "integrated global bank," that Credit Suisse "takes a unified approach to risk management," that CSI personnel report to CSGAG personnel, that CSI is generally managed as part of CSGAG, that CSI shares revenue with CSGAG, that CSGAG lends money to CSI, that CSGAG and CSI have overlapping Boards of Directors, and that CSI adheres to CSGAG's employment policies. Third OTC Compl. ¶¶ 26-27. Clearly, these pleaded facts suggest that CSGAG controlled CSI to a considerable degree and that CSI could conceivably have acted as CSGAG's agent for some purposes. None of these facts, however, indicates that CSI acted as CSGAG's agent on swap transactions or that CSGAG supervised CSI's swap-trading operations. This absence distinguishes the Proposed Third Amended Complaint from Elbit Systems, Ltd. v. Credit Suisse Group, 917 F. Supp. 2d 217, 225-26 (S.D.N.Y. 2013), in which the complaint alleged that the corporate parent closely managed the operations of the particular investment group whose employees allegedly violated federal securities laws. Likewise, the Proposed Third Amended Complaint is distinguishable from the Ntsebeza Complaint in In re South African Apartheid Litigation, 617 F. Supp. 2d 228,

274–75 (S.D.N.Y. 2009).  That complaint alleged that the corporate parents of two South African car companies directed the specific activities that allegedly violated federal and international law.[32]

## 2.2.  SEIU

### 2.2.1.  Statute of Limitations

SEIU purchased bonds issued by Credit Suisse (USA), Inc. (CSUSA) directly from a broker-dealer affiliate of Credit Suisse. SEIU filed its original complaint against CSGAG on March 5, 2013, and proposed to sue CSUSA as well on August 20, 2014.  SEIU's claims against CSUSA do not relate back to the complaint against CSGAG because nothing in the original complaint indicates that SEIU sued CSGAG instead of CSUSA by "mistake."  Fed. R. Civ. P. 15(c)(1)(C)(ii).  Instead, the original complaint appears to reflect a strategic decision to sue only panel banks.[33]  Cf. LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *157, 2015 U.S. Dist. LEXIS 147561, at *490 ("[T]his is not a case in which plaintiffs made a factual mistake as to who their counterparties

---

[32] Credit Suisse's reliance on the text of the ISDA agreement is misplaced.  See ISDA Agreement, ECF No. 959-1, Ex. C, § 5(b)(i) ("Each party will be deemed to represent to the other party . . . that: (4) . . . [i]t is entering into this Agreement . . . as principal and not as agent of any person or entity.").  This passage constitutes a representation by CSI that CSI is not the agent of another entity, not a concession by TCEH that CSI is not an agent.  The purpose and the effect of this passage is simply to prevent CSI from excusing itself from liability on the pretense that CSI acted as some other entity's agent; the section in no way estops TCEH from holding some other entity to account if, in fact, CSI acted as the other entity's agent.

[33] On the other hand, if SEIU finds it necessary to name CSAG as a panel bank entity in place of CSGAG, then the substitution would be a "mistake" subject to Rule 15.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *157, 2015 U.S. Dist. LEXIS 147561, at *490–91.

were or were ignorant of their identity.  Rather, any error was a strategic decision to sue panel banks in their capacity as panel banks, rather than counterparties in their capacity as affiliates of panel banks.").

As SEIU is based in the District of Columbia and sued in New York, New York's borrowing rule requires that SEIU's claims be timely under both New York and DC law.

With respect to New York law, we apply a three-year limitations period without a discovery rule.  See supra at 55-56.  However, it appears that the complaint in Ravan Investments (No. 11-cv-3249 (NRB), ECF No. 1, operative between May 13, 2011, and April 30, 2012), and the amended complaints in Baltimore (No. 11-cv-5450, ECF Nos. 130, 406, operative from April 30, 2012, onwards) suffice to toll SEIU's claims against CSGAG.  This implies that SEIU's unjust enrichment claim is timely (at least under New York law) as to claims arising on or after May 13, 2008.  However, none of these complaints placed CSUSA on notice of SEIU's claims, and so SEIU's claims against CSUSA are untimely under New York law.

Turning to DC law, it might be thought that SEIU was not on inquiry notice of wrongdoing by the non-panel entity CSUSA, so that the statute of limitations did not commence in May 2008.  LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *134, 2015 U.S. Dist. LEXIS, at *433-34.  However, SEIU was on notice that some Credit Suisse entity (namely a panel bank) had possibly

suppressed LIBOR and that SEIU held bonds issued by CSUSA.  This was enough to establish the possibility that CSUSA would be liable for unjust enrichment on the basis of its affiliate's misconduct. Thus, publicity in 2008 regarding LIBOR would be sufficient to place SEIU on inquiry notice as to its unjust enrichment claim.

Even so, as with other OTC Plaintiffs, we do not yet have cause to find that SEIU was aware of news reports regarding LIBOR in spring 2008 or at any particular time before SEIU filed its complaint.   Therefore, we cannot conclude that SEIU's claims against either CSGAG or CSUSA are untimely under DC law.

### 2.2.2. Counterparty Requirement and Agency Pleading

SEIU alleges that CSUSA acted as an agent of CSGAG, for essentially the same reasons that TCEH argues that CSI acted as an agent of CSGAG.  See supra at 56-58.

In contrast to TCEH's agency pleading, we accept SEIU's pleading that CSUSA acted as an agent of CSGAG when it issued bonds.[34]  Unlike a discrete swap transaction, a bond issuance is a major corporate event that officers and directors of the corporate parent would typically oversee.   Complex financial entities coordinate their financing with extraordinary care and are unlikely to allow entities to issue securities without top-level

---

[34] Credit Suisse has asserted that CSAG, rather than CSGAG, was a member of the LIBOR panel.  We grant SEIU leave to allege its agency allegations against CSAG instead of against CSGAG in the Third Amended Complaint, provided of course that counsel can do so consistent with Rule 11.

approval.  At the very least, it is plausible that CSUSA did not strike out on its own to issue a bond, but instead acted at the direction of its corporate parents.  Accordingly, SEIU's claims against CSGAG survive on an agency theory.

### 2.3. Highlander Realty

Highlander Realty presents itself as an OTC Plaintiff that was exposed to LIBOR suppression by trading an interest rate swap with Citizens Bank of Massachusetts, an affiliate of the Royal Bank of Scotland.  In reality, however, Highlander's swap and bond agreements[35] definitely show that Highlander was never exposed to fluctuations in LIBOR at all.  We therefore dismiss Highlander Realty's complaint for lack of standing.[36]

In 2006, Highlander entered into what is known as a "synthetic fixed-rate loan," meaning that it simultaneously took out a floating-rate loan from Citizens Bank and used an interest rate swap to exchange its floating-rate obligations for fixed-rate obligations.  The effect of the combined agreements was to insulate Highlander completely from changes in LIBOR.  Both agreements used the same tenor of LIBOR to define the offsetting floating-rate cash flows, and any minor discrepancy in the agreements'

---

[35] As defendants pointed out at oral argument, there is no question that Highlander Realty's swap agreement and its associated loan agreement are integral to the allegations in Highlander Realty's complaint and may therefore be considered on this motion to dismiss.  Tr. 33:25-34:1.

[36] This resolution obviates the question of precisely what procedural action Highlander Realty sought to take.

definitions of LIBOR is resolved by the text of the swap confirmation, which provides: "In the event there is a conflict between the [swap's] definition [of LIBOR] and the definition of such term in the [loan agreement], the foregoing definition shall govern and prevail for all purposes, including without limitation the calculation of [Highlander's] payment obligations under the [loan]." Interest Rate Swap Confirmation CED14314, at 2, ECF No. 968-2.

Highlander points to various provisions in the agreement that could have exposed Highlander to LIBOR. But these provisions deal with special events——pre-payment, early termination, a discrepancy in day-count conventions, or a determination by Citizens Bank that a LIBOR loan was no longer lawful——that, so far as the pleadings inform us, never came to pass. For example, since there was no early termination, the "LIBOR Reserve Percentage" calculation that Highlander points to is irrelevant. And since Citizens Bank never determined that a LIBOR loan was unlawful, the "LIBOR-Reference Banks Lending Rate" provision is irrelevant as well.

Highlander's counsel stated at oral argument that the bond and swap payments do not offset. Tr. 17:24–18:15. This appears to miss the point of the transaction. Highlander borrowed money from Citizens Bank, so Highlander ought to pay some amount of money, on net, each month. Highlander's bond payment offsets only the floating leg of the swap payment, and there is no plausible

pleading (or information provided in response to defendants' motion) that the bond payment fails to do so. Furthermore, if it were the case that the bond payments failed to offset the floating leg of the swap payment, then the proper action would be for breach of the above-quoted contractual language, a matter that would not relate to the manipulation of LIBOR.

Finally, Highlander argues that it was damaged by bearing extra credit risk. According to Highlander, RBS's LIBOR quotes portrayed RBS, a guarantor of Citizens Bank's swap agreement, as healthier than RBS truly was. Highlander cites no precedent, and we have found none, to support a cause of action for credit risk on its own. If a mortgagor, for instance, fills out a fraudulent mortgage application and then pays his mortgage in full, we do not think that the lender could sue for the damage that might have been. The traditional cause of action for actual damage sustained is sufficient to compensate a defrauded lender. Furthermore, even if "credit risk in the air" were a form of damages, Highlander bore no credit risk in this case because Highlander was always to be a net borrower under the combined swap and loan agreements.

For these reasons, Highlander Realty is dismissed.

### 2.4. Jennie Stuart

Jennie Stuart traded swaps with Bank of America, N.A., and now proposes to include contract and unjust enrichment claims against Bank of America, N.A., and Bank of America Corporation in

the consolidated OTC complaint.  The proposed claims against Bank of America Corporation do not run against a counterparty, and so leave to amend with respect to that entity is denied.  See LIBOR III, 27 F. Supp. 3d at 477–82.

At least some of Jennie Stuart's claims against its swap counterparty (Bank of America, N.A.) survive our prior holdings, as the alleged suppression period ended within three years of when the OTC Plaintiffs alleged unjust enrichment and contract claims against Bank of America, N.A.  See LIBOR IV, ___ F. Supp. 3d at ___, 2015 WL 6243526, at *145–46, 2015 U.S. Dist. LEXIS 147561, at *457–59 (applying class-action tolling to New York statute of limitations); see also Ky. Rev. Stat. Ann. § 413.090(2) (15-year limitations period for actions upon a written contract); Ky. Rev. Stat. Ann. § 413.120(1) (5-year limitations period for actions upon an implied contract).  Because at least some claims are timely, we need not yet resolve precisely which of Jennie Stuart's claims are timely.  The parties should proceed with the expectation that our prior rulings regarding the statute of limitations will ultimately apply to Jennie Stuart's claims.

Bank of America offers one novel argument in opposition to the proposed Jennie Stuart amendment.  According to Bank of America, Jennie Stuart may not predicate a claim upon its swap agreement dated October 2, 2008, because Jennie Stuart was on "inquiry notice" of LIBOR manipulation by that point, so that Bank

of America's alleged misconduct was within the "intent and reasonable expectations" or the "reasonable contemplation" of the parties.  Letter from Robert F. Wise, Jr. at 2-3, ECF No. 971.  To support this argument, Bank of America cites three cases: Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497 (2d Cir. 1989), in which a lender's foreclosure action in response to a borrower's default was held to be within the contemplation of the parties; Dorset Industries, Inc. v. Unified Grocers, Inc., 893 F. Supp. 2d 395, 406 (E.D.N.Y. 2012), in which one party's alleged competition with another was sufficient to state a claim for breach of the implied covenant; and U.S. Bank N.A. v. Ables & Hall Builders, 696 F. Supp. 2d 428 (S.D.N.Y. 2010) (Chin, J.), in which the application of a contractual early termination procedure was held to be within the contemplation of the parties.  None of these holdings supports the view that Jennie Stuart implicitly consented to manipulation of swap payments simply because suspicions of manipulation had been made public several months earlier.  Even a known fraudster owes his counterparties a duty of good faith and fair dealing.

We grant the OTC Plaintiffs leave to add Jennie Stuart as a plaintiff in Baltimore subject to the caveat that we may ultimately hold some claims to be time-barred in accordance with the general principles we have previously announced.

### 2.5. Miami Children's Hospital

The OTC Plaintiffs' application for leave to add the Miami Children's Hospital as a plaintiff in <u>Baltimore</u> is granted as unopposed. <u>See</u> Tr. 50:21–25.

### XIII. CONCLUSION

The Clerk is directed to terminate the motions listed in the appendix. <u>Weglarz</u> and <u>Nagel</u> are dismissed in their entirety. The Clerk is directed to enter judgment and to report the judgment to the Judicial Panel on Multidistrict Litigation and the United States District Courts for the Northern District of Illinois (<u>Weglarz</u>) and the Western District of Wisconsin (<u>Nagel</u>). <u>Berkshire Bank</u> is dismissed except as to the claims of Directors Financial Group, and is dismissed as to the BBA entities. The Clerk is directed to terminate the Berkshire Bank, the Government Development Bank for Puerto Rico, the British Bankers' Association, BBA Enterprises Ltd., and BBA Libor Ltd. as parties. <u>Payne</u> is dismissed <u>except</u> as to plaintiff Rivera's claims against defendant Bank of America, N.A. The Clerk is directed to terminate all other parties. The OTC Plaintiffs are granted leave to amend their consolidated complaint to include claims of SEIU (only against CSGAG or CSAG, and only for claims arising on or after May 13, 2008), Jennie Stuart Medical Center (only against Bank of America, N.A.), and Miami Children's Hospital, but not claims of TCEH or Highlander Realty. <u>Highlander Realty</u> is dismissed in its

entirety.  The Clerk is directed to enter judgment and to report the judgment to the Judicial Panel on Multidistrict Litigation and the United States District Court for the District of Massachusetts.

**IT IS SO ORDERED.**

Dated:     November 3, 2015
           New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

## APPENDIX

This Memorandum and Order resolves the following docket entries in the following cases:

| CASE NAME | CASE NO. | ECF NO. |
|---|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | 950<br>958<br>964<br>966<br>969<br>1191 |
| FTC Capital Gmbh et al. v. Credit Suisse Group AG et al. | 11-cv-2613 | 242 |
| Mayor and City Council of Baltimore v. Credit Suisse Group AG et al. | 11-cv-5450 | 103<br>107<br>110 |
| The Berkshire Bank et al. v. Bank of America Corp. et al. | 12-cv-5723 | 114<br>139 |
| Payne et al. v. Bank of America Corp. et al. | 13-cv-0598 | 108<br>111 |
| Directors Financial Group v. Bank of America Corp. | 13-cv-1016 | 95<br>118 |
| Weglarz et al. v. JP Morgan Chase Bank, N.A. et al. | 13-cv-1198 | 91 |
| Highlander Realty, LLC et al. v. Citizens Bank of Mass. et al. | 13-cv-2343 | 84 |
| Nagel v. Bank of America, N.A. | 13-cv-3010 | 75 |