```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:
```

LIBOR-Based Financial Instruments
Antitrust Litigation.

**MEMORANDUM AND ORDER**

11 MDL 2262 (NRB)

```
----------------------------------------
```

This document applies to:

CASES LISTED IN APPENDIX.

```
----------------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

This opinion addresses five pending requests, all of which must be understood in the context of our prior decisions analyzing the sufficiency of the complaints of six putative class actions and 27 individual actions. The current motions require us to once again consider pleading standards, personal jurisdiction, and statutes of limitations, subjects that we have already considered in opinions that total over 800 pages.

## I.  Over-The-Counter Class

The Over-the-Counter ("OTC") plaintiffs seek leave to file a third amended complaint and also request that we clarify LIBOR V. Defendants Royal Bank of Canada ("RBC"), Credit Suisse AG ("CSAG"), and Credit Suisse Group AG ("CSGAG") request a modification of LIBOR V's holding regarding American Pipe tolling as it applies to

SEIU Pension Plans Master Trust ("SEIU"), a named plaintiff in the OTC action.

### A.   Motion to Amend

In LIBOR IV, this Court upheld claims of fraud brought by plaintiffs in the individual actions against the panel banks for allegedly making false LIBOR submissions to the British Bankers' Association, which purportedly caused plaintiffs to receive suppressed payments on their LIBOR-based instruments, 11 MD 2262, 2015 WL 6243526, at *62, 2015 U.S. Dist. LEXIS 147561, at *256 (Oct. 20, 2015), and in LIBOR V, we upheld Directors Financial Group's fraud claims.  11 MD 2262, 2015 WL 6696407, at *13, 2015 U.S. Dist. LEXIS 149629, at *79 (Nov. 3, 2015).  Attempting to piggy-back on these holdings, the OTC plaintiffs now request leave to add fraud and aiding and abetting fraud claims to their second Proposed Third Amended Complaint.  That request is denied.

To recap the history of the pleadings: the Mayor and City Council of Baltimore filed a complaint on behalf of themselves and other purchasers of LIBOR-based derivatives on August 5, 2011.  Pre-Trial Order No. 1 designated Mayor & City Council of Baltimore v. Bank of America Corp., No. 11-cv-5450 (NRB) (S.D.N.Y.), the lead case for the consolidated OTC plaintiff putative class action.  Thereafter, plaintiffs filed a Consolidated Amended Complaint on April 30, 2012.  When LIBOR I dismissed the OTC plaintiffs' antitrust claim and declined to exercise supplemental jurisdiction

over the Consolidated Amended Complaint's state-law claim, we noted that plaintiffs' theory "is . . . possibly [one] of fraud[.]" LIBOR I, 935 F. Supp. 2d 666, 689 (S.D.N.Y. 2013).  On August 23, 2013, LIBOR II granted plaintiffs' motion for leave to file a second amended complaint alleging unjust enrichment and breach of contract claims.  Thereafter, the OTC plaintiffs filed a Second Consolidated Amended Complaint on September 10, 2013.  In August of 2014, they sought leave to file a Third Consolidated Amended Complaint.  Not until November of 2015, more than four years after the filing of the initial complaint, more than three years after the filing of the Consolidated Complaint, and after two further amendments, and three rounds of briefing, did the OTC plaintiffs seek leave to add fraud claims.

We acknowledge that Rule 15(a) provides that courts "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), and that as a general matter, courts should not deny a request for leave to amend solely on the basis of undue delay.  McGee v. Dunn, 940 F. Supp. 2d 93, 108 (S.D.N.Y. 2013).  "However, after a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay."  Id. (internal quotation marks omitted).  Here, plaintiffs have provided no valid reason for their delay in bringing their fraud claims, nor could they: other plaintiffs

alleged such claims more than a year before plaintiffs filed their initial proposed Third Amended Complaint, which contained no fraud claims.  See Proposed Third Am. Compl. ¶¶ 380-409, ECF No. 627-1 to 627-3.  Plaintiffs' attempt to justify their delay fails.  While plaintiffs argue that the information contained in the documents received from Barclays Bank plc in connection with its settlements now allows them to plead that Barclays learned the submissions of other panel banks before the submissions deadline, plaintiffs not only could have, but they in fact did, plead this information before filing this version of the Proposed Third Amended Complaint. See id. ¶¶ 116-18.

In LIBOR II, we denied plaintiffs' motion for leave to amend their antitrust claims after they were dismissed in LIBOR I, because, inter alia, "to permit amendment here might have the perverse effect of turning defense counsel and the Court into plaintiffs' counsel's co-counsel, with plaintiffs waiting to see what objections defendants raise and how the Court rules on those objections and then amending their complaint as necessary based on what they learned in the process." LIBOR II, 962 F. Supp. 2d 606, 626-27 (S.D.N.Y. 2013).  A similar principle applies here: plaintiffs may not, after seeing other, unrelated plaintiffs successfully plead claims that the OTC plaintiffs declined to allege, amend their complaint in light of this Court's ruling.

The OTC plaintiffs' much-belated application to add fraud claims is denied.

**B.   Clarification of LIBOR V**

In LIBOR V, this Court addressed the claims of OTC plaintiffs added in the first Proposed Third Amended Complaint, including those of Texas Competitive Electric Holdings ("TCEH").   TCEH entered into a master swap agreement with Credit Suisse International ("CSI"), an affiliate of CSGAG, and asserted claims against both entities for breach of contract and unjust enrichment. We held that TCEH's claim for unjust enrichment was untimely and that TCEH had not sufficiently pleaded that CSI acted as CSGAG's agent when it entered into the swap agreement.   LIBOR V, 2015 WL 6696407, at *21, 2015 U.S. Dist. LEXIS 149629, at **102-03.   This Court further held that the OTC plaintiffs could not amend their complaint to allege claims on behalf of TCEH.   Id., 2015 WL 6696407, at *25, 2015 U.S. Dist. LEXIS 149629, at *114.   The OTC Plaintiffs ask that we clarify that LIBOR V did not dismiss TCEH's breach of contract claim against CSI.[1]

The OTC plaintiffs misread LIBOR V: CSI's motion to dismiss TCEH's breach of contract claim was granted.   In the motion to dismiss briefing, the parties disputed whether, as CSGAG's agent,

---

[1] Plaintiffs also ask that we clarify that LIBOR V did not dismiss claims brought on behalf of TCEH against Barclays and Citibank or SEIU's claims against Royal Bank of Canada, none of whom moved to dismiss those claims.  This unopposed request is granted.

CSI had an obligation to disclose CSGAG's wrongdoing and the underpayments CSI made to TCEH, and was therefore liable for breach of contract. See Mem. of Law in Supp. of Credit Suisse Group AG's, Credit Suisse Int'l's, and Credit Suisse (USA) Inc.'s Mot. to Dismiss at 13-15, ECF No. 960; OTC Pls.' Mem. of Law in Opp. to Credit Suisse Group AG, Credit Suisse Int'l, and Credit Suisse (USA) Inc.'s Mot. to Dismiss at 19-20, ECF No. 1080; Reply Mem. of Law in Further Supp. of Credit Suisse Group AG's, Credit Suisse Int'l's, and Credit Suisse (USA) Inc.'s Mot. to Dismiss at 8-9, ECF No. 1113. LIBOR V found that plaintiffs had not sufficiently alleged an agency relationship. 2015 WL 6696407, at *21, 2015 U.S. Dist. LEXIS 149629, at **102-03. Plaintiffs correctly point out that this Court has elsewhere held that parties may assert implied covenant claims against non-panel banks when they "can allege that the counterparty entity participated somehow in the panel bank's illicit manipulation." LIBOR IV, 2015 WL 6243526, at *76, 2015 U.S. Dist. LEXIS 147561, at *293. However, in LIBOR IV, we found such pleadings sufficient only against such entities where the Commodity Futures Trading Commission found, or a related entity admitted, that the affiliate manipulated LIBOR, even though those documents did not specify each entity's role in manipulation. LIBOR IV, 2015 WL 6243526, at *43, 2015 U.S. Dist. LEXIS 147561, at **205-06. Allegations that Credit Suisse entities operated as "one bank" are insufficient to properly plead that CSI intended to

harm TCEH or recklessly disregarded the risk of such harm.  Thus, though LIBOR V might have stated its holding more clearly, it did not leave TCEH's breach of contract claim against CSI unaddressed.

## C.  American Pipe Tolling

LIBOR V further addressed the claims of SEIU against Credit Suisse (USA), Inc. ("CSUSA") and CSGAG, arising out of the purchase of bonds from CSUSA, holding that the complaints in Ravan Investments v. Bank of America Corp., No. 11-cv-3249 (NRB), ECF No. 1, and the amended complaints in Mayor and City Council of Baltimore v. Bank of America Corp., No. 11-cv-5450 (NRB), ECF Nos. 130, 406, tolled the statute of limitations applicable to SEIU's claims against CSGAG.  RBC, CSAG, and CSGAG argue that this holding was in error, because SEIU purchased bonds from affiliates of RBC, CSAG, and CSGAG, while the class definitions in those complaints require the purchase of instruments directly from defendants.

Those complaints serve to toll the statute of limitations for parties that purchased LIBOR-based instruments "directly" from defendants.  Given the well-pled agency relationship between CSGAG and CSUSA, LIBOR V, 2015 WL 6696407, at *22, 2015 U.S. Dist. LEXIS 149629, at **106-07, the principal — here, CSGAG — would qualify as a party to the contract, and SEIU therefore purchased its bonds "directly" from CSGAG.  See Restatement (Third) of Agency §§ 6.01-03 (where an agent and a third party contract, the principal is also a party to the contract).  Further, as RBC did not move to

7

dismiss SEIU's claim against it, it may not now seek reconsideration or the correction of any purported errors. The defendants have not convinced this Court that its ruling in <u>LIBOR V</u> was in error.[2]

## II. Lender Plaintiffs

In <u>LIBOR V</u>, this Court addressed the sufficiency of the Lender Plaintiffs' Consolidated Second Amended Class Action Complaint. We dismissed The Berkshire Bank ("Berkshire Bank") for failure to plead damages under New York law and denied defendants' motion to dismiss the claims of Directors Financial Group ("DFG"). The Lender Plaintiffs request leave to amend their complaint to allege damages on behalf of Berkshire Bank and defendants renew their request to dismiss the claims of DFG.

### A. Berkshire Bank

In <u>LIBOR V</u>, this Court dismissed plaintiff Berkshire Bank for failure to plead damages under New York law. New York law requires that a plaintiff bringing suit for fraud allege "out of pocket" losses. <u>LIBOR V</u>, 2015 WL 6696407, at *9, 2015 U.S. Dist. LEXIS 149629, at *70. In the context of bonds or loans, a comparison between the cash flows received and what the plaintiff would have earned if he or she had held another investment is required. <u>Id.</u>,

---

[2] Given that we have not disturbed the holding of <u>LIBOR V</u>, this analysis similarly satisfies the Direct Action Plaintiffs' request that we not revisit that decision.

2015 WL 6696407, at *11, 2015 U.S. Dist. LEXIS 149629, at *72. Because "Berkshire Bank [did] not plead[] information about any specific investment, . . . we [could not] assess whether Berkshire Bank suffered any net loss on any mortgage or other loan." LIBOR V, 2015 WL 6696407, at *11, 2015 U.S. Dist. LEXIS 149629, at *73.

Berkshire Bank now seeks leave to amend its complaint to state that if it had known that defendants were manipulating LIBOR, it would have used the Eurodollar deposit rate benchmark published by the Federal Reserve Bank of New York (the "Fed Eurodollar Rate") or exchanged its LIBOR-based cash flows for a fixed-rate cash flow by purchasing a swap. Defendants argue that these allegations are deficient under LIBOR V, because the alternative investments alleged by Berkshire Bank are insufficiently specific.

The Proposed Second Amended Complaint is sufficient to allege damages. As noted in LIBOR V, "[v]arying circumstances must logically require variation in the application of [the] measure of damages." Hotaling v. Leach & Co., 247 N.Y. 84, 88, 159 N.E. 870, 871 (1928). The Fed Eurodollar Rate, we have observed before, represents the rate at which banks would pay to borrow from one another and it should track LIBOR closely. LIBOR I, 935 F. Supp. 2d at 679-80. Given that Berkshire Bank issued at least one loan during the period of alleged LIBOR suppression, it could have tied the loan to a different floating rate as "mortgage lender[s] . . . normally dictate[] terms to a mortgagor," LIBOR V, 2015 WL

9

6696407, at *11, 2015 U.S. Dist. LEXIS 149629, at *74, and the Fed Eurodollar rate is a natural alternative benchmark to choose.  To cover loans that Berkshire issued before the period of alleged suppression, Berkshire could have easily entered the market and obtained a swap to exchange its floating payments for fixed payments.  The USD LIBOR swap market, Berkshire alleges, "is one of the most liquid financial markets in the world with over $1.4 trillion in notional value turn over on a daily basis."  Proposed Second Am. Consol. Class Action Compl. ("Proposed Lender Complaint") ¶ 16, ECF No. 1252-1.  Unlike other investments a plaintiff might hold, where innumerable comparable products might exist, here, where one holds a product tied to LIBOR, the purchase of an easily obtainable swap is plausibly the most appropriate mechanism for shielding oneself from exposure to that rate.

**B.   Directors Financial Group**

In LIBOR V, we upheld DFG's "false data" fraud claims against the panel banks, holding, inter alia, that it alleged a simple, plausible theory of damages: it "held loans whose interest rate payments were tied to LIBOR," so "if LIBOR was persistently suppressed, the interest payments on the loans were lower than the payments would have been if the payments had been calculated from 'true LIBOR.'"  2015 WL 6696407, at *9, 2015 U.S. Dist. LEXIS 149629, at *68.  We also granted leave for DFG to amend to set out its portfolio more specifically, id., 2015 WL 6696407, at *13,

10

2015 U.S. Dist. LEXIS 149629, at *79, as it had not pleaded this information in its complaint.  Id., 2015 WL 6696407, at *2, 2015 U.S. Dist. LEXIS 149629, at *50.

In its First Amended Consolidated Class Action Complaint, DFG describes four loans it originated and sold.  First Am. Consol. Class Action Compl. ¶ 14(a)-(d), ECF No. 1238.  However, DFG's theory of liability has changed.  As documents submitted to the Court in response to our request for further information regarding DFG's loans show, none of the loans exposed DFG to a floating rate of interest based on LIBOR.  Now, it alleges that it used LIBOR to determine the initial, fixed interest rate of the loan and therefore received an artificially lowered fixed interest rate, and that when it sold the loans, it received a depressed servicing fee, which is based on the expected future income streams.

Defendants challenge both theories of damages.  First, they assert, with respect to the alleged harm from the fixed rate component of the loans, that DFG has not put forth sufficient documentation to show that it in fact incorporated LIBOR into the fixed interest component, nor has it shown that it is within the class of persons that defendants anticipated would use LIBOR. Second, they assert that DFG has submitted insufficient documentation to show that it in fact incorporates a servicing fee into its sale price, that a depressed servicing fee would benefit DFG, and that this theory is merely another version of reliance on

the integrity of LIBOR in making pricing decisions, which we have previously rejected.

DFG has properly alleged damages insofar as it states that it incorporated LIBOR into the fixed portion of its interest rates on its loans.  DFG has provided the specific formula it used to price the fixed interest rate in its loans, and while the Court cannot understand why DFG has not provided further documentary support for this formula, we trust that DFG's counsel has complied with the requirements of Rule 11.  Further, DFG is within the class of persons expected to rely on LIBOR.  In LIBOR V, we held that defendants would expect mortgage lenders to rely on LIBOR because "it is plausible that mortgages were within the scope of transactions for which LIBOR was intended to be used . . . ."  2015 WL 6696407, at *11, 2015 U.S. Dist. LEXIS 149629, at *74.  While undoubtedly LIBOR is intended primarily to be used as a component of a floating interest rate, we think it is plausible that defendants expected mortgage lenders to use LIBOR as an input in determining the initial, fixed interest rate.  This holding does not, as defendants argue, hold them "liable to anyone who allegedly lost money as a result of using LIBOR in their private pricing calculations and valuations." Burke Letter at 2, January 15, 2016, ECF No. 1299.  Rather, it finds that reliance may be expected where its use is integrally connected to the central use of LIBOR for a party already expected to rely on that rate.

DFG's other damages theory, however, is untenable.  In LIBOR IV, we held that "plaintiffs who used LIBOR-based pricing to decide whether to invest in LIBOR-based instruments were [not] within the 'class of persons' who were expected to rely on LIBOR," because it was "essentially a 'fraud on the market' theory that efficient market forces embedded defendants' false information in otherwise reliable prices," which the common law generally does not recognize as a form of reliance.  2015 WL 6243526, at *65, 2015 U.S. Dist. LEXIS 149629, at **264-65.  As defendants correctly point out, DFG's servicing fees theory is essentially a variation on the fraud on the market theory.  Significantly, DFG does not argue otherwise.

Finally, defendants argue that because none of the loans that DFG presented to the Court fall within the class definition, DFG is not a member of its own class and its claims should therefore be dismissed.  DFG asserts claims on behalf of "all lending institutions headquartered in the United States . . . that originated loans, held loans, purchased whole loans, purchased interests in loans or sold loans with interest rates tied to USD LIBOR, which rates adjusted at any time between August 1, 2007 and May 31, 2010," First Am. Consol. Class Action Compl. ¶ 345, ECF No. 1238, while the interest rates on the loans DFG submitted to the Court all adjust to a LIBOR-based floating rate after May 31, 2010.  Given that Directors Financial Group v. Bank of America Corp., No. 13-cv-1016 (NRB) (S.D.N.Y.) has been consolidated for

all purposes with The Berkshire Bank et al. v. Bank of America
Corp. et al., No. 12-cv-5723 (NRB) (S.D.N.Y.), that Berkshire Bank
will be allowed to proceed as a named plaintiff representing the
putative lender class, that DFG has stated claims, and that the
determination as to the adequacy of the named plaintiff typically
occurs at the class certification stage, see Banyai v. Mazur, 205
F.R.D. 160, 164 (S.D.N.Y. 2002) (analyzing whether named
plaintiffs are members of class in context of class certification
motion), we will not dismiss DFG's claims at this time, though we
are skeptical that it will be able to prove that it should
represent the putative lender class.

## III. Exchange-Based Plaintiffs

On June 29, 2015, the Exchange-Based Plaintiffs requested
leave to file a Third Amended Complaint. Lovell & Kovel Letter,
June 29, 2015, ECF No. 1159. In response, all defendants — other
than Barclays Bank plc — stated that, absent further direction
from the Court, they would respond after we decided the then-
pending motions to dismiss for lack of personal jurisdiction.
Gottridge Letter, July 31, 2015, ECF No. 1163. Defendants have
since opposed the Exchange-Based Plaintiffs' request on personal
jurisdiction, statute of limitations, and futility grounds.[3]

---

[3] Defendants' letters totaled 85 pages and resulted in 77 pages in response
from the Exchange-Based Plaintiffs.

## A.   Personal Jurisdiction

Defendants CSAG, DB Group Services (UK), Ltd. ("DBGS"), HSBC Holdings plc, HSBC Bank plc, HBOS plc, Lloyds Banking Group plc, Lloyds Bank plc, Portigon AG, Westdeutsche Immobilienbank AG, Bank of Tokyo-Mitsubishi UFJ, Ltd. and The Norinchukin Bank, and new defendants ICAP plc, ICAP Europe Limited, and Tullett Prebon plc all argue that plaintiffs' Proposed Third Amended Complaint fails to make out a prima facie showing that personal jurisdiction exists over persistent suppression claims against them, while defendants Deutsche Bank and Merrill Lynch International ("MLI") contend that this Court cannot exercise personal jurisdiction over certain trader-based claims.   In LIBOR IV and LIBOR V, we held that this Court can exercise personal jurisdiction over Commodities Exchange Act claims "only where the LIBOR submission was determined or transmitted" and, for trader-based claims, we additionally upheld personal jurisdiction "in the location of the person who requested the submitter to engage in manipulation."   LIBOR IV, 2015 WL 6243526, at *38, 2015 U.S. Dist. LEXIS 147561, at **189-90; LIBOR V, 2015 WL 6696407, at *8, 2015 U.S. Dist. LEXIS 149629, at **66-67.   We adhere to those principles.[4]   It flows from these holdings

---

[4] To the extent that plaintiffs request that we not distinguish our personal jurisdiction analysis between persistent suppression and trader-based claims because some defendants allegedly engaged in both, we decline to alter our holdings.   "A plaintiff asserting specific personal jurisdiction 'must establish the court's jurisdiction with respect to each claim asserted.'"   LIBOR IV, 2015 WL 6243526, at *27, 2015 U.S. Dist. LEXIS 147561, at *155 (quoting Sunward

that plaintiffs may not assert trader-based claims that involve no domestically based actors.

The Exchange-Based Plaintiffs urge us to alter our conclusions. None of plaintiffs' reasons is persuasive. First, plaintiffs argue that the Fourteenth Amendment's personal jurisdiction analysis simply does not apply to federal claims, and they therefore need not show that defendants are either "at home" in or have "minimum contacts" with the United States. However, "because the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide" the jurisdictional analysis. S.E.C. v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013). Second, plaintiffs argue that the Second Circuit does not require a defendant's forum-related contacts to be the but for cause of a plaintiff's injury. We decline to alter our conclusion that but for causation remains an essential element of the jurisdictional inquiry. LIBOR IV, 2015 WL 6243526, at *28, 2015 U.S. Dist. LEXIS 147561, at **157-58. Third, plaintiffs assert that defendants' connections with New York are the but for cause of plaintiffs' injury. According to plaintiffs, defendants' domestic lending activities led to the financial crisis, which in turn led to defendants' allegedly suppressed LIBOR submissions.

---

Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original))."

However, this argument stretches the concept of but for causation well beyond the breaking point, and in any event, plaintiffs do not link the lending activities of any bank to the subprime mortgage crisis, much less any subsequently depressed LIBOR submissions.

Fourth, plaintiffs assert that defendants' — or their affiliates — status as "Large Traders" of Eurodollar futures and/or options both indicates that they intended to manipulate that market, therefore purposefully directing allegedly wrongful activity to the United States, and also provides an example of defendants' contacts with the United States.  However, we have already rejected the argument that a large position itself is sufficient to support a pleading of scienter that would support specific personal jurisdiction.  Compare LIBOR III, 27 F. Supp. 3d 447, 468, 470-71 (S.D.N.Y. 2014) (positions in the Eurodollar futures market insufficient to establish scienter, but plaintiffs did plead scienter under conscious misbehavior or recklessness), with LIBOR V, 2015 WL 6696407, at *19, 2015 U.S. Dist. LEXIS 149629, at *97 (conscious misbehavior or recklessness "does not rise to the level of purposeful direction . . . of . . . allegedly wrongful conduct to the United States").  Further, while these large positions may bolster a defendant's contacts sufficiently to permit a plaintiff to support a prima facie case of personal jurisdiction based on but for — rather than proximate — causation,

17

such a showing is still required.  As we have found, plaintiffs have not sufficiently connected defendants' positions with the proper causal showing.

In further support of this position, plaintiffs cite Judge Schofield's recent decision in In re Foreign Exchange Benchmark Rate Antitrust Litigation, No. 13 Civ. 7789 (LGS), 2016 WL 1268267, 2016 U.S. Dist. LEXIS 44219 (S.D.N.Y. Mar. 31, 2016) ("FOREX II"). In that case, Judge Schofield held that plaintiffs had adequately made out a prima facie case of personal jurisdiction over certain defendants where plaintiffs alleged defendants' conspiratorial and wrongful acts largely took place in the United States and that defendants possessed "extensive [foreign exchange ("FX")] operations in the United States," id., 2016 WL 1268267, at **5-6, 2016 U.S. Dist. LEXIS 44219, at **28-29, because "[t]aken as a whole, [plaintiffs' complaint] plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the country due to [defendants'] substantial FX business here."[5] Id., 2016 WL 1268267, at *6, 2016 U.S. Dist. LEXIS 44219, at *32.

---

[5] While plaintiffs make glancing references in their letters to a conspiracy between all panel banks sufficient to assert jurisdiction over each one, connection to banks subject to general jurisdiction in the United State is wholly insufficient when the wrongdoing takes place in London and in the absence of conduct directed at the United States. See In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005).  For similar reasons, plaintiffs' arguments regarding jurisdiction pursuant to vicarious liability and aiding and abetting claims are misplaced.

This holding has no application to the instant case.[6]   In FOREX II, defendants allegedly manipulated the WM/Reuters Closing Spot Rates, an important benchmark in the FX market, by discussing and engaging in coordinated trading strategies.   In re Foreign Ex. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 587-88 (S.D.N.Y. 2015).   Therefore, substantial FX business, including billions of dollars of FX transactions, in the United States provides a basis to find that defendants engaged in suit-related conduct here, because defendants' accomplished their purported scheme by entering into FX transactions.   Here, by contrast, defendants need not engage in any market transactions at all, much less in Eurodollar futures contracts, to affect the LIBOR fix, and we have already held that plaintiffs have failed to show that defendants engaged in their purported suppression of LIBOR in order to benefit their Eurodollar trading position.   LIBOR III, 27 F. Supp. 3d at 469.

Fifth, plaintiffs contend that certain defendants consented to general jurisdiction in New York by registering with the New York State Department of Financial Services pursuant to New York Banking Law § 200(3).   This argument flies in the face of the plain language of the statute.   By its terms, New York Banking Law §

---

[6] We also note that the reasoning of FOREX II supports our holdings with respect to the application of the "at home" and "minimum contacts" tests to CEA claims, id., 2016 WL 1268267, at *4, 2016 U.S. Dist. LEXIS 44219, at **23-24, and our interpretation of N.Y. Banking Law § 200(3).   Id., 2016 WL 1268267, at *2, 2016 U.S. Dist. LEXIS 44219, at **17-20.

200(3) provides that registration describes a consent to <u>specific</u> jurisdiction: a foreign banking corporation must "appoint[] the superintendent and his or her successors its true and lawful attorney, upon whom all process in any action or proceeding against it on a cause of action arising out of a transaction with its New York agency or agencies or branch or branches . . . ."  N.Y. Banking Law § 200(3); <u>see also</u> <u>7 W. 57th St. Realty Co. v.</u> <u>Citigroup, Inc.</u>, 13 Civ. 981 (PGG), 2015 WL 1514539, at *11, 2015 U.S. Dist. LEXIS 44031, at **39-40 (S.D.N.Y. Mar. 31, 2015) (registration under N.Y. Banking Law § 200(3) does not provide a court with general jurisdiction over a foreign bank).  In response, plaintiffs point to two cases in which courts have exercised personal jurisdiction over non-party banks to enforce post-judgment information subpoenas, <u>Vera v. Republic of Cuba</u>, 91 F. Supp. 3d 561 (S.D.N.Y. 2015) and <u>B&M Kingstone, LLC v. Mega Int'l</u> <u>Commercial Bank Co.</u>, 15 N.Y.S. 3d 318, 131 A.D.3d 259 (1st Dep't 2015).  However, these cases held that "foreign banks operating local branches in New York . . . [have] obligations to participate as third-parties in lawsuits which involve assets under their management," <u>Vera</u>, 91 F. Supp. 3d at 570, <u>not</u> that such banks have consented to general jurisdiction in New York.  To the extent that these opinions <u>do</u> so hold, we respectfully disagree.  Interpreting this statute as one that provides general jurisdiction in the absence of express consent — where the most natural reading of the

20

provision <u>does not</u> provide general jurisdiction — would "risk unravelling the jurisdictional structure envisioned [by the Supreme Court] based only on a slender inference of consent pulled from routine bureaucratic measures that were largely designed for another purpose entirely." <u>Brown v. Lockheed Martin Corp.</u>, 814 F.3d 619, 639 (2d Cir. 2016).  This we decline to do.

Based on the foregoing principles, plaintiffs have not alleged a <u>prima facie</u> case of personal jurisdiction for persistent suppression claims with respect to CSAG, DBGS, HSBC Holdings plc and HSBC Bank plc, ICAP plc and ICAP Europe Limited, HBOS plc, Lloyds Banking Group plc and Lloyds Bank plc, Portigon AG, Tullet Prebon plc, Westdeutsche Immobilien Bank AG, Bank of Tokyo-Mitsubishi UFJ, Ltd. and The Norinchukin Bank.[7]

**B.   Trader-Based Claims**

Plaintiffs further seek to add numerous trader-based claims to the PTAC, which defendants challenge on the grounds of failure to state a claim, in addition to the personal jurisdiction objections noted <u>supra</u>.

**1.   Pleading Standards**

Defendants argue that plaintiffs have failed to conform their allegations to the pleading standards for these claims as outlined in <u>LIBOR III</u>, principally by (1) not identifying the named

---

[7] Plaintiffs' further request for jurisdictional discovery will be addressed in a forthcoming Memorandum and Order.

plaintiffs' net position on each day of alleged manipulation and (2) failing to identify a plaintiff harmed at all on certain days. With respect to the first argument, while we do not understand why plaintiffs refuse to identify whether a named plaintiff was a net buyer or seller, given the extensive argument on this issue, we will assume that plaintiffs and their counsel are proceeding in good faith and that named plaintiffs held a net position consistent with injury.

With respect to defendants' second argument, plaintiffs have failed to show that claims for which no named plaintiff suffered an injury can survive.  In support of their position, plaintiffs argue that because a named plaintiff has stated a claim against each defendant, plaintiffs have class standing to assert other trader-based claims against defendants.  In support of their position that a named plaintiff need not trade on each day of alleged manipulation, plaintiffs cite NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., which held that "a plaintiff has class standing [to allege claims on behalf of absent class members that he or she otherwise does not have standing to allege] if he plausibly alleges (1) that he personally has suffered some actual injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants."  693 F.3d

145, 162 (2d Cir. 2012) ("NECA") (alterations, internal quotation marks, and citations omitted).   In NECA, the named plaintiffs purchased residential mortgage-backed certificates in two of the seventeen offerings pursuant to a common shelf registration statement, though each offering used different prospectus supplements.  Id. at 149.  Goldman Sachs & Co. underwrote and GS Mortgage Securities Corp. issued all of the certificates.   Id. Because the various offering documents included "nearly identical misrepresentations," id. at 162, the named plaintiffs could assert claims against the defendants for misrepresentations regarding some of the certificates named plaintiffs did not purchase. Plaintiffs had class standing to bring claims related to certificates backed by loans issued by originators of the loans the named plaintiffs purchased.  Id. at 164.  In Retirement Board of the Policeman's Annuity & Benefit Fund of the City of Chicago v. Bank of New York Mellon, the Second Circuit examined NECA, and held that named plaintiffs did not have class standing to assert claims on behalf of absent class members against a common defendant for breach of contract, breach of fiduciary duty, and violations of the Trust Indenture Act of 1939 with respect to 530 RMBS trusts. 775 F.3d 154, 155-57 (2014) ("Retirement Board").  Unlike the violations alleged in NECA, which involved "the same misstatements across multiple offerings," the claims in Retirement Board "must

23

be proved loan-by-loan and trust-by-trust." Id. at 162 (emphasis in original).

The instant case is closer to Retirement Board than NECA. Trader-based claims are "day-to-day" and "episodic," and plaintiffs must prove the substantive elements of each claim. Proof that a bank caused an artificial price one day will not determine whether it did so on another day. Therefore, claims on behalf of absent class members for trader-based CEA violations do not involve "the same set of concerns" as the claims brought on behalf of named plaintiffs, and the named plaintiffs do not have class standing to bring claims on days on which they did not hold a relevant net position.

### 2. Injury

Defendants further identify several dates on which the allegedly false LIBOR submission could not have affected the ultimate fix. For example, this Court has already rejected claims based on an allegedly upwardly manipulated submission where that submission is in the bottom quartile for that day or claims based on an allegedly downwardly manipulated submission where that submission is in the top quartile for that day. LIBOR IV, 2015 WL 6243526, at *40 n.73, 2015 U.S. Dist. LEXIS 147561, at **196-97. Further, when at least eight panel banks not alleged to have engaged in manipulation on a particular day submit the same LIBOR quote in the interquartile position, then the allegedly false

submission of the relevant defendant or defendants would be excluded from the fix calculation regardless of any alleged manipulation.

Next, defendants argue that trader-based allegations relating to tenors of LIBOR other than the three-month rate cannot affect the price of Eurodollar futures contracts, whose price depends on the three-month rate only. While this Court has previously indicated that misconduct in one tenor of LIBOR does not imply misconduct in other tenors, see LIBOR II, 962 F. Supp. 2d at 623-24, Deutsche Bank represents a special case. In DBGS' plea agreement, on which plaintiffs have relied, the stipulated statement of facts provided that when making LIBOR submissions to benefit traders, Deutsche Bank's "USD LIBOR submitter would not simply alter one or two of the tenors for [Deutsche Bank's] daily USD LIBOR submissions," but would "often alter[] the other tenors so that the manipulation was not conspicuous." Plea Agreement, United States of America v. DB Group Services UK Limited, Ex. 3 ¶ 30. Given this admission, the Exchange-Based plaintiffs may rely, at least at this stage, on requests for manipulation in other tenors when otherwise properly pleading claims against Deutsche Bank.

### 3.   Defendant-Specific Arguments

Defendants further argue plaintiffs should not be given leave to add Merrill Lynch International ("MLI") as the claims against

MLI are time-barred and fail on the merits.  We agree with MLI that the statute of limitations has run on these claims.[8]

The Proposed Third Amended Complaint alleges that a London-based interest rate swap trader who worked at MLI, Stylianos Contogoulas, identified in the Barclays Settlement Agreement as "Trader-1," made a request for a false LIBOR submission to a New York-based Barclays employee, who forwarded his request to Barclays' London office.  Plaintiffs argue that without the Barclays Cooperation materials, they could not have identified Contogoulas as Trader-1, because that agreement did not provide sufficient information regarding MLI or Contogoulas to trigger inquiry notice.  However, Barclays' settlement agreement put plaintiffs on inquiry notice that trader-based conduct had harmed

---

[8] MLI also argues that this Court cannot exercise personal jurisdiction over it, because Stylianos Contogoulas did not purposefully avail himself of the privilege of doing business in the United States, nor did he expressly aim his conduct to the United States, and, further, because of the deficiencies in plaintiffs' conspiracy theory of jurisdiction, a theory we declined to reach in LIBOR IV.  2015 WL 6243526, at *29 n.48, 2015 U.S. Dist. LEXIS 147561, at *161 n.48.  Because the viability of the conspiracy theory of personal jurisdiction is unsettled in this Circuit, compare Allstate Life Ins. Co. v. Linter Grp. Ltd., 782 F. Supp. 215, 223 (S.D.N.Y. 1992) (asserting personal jurisdiction over defendants based on conspiracy theory of personal jurisdiction), with Tymoshenko v. Firtash, No. 11-CV-2794, 2013 WL 1234943, at **4-5, 2013 U.S. Dist. LEXIS 43543, at **13-14 (S.D.N.Y. Mar. 27, 2013), and because the statute of limitations holding regarding MLI flows directly from our prior holdings, we decline to address the personal jurisdiction arguments.  See ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013) ("Although we traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." (citation omitted)); 4 C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 1067.6 (4th ed.) ("[W]hen the jurisdictional question is complex or difficult, a court simply may avoid the issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction . . . .").

them, and a reasonable search thereafter would have uncovered a January 25, 2013 <u>Financial Times</u> article that identified the anonymous individuals in Barclays' settlement agreement. Caroline Binham, <u>Ex-Barclays chiefs named in Libor Case</u>, Fin. Times, Jan. 25, 2013. By simply comparing Barclays' settlement agreement to the <u>Financial Times</u> article, plaintiffs could have identified Contogoulas as Trader-1. Therefore, the statute of limitations began to run, at the latest, on January 25, 2013, and claims against MLI are time-barred.

Nor do claims against MLI relate back to the Second Amended Complaint. Plaintiffs argue that MLI should have been on notice that plaintiffs intended to include it in earlier complaints, and only failed to do so because it did not know the employer of Trader-1. In support of this argument, plaintiffs note that they specifically alleged that affiliates of panel banks engaged in a conspiracy with the panel banks to manipulate LIBOR. Accurate, but irrelevant: plaintiffs identified a list of affiliates that <u>they chose not to name as defendants</u>. Second Am. Consol. Class Action Compl. ¶ 46, ECF No. 438. Such a list cannot place MLI on notice that it would have been named as a defendant if plaintiffs knew of its identity; rather, it does just the opposite. Nor does the fact that the Second Amended Complaint described some of Contogoulas' conduct, without knowing his identity, suggest that plaintiffs would have named MLI as a defendant, but for a mistake

regarding its identity: as the list of affiliates shows, plaintiffs referred to the allegedly wrongful conduct of several entities they did not intend to sue and had not sued.   In addition, plaintiffs did name several John Doe defendants, but the employer of Trader-1 was not among them.   See id. ¶ 48 ("Defendants John Doe 1-5 are persons and entities employed by or constituting interdealer brokers . . . .").

For this reason, claims against Deutsche Bank Securities Inc. and RBS Securities, Inc. are also untimely, as they do not relate back to any earlier complaint.   Indeed, this reasoning applies with even greater force, as plaintiffs themselves identified both entities by name in the Second Amended Complaint without naming them as defendants.   Id. ¶ 46.   Thus, there can be no doubt that the decision not to name these affiliates does not represent a "mistake" about their identities.

Citibank and Citigroup Global Markets, Inc. contend that plaintiffs' allegations do not render it "plausible" that Citibank manipulated LIBOR on September 28, 2006.   On that date, a Barclays trader requested a high submission, and in response, a Citibank trader said "ask ur guy who [submits LIBOR] for us and I can call him.   I have no clue who does it for us."   The leap from these facts to an allegedly manipulated LIBOR requires several inferences: that the Barclays trader found out who submits LIBOR for Citibank, that he then identified that submitter to the

Citibank trader, and that the submitter was willing to manipulate LIBOR.  Given these layers of assumptions, we do not think that plaintiffs have alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of a false submission.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007).

### 4.  Conclusion

Consistent with the foregoing analysis, the Exchange-Based Plaintiffs may plead the following additional trader-based claims:

| Date | Bank | Direction of Alleged Request | Quartile Position | Plaintiff Harmed | Plaintiff Position |
|------|------|------------------------------|-------------------|------------------|--------------------|
| 11/28/05 | Deutsche Bank[9] | Upward | Interquartile | Atlantic Trading | Seller |
| 3/1/07 | Deutsche Bank | Upward | Interquartile | Atlantic Trading | Seller |

To be explicit, plaintiffs may not sue entities for trader-based manipulation where no such claims survives.

### C.  Class Period

In the PTAC, plaintiffs seek to extend the Class Period backwards and forwards: persistent suppression and trader-based claims would now extend until May 31, 2011, while trader-based claims would begin in January 1, 2003.  However, plaintiffs provide no basis for extending the class period with respect to trader-

---

[9] Our review of DBGS' plea agreement shows that DBGS employed Deutsche Bank's LIBOR submitters.  See Plea Agreement, United States of America v. DB Group Services UK Limited, Ex. 3 ¶¶ 26-27.  If this is correct, plaintiffs have stated a claim against DBGS for trader-based manipulation.

based claims: they have not properly pleaded any trader-based claims pre-dating January 1, 2005 or post-dating August 2007, and therefore such extensions of the class period are futile. Further, claims related to persistent suppression after May 2010 are time-barred pursuant to the CEA's two-year statute of limitations. While plaintiffs argue that American Pipe tolling saves their claims, this tolling rule does not apply to named plaintiffs. Vincent v. Money Store, 915 F. Supp. 2d 553, 561 (S.D.N.Y. 2013).

### D. Motion to Strike

UBS and Citibank ask us to strike from the complaint allegations related to manipulation of Yen LIBOR and Euribor, because such material is "immaterial [or] impertinent . . . ." Fed. R. Civ. P. 12(f). Because this MDL involves only U.S. Dollar LIBOR, LIBOR IV, 2015 WL 6243526, at *4, 2015 U.S. Dist. LEXIS 147561, at *91, and because defendants' allegedly "reprehensible behavior in one product (or even many products: Yen LIBOR, TIBOR, Swiss Franc LIBOR, EURIBOR, foreign exchange, precious metals, mortgages, auction-rate securities, foreign tax shelters, and so on) [does not] suffice[] to overcome deficiencies in the pleading of actionable bad behavior in USD LIBOR," id., 2015 WL 6243526, at *45, 2015 U.S. Dist. LEXIS 147561, at *210, these allegations should be struck from the filed PTAC.

### E.  Dismissed Claims

Plaintiffs have continued to assert claims that have previously been dismissed in order to preserve them for appeal, because, they argue, "the law in this circuit appears to be unsettled on whether plaintiffs need to re-plead dismissed claims to preserve them for appeal when granted leave to amend."  Lovell & Kovel Letter, January 5, 2016, ECF No. 1286, at 4 n.8.  While the Second Circuit has not definitively ruled on "the appropriate standard for cases where the district court has granted leave to amend a dismissed claim," P. Stolz Family Partnership L.P. v. Daum, 355 F.3d 92, 96 n.2 (2d Cir. 2004) (emphasis added), when a court has not granted leave to amend a claim, plaintiffs need not replead that claim in order to preserve it for appeal.  Id. at 96.  To be perfectly clear, plaintiffs should not replead definitively dismissed claims where they have not received this Court's leave to amend those claims.

## CONCLUSION

The Clerk is directed to terminate the motions listed in the appendix. The OTC Plaintiffs are granted leave to amend their consolidated complaint to include claims of TCEH against Barclays and Citibank and claims of SEIU against Royal Bank of Canada. The Lender Plaintiffs are granted leave to amend their complaint to include the claims of Berkshire Bank. The Exchange-Based Plaintiffs may amend their complaint consistent with the rulings herein.

**IT IS SO ORDERED.**

Dated:     April 14, 2016
           New York, New York

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

## APPENDIX

This Memorandum and Order resolves the following docket entries in the following cases:

| CASE NAME | CASE NO. | ECF NO. |
|---|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | 1159<br>1239<br>1240<br>1247<br>1252<br>1269<br>1312 |
| FTC Capital Gmbh et al. v. Credit Suisse Group AG et al. | 11-cv-2613 | 292 |
| The Berkshire Bank et al. v. Bank of America Corp. et al. | 12-cv-5723 | 145<br>148<br>149 |
| Directors Financial Group v. Bank of America Corp. | 13-cv-1016 | 123<br>126<br>127 |