UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments
Antitrust Litigation.

This Document Applies to:

CASES LISTED IN APPENDIX

----------------------------------------X

**MEMORANDUM AND ORDER**

11 MDL 2262 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

## <u>LIBOR VI</u>

**I.   Introduction**

Following an unusual, if not unique, appellate journey, we once again address the antitrust claims in this multi-district litigation ("MDL") arising from the alleged manipulation of the London Interbank Offer Rate ("LIBOR"), which we initially dismissed for lack of antitrust standing in March 2013.   <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("<u>LIBOR I</u>").

On this motion, defendants present two bases for dismissal of the antitrust claims:   first, that this Court lacks personal jurisdiction over some defendants; and second, that plaintiffs lack antitrust standing because they are not efficient enforcers of the antitrust laws.   Defendants have properly preserved their

request to move for dismissal on other bases after the resolution of this motion.

For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.  We grant the moving defendants' motion to dismiss for lack of personal jurisdiction, although such a result means we retain personal jurisdiction over the non-moving defendants.[1]  We grant the defendants' motion to dismiss the putative Bondholder class's claims because they are not efficient enforcers of the antitrust laws.  While we deny the defendants' motion to dismiss on efficient enforcer grounds as to all other antitrust claims, those claims are circumscribed as set forth in this opinion.

## II.  Background

The nature of LIBOR, its alleged manipulation, and the parties in this case have been explored in our prior opinions.[2]  Thus, we assume familiarity with the facts.

---

[1] Whether a defendant is a movant or non-movant is case-dependent in this MDL. Defendants' Notice of Motion lists the relevant cases and movants.  Notice of Defs.' Joint Mot. to Dismiss App'x B, ECF No. 1480.

[2] E.g., In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2015 WL 6696407, 2015 U.S. Dist. LEXIS 149629 (S.D.N.Y. Nov. 3, 2015) ("LIBOR V"); In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2015 WL 6243526, 2015 U.S. Dist. LEXIS 147561 (S.D.N.Y. Oct. 20, 2015) ("LIBOR IV"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 27 F. Supp. 3d 447 (S.D.N.Y. 2014) ("LIBOR III"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("LIBOR II"); LIBOR I, 935 F. Supp. 2d 666.

In LIBOR I, we dismissed the antitrust claims brought by Bondholder plaintiffs, over-the-counter ("OTC") plaintiffs, Exchange-Based plaintiffs, and Schwab plaintiffs for lack of antitrust standing.  For a plaintiff to have antitrust standing, it must allege that it (1) has experienced antitrust injury and (2) is an efficient enforcer of the antitrust laws; we concluded that the plaintiffs lacked standing because they failed to allege an antitrust injury.  As the Bondholders had only brought antitrust claims, their dismissal effectively dismissed the Bondholders' case.

The Bondholder and Schwab plaintiffs appealed LIBOR I to the Second Circuit, which dismissed the appeal *sua sponte* for lack of appellate jurisdiction on the grounds that we had not issued a final order and LIBOR I did not dispose of all claims in the MDL. In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 13-3565-L, 2013 WL 9557843, at *1 (2d Cir. Oct. 30, 2013).

The Bondholders sought and were granted certiorari.  The Supreme Court unanimously reversed, holding that the Bondholders' right to appeal ripened when we dismissed their case, and not at the eventual completion of the MDL proceedings.  Gelboim v. Bank of Am. Corp., 135 S. Ct. 897, 900 (2015).  The Supreme Court remanded to the Second Circuit for consideration of the merits.

The Second Circuit issued its merits decision in May 2016. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016)

("Gelboim").  The Circuit reversed LIBOR I, holding that plaintiffs sufficiently pled an antitrust conspiracy[3] and the first prong of antitrust standing, that is, the existence of antitrust injury.[4] It remanded to us for further consideration of the second prong of antitrust standing, whether plaintiffs are efficient enforcers. The defendants' motion followed on a schedule set by the Court in a letter order dated June 7, 2016.

## III. Personal Jurisdiction

The Second Circuit's holding that the plaintiffs adequately pled a conspiracy requires an analysis of that conspiracy and the consequent impact, if any, on whether this Court has personal jurisdiction over the moving defendants.  This Court observes the teaching of Gelboim and proceeds on the premise that the conspiracy had an impact on price.  Plaintiffs make much of the Second Circuit's statement that their "allegations evince a common motive to conspire -- increased profits and the projection of financial soundness," Gelboim, 823 F.3d at 781-82.  Plaintiffs focus on "increased profits" as the object of the conspiracy and thus argue

---

[3] Gelboim did not revive an alternative theory of antitrust violation, as advanced by some plaintiffs, that defendants fixed the market for benchmark rates.  We have already rejected the viability of this theory.  See LIBOR IV, 2015 WL 6243526, at *89-90.  Therefore, the attempt of some plaintiffs to resuscitate this theory in the briefing on the present motions to dismiss was improper.

[4] The defendants filed a petition for a writ of certiorari on October 20, 2016.

that personal jurisdiction may be obtained over all panel banks because of the banks' economic activity in the United States. Plaintiffs misread and overread <u>Gelboim</u>.

It is far from clear that <u>Gelboim</u> should be read to mean that plaintiffs have sufficiently alleged "increased profits" as a goal independent of a conspiracy to "project[] . . . financial soundness." <u>Id.</u> at 782. Regardless, the premise that the primary goal of the conspiracy was to increase profits by lowering the interest rate the banks had to pay when they were in the role of borrower is not plausible, as <u>Gelboim</u> itself noted: "[C]ommon sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR. . . . It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." <u>Id.</u> at 783.[5]  The <u>Gelboim</u> court continued this observation as follows: "On the other hand, the record is undeveloped and it is not even established that the Banks used LIBOR in setting rates for lending transactions." <u>Id.</u>

However, the record is developed.[6]  Nor is there a need to rely on common knowledge or common sense.  There were complaints

---

[5] Contrary to plaintiffs' argument that the profit-motivated goal should be assumed simply because "a person intends the natural and probable consequences of his actions," Oct. 27, 2016 Hr'g Tr. 23:4-5 ("Tr."), a conspiracy requires an agreement to achieve a particular goal, which cannot be assumed.

[6] We have always permitted the plaintiffs to rely on information resulting from government investigations here and abroad in their submissions without requiring

brought on behalf of student loan holders who asserted that LIBOR manipulation resulted in lowered LIBOR-based borrowing costs. These complaints were dismissed precisely because under such an arrangement the loanholders benefited and the defendant banks lost income.   LIBOR V, 2015 WL 6696407, at *2, *6.   Contrary to Shakespeare's advice, "Neither a borrower nor a lender be," the defendant banks are both.

If, as plaintiffs suggest, the conspiracy were profit-motivated, it would have required all of the sixteen panel banks to have made a parallel decision to be net borrowers of money over the suppression period in the LIBOR-based lending market.   After five years of voluminous discovery in both civil litigation and government investigations, plaintiffs have not offered evidence that the panel banks made such a decision or were in fact net borrowers.

Rather, the object of the conspiracy that the Circuit recognized and which meets the plausibility test is the projection of financial soundness.   Without question, if implemented, a conspiracy with such an object would, under Gelboim's analysis of

---

formal amendments to complaints.   Plaintiffs have had the benefits of the findings from "wide-ranging investigations of LIBOR since at least 2011 by the Securities Exchange Commission, the Commodities Futures Trading Commission, the Department of Justice, the New York State Attorney General, and numerous foreign regulators, and [] public settlements and plea agreements involving Barclays, Citi, Deutsche Bank, JPMorgan, Rabobank, RBS, Societe Generale, UBS, and brokers . . . ." LIBOR IV, 2015 WL 6243526, at *43.

antitrust injury, have an impact on price.   However, as we have previously held, such an object is not sufficiently directed to the United States such as would support the exercise of personal jurisdiction over all panel banks.

Plaintiffs argue in the alternative that if this Court has specific personal jurisdiction over at least one panel bank, it follows that this Court has personal jurisdiction over all panel banks under the theory of conspiracy jurisdiction.   Because plaintiffs have failed to establish that any defendant committed an act in furtherance of the conspiracy in or directed at the United States, this Court has only general personal jurisdiction over certain panel banks as to the antitrust claims, and therefore the conspiracy jurisdiction argument has no purchase.

Finally, defendants have not forfeited their personal jurisdiction defense.   Since the Supreme Court decided Daimler AG v. Bauman, 134 S. Ct. 746 (2014), and the Second Circuit decided Gucci America, Inc. v. Weixing Li, 768 F.3d 122 (2d Cir. 2014), when the antitrust claims were winding their way up to the Supreme Court on an issue of appellate procedure, defendants had no opportunity to address this personal jurisdiction defense until they properly preserved it in their Second Circuit briefing in the spring of 2015.

**1.   Scope of the Conspiracy**

The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy, because only acts taken pursuant to that conspiracy are jurisdictionally relevant:

> For overt acts . . . are meaningful only if they are within the scope of the conspiratorial agreement.  If that agreement did not, expressly or impliedly, contemplate that the conspiracy would continue in its efforts to [achieve a particular goal], then the scope of the agreement cannot be broadened retroactively by the fact that the conspirators took steps after the conspiracy which incidentally had that effect.

Grunewald v. United States, 353 U.S. 391, 414 (1957).  The consequence is that "when questions arise concerning matters such as venue or the statute of limitations, which depend on the formation of the agreement or the occurrence of overt acts, it becomes crucial to determine the scope of the conspiratorial agreement."  United States v. Rosenblatt, 554 F.2d 36, 39 (2d Cir. 1977) (internal quotation marks and citations omitted).

This approach applies equally to civil cases and to questions concerning personal jurisdiction.  See, e.g., In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 340, 342 (S.D.N.Y. 2000) (personal jurisdiction attached in New York over foreign defendants because "Plaintiffs allege that [the defendants] engaged in a scheme to defraud the copper market, including copper traded on New York's Comex," and "committed tortious acts in New York in furtherance of

8

that conspiracy"). As an example of the necessary analysis, in the price-fixing case <u>United States v. Socony-Vacuum Oil Co.</u>, 310 U.S. 150 (1940), the Supreme Court explained that absent "evidence that the conspiracy was formed within the Western District of Wisconsin, the trial court was without jurisdiction unless some act pursuant to the conspiracy took place there." <u>Id.</u> at 252. The Court then inquired into the "chief end and objective" of the price-fixing conspiracy, finding it to be "the raising and maintenance of Mid-Western prices at higher levels." <u>Id.</u> at 253. Sales of price-fixed products were therefore jurisdictionally relevant to the conspiracy:

> [T]he objectives of the conspiracy would fail if respondents did not by some formula or method relate their sales in the Mid-Western area to the spot market prices . . . [or] if respondents, contrary to the philosophy of all the stabilization efforts, indulged in price cutting and price wars. . . . In sum, the conspiracy contemplated and embraced, at least by clear implication, sales to jobbers and consumers in the Mid-Western area at the enhanced prices. The making of those sales supplied part of the continuous cooperation necessary to keep the conspiracy alive.

<u>Id.</u> (internal quotation marks omitted). With these facts, the Court found that personal jurisdiction in the Western District of Wisconsin attached.[7]

---

[7] Sales of price-fixed products are not a necessary element of a violative price-fixing conspiracy. "[I]t is . . . well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. It is the contract, combination or conspiracy, in restraint of trade or commerce which [Section] 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." <u>Socony-Vacuum Oil</u>, 310 U.S. at 224 n.59 (internal quotation

Despite plaintiffs' protestations at oral argument, it should be uncontroversial that the jurisdictional relevance of an act depends on the goal of the conspiracy.    In fact, plaintiffs themselves implicitly recognize this principle, which is why they exert such effort to define the conspiracy as one with a profit motive.    See, e.g., Pls.' Joint Mem. of Law in Opp'n 1, ECF No. 1524 (arguing that given the reference to "increased profits" in the Second Circuit's opinion, "Gelboim thus brings into the jurisdictional analysis of Plaintiffs' antitrust claims a wider range of conduct than that which was relevant to the non-conspiratorial 'data fraud' claims").

We reject plaintiffs' attempt to read the Second Circuit's opinion so broadly, and we find that plaintiffs have only sufficiently alleged that the goal of the antitrust conspiracy was the projection of financial soundness.  The Circuit's examples of the allegations that "evince a common motive to conspire" pertained only to the banks' reputational concerns, not an independent motive to reap profits on persistently suppressed LIBOR by maintaining one bank-wide position throughout the class period.  Id. at 782 n.19.  More importantly, the Circuit went on to observe that a

---

marks and citations omitted); see also United States v. Milikowsky, 896 F. Supp. 1285, 1288 (D. Conn. 1994) (in a "conspiracy to fix prices for violation of the Sherman Antitrust Act, the agreement itself constitutes the complete offense"), aff'd, 65 F.3d 4 (2d Cir. 1995).  Additional overt acts in furtherance of the conspiracy are not needed.

profit motive in the persistent suppression conspiracy is logically unsound: "[C]ommon sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR. Banks do not stockpile money, any more than bakers stockpile yeast. It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." Id. at 783. The only conclusion to be drawn is that the Circuit meant "increased profits and the projection of financial soundness" to describe collectively a single, reputation-based motive to conspire, where increased profits followed from a positive reputation.[8]

In fact, taking the Circuit's observation one step further, the defendant banks could not have profited on transactions in the

---

[8] This understanding of the Circuit's observation is consistent with this Court's comments in LIBOR III and LIBOR IV about the motivations of defendants, rejecting as implausible any suggestion that defendants engaged in the persistent suppression of LIBOR to increase transactional profits. E.g., LIBOR III, 27 F. Supp. 3d at 469 ("[I]t is implausible that all defendants would maintain parallel trading positions . . . across the Class Period and that those positions, in turn, motivated their daily LIBOR submissions. . . . The far more likely explanation is that, to the extent all defendants engaged in parallel manipulation of LIBOR, the conduct was motivated by reputational concerns, not by the banks' positions . . . .") (internal alterations omitted). To be clear, what we have found plausible is that defendants engaged in trader-based manipulation were motivated by the prospect of increased profits. E.g., LIBOR IV, 2015 WL 6243526, at *6 ("[I]ndividual traders received money, promotions, and adulation based on their personal profit and loss. To gain profits or avoid losses, therefore, a trader would sometimes ask his bank's LIBOR submitter to engage in what we call trader-based manipulation. The submitter would send a false quote in whichever currency and tenor suited the trader's book."). Profit-motivated trader-based manipulation, which was sporadic and would result in both the inflation and deflation of LIBOR submissions, id. at *32, has nothing to do with the persistent suppression conspiracy that is at issue in the antitrust claims, Gelboim, 823 F.3d at 764.

course of a persistent suppression conspiracy unless each bank
borrowed more money using a LIBOR-based interest rate than the
amount it lent using a LIBOR-based interest rate throughout the
class period.  The corollary is that for a transaction-based profit
*motive* to exist, the panel banks would have had to fix LIBOR with
the parallel intent to be a net borrower across the suppression
period.  Both propositions are implausible.

In re Commodity Exchange, Inc., Gold Futures and Options
Trading Litigation, No. 14-MD-2548 (VEC), 2016 WL 5794776
(S.D.N.Y. Oct. 3, 2016) ("Gold"), is instructive.  Like in this
case, the plaintiffs in Gold asserting antitrust claims alleged
both persistent suppression and trader-based manipulation of gold
prices (although these theories are not so labeled in that case).
Id. at *5-6.  Like in this case, the Gold court found a profit
motive in the trader-based conspiracy to be plausible, because
banks could "predictably [] cause gold prices to rise or fall at
the Gold Fixing" and therefore "strategically buy low and sell
high in ways that other non-Fixing market participants could not."
Id. at *19.  In contrast, the Gold court found implausible a profit
motive in the persistent suppression of gold prices, which would
have required plaintiffs to show that defendants "held net short
gold futures positions on COMEX, which allowed them to profit when
the price of gold fell . . . ."  Id. at *18.  Even after evaluating
plaintiffs' data showing that large bullion banks were "as a whole"

net short on gold futures and options throughout the class period, the court concluded that "the data does not plausibly support an allegation that any particular bank was net short at any particular time (let alone that all of the Defendants were net short throughout the alleged conspiratorial period)" and that the data fatally excluded defendants' positions in other relevant markets. Id.

Allegations that defendants were net borrowers in the LIBOR persistent suppression conspiracy are even less availing. Unlike in Gold, where the plaintiffs at least presented data showing an aggregate net short position, the plaintiffs here are empty-handed. To the extent the complaints say anything about net borrowing at all,[9] they rely on information regarding interest rates generally, not USD LIBOR specifically;[10] draw conclusions

---

[9] The relevant allegations are generally uniform across all of the complaints, so we cite to representative examples in the following footnotes.

[10] E.g., Mayor and City Council of Balt. v. Credit Suisse Grp. AG, Second Consolidated Am. Compl. ¶ 78, No. 11-md-2262 (NRB), ECF No. 406 ("OTC Compl.") ("Illustrating Defendants' motive to artificially suppress LIBOR, in 2009 Citibank reported it would make $936 million in net interest revenue if rates would fall by 25 bps per quarter over the next year and $1.935 billion if they fell 1% instantaneously. JPMorgan Chase likewise reported significant exposure to interest rates in 2009: The bank stated that if interest rates increased by 1%, it would lose over $500 million. HSBC and Lloyds also estimated they would earn hundreds of millions of additional dollars in 2008-2009 in response to lower interest rates and would lose comparable amounts in response to higher rates."); Fed. Home Loan Mortg. Corp. v. Bank of Am. Corp., Am. Compl. ¶ 89, No. 13-cv-3952 (NRB), ECF No. 61 ("Freddie Mac Compl.") ("Bank of America further stated that it held a notional amount of more than $50 billion in receive fixed/pay floating interest-rate swaps that would mature in 2008 or 2009 with no offsetting pay fixed/receive floating interest-rate swaps.").

based on information that has nothing to do with LIBOR suppression;[11] and advance unsupported assertions.[12]

The one allegation that approaches the line between conceivable and plausible, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007), is that of plaintiffs FDIC and Freddie Mac, who quote from Bank of America's 2008 Annual Report that Bank of America is "liability sensitive to LIBOR." Fed. Deposit Ins. Corp. v. Bank of Am. Corp., Am. Compl. ¶ 81, No. 14-cv-1757 (NRB), ECF No. 23 ("FDIC Compl.") (quoting Bank of Am., 2008 Annual Report, at 88 (2008), available at http://media.corporate-ir.net/media_files/irol/71/71595/reports/2008_AR.pdf); Freddie Mac Compl. ¶ 89 (same). Taken in context, however, this statement is not sufficient. The full sentence in the Annual Report includes

---

[11] E.g., OTC Compl. ¶ 78 ("Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to LIBOR because LIBOR was low.") (citing Jean Eglesham, Bank Made Huge Bet, and Profit, on Libor, Wall St. J., Jan. 10, 2013, at http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html). The cited article describes profits made not on LIBOR suppression but rather on "trades pegged to the interest rates" such as bets regarding "the gap between different rates related to Libor and the euro interbank offered rate" and "each hundredth of a percentage point that the three-month U.S. dollar Libor increased compared with the one-month U.S. dollar Libor."

[12] E.g., OTC Compl. ¶ 78 ("These banks collectively earned billions in net revenues between August 2007 and May 2010 from suppressed USD LIBOR."); Metzler Inv. GmbH v. Credit Suisse Grp. AG, Corrected Second Am. Consolidated Compl. ¶ 268, No. 11-md-2262 (NRB), ECF No. 438 ("Exchange-Based Compl.") ("Because their interest earning assets, as compared to their funding mix, generally included more longer-term and more fixed-rate instruments, suppression of LIBOR would tend to reduce Defendants' funding costs more than it would reduce their interest income. Thus, by suppression of LIBOR, Defendants would contribute to increasing, maintaining, or mitigating deterioration of their net interest margins."); Freddie Mac Compl. ¶ 89 ("During this time, many of the Bank Defendants were net borrowers, meaning that they financially benefited from reductions in short-term interest rates.").

an important modifier:  "We are *typically* asset sensitive to Federal Funds and Prime rates, and liability sensitive to LIBOR." Bank of Am., 2008 Annual Report, at 88 (emphasis added).  The paragraph goes on to say, "At December 31, 2008, the spread between the three-month LIBOR rate and the Federal Funds target rate had significantly widened since December 31, 2007. . . . As the Federal Funds and LIBOR dislocation widens, the benefit to net interest income from lower rates is limited.  Subsequent to December 31, 2008, the spread between the three-month LIBOR rate and the Federal Funds target rate has narrowed."  Id.  This paragraph offers no assistance to plaintiffs:  as in Gold, it does not plausibly support an allegation that Bank of America was a net borrower on LIBOR-based products at a particular time, much less that Bank of America was a net borrower throughout the class period, and even less that all defendants were net borrowers throughout the class period.  Cf. Gold, 2016 WL 5794776, at *18.  When pressed at oral argument for evidence that the banks were in fact net borrowers, plaintiffs had none.  Tr. 10:1-9.[13]

---

[13] After oral argument, plaintiffs submitted an academic paper that suggested that "banks mostly take pay-floating positions in interest-rate derivatives, which are positions that gain in value from a surprise fall in interest rates." Carmody Letter 2, ECF No. 1638.  As plaintiffs acknowledge, the study relates only to U.S. banks, id. at 2 n.3; the study examines interest rates generally, not LIBOR specifically; and LIBOR suppression does not mean that LIBOR experienced a surprise fall, only that LIBOR was lower than it otherwise would have been.  The paper therefore does not save plaintiffs' theory.

As to the necessary parallel *intent* to be net borrowers, Plaintiffs have neither allegations nor evidence that this parallel intent existed or would be logical.

What is logical -- and what is supported by specific allegations and evidence -- is a conspiracy aimed at the projection of financial soundness.[14] The plaintiffs' complaints are replete with admissions from defendant banks that, for example:

> The instructions at UBS to suppress USD LIBOR to stay within the pack and err on the low side "were issued, at least in significant part, because of concerns that if UBS submitted higher LIBOR rates relative to other banks, UBS could attract negative attention in the media." In so acting, UBS "sought to avoid negative media attention and, relatedly, sought to avoid creating an impression that it was having difficulty obtaining funds." To the extent those directions from UBS management "were motivated by reputational concerns," they "were inconsistent with the definition of LIBOR."

OTC Compl. ¶ 69 (quoting Non-Prosecution Agreement between the United States Department of Justice, Criminal Division, Fraud Section and UBS AG, App'x A, Statement of Facts ¶ 100, Dec. 18, 2012 ("UBS DOJ SOF")); and

> [O]n September 22, 2008, a UBS employee wrote in an electronic chat that "the real cash market isn't trading anywhere near LIBOR," and he suspected the reason was that Banks[] "undervalue LIBOR in times like this so as

---

[14] Two prominent economists tasked with reforming LIBOR came to the same conclusion about the motivations for LIBOR manipulation. See Darrell Duffie & Jeremy C. Stein, Reforming LIBOR and Other Financial Market Benchmarks, 29 J. Econ. Persp. 191, 191 (2015) ("Banks had incentives to announce biased interest rates, for two reasons. First, in times of economic stress, reporting a lower interest rate would signal that the bank is more creditworthy, all else equal. Second, some of the bank's trading positions would be more profitable if LIBOR could be pushed one way or the other, depending on the position taken.").

to not show where they really pay in case it creates
headlines about that bank being desperate for cash."

Id. ¶ 70 (quoting UBS DOJ SOF ¶ 101) (internal alterations
omitted); and

> Because [] managers "sought to avoid what they believed
> would be an inaccurate perception that Barclays was not
> in good financial shape when compared to its peers,"
> Barclays "engaged in this misconduct in order to reduce
> the reputational risk associated with proper, higher
> LIBOR submissions." In other words, the DOJ explained
> -- borrowing from Barclays employees' comments in
> internal communications -- "the purpose of the strategy
> of under-reporting Dollar LIBORs was to keep Barclays's
> 'head below the parapet' so that it did not get 'shot'
> off."

Id. ¶ 71(c) (quoting Non-Prosecution Agreement between the United
States Department of Justice, Criminal Division, Fraud Section and
Barclays Bank PLC, App'x A, Statement of Facts ¶ 40, June 26, 2012)
(emphases omitted).

Because the projection of financial soundness is the only
sufficiently pled goal of the persistent suppression conspiracy,
we adhere to our earlier ruling that the contacts relevant to
specific jurisdiction are only those in the "forum containing the
office from which a defendant determined, or transmitted, a false
LIBOR submission." LIBOR IV, 2015 WL 6243526, at *32.

In this context, plaintiffs entreat us to rely on the sales
of LIBOR-based financial products in the United States regardless
of the motive of the defendants. Such reliance would be misplaced
since "defendants need not engage in any market transactions at

17

all . . . to affect the LIBOR fix . . . ."  Mem. & Order, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 15, 2016), ECF No. 1380.  This case is different from Socony-Vacuum Oil, in which the Supreme Court reasoned that goal of the conspiracy -- the raising and maintenance of high prices -- would have been vitiated had the defendants engaged in "price cutting and price wars"; the result was that the conspiracy necessarily involved selling price-manipulated products into the jurisdiction.  310 U.S. at 253.  Here, the goal of the conspiracy would have succeeded regardless of whether any defendants based their products on LIBOR and regardless of whether any defendant bank increased or decreased the margin on their LIBOR-based products.  The sales of LIBOR-based products are not meaningful in a jurisdictional analysis because they were not "within the scope of the conspiratorial agreement"; and the scope of the agreement "cannot be broadened retroactively by the fact that the conspirators took steps after the conspiracy which incidentally had [a particular] effect."  Grunewald, 353 U.S. at 414.

### 2. Due Process Analysis

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over each defendant.  Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  Whether the court has jurisdiction over a defendant is "governed by a

combination of state law, federal statute, and principles of due process," but the due process analysis must be undertaken in every case.   In re Aluminum Warehouse Antitrust Litig., 90 F. Supp. 3d 219, 223 (S.D.N.Y. 2015).

Plaintiffs' prima facie showing of jurisdiction "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 673 (2d Cir. 2013).   The court has "considerable procedural leeway.   It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84 (2d Cir. 2013).   In the absence of an evidentiary hearing, the court must "construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor," Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008), although it may not "draw argumentative inferences in the plaintiff's favor," Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (internal quotation marks omitted).

The due process analysis of specific personal jurisdiction requires the court to evaluate first, whether the defendant has purposefully established minimum contacts within the forum, and second, whether the exercise of jurisdiction would be so

unreasonable as to offend traditional notions of fair play and substantial justice.  Walden v. Fiore, 134 S. Ct. 1115, 1121 (2014).  "Due process limits on [a court's] adjudicative authority principally protect the liberty of the nonresident defendant -- not the convenience of plaintiffs or third parties."  Id. at 1122.

Additionally, "specific jurisdiction depends on an affiliation between the forum and the underlying controversy," and therefore "the defendant's suit-related conduct must have created a substantial connection with the forum."  LIBOR IV, 2015 WL 6243526, at *27 (internal quotation marks, citations, and alterations omitted).  The relevant forum for the assessment of minimum contacts is the United States as a whole.  Id. at *23.

We reject any suggestion that Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120 (2d Cir. 2002), relaxed the minimum contacts standard to a mere "relatedness" standard.  Bank Brussels itself explained that, in that case, the jurisdictionally relevant activities proximately caused the engagement of the law firm at issue.  Id. at 128.  We repeat our prior holding that specific jurisdiction requires "no less than a 'but for' connection between the defendant's forum-directed activities and the claim."  LIBOR IV, 2015 WL 6243526, at *28.  Therefore, any allegations of forum-related contacts that "relate to" the antitrust conspiracy but that are not causally connected to actual LIBOR submissions are jurisdictionally insufficient.

Plaintiffs have failed to show that overt acts in furtherance of the reputation-driven antitrust conspiracy occurred in or were aimed at the United States.  Plaintiffs have inundated this Court with vacuous submissions derived from millions of pages of discovery, including some made at the eleventh hour immediately prior to oral argument and even some made after oral argument. While the volume makes it impossible to address every individual allegation, generally speaking the submissions pertain to trader-based allegations, manipulation of LIBOR pegged to other currencies, color about the state of USD LIBOR, marketing activities -- everything but what the plaintiffs are actually required to plead.  While for present purposes we accept plaintiffs' many jurisdictional allegations as true, we find them ultimately insufficient.  Most of the allegations fail to address whether defendants determined, or transmitted, a false LIBOR submission from the United States; the few allegations that attempt to do so are unavailing.

First, defendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy.  Likewise, trader-based allegations have no relevance here.  It bears repeating that defendants' sales of LIBOR-based products to plaintiffs in a forum are sufficient to grant personal jurisdiction under certain contract claims, unjust enrichment claims, and fraud claims, and

plaintiffs may seek recovery for damages under those theories. Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (a plaintiff asserting specific personal jurisdiction "must establish the court's jurisdiction with respect to *each* claim asserted") (emphasis in original); e.g., LIBOR IV, 2015 WL 6243526, at *31 ("[S]wap agreements support personal jurisdiction in the plaintiffs' home forums over claims (whether pleaded in contract, unjust enrichment, or tort) concerning the contractual relationships that they embody."); id. at *37 ("[W]e also uphold jurisdiction where [a] bond was issued" in such claims against bond obligors).

Second, plaintiffs allege that defendants aimed their conduct at the United States under the Calder effects test. The Calder effects test requires plaintiffs to show "purposeful direction, where the defendant took intentional, and allegedly tortious, actions expressly aimed at the forum." LIBOR IV, 2015 WL 6243526, at *27 (internal quotation marks and citations omitted).[15] None of plaintiffs' voluminous submissions persuade us to alter our prior holdings that there is "no suggestion, and it does not stand to reason, that foreign defendants aimed their manipulative [persistent suppression] conduct at the United States or any

---

[15] Plaintiffs' allegation that defendants "intentionally directed their unlawful conspiracy at the United States" is conclusory and thus insufficient to meet their burden.  Pls.' Joint Mem. of Law in Opp'n 15.

particular forum state." Id. at *32. As plaintiffs acknowledge,
it would be necessary to disturb that holding only if plaintiffs
sufficiently pled a profit-motivated conspiracy, Pls.' Joint Mem.
of Law in Opp'n 14-15,[16] which they have not, supra. Indeed, the
present case is to be contrasted with the antitrust cases on which
plaintiffs rely and in which courts have sustained personal
jurisdiction in the United States under the effects test. In those
cases, the court expressly or impliedly found that the conspiracy's
goal was to "inflict[] supracompetitive prices on foreign
countries such as the United States," In re Vitamin C Antitrust
Litig., No. 05-CV-453 BMC JO, 2012 WL 12355046, at *12 (S.D.N.Y.
Aug. 8, 2012), thus making sales of price-fixed products relevant
-- which is not the case here. See also In re Fasteners Antitrust
Litig., No. 08-MD-1912, 2011 WL 3563989, at *13 (E.D. Pa. Aug. 12,
2011) (co-conspirators agreed to "future price increases in North
America"); In re Cathode Ray Tube (CRT) Antitrust Litig., 27 F.
Supp. 3d 1002, 1012 (N.D. Cal. 2014) (co-conspirators "coordinated
pricing decisions in relation to United States market

---

[16] Plaintiffs write, "While this Court previously declined to apply Calder to
assert personal jurisdiction for data fraud claims, concluding that persistent
suppression was not designed to 'benefit Defendants' trading position' and 'it
did not stand to reason, that foreign defendants aimed their manipulative
conduct at the United States or any particular forum state,' Plaintiffs
respectfully submit that this Court's conclusions on data fraud do not apply to
the antitrust allegations that Defendants had a 'common motive to conspire' to
suppress USD LIBOR for 'increased profits,' Gelboim, 823 F.3d at 781-82. Viewed
in that light, Plaintiffs satisfy every element of the Calder analysis for their
antitrust claims." Pls.' Joint Mem. of Law in Opp'n 14-15 (internal alterations
omitted).

conditions"). And contrary to plaintiffs' argument that "suffer[ing] the brunt of the harm" in the United States alone is sufficient for jurisdiction, Pls.' Joint Mem. of Law in Opp'n 19-20, under the due process inquiry "it is the defendant's conduct that must form the necessary connection . . . ." Walden, 134 S. Ct. at 1122; see also Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A., 623 F.3d 440, 445 n.1 (7th Cir. 2010) (Calder focuses on "whether the defendant intentionally aimed its conduct at the forum state rather than on the possibly incidental and constitutionally irrelevant effects of that conduct on the plaintiff.").

Third, as we have already held, marketing activities are jurisdictionally irrelevant in the persistent suppression conspiracy. "[T]hat a panel bank defendant engaged in LIBOR 'marketing' activities which reached a given forum state does not mean that the same defendant is subject to personal jurisdiction in that state on the basis of the defendant's manipulation of LIBOR. . . . It is incontrovertible that the importance of LIBOR was its universal significance, not its projection into any particular state, and plaintiffs do not plead otherwise." LIBOR IV, 2015 WL 6243526, at *30.

Fourth, plaintiffs rely on allegations regarding panel banks' subsidiaries and affiliates in the United States, but "have not pleaded facts or submitted supporting material that suggests that

24

any panel bank's United States-based affiliate played a role in that bank's alleged suppression of LIBOR." Mem. & Order, 2016 WL 1733463, at *3 (S.D.N.Y. Apr. 29, 2016), ECF No. 1396 ("April 29 Order"). For plaintiffs to establish personal jurisdiction through the activity of banks' subsidiaries and affiliates, plaintiffs must first show a "merging [of] parent and subsidiary for jurisdictional purposes[, which] requires an inquiry comparable to the corporate law question of piercing the corporate veil." Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 930 (2011) (internal quotation marks omitted). Plaintiffs must then show that the defendants' affiliates or subsidiaries took jurisdictionally relevant acts consistent with the principles we have set out for the panel bank defendants. Here, plaintiffs have done neither; they merely allege that defendants' affiliates "participated in USD LIBOR suppression" and sold price-fixed LIBOR-based instruments in the United States. Pls.' Mem. of Law in Opp'n 10.[17] To reiterate, "the fact of significant activity,

---

[17] For example, plaintiffs allege, "In a 2007 internal email sent to Barclays' former CEO Robert Diamond, BCI [Barclays Capital Inc., a wholly owned subsidiary of Barclays] Director and Executive Officer Jerry del Missier, who was based in New York, wrote that the USD LIBOR submissions for all of the Panel Banks were 'fantasy rates.' Del Missier has admitted that he instructed subordinates to submit artificially low USD LIBOR rates." Pls.' Supp. Statement of Additional Jurisdictional Facts ¶ 26, ECF No. 1517 (citing Jill Treanor, *Former Barclays executive insists Bob Diamond instructed him to cut Libor*, The Guardian, July 16, 2012, https://www.theguardian.com/business/2012/jul/16/barclays-del-missier-bob-diamond-libor).

First, the "fantasy rates" comment offers nothing more than market color. Second, the article on which plaintiffs rely makes clear that the direction to submit low LIBOR rates came from CEO Bob Diamond, not from Del Missier. Id.

by a defendant or affiliates, in this country, combined with some evidence of LIBOR manipulation in London, provides no indication that the LIBOR determination and submission process occurred any place other than outside the United States." April 29 Order, 2016 WL 1733463, at *3.

Fifth, plaintiffs allege that LIBOR submissions were transmitted to Thomson Reuters in New York, as stated by former Rabobank trader Lee Stewart in his plea allocution in United States v. Stewart, Case No. 1:14-cr-00272-JSR (S.D.N.Y.), Tr. at 15:3-6, Apr. 1, 2015, ECF No. 46 ("Stewart Tr.").[18] As defendants point out, it is unlikely that Lee Stewart, who was not a LIBOR submitter, had personal knowledge of the location from which Thomson Reuters received LIBOR submissions.[19] Furthermore, it is implausible that Thomson Reuters in New York would be in the role

---

("In evidence to MPs following his resignation as chief operating officer of Barclays, Del Missier was adamant that Diamond instructed him to cut the Libor rate following a conversation with Paul Tucker, deputy governor of the Bank of England. . . . Asked if he was acting on an instruction from Diamond, Del Missier said: 'Yes it [sic] was.'").

[18] Carmody Letter 1, Oct. 20, 2016, ECF No. 1600. Plaintiffs also rely on the testimony of former Rabobank trader Takayuki Yagami, even though Yagami traded products tied to Yen LIBOR. Id. at 2. We do not understand plaintiffs' continued, stubborn refusal to comply with our simple admonition that only allegations pertaining to USD LIBOR are potentially relevant to this case. LIBOR IV, 2015 WL 6243526, at *45 ("We continue to reject the impermissible inference that defendants' reprehensible behavior in one product (or even many products: Yen LIBOR, TIBOR, Swiss Franc LIBOR, EURIBOR, . . . and so on) suffices to overcome deficiencies in the pleading of actionable bad behavior in USD LIBOR.").

[19] Stewart's statement itself suggests that he lacked personal knowledge: "I also understand that someone at Rabobank, first in London and later in Utrecht, would submit a Rabobank LIBOR rate each day to Thom[]son Reuters in New York by means of an electronic wire submission." Stewart Tr. at 15:3-6 (emphasis added).

of accepting LIBOR submissions at around 11:00 a.m. London time (6:00 or 7:00 a.m. New York time).  In any event, an allegation that the submissions were sent to New York, without additional allegations that any person or entity did anything further with the submissions in the United States, is insufficient to support personal jurisdiction.  Laydon v. Mizuho Bank, Ltd., No. 12 CIV. 3419 GBD, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) ("Communications that passed through and/or were stored within the United States are insufficient to assert personal jurisdiction over a defendant.") (internal quotation marks omitted).

The few allegations that do address the forum in which a defendant determined or transmitted a false LIBOR submission are easily discounted, especially in light of the moving defendants' declarations stating that they did not determine or transmit their LIBOR submissions from the United States.  Kurtzberg Decl. Ex. 1, ECF No. 1484; Connors Decl., ECF No. 1590.

Taking these allegations *seriatim*, plaintiffs misleadingly suggest that one of Citibank's USD LIBOR submitters requested a submission from New York, Pls.' Joint Mem. of Law in Opp'n 8, but defendants have put forward a sworn document stating that this individual was no longer Citibank's USD LIBOR submitter at the time that plaintiffs allege he was present in New York, Kurtzberg Reply Decl., Ex. 2 at 10, ECF No. 1546.

Plaintiffs also allege that a senior JPMorgan executive in New York directed JPMorgan's LIBOR submissions, OTC Pls.' Supp. Mem. of Law in Opp'n 3, ECF No. 1508, but the substance of the exchange contains nothing more than intrabank communications regarding the executive's thoughts on LIBOR levels, see LIBOR IV, 2015 WL 6243526, at *60 (such individuals do not "purport[] to do anything more than to state a sincere opinion based on publicly available information").

Plaintiffs cite UBS's settlement papers with the U.S. Department of Justice to argue that UBS has "admitted that an executive in Connecticut directed that submissions for all currencies stay low and instituted a policy that submissions for all currencies stay within the pack." Pls.' Joint Mem. of Law in Opp'n 9 (citing UBS DOJ SOF ¶ 108). UBS's actual admission reads: "[T]he manager of the Yen trading desk understood that this direction to submit low LIBOR contributions was issued by the senior manager of Group Treasury based in Stamford in order to make the bank appear more creditworthy, and that it applied to all currencies." UBS DOJ SOF ¶ 108. Plaintiffs stretch the admission to the breaking point. The admission regards a Yen LIBOR trader's understanding as to the source of the policy, but the Statement of Facts itself explains that the actual source of the policy was "an ALM senior manager in Zurich." Id. ¶ 102. Thus, the Statement of Facts does not contradict UBS's sworn statement to the Court that

28

"[n]o UBS employee in the United States determined or submitted USD LIBOR to the British Bankers Association ('BBA') during the relevant time, . . . 2005 to 2012."  Connors Decl. ¶ 3, ECF No. 1590.

Finally, plaintiffs allege that New York-based entity Credit Suisse First Boston made USD LIBOR submissions on behalf of Credit Suisse.  OTC Pls.' Supp. Mem. of Law in Opp'n 4.  The document on which plaintiffs rely is nothing more than a high-level market commentary e-mail from the Royal Bank of Scotland, sent to a host of third parties, that makes a stray reference to Credit Suisse First Boston.  Joint Decl. of Kovel & Hausfeld, Ex. 60 at 11, ECF No. 1510.  This document does not credibly support the allegation.

When the allegations are evaluated soberly, plaintiffs fail to carry their burden of making a prima facie showing of minimum contacts.  Plaintiffs protest that "[a]t its core, Defendants' Motion rests on the absurd premise that domestic victims of a price-fixing cartel should be precluded from bringing suit in the U.S. against the members of that cartel, some of whom are domiciled in the U.S., for harm caused by the cartel's conduct in or aimed at the U.S."  Pls.' Joint Mem. of Law in Opp'n 3.  Plaintiffs' rhetoric is unconvincing.  Of course, defendants that are domiciled in the relevant forum are subject to general personal jurisdiction,

and neither the Court nor the non-moving defendants[20] contest that principle; it is black-letter law that harm experienced in a forum is not sufficient to establish specific personal jurisdiction; and the plaintiffs have not shown that the *persistent suppression* conspiracy, as distinguished from the trader-based conspiracy, is aimed at the United States.

We hold that plaintiffs have failed to carry their burden under the first prong, purposeful availment, of the due process analysis as to all moving defendants.  Therefore, we need not reach the second prong, whether the exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice.  We also need not reach defendants' arguments regarding lack of venue.

### 3.  Pendent Jurisdiction

The non-moving defendants concede that we have general personal jurisdiction over them as to the relevant federal and state antitrust claims, so we need not address pendent jurisdiction as to the state antitrust claims.

In contrast, we decline to exercise pendent jurisdiction over antitrust claims, whether they be federal or state, based on forum selection clauses in particular contracts or based on the location from which a bond was issued.  We repeat that not all claims

---

[20] See *supra* note 1.

"against a counterparty may be brought in a contractually selected forum.   The claim must relate to the particular contractual relationship.   Thus, for example, we will not uphold jurisdiction over a counterparty for all fraud claims that a plaintiff might bring against that counterparty on the basis of the forum selection clause." LIBOR IV, 2015 WL 6243526, at *34; see also Mem. & Order, 2016 WL 4773129, at *2 (S.D.N.Y. Sept. 12, 2016), ECF No. 1557. Likewise, we will not uphold jurisdiction over a counterparty for antitrust claims simply on the basis of a forum selection clause or the location from which a bond was issued.

### 4.  Conspiracy Jurisdiction

Plaintiffs assert that, under the theory of conspiracy personal jurisdiction, we have personal jurisdiction over all of the defendants.   "[C]ourts that have recognized personal jurisdiction on the basis of conspiracy have required plaintiffs to (1) make a prima facie factual showing of a conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to the conspiracy in the forum." LIBOR IV, 2015 WL 6243526, at *34 (internal quotation marks and alterations omitted).

Given that plaintiffs have not plausibly alleged that any defendant committed an act pursuant to the pled conspiracy in the United States, conspiracy jurisdiction does not apply here.   In

31

making this ruling, we do not express an opinion as to whether conspiracy jurisdiction survives as a doctrine after the Supreme Court's ruling in Walden v. Fiore, 134 S. Ct. 1115 (2014), and after recent opinions in the Southern District of New York, such as In re Alumnium Warehousing Antitrust Litigation, 90 F. Supp. 3d 219 (S.D.N.Y. 2015), and Laydon v. Mizuho Bank, Ltd., No. 12 CIV. 3419 GBD, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015).

**5.   Forfeiture**

Plaintiffs argue that defendants have forfeited their personal jurisdiction arguments on the antitrust claims through defendants' availment of the United States courts.  This argument is meritless.

Although there is "a dearth of caselaw . . . defining precisely what types of appearances and filings qualify" to forfeit a personal jurisdiction defense, it is evident that "not all do." Gerber v. Riordan, 649 F.3d 514, 519 (6th Cir. 2011).  The touchstone is that to forfeit a personal jurisdiction defense, "a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking." Corporacion Mexicana De Mantenimiento Integral v. Pemex-Exploracion Y Produccion ("Pemex"), 832 F.3d 92, 102 (2d Cir. 2016). The rationale is that "defendants should raise such preliminary matters before the court's and parties' time is

consumed in struggle over the substance of the suit." Dem. Rep. of Congo v. FG Hemisphere Assocs., LLC, 508 F.3d 1062, 1064 (D.C. Cir. 2007).   But "a party cannot be deemed to have waived objections or defenses which were not known to be available at the time they could first have been made, especially when it does raise the objections as soon as their cognizability is made apparent." Holzsager v. Valley Hosp., 646 F.2d 792, 796 (2d Cir. 1981).

We initially dismissed plaintiffs' antitrust claims in March 2013.   LIBOR I, 935 F. Supp. 2d 666.   Certain plaintiffs appealed the dismissal; in October 2013, the Second Circuit *sua sponte* dismissed the appeal for lack of appellate jurisdiction.   In re LIBOR-Based Fin. Instruments Antitrust Litig., Nos. 13-3565-L & 13-3636(Con), 2013 WL 9557843 (2d Cir. Oct. 30, 2013).   In March 2014, the Bondholder plaintiffs appealed that decision to the Supreme Court, presenting the question, "Is the right to appeal secured by [28 U.S.C.] § 1291 affected when a case is consolidated for pretrial proceedings in multidistrict litigation (or MDL) authorized by 28 U.S.C. § 1407?".   Gelboim v. Bank of Am. Corp., 135 S. Ct. 897, 901 (2015).   That question was fully briefed by November 2014.

Between the time the Second Circuit dismissed the appeal and the completion of briefing in the Supreme Court, jurisdictional defenses became available to the defendants:   the Supreme Court decided Daimler, 134 S. Ct. 746, in January 2014 and the Second

33

Circuit decided Gucci, 768 F.3d 122, in September 2014.  Defendants raised Daimler-based jurisdictional defenses in the cases still pending before this Court.  Kurtzberg Letter, Aug. 13, 2014, ECF No. 601.

In January 2015, the Supreme Court reversed the Second Circuit and remanded for a decision on the merits.  In April 2015 (before merits briefing began in May 2015), defendants noted to the Second Circuit that they "expressly preserve all defenses regarding personal jurisdiction as to all matters on appeal."  Defs.- Appellees' Mot. to Consolidate Appeals 5 n.4, Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2015) (No. 13-3565), ECF No. 221. Additionally, in the merits briefing in May 2015, defendants noted that "[t]wenty of the twenty-five actions on appeal are subject to motions to dismiss for lack of personal jurisdiction pending in the district court, . . . and in the remaining actions, certain defendants intend to assert personal jurisdiction defenses before the district court at an appropriate time, if necessary."  Joint Br. for Defs.-Appellees 28 n.23, Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2015) (No. 13-3565), ECF No. 464.  These statements were sufficient to put the plaintiffs on notice that, if the antitrust claims were to be reinstated, defendants would move for dismissal on this basis.[21]

---

[21] We firmly reject plaintiffs' attempt to spin their own appeal as a "tactical choice" by the *defendants* "to take the merits up on appeal . . . by affirmatively

Given this timeline, the only plausible argument that plaintiffs can make is that the defendants should have preserved their newfound personal jurisdictional defense as to the antitrust claims in their opposition to plaintiffs' petition for certiorari on May 27, 2014, or in their opposition brief in the Supreme Court on October 15, 2014, because those briefs are the only substantive submissions that defendants had the opportunity to make in any court in the Bondholder case between March 2013 and April 2015.[22]

We conclude that defendants' failure to mention the personal jurisdiction defense in their Supreme Court briefs in no way created "a reasonable expectation that [they would] defend the suit on the merits" or "cause[d] the court to go to some effort that would be wasted if personal jurisdiction is later found lacking," Pemex, 832 F.3d at 102. There is no reason to think that the Supreme Court's decision on the writ of certiorari would have been affected by an inchoate personal jurisdiction defense that had not been raised in or evaluated by a lower court.

---

asking the Second Circuit . . . to affirm on the merits," OTC Pls.' Suppl. Mem. of Law in Opp'n 5.  Defendants, of course, were not the appellants.

[22] Plaintiffs argue that the Bondholder case returned to the district court between the Second Circuit's dismissal in October 2013 and the Bondholder plaintiffs' appeal to the Supreme Court in March 2014, and so the defendants should have raised the defense then.  Bondholder Pls.' Supp. Mem. in Opp'n 2-3, ECF No. 1499.  This argument is beyond comprehension.  Until the Supreme Court granted certiorari in June 2014, there simply was no Bondholder case:  it had been dismissed in the district court and dismissed in the Second Circuit. Plaintiffs would have us create a rule requiring defendants to raise defenses in cases that do not exist.

Furthermore, the Supreme Court granted certiorari limited to the scope of the Second Circuit's power to take an appeal in a multidistrict litigation, and the Court does not countenance briefing on questions on which it has not granted certiorari. See Supreme Court Rule 24.1(a) ("[T]he brief may not raise additional questions or change the substance of the questions" that have been presented in the "petition for a writ of certiorari or the jurisdictional statement."). Plaintiffs somewhat bizarrely suggest that defendants should have (1) asked the Supreme Court to remand so that the defendants could move the district court to consider a personal jurisdiction defense on claims that the district court had already dismissed or (2) asserted the defense despite the Supreme Court's rules. Bondholder Pls.' Supp. Mem. in Opp'n 3, ECF No. 1499. These suggestions only serve to highlight how groundless the plaintiffs' position is.

In this regard, plaintiffs' heavy reliance on Pemex is misplaced. In Pemex, the defendant lost in the district court and appealed to the Second Circuit on several grounds, including for lack of personal jurisdiction. 832 F.3d at 101. After a new development during the course of the appeal, the defendant-appellant asked the Second Circuit to remand to the Southern District so that the district court could consider the merits of the case. Once the Southern District ruled against the defendant-appellant, the defendant-appellant reasserted its challenge of

36

personal jurisdiction.  The Second Circuit held that the defendant-appellant waived its personal jurisdiction defense because it had affirmatively asked the Second Circuit to send the case back to the Southern District in hopes of a favorable merits ruling below. Id.

Defendants have done nothing of the sort here.  After the Supreme Court's decision, defendants appropriately preserved the personal jurisdiction defense in the Second Circuit and subsequently moved on personal jurisdiction grounds in this Court at the first opportunity they could post-Daimler, and so have not forfeited the defense.[23]  Thus, we apply here our prior holding that "[i]n light of the change in the law of personal jurisdiction as applied to foreign banks under Daimler and Gucci, and finding no prejudice to plaintiffs from a successive motion, we do not consider defendants' Rule 12(b)(2) motion improper or inappropriate." LIBOR V, 2015 WL 6696407, at *18.

---

[23] This ruling applies equally to defendant UBS, which did not waive its personal jurisdiction defense as to the antitrust claims when it consented to personal jurisdiction in New York as to other claims.  Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (a plaintiff "must establish the court's jurisdiction with respect to each claim asserted") (emphasis in original).

Similarly, defendants without New York branches did not forfeit their personal jurisdictional defense in failing to assert the defense in 2012.  As defendants point out, Daimler cast significant doubt on other avenues of establishing personal jurisdiction, such as the Second Circuit's theory of jurisdiction under Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88 (2d Cir. 2000). See Sonera Holding B.V. v. Cukurova Holding A.S., 750 F.3d 221, 224-26 (2d Cir. 2014).

### 6.   Request for Jurisdictional Discovery

Despite the tomes of submissions, plaintiffs have not made a "threshold showing that there is some basis for the assertion of jurisdiction." Daval Steel Prods. v. M.V. Juraj Dalmatinac, 718 F. Supp. 159, 162 (S.D.N.Y. 1989).   We therefore exercise our discretion to deny jurisdictional discovery.   Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic, 582 F.3d 393, 401 (2d Cir. 2009); see April 29 Order, 2016 WL 1733463, at *3 ("[P]laintiffs' submissions do not identify facts that indicate that discovery could show that [the relevant] defendants determined or submitted LIBOR in forums that would allow this Court to exercise personal jurisdiction.").

## IV.  Efficient Enforcer

"The four efficient enforcer factors are: (1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking appellants' asserted injury and the Banks' alleged price-fixing; (2) the existence of more direct victims of the alleged conspiracy; (3) the extent to which appellants' damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Gelboim, 823 F.3d at 778 (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters

38

("AGC"), 459 U.S. 519, 540-45 (1983)) (internal quotation marks omitted).

These factors are meant to guide a court in exploring the fundamental issue of "whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." Gelboim, 823 F.3d at 780 (internal quotation marks omitted). After all, "[i]t is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." AGC, 459 U.S. at 536. Indeed, "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages." Id. at 535-36. In both situations, the court must draw a line beyond which a defendant will not be held responsible for harm experienced by a plaintiff. See id. at 534. And in both situations, no black-letter rule exists; a court must "exercise [its] judgment in deciding whether the law affords a remedy in specific circumstances." Id. at 536-37. While all efficient enforcer analyses require the exercise of judgment, the task before us is particularly challenging because, as the Second Circuit recognized in Gelboim, "there are features of this case that make it like no other . . . ." 823 F.3d at 778.

39

In this regard, it is clear that the Second Circuit believed that not all plaintiffs should survive the efficient enforcer analysis.  Of particular concern was the specter that "[r]equiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would . . . not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated." Id. at 779.  Though the Circuit's preliminary views were offered in dicta, we are deferential to them.

In their papers on this motion, defendants note the failure of plaintiffs to plead specifics about particular transactions. While we likewise observe the manifest deficiencies in many of the pleadings despite multiple opportunities to amend or supplement them, we do not find that these deficiencies prevent us from evaluating the efficient enforcer factors.  However, these deficiencies may affect other antitrust issues or the adequacy of the pleadings more broadly.

We consider each of the efficient enforcer factors in turn.

**1.  Causation**

Under the first factor, courts examine "whether the violation was a direct or remote cause of the injury." Gelboim, 823 F.3d at 772.  The concern associated with remote causation -- particularly

in the present case -- is that defendants will face "damages disproportionate to wrongdoing . . . ." Id. at 779.

One consideration in determining causation is whether plaintiffs transacted with defendants directly. See 2A Areeda & Hovenkamp, Antitrust Law ¶ 335c(3) (2014) ("Beyond the actual customers, most other plaintiffs would be classified as 'remote' and denied standing even though they have suffered injury-in-fact."). Plaintiffs who purchased products from non-defendants but allege that defendants' actions raised their prices are called "umbrella purchasers."[24] Some courts reject standing of umbrella purchasers because "'significant intervening causative factors,' most notably, the 'independent pricing decisions of non-conspiring retailers,'" attenuate the causal connection between the violation and the injury. Gold, 2016 WL 5794776, at *13 (quoting Gross v. New Balance Athletic Shoe, Inc., 955 F. Supp. 242, 245-47 (S.D.N.Y. 1997)). In such circumstances, "the defendants secured no illegal benefit at [the plaintiffs'] expense," and permitting recovery in such a transaction "could subject antitrust violators to potentially ruinous liabilities, well in excess of their

---

[24] There exists a circuit split on whether umbrella purchasers have antitrust standing. Gelboim, 823 F.3d at 778. Among the district courts there seems to be broader agreement: "The overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after [AGC] have rejected 'umbrella' claims." In re Vitamins Antitrust Litig., No. 99CIV5134, 2001 WL 855463, at *4 (D.D.C. July 2, 2001).

illegally-earned profits . . . ."   Mid-West Paper Prods. Co. v. Cont'l Grp., Inc., 596 F.2d 573, 583, 586 (3d Cir. 1979).

Although "[t]he antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing," In re Foreign Exch. Benchmark Rates Antitrust Litig. ("FOREX"), No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016), a determination of standing in an individual antitrust case is highly fact-specific, AGC, 459 U.S. at 536-37. In this case, we are persuaded to draw a line between plaintiffs who transacted directly with defendants and those who did not.  A plaintiff and a third party could, and did, easily incorporate LIBOR into a financial transaction without any action by defendants whatsoever.  Their independent decision to do so breaks the chain of causation between defendants' actions and a plaintiff's injury.

Counsel for the Bondholder plaintiffs effectively conceded as much at oral argument.  Tr. 47:15-48:1 ("[I]magine that I walk into . . . Citibank, and say I want to borrow $100,000.  And we negotiate over the terms and one of the terms that we put in is LIBOR . . . .  [I]t is not proximately caused because we made the independent decision, the banker and I, to put LIBOR in."); id. 53:19-22 ("If we were just saying anybody who has LIBOR in their price could come in and be a plaintiff in this case, then you would have a real question of proximate causation.").  Counsel attempted to distinguish those hypothetical plaintiffs from the Bondholder

plaintiffs under the theory that the former concerns the impermissibly broad "worldwide market for money," whereas the latter concerns only "the LIBOR-denominated bond market." Id. 53:6-15. This artificial market delineation is unrelated to the causation question and has no analytical force. Even if we accepted that the relevant market should be "the LIBOR-denominated bond market," plaintiffs who did not purchase directly from defendants continue to face the same hurdle: they made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit. To hold defendants trebly responsible for these decisions would result in "damages disproportionate to wrongdoing . . . ." Gelboim, 823 F.3d at 779.

Therefore, where a plaintiff's counterparty is reasonably ascertainable and is not a defendant bank,[25] a plaintiff is not an efficient enforcer. Accordingly, the Bondholder plaintiffs lack antitrust standing, and their antitrust claims are dismissed.

The above framework is not readily transferable to the Eurodollar futures market. Tr. 84:21-24 ("The [Chicago Mercantile Exchange], legally, at its clearing house, takes the role of intermediary[,] removing counter-party risk from the buyer and the

---

[25] There remains an open question about the treatment of plaintiffs who transacted with a subsidiary or affiliate of a panel bank. We do not resolve that question here, but note that the parties should consider this question at the class certification stage.

seller.   So, the CME is the counter-party to both contracts."). Therefore, the approach utilized by Judge Schofield in FOREX is helpful here.   In FOREX, Judge Schofield examined the portion of the FX market that the defendants controlled, concluding that the causation factor had been met because of the allegation that the defendants "dominated the FX market with a combined market share of over 90% as significant participants in both OTC and exchange transactions."   2016 WL 5108131, at *9 (internal alterations omitted).[26]  This approach essentially may be viewed as a proxy for the question of direct causation:   if defendants "control[led] only a small percentage of the ultimate identified market," then plaintiffs' claims may generate "damages disproportionate to wrongdoing."   Gelboim, 823 F.3d at 779.

Exchange-Based Plaintiffs endeavored to meet the FOREX standard by alleging that from October 2008 through December 2010, all 16 panel bank defendants or their affiliates were "large traders" of Eurodollar futures and options, and large traders comprised 70 to 90 percent of that market.   Kovel & Hausfeld Joint Decl. Ex. 1, ECF No. 1510; Lovell & Kovel Letter 3 n.2, ECF No.

---

[26] We reject plaintiffs' attempt to turn the question of market control into a question of "price control . . . over . . . the entire Eurodollar futures market by virtue of their authorship of LIBOR," Exchange-Based Pls.' Mem. of Law in Opp'n 7, ECF No. 1504.   The thrust of the umbrella purchaser concept is to distinguish between those plaintiffs who dealt with price-fixing defendants directly and other plaintiffs whose prices were affected by price-fixing defendants' actions.  Plaintiffs' approach would nullify the causation question in all antitrust cases.

1650.  They neglected to mention that the number of defendant banks was dwarfed by the total population of over 2,900 large traders in that market during the same time period.  Gluckow Letter 5 n.12, ECF No. 1661.[27]  Even so, it remains possible that the panel banks, which included some of the world's largest financial institutions, together controlled a large percentage of the market, measured by number of trades or by dollar amount.  As of now, there is simply not a sufficient record on the issue of market control.  Although we are skeptical that the Exchange-Based plaintiffs can ultimately show that the defendants controlled the market, we defer that determination to a later stage.

### 2.   Existence of More Direct Victims

Under this factor, courts examine whether there exists a class that suffered an antitrust injury more directly than the present class and therefore would be more suited to bring an antitrust claim.  AGC, 459 U.S. at 542.

The Second Circuit expressly recognized that even though "appellants allege status as consumers," in this case "directness may have diminished weight" because "one peculiar feature of this

---

[27] The Court was not informed of this fact until defendants' letter of December 2, 2016, which is particularly striking given the Court's question on this very issue at oral argument on October 27, 2016.  Tr. 102:22-103:14 ("THE COURT: How many large traders are there all together[?] . . . [I]f there were 400 large traders and there are 16 banks, the percentage is low in terms of the analysis that was utilized in FOREX.  That's what I am trying to learn.  [COUNSEL FOR EXCHANGE-BASED PLAINTIFFS]: We don't know what the percentage is.  It may be low [], it might not be low.").

case is that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks." <u>Gelboim</u>, 823 F.3d at 779.

We agree that this factor must carry diminished weight. Any other result would vitiate the first prong of causation. <u>See Daniel v. Am. Bd. of Emergency Med.</u>, 428 F.3d 408, 443 (2d Cir. 2005) ("[T]he weight to be given the various [efficient enforcer] factors will necessarily vary with the circumstances of particular cases.").

### 3.   Speculative Damages

While "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created," <u>In re DDAVP Direct Purchaser Antitrust Litig.</u>, 585 F.3d 677, 689 (2d Cir. 2009), at the same time "highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement," <u>Gelboim</u>, 823 F.3d at 779.   The Second Circuit expressed skepticism that some of the present antitrust claims could survive this factor, opining, "Any damages estimate would require evidence to support a just and reasonable estimate of damages, and it is difficult to see how appellants would arrive at such an estimate, even with the aid of expert testimony." <u>Id.</u>

In evaluating standing in price-fixing cases, damages may be unduly speculative for several reasons.

One reason is that the damages claim is conclusory.  E.g., AGC, 459 U.S. at 542-43 (damages were speculative because there was "no allegation that any collective bargaining agreement was terminated as a result of the coercion, no allegation that the aggregate share of the contracting market controlled by union firms has diminished, no allegation that the number of employed union members has declined, and no allegation that the Union's revenues in the form of dues or initiation fees have decreased").

A second reason is that the injury is so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions.  This rationale tends to dovetail with the first factor of direct causation.  E.g., Reading Indus., Inc. v. Kennecott Copper Corp., 631 F.2d 10, 13 (2d Cir. 1980).

A third reason is that, due to external market factors, there is no relationship between the fixed price and the price that the plaintiffs ultimately paid.  E.g., Gold, 2016 WL 5794776, at *14 ("[T]he Court is concerned that at least some Plaintiffs' alleged injuries are highly speculative. . . . Plaintiffs cannot deny that other market variables may have affected gold prices before and after the PM fixing.").

In Gelboim, the Second Circuit offered a fourth:  damages may be speculative where the non-fixed components of a transaction

were heavily negotiated between the parties in relation to the
fixed component.  823 F.3d at 780.

    To summarize, plaintiffs' damages theory will not be held to
be speculative if it is credible.  The relevant question is
"whether the putative plaintiff is a proper party to perform the
office of a private attorney general and thereby vindicate the
public interest in antitrust enforcement."  Id.  The question is
not one of damages calculation, which forms the essence of the two
broad arguments advanced by defendants:  first, that the parties
would need to reconstruct but-for LIBOR, and second, that damages
would need to be netted.  As to the first argument, the estimation
of but-for LIBOR is the job of the parties' competing experts.
While this case might involve more relevant numbers than most --
numbers "for each of 16 panel banks across 15 maturities, for a
total of 240 quotes per business day," Defs.' Joint Mem. of Law
18, ECF No. 1481 -- that is not a sufficient reason to deem the
damages speculative.

    As to the second argument, we agree that plaintiffs may
ultimately recover only to the extent of their net injury, given
that plaintiffs may well have benefited from LIBOR suppression in
the same transaction or in a different transaction.  See Minpeco,
S.A. v. Conticommodity Servs., Inc., 676 F. Supp. 486, 489
(S.D.N.Y. 1987) ("[A]n award of damages should put a plaintiff
forward into the position it would have been [in] 'but for' the

defendant's violation of the law. . . . An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct.") (quoting L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1367 (9th Cir. 1986)).  Again, however, netting in and of itself does not render the damages unduly speculative.

We now turn to an analysis of whether the different groups of plaintiffs have articulated a non-speculative theory of damages which would support a finding that they could be efficient enforcers.  As discussed below, there are issues with each group of plaintiffs.  To the extent that any plaintiffs sue under transactions not specifically addressed herein, the principles of each category of transaction should be applied accordingly.

### i. Non-Negotiated Transactions Such As Bonds

The first group of plaintiffs is those who entered into non-negotiated transactions such as bonds.[28]  These plaintiffs argue that the appropriate calculation of damages is simply the difference between suppressed LIBOR and but-for LIBOR.  We disagree, as the effect of a change in LIBOR cannot be isolated in

---

[28] Although the Bondholder class -- comprised of plaintiffs who did not transact directly from defendants -- is dismissed under the first factor of causation, there remain plaintiffs within the OTC class who allege that they purchased bonds directly from defendants, such as plaintiff SEIU.  The analysis in this section pertains to such plaintiffs.

the same way as the overcharge of a typical price-fixed product such as a book, as explained in the following paragraph.

We have already made two fundamental observations regarding bonds consistent with "common economic experience," Twombly, 550 U.S. at 565.  First, the purchase price of a bond is "equal to the present value of its expected future interest and principal payments . . . ."  LIBOR IV, 2015 WL 6243526, at *70.  Second, if LIBOR was suppressed at the time the bondholder purchased the bond, then both the expected future interest payments and the purchase price of the bond would have reflected that lower LIBOR level. Id.  That is, for a bond, the future interest payments equal the interest rate (LIBOR plus perhaps a spread) multiplied by the notional value of the bond.   If the notional value is held constant, and if the spread represents issuer risk that is not affected by LIBOR, Tr. 83:1-7, then when LIBOR falls the purchase price must fall correspondingly; any other result would defy basic economic principles.[29]  Generally speaking, this interaction would

---

[29] The Schwab plaintiffs submitted declarations arguing the following:

> I do not agree that [LIBOR suppression] would have somehow been reflected in a lower price to the Treasury Entities, thereby compensating them.  In initial offerings the Treasury Entities simply bought at par.  In secondary markets the Treasury Entities sometimes bought at a discount or premium to par -- but any discount or premium would have reflected underlying changes in interest rates or credit-worthiness of the issuer, not 'compensation' for LIBOR suppression.  Whether in the primary or secondary market, Schwab overpaid for the investments; the suppression of LIBOR systematically caused the risk of the investment to be understated

also be reflected in the purchase price of other LIBOR-based, non-negotiated financial instruments such as asset-backed securities.

Therefore, bondholders would be harmed from lowered coupon payments only if the price they paid for the bond was not correspondingly lowered in absolute dollars. An example is a bondholder who purchased a bond prior to the suppression period and then received suppressed returns. A more complicated situation is presented by a bondholder who purchased a bond during LIBOR suppression. If the level of LIBOR suppression remained constant over the life of the bond, then that bondholder did not experience damages flowing from the defendants' actions and the measure of damages would be zero. But if the suppression level increased over the life of the bond, then the bondholder has experienced damages in the amount of the "extra" suppression. As an example, if the LIBOR suppression level was 15 basis points below but-for LIBOR at the time the plaintiff purchased the bond, and then the suppression level increased to 45 basis points below but-for LIBOR at the time of the first coupon payment, the bondholder was damaged

---

compared to the interest rate being offered and reduced the Treasury Entities' income.

Decl. of Dennis Goldman ¶ 10, ECF No. 1512.

Whether a bond is purchased at par value is immaterial to the question of whether the purchase price is equal to the present value of the expected payments. Purchasing a new-issue bond at par simply means that the future payments are set at a level that reflects a present value of par. As to the secondary market, it would seem that the point of the Schwab plaintiffs is the same as our point: a discount or premium on the purchase price "reflect[s] underlying changes in interest rates," such as LIBOR suppression.

to the tune of 30 basis points on that coupon payment.  And if on a later coupon payment the suppression level became 5 basis points below but-for LIBOR, then the benefit of 10 basis points on that coupon payment should be netted against the measure of damages. These scenarios present issues of proof, and not ones of standing.

### ii.  Negotiated Transactions Such As Swaps

The second group of plaintiffs is those who entered into negotiated transactions such as interest rate swaps.  An interest rate swap is an instrument in which "two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another.  These are highly liquid financial derivatives.  Interest rate swaps are commonly used for both hedging and speculating."  OTC Compl. ¶ 35(f).[30]  The interest rate derivatives market in which these instruments were created and sold was an "informal bilateral market consisting of broker/dealers that traded price information and negotiated transactions over electronic communications networks. . . . [D]ealers active in this market custom-tailor agreements to meet the specific needs of their customers."  Freddie Mac Compl. ¶ 207.

---

[30] The named plaintiffs of the proposed OTC class only purchased interest rate swaps, but the OTC complaint lists other types of instruments on which it would sue on behalf of the class.  The instruments "include but are not limited to asset swaps, collateralized debt obligations, credit default swaps, forward rate agreements, inflation swaps, interest rate swaps, total return swaps, and options."  OTC Compl. ¶ 35.

The Second Circuit expressed skepticism about the measure of damages in such highly negotiated transactions.  Gelboim, 823 F.3d at 780.  In response, plaintiffs argue that courts do not consider the presence of negotiation to be fatal to the calculation of damages.  OTC Pls.' Mem. of Law in Opp'n 10 n.12, ECF No. 1511. Defendants, meanwhile, argue that the presence of negotiation "means greater opportunity for changes in the but-for world -- i.e., the introduction of further intervening causal intermediaries."  Defs.' Reply Mem. of Law 25, ECF No. 1544.  Both of these arguments miss the mark.

When parties enter into bespoke swaps, they do so to effect a financial goal -- to exchange risk for safety, to achieve a balance in their holdings, or to make a bet on a belief that LIBOR will move in a certain direction.  Gaining or trading away exposure to LIBOR is the point of the swap.  Thus, in entering into a swap transaction the parties take into consideration the present level of LIBOR and their view of how LIBOR will change in the future. The parties respond to these considerations when they set the non-LIBOR portions of the swap.  As direct action plaintiffs agree, "[T]he fixed rate was designed to be the net present value of what LIBOR was [at the time of the transaction]."  Tr. 78:15-16.  Thus, in our view, the point of the Second Circuit's observation is that when swaps were entered into during the suppression period, the negotiated components absorbed the effects of LIBOR suppression.

Plaintiffs cite to Loeb Industries, Inc. v. Sumitomo Corp., 306 F.3d 469 (7th Cir. 2002), to support their view that damages should simply be measured from the but-for level even in negotiated contracts. Loeb actually cuts against their argument. In that case, the price of a contract for copper cathode futures was comprised of (1) a number equivalent to the average of Comex copper prices, and (2) a negotiated premium set on a quarterly or monthly basis. Id. at 476, 487. The court held that the negotiated premium did not render the damages speculative, for the reason that "the evidence show[ed] that as the Comex price increased, the premium also increased. Thus, there [wa]s no possibility that the two components 'offset' or that the premium somehow compensated for the defendants' manipulated price inflation." Id. at 487-88. Here, the circumstances are different, as the Second Circuit recognized, and there is every expectation that the negotiated component compensated for manipulated LIBOR. Cf. FOREX, 2016 WL 5108131, at *8 (LIBOR is distinguishable from the FX market, which "does not entail the same level of 'negotiation' between parties in selecting the ultimate rates for their transactions.").[31]

---

[31] Plaintiffs also rely heavily on New York v. Hendrickson Brothers, Inc., 840 F.2d 1065 (2d Cir. 1988), which said that "antitrust treble-damage actions should not be complicated by a need to trace the effects of the overcharge with respect to such matters as prices, costs, and the potentially different behavior of all the pertinent variables in the absence of the overcharges." Id. at 1079. Plaintiffs use this quotation out of context. The court in Hendrickson was explaining why indirect purchasers are routinely denied antitrust standing -- that is, because allowing recovery by indirect purchasers would require courts to trace all of the effects of an overcharge.

At bottom, swapholders are in a position similar to bondholders. Plaintiffs who entered into swaps before the suppression period may recover for suppressed payments relative to but-for LIBOR. And plaintiffs who entered into swaps during the suppression period may recover for any super-suppressed payments, netted against any less-suppressed payments. See Tr. 78:11-15 (where counsel for the direct action plaintiffs stated, "There may be transactions where damages are zero if they're late in the time period. There are going to be [damages] for sure, if they enter a swap in 2007 before the suppression really starts going down.").

### iii. Futures Contracts

The third group of plaintiffs is those who purchased Eurodollar futures contracts on an exchange. Relying on the undisputed fact that the settlement price of a Eurodollar future is 100 minus the three-month USD LIBOR fix on the contract's last trading day,[32] Exchange-Based plaintiffs allege that defendants "affected Eurodollar futures prices directly by manipulating the index that was directly incorporated into the formula for those prices." LIBOR II, 962 F. Supp. 2d at 612.

The mathematical relationship between LIBOR and the settlement price of Eurodollar futures contracts does not address

---

[32] Metzler Inv. GmbH v. Credit Suisse Grp. AG, Corrected Second Am. Compl. ¶ 433, No. 11-md-2262 (NRB), ECF No. 438 ("Exchange-Based Compl.").

the relationship, if any, between LIBOR and the *trading* price of Eurodollar futures contracts (that is, the price at which Eurodollar futures contracts were bought and sold prior to settlement). The trading price reflects the market's prediction for what the price will be at settlement, which could be years away -- not what LIBOR is at the present moment. See Exchange-Based Compl. ¶ 431 ("[I]n practice, Eurodollar futures are a proxy for the LIBOR-based credit curve.") (internal alterations omitted); Tr. 90:20, 98:19-20 (settlement can occur five or ten years in the future). Therefore, it will only be possible to determine the effect of LIBOR on trading prices if the two are in fact closely related. In FOREX, such a relationship -- where the "exchange price . . . [and] the FX spot prices . . . move virtually in tandem" -- was demonstrated by empirical data provided in the complaint as well as acknowledgments in settlements with the U.S. Commodity Futures Trading Commission that "exchange rates in many actively traded CME foreign exchange futures contracts track rates in foreign exchange markets at near parity." 2016 WL 5108131, at *9 (internal alterations omitted). By contrast, in Gold, the court expressed skepticism that such a relationship could be shown because "Plaintiffs cannot deny that other market variables may have affected gold prices before and after the PM Fixing. (Indeed, were it otherwise, pricing across gold markets would essentially be flat, varying only twice a day)." 2016 WL 5794776, at *14.

Here, the Exchange-Based plaintiffs have not sufficiently pled that the LIBOR level on a given day moves in tandem with the trading price of Eurodollar futures contracts. Exchange-Based plaintiffs have merely pled that "[t]raders who exit their positions before settlement are still affected by LIBOR mispricing because the Eurodollar futures contracts trade based on what LIBOR is expected to be in the future. To the extent that LIBOR is mispriced in the present, expectations of what LIBOR will be in the future will also be skewed." Exchange-Based Compl. ¶ 439. The complaint continues, "The current and prospective higher settlement prices of CME Eurodollar futures contracts created higher reference points for the expectations of all market participants." Id. ¶ 447. This hardly pleads a sufficiently close relationship between LIBOR and trading prices.

Exchange-Based plaintiffs offer one example in their attempt to show a relationship between LIBOR and Eurodollar futures prices. Their complaint presents data on LIBOR and Eurodollar futures contracts in the days surrounding "the events on April 17, 2008. . . . LIBOR jumped on that day following the BBA's announcement that it would investigate the authenticity of LIBOR reporting." Id. at ¶ 444. Figure 21 of the complaint purports to show the "sharp decrease in the Eurodollar futures price on April 17, 2008[,] . . . [as well as] the behavior of LIBOR during the same period, which exhibits opposite movements to the Eurodollar

futures price." The price shown in the graph is the price of the "nearby Eurodollar futures contract . . . ." <u>Id.</u>

Unless Figure 21 is inadvertently mislabeled, it is extraordinarily misleading.[33] Figure 21 presents two graphs. On each graph, a two-day period in the middle of April 2008 is highlighted to demonstrate the supposed one-to-one, causal relationship between LIBOR and Eurodollar contract prices. One graph shows a sharp increase in LIBOR over the course of two days in the middle of April 2008 (the "LIBOR Increase"), and the other graph shows a sharp decline in Eurodollar contract prices over the course of two days in the middle of April 2008 (the "Eurodollar Decrease"). If LIBOR truly caused a linear movement in Eurodollar contract prices, one would expect to see either that the LIBOR Increase and the Eurodollar Decrease occurred during the same two days or that the LIBOR Increase occurred shortly before the Eurodollar Decrease.

---

[33] There is little reason to believe that the graphs are mislabeled. Although the complaint provides no information as to the source of the data in the graphs, publicly available data suggests that the date labels are correct. <u>See, e.g.</u>, Federal Reserve Bank of St. Louis, <u>3-Month London Interbank Offered Rate (LIBOR)</u>, based on U.S. Dollar, FRED Economic Data, https://fred.stlouisfed.org/series/USD3MTD156N; Quandl, <u>Eurodollar Futures, August 2008, EDQ2008, CME</u>, https://www.quandl.com/data/CME/EDQ2008-Eurodollar-Futures-August-2008-EDQ2008-CME (Tab TABLE, which provides, <u>inter alia</u>, a drop in prices from April 15 to April 17, 2008 that approximates the amount of the drop provided in Figure 21 of the complaint). Exchange-Based plaintiffs have also submitted a proposed amended complaint and a post-oral argument letter, both relying on the same graph and providing no other empirical examples. <u>Metzler Inv. GmbH v. Credit Suisse Grp. AG</u>, Proposed Third Amnded Compl. ¶ 622, No. 11-cv-2613 (NRB), ECF No. 292; Lovell & Kovel Letter App'x B, MDL ECF No. 1650.

What Figure 21 shows instead is that the LIBOR Increase occurred *after* the Eurodollar Decrease:  the Eurodollar Decrease occurred from April 15 to April 17, 2008, but the LIBOR Increase occurred from April 16 to April 18, 2008.  The graphs suggest that Eurodollar futures prices moved unconnected to the actual LIBOR level.

Even putting aside the movements over these three days, the movements throughout April 2008 belie the Exchange-Based plaintiffs' claim of a causal relationship.  The relative flatness of LIBOR levels (1) between April 4, 2008 and April 15, 2008 and (2) between April 18, 2008 and April 28, 2008 appear to have no relationship to (1) falling Eurodollar contract prices between April 4, 2008 and April 15, 2008 and (2) rising Eurodollar contract prices between April 18, 2008 and April 28, 2008.  And given that the graph purports to show the prices of the *nearby* Eurodollar futures contract, the relationship in futures contracts that expire further out must be even more attenuated.  The graphs do not credibly support the notion that Exchange-Based plaintiffs will be able to show that LIBOR suppression of a particular amount would have caused a corresponding, determinable change in trading prices.

This is not a case where information pertaining to the supposed causal relationship is uniquely in defendants' hands.  Notably, despite the apparent availability of the data, Exchange-

Based plaintiffs offer no other empirical information showing that Eurodollar futures prices move in tandem with LIBOR -- no other graphs, trendlines, or correlations.   And unlike in FOREX, Exchange-Based plaintiffs have not cited to any official findings that Eurodollar futures trading prices track LIBOR at near parity. Without demonstrating such a relationship, plaintiffs cannot prove that defendants caused any particular changes in Eurodollar trading prices.

A separate reason to dismiss claims of intermediate traders is that there is good reason to doubt that they suffered damages in any event.   After all, these traders made the decision to purchase a futures contract at a particular price and made the decision to sell it back to the market at a particular price.   The precise amount of money that they would make or lose on the market was known to them at the time they made the decision to sell, and LIBOR suppression did not change this knowledge.   Cf. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005) ("Normally, in cases such as this one (i.e., fraud-on-the-market cases), an inflated purchase price [of a stock] will not itself constitute or proximately cause the relevant economic loss.   For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value.   Moreover, the logical link between the inflated

60

share purchase price and any later economic loss is not invariably strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").

Therefore, a damages theory predicated on a direct link between an act of LIBOR suppression and an impact on Eurodollar futures trading prices in a particular amount is speculative.  The only Exchange-Based plaintiffs with a non-speculative theory are those who, before the suppression period started, shorted contracts that were held to settlement during the suppression period.  Such plaintiffs would be able to rely on an unmanipulated selling price as well as a settlement price demonstrably impacted by LIBOR suppression, as set forth in the example in Paragraph 440 of the Exchange-Based plaintiffs' complaint.

### 4.  Duplicative Recovery and Complex Apportionment

The last factor reflects a "strong interest . . . in keeping the scope of complex antitrust trials within judicially manageable limits."  <u>AGC</u>, 459 U.S. at 543.

Under this factor courts are traditionally concerned with the prospect of different groups of plaintiffs attempting to recover for the same exact injury, <u>id.</u>, which plaintiffs do not do here.  Courts are not traditionally concerned with considerations that defendants have raised, namely, whether governments have conducted

investigations concerning the conduct at issue, and whether the plaintiffs assert alternative theories of recovery.  See, e.g., Mid-West Paper, 596 F.2d at 594 n.85 (plaintiffs are not "necessarily foreclosed from . . . relief by the mere pendency of the government and direct purchaser suits for similar remedies. Generally, they may proceed simultaneously or in disregard of each other . . . .") (internal quotation marks and citation omitted); Alaska Elec. Pension Fund v. Bank of Am. Corp. ("ISDAFix"), No. 14 Civ. 7126, 2016 WL 1241533, at *8 (S.D.N.Y. Mar. 28, 2016) ("[T]he damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery.").

Clearly, the Second Circuit in Gelboim was concerned with the scope of government recovery, as "the ramified consequences are beyond conception."  823 F.3d at 780.  As of now, there has been no showing that certain plaintiffs have been made whole through the receipt of restitution payments made to governments; if such a showing is made in the future, we will take the steps necessary to avoid duplicative recovery.  Moreover, defendants suggest no substitute avenue of recovery for plaintiffs who transacted with a panel-bank defendant that is not under government investigation.

We are also unaware of any authority foreclosing plaintiffs from pursuing antitrust claims simply because they are also pursuing non-antitrust claims.  While plaintiffs cannot recover

twice for the same injury, they are permitted to assert alternative theories of liability.

**5.   State Law Claims**

Some plaintiffs have asserted state antitrust law claims in addition to their federal law claims.  Defendants argue that antitrust standing in the state claims also turns on the AGC factors.

"In addressing unsettled areas of state law, . . . our role as a federal court . . . is not to adopt innovative theories that may distort established state law.  Instead we must carefully predict how the state's highest court would resolve the uncertainties that we have identified.  In making this prediction, we give the fullest weight to pronouncements of the state's highest court, . . . while giving proper regard to relevant rulings of the state's lower courts.  We may also consider decisions in other jurisdictions on the same or analogous issues." Travelers Ins. Co. v. Carpenter, 411 F.3d 323, 329 (2d Cir. 2005) (internal quotation marks and citations omitted).  Additionally, "the judgment of an intermediate appellate state court is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" New York v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 210 (2d Cir. 2006) (quoting Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)).

We only address those state law claims that remain after our personal jurisdiction rulings:  California Cartwright Act claims in Bay Area Toll Authority v. Bank of America Corp., No. 14-cv-3094, and New York Donnelly Act claims in Federal Deposit Insurance Corp. v. Bank of America Corp., No. 14-cv-1757; Principal Financial Group, Inc. v. Bank of America Corp., No. 13-cv-6014; and Principal Funds Inc. v. Bank of America Corp., No. 13-cv-6013.  As explained below, we conclude that the AGC factors should apply to the California and New York antitrust claims, and therefore the standing analyses set forth above apply equally to the state law claims.

### i.   California Cartwright Act Claims

California's highest court has not considered the application of the AGC factors, but it has recently stated that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act . . . ."  Aryeh v. Canon Bus. Sols., Inc., 292 P.3d 871, 877 (Cal. 2013).  Prior to the California Supreme Court's decision in Aryeh, a California intermediate appellate court applied the AGC factors to a Cartwright Act claim, Vinci v. Waste Mgmt., Inc., 43 Cal. Rptr. 2d 337, 338-39 (Cal. Ct. App. 1995), as did the Ninth

Circuit, <u>Knevelbaard Dairies v. Kraft Foods, Inc.</u>, 232 F.3d 979, 987 (9th Cir. 2000)[34].

Plaintiffs argue that <u>Aryeh</u> nullified the standing analyses in <u>Vinci</u> and <u>Knevelbaard</u>.  We are not so persuaded.  <u>Aryeh</u> -- a case ultimately about California's unfair competition law -- did not analyze antitrust standing, and did not indicate that the California Supreme Court disapproved of the application of the <u>AGC</u> factors.  Indeed, a recent case in the Eastern District of New York concluded that "because there is no California law contrary to the state appellate court's application of the <u>AGC</u> factors in <u>Vinci</u>, the Court applies the <u>AGC</u> factors to Plaintiffs' [Cartwright Act] claim.  The decision of both an intermediary court and the Ninth Circuit remain the best predictor of the state's highest court's action on the issue, and the Court is not convinced to disregard this data by any other indication that the highest court of the state would decide otherwise." <u>Salveson v. JP Morgan Chase & Co.</u>, 166 F. Supp. 3d 242, 258 (E.D.N.Y. 2016) (internal quotation marks omitted).  We agree with this analysis and conclude that the <u>AGC</u> factors apply to plaintiffs' Cartwright Act claims.

_____

[34] The Ninth Circuit noted that antitrust standing is more permissive under Cartwright Act claims than under federal law in that the Cartwright Act permits suits by both direct and indirect purchasers.  <u>Knevelbaard Dairies</u>, 232 F.3d at 987, 991.  That fact does not impact the analysis in this case.

### ii.  New York Donnelly Act Claims

New York's highest court has not opined on the applicability of the AGC factors.  However, a New York intermediate appellate court has quoted AGC approvingly in considering a Donnelly Act claim.  Cont'l Guest Servs. Corp. v. Int'l Bus Servs., Inc., 939 N.Y.S.2d 30, 30 (N.Y. App. Div. 1st Dep't 2012).  Relying on Continental Guest Services Corp., the Second Circuit subsequently held that "[w]e see no reason . . . to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing."  Gatt Comm'ns, Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 81 (2d Cir. 2013).  We conclude that the AGC factors apply to plaintiffs' Donnelly Act claims.

## V.  Conclusion

After applying the personal jurisdiction and efficient enforcer holdings in this opinion, the antitrust claims that remain are set out in the accompanying appendix.  The Court anticipated before the briefing on this motion that its decision would be informative with regard to any proposed additional motion.  Accordingly, any party wishing to pursue a motion previewed in June and derived from Gelboim should submit a pre-motion letter by January 6, 2017.  Any letters in opposition to any such proposal should be filed by January 13, 2017.

This Memorandum and Order resolves MDL docket entry 1480.

**SO ORDERED.**

Dated:   New York, New York
        December 20, 2016

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

**APPENDIX**

| Action | Jurisdiction Filed | Antitrust Claims | Remaining Defendants |
|---|---|---|---|
| *Gelboim v. Credit Suisse Grp. AG*, No. 12-cv-1025 (Bondholders) | S.D.N.Y. | Federal | *Antitrust claims dismissed on efficient enforcer grounds* |
| *Metzler Inv. GmbH v. Credit Suisse Grp. AG*, No. 11-cv-2613 (Exchange-Based) | S.D.N.Y. N.D. Ill. D. Minn. D.N.J. | Federal | Bank of America Corp. Bank of America, N.A. Citibank, N.A. Citigroup Inc. JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. John Does 1-5 |
| *Mayor and City of Baltimore v. Credit Suisse Grp. AG*, No. 11-cv-5450 (OTC) | S.D.N.Y. | Federal | Bank of America Corp. Bank of America, N.A. Citibank, N.A. Citigroup Inc. JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. |
| *Charles Schwab Bank, N.A. v. Bank of Am. Corp.*, No. 11-cv-6411 | N.D. Cal. | Federal, California | *Antitrust claims dismissed on personal jurisdiction grounds* |
| *Schwab Money Mkt. Fund v. Bank of Am. Corp.*, No. 11-cv-6412 | N.D. Cal. | Federal, California | *Antitrust claims dismissed on personal jurisdiction grounds* |
| *Schwab Short-Term Bond Mkt. Fund. v. Bank of Am. Corp.*, No. 11-cv-6409 | N.D. Cal. | Federal, California | *Antitrust claims dismissed on personal jurisdiction grounds* |
| *Amabile v. Bank of Am. Corp.*, No. 13-cv-1700 | S.D.N.Y. | Federal | Bank of America Corp. Citibank, N.A. JPMorgan Chase & Co. |
| *Bay Area Toll Auth. v. Bank of Am. Corp.*, No. 14-cv-3094 | N.D. Cal. | Federal, California | Citibank, N.A. |
| *City of Houston v. Bank of Am. Corp.*, No. 13-cv-5616 | S.D. Tex. | Federal, Texas | *Antitrust claims dismissed on personal jurisdiction grounds* |

| | | | |
|---|---|---|---|
| *City of Phila. v. Bank of Am. Corp.,* No. 13-cv-6020 | E.D. Pa. | Federal | Citigroup Inc. |
| *Darby Fin. Prods. v. Barclays Bank PLC,* No. 13-cv-8799 | N.Y. Sup. Ct. | Federal | JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. |
| *Fed. Deposit Ins. Corp. v. Bank of Am. Corp.,* No. 14-cv-1757 | S.D.N.Y. | Federal, New York | Bank of America Corp. Bank of America, N.A. Bear Stearns Capital  Markets, Inc. JPMorgan Chase & Co. JPMorgan Chase Bank, N.A. Citibank, N.A. Citigroup Inc. Citigroup Financial  Products, Inc. HSBC Bank USA, N.A. Merrill Lynch & Co. Merrill Lynch Capital  Services Inc. |
| *Fed. Home Loan Mortg. Corp. v. Bank of Am. Corp.,* No. 13-cv-3952 | E.D. Va. | Federal | HSBC Bank USA, N.A. |
| *Nat'l Credit Union Admin. Bd. v. Credit Suisse Grp. AG,* No. 13-cv-7394 | D. Kan. | Federal, California, Illinois, Kansas | *Antitrust claims dismissed on personal jurisdiction grounds* |
| *Principal Fin. Grp., Inc, v. Bank of Am. Corp.,* No. 13-cv-6014 | S.D. Iowa | Federal, New York | JPMorgan Securities LLC Merrill Lynch, Pierce,  Fenner & Smith Inc. RBS Securities Inc. |
| *Principal Funds, Inc. v. Bank of Am. Corp.,* No. 13-cv-6013 | S.D. Iowa | Federal, New York | JPMorgan Securities LLC Merrill Lynch, Pierce,  Fenner & Smith Inc. RBS Securities Inc. |

A-2

| | | | |
|---|---|---|---|
| *Prudential Inv. Portfolios 2 v. Bank of Am. Corp.*, No. 14-cv-4189 | D.N.J. | Federal | Citigroup Inc.<br>HSBC Finance Corp.<br>HSBC Securities (USA) Inc.<br>HSBC USA Inc.<br>JPMorgan Securities LLC<br>MLPFS Inc.<br>RBS Securities Inc. |
| *Regents of the Univ. of Cal. Bank of Am. Corp.*, No. 13-cv-5186 (Cal. Consol.) | N.D. Cal.<br>S.D. Cal.<br>C.D. Cal.<br>E.D. Cal. | Federal, California | *Antitrust claims dismissed on personal jurisdiction grounds* |
| *Salix Capital US Inc. v. Banc of Am. Sec. LLC*, No. 13-cv-4018 | N.Y. Sup. Ct. | Federal | Bank of America Corp.<br>Bank of America, N.A.<br>Barclays Capital<br>JPMorgan Chase & Co.<br>JPMorgan Chase Bank, N.A.<br>JPMorgan Securities LLC<br>Citibank, N.A.<br>Citigroup Inc.<br>Citigroup Global Markets Inc.<br>Citigroup Global Markets Limited<br>Credit Suisse Securities (USA) LLC<br>Deutsche Bank Securities Inc.<br>MLPFS Inc. |