# KIRBY McINERNEY LLP

825 Third Avenue
New York, NY 10022
212.371.6600
Fax. 212.751.2540
WWW.KMLLP.COM
Of counsel
  Roger W. Kirby
  Alice McInerney

January 3, 2017

**BY ECF AND HAND DELIVERY**
Honorable Naomi Reice Buchwald
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

      Re:   *In re LIBOR-Based Financial Instruments Antitrust Litig.*,
               No. 11 Civ. 2613 (NRB), Master File No. 11-md-2262 (NRB)

Dear Judge Buchwald:

      We are interim co-lead counsel for the Exchange-Based Plaintiffs and the proposed Class ("Plaintiffs") in the above-referenced action, and respectfully submit this letter in accordance with Rule 2.B of Your Honor's Individual Practices to request a pre-motion conference to seek leave to file a motion to reconsider the portion of the Court's *LIBOR VI*[1] decision dismissing part of Plaintiffs' claims on efficient enforcer grounds.

      Plaintiffs seek leave to move for reconsideration under Local Rule 6.3.[2] For the reasons summarized below, Plaintiffs respectfully submit that *LIBOR VI*'s partial dismissal of Plaintiffs' antitrust claims on efficient enforcer grounds was clear error. The Court's analysis in this complex area runs counter to peer-reviewed academic literature regarding causation in futures markets. Rather than credit Plaintiffs' well-pled allegations that "Eurodollar futures contracts . . . move in lockstep with LIBOR" (TAC ¶ 17[3]), rather than credit the academic literature including that cited by Plaintiffs, and rather than credit established case law, the Court committed clear error.

     **I.**    **The Conclusions About Causation and Analysis of Figure 21 Are Clearly Erroneous**

      *LIBOR VI*'s partial dismissal of Plaintiffs' claims was based on the finding that any damages inflicted on Plaintiffs resulting from the fixing of LIBOR was speculative because

---

[1] *In re LIBOR-Based Fin. Instruments Antitrust Litig. ("LIBOR VI")*, No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).

[2] This Court has stated that "reconsideration is typically only appropriate when the movant ha[s] pointed to 'controlling decisions or data that the court overlooked' -- matters 'that might reasonably be expected to alter the conclusion reached by the court" or where "there is a need to correct a clear error or prevent manifest injustice." *Small v. Nobel Biocare USA*, LLC, No. 05 Civ. 3225 (NRB), 2012 WL 952396, at *1 (S.D.N.Y. Mar. 21, 2012) (quoting *Padilla v. Maersk Line, Ltd.*, 636 F. Supp. 2d 256, 259 (S.D.N.Y. 2009); *Lora v. O'Heaney*, 602 F.3d 106, 111 (2d Cir. 2010) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

[3] "SAC ¶" refers to [Corrected] Second Amended Consolidated Class Action Complaint, ECF No. 438. "TAC ¶" refers to [Proposed] Third Amended Consolidated Class Action Complaint, ECF No. 1159-1.

Plaintiffs had not demonstrated a "close relationship" between LIBOR and Eurodollar future trading prices (as distinguished from settlement prices). *LIBOR VI*, 2016 WL 7378980 at *21-23, Slip Op. at 57. This finding was based on the Court's analysis of Figure 21, which was a graph included in Plaintiffs' complaints to demonstrate this relationship [*see* SAC ¶ 445; TAC ¶ 622]. *LIBOR VI*, 2016 WL 7378980 at *21, Slip Op. at 57. The Court, however, considered Figure 21 to be "extraordinarily misleading." The remainder of the Court's analysis concluding that LIBOR and Eurodollar trading prices were not closely related flowed from this analysis. *Id*. at *22, Slip Op. at 58.

The Court specifically observed, "Figure 21 presents two graphs. On each graph, a two-day period in the middle of April 2008 is highlighted to demonstrate the supposed one-to-one, causal relationship between LIBOR and Eurodollar contract prices." *Id.* The Court reasoned that Figure 21 was "extraordinarily misleading" because "[i]f LIBOR truly caused a linear movement in Eurodollar contract prices, one would expect to see either that the LIBOR Increase and the Eurodollar Decrease occurred during the same two days or that the LIBOR Increase occurred shortly before the Eurodollar Decrease." *Id.* Both the Court's standard and the Court's interpretation of Figure 21 are in clear error. The natural extension of this clear error is that the Court misapprehended the relationship between a futures contract and the future contract's underlying asset.

*First*, the Court assumed that a one-for-one relation between spot prices and futures prices was necessary for manipulation of the spot prices to lead directly and mathematically to artificial futures prices. *Id.* at *22, Slip Op. at 59.[4] But an exact one-for-one relationship need not exist for there to be a well-established mathematical relationship between the underlying asset and futures.[5] In fact, there is an established mathematical relation between LIBOR and Eurodollar futures prices:[6]

$$IFR_{d3,d1} = \frac{[1 + R_{d2}(d2/360)]}{(d3/360)[1+R_{d1}(d1/360)]} - \frac{1}{(d3/360)}$$

Information that arrives today can have different effects on current LIBOR versus expected future values of LIBOR, *a priori* one would not expect a one-for-one relationship between LIBOR and Eurodollar futures, and that indeed, the ratio of LIBOR to Eurodollar futures movements should be progressively smaller for progressively longer maturity futures.[7] This point is entirely

---

[4] There is a one-for-one relationship between LIBOR and the prices of futures contracts at settlement (Futures =100-LIBOR).

[5] *See also* J. Labuszewski and R. Co, *Eurodollar Futures: Interest Rate Market Building Blocks*, CME Group, at 6, available at https://www.cmegroup.com/trading/interest-rates/files/Eurodollar_Futures_Interest_Rate_Building _Blocks.pdf (last visited Jan. 3, 2017).

[6] *Id.*

[7] Nonetheless, this mathematical relationship is of the same sort as that in the foreign currency market that the Court cited to favorably. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016).

Honorable Naomi Reice Buchwald
January 3, 2017
Page 3

consistent with constructing the "LIBOR-based credit curve" [TAC ¶ 608][8] and establishes direct correlation. In sum, that the Court would require a one-for-one relation between the spot and futures prices does not correspond to the real mathematical relationships in the futures markets.

*Second*, the Court erred when it stated: "If LIBOR truly caused a *linear* movement in Eurodollar contract prices, one would expect to see either that the LIBOR Increase and the Eurodollar Decrease occurred during the same two days or that the LIBOR Increase occurred shortly before the Eurodollar Decrease." *LIBOR VI*, 2016 WL 7378980 at *22, Slip Op. at 58 (emphasis added). Contrary to the Court's statements, LIBOR does not need to cause a linear movement in Eurodollar contract prices for manipulation of the spot prices to lead directly and mathematically to artificial futures prices. *See supra* n.5, at 3 ("Pricing patterns in the Eurodollar futures market are very much a reflection or mirror of conditions prevailing in the money markets and moving outwards on the *yield curve*.") (emphasis added).

*Third*, the Court appears to have overlooked that the data reflects the strong contemporaneous inverse relationship between Eurodollar futures prices and LIBOR during the very days it analyzed. For this purpose, it is helpful to reproduce Figure 21 in tabular form. Table 1 below shows the Eurodollar prices and LIBOR from Figure 21 between April 16, 2008 and April 18, 2008:

| | | | Table 1 | | | |
|---|---|---|---|---|---|---|
| Date | 3 Mo LIBOR | Change in LIBOR | ED Futures Price | Change in ED Futures Price | Implied ED Rate | Change in Implied ED Rate |
| 4/15/08 | 2.71594 | | 97.370 | | 2.630 | |
| 4/16/08 | 2.73375 | 0.01781 | 97.210 | -0.160 | 2.790 | 0.160 |
| 4/17/08 | 2.81750 | 0.08375 | 97.070 | -0.140 | 2.930 | 0.140 |
| 4/18/08 | 2.90750 | 0.09000 | 97.000 | -0.070 | 3.000 | 0.070 |

As can be seen above, there is a strong contemporaneous (tandem) and inverse relation between movements in LIBOR and movements in Eurodollar futures prices. For each of the three days that LIBOR increased, Eurodollar futures prices declined in tandem. This fits the definition of a contemporaneous negative relation. Thus, the Court misapprehended that the data set forth in Figure 21 *does* reflect the Court's state expectation to see that "that the LIBOR Increase and the Eurodollar Decrease occurred during the same two days . . . ."

*Fourth*, that Eurodollar futures anticipated LIBOR's moves does not vitiate Plaintiffs' well-pled allegations of causation. The fundamental error in the critique is that Figure 21 actually demonstrates the causal relationship between LIBOR and Eurodollar futures because futures markets are **anticipatory markets** that lead, as well as follow, the underlying asset that they are intended to track. Looking at the extraordinary price moves in mid-April 2008 shows that Eurodollar futures anticipated, and moved in tandem with, LIBOR.

---
[8] *See supra* n.5, at 6.

To appreciate the complex causation issue here, it should be understood that Eurodollar futures contracts trade almost continuously and thus respond almost immediately to the arrival of new information. LIBOR, the price of these futures, is set only once a day. Therefore, LIBOR cannot adjust as rapidly as futures prices to information that affects LIBOR but which arrives between LIBOR settings. It follows that changes in what LIBOR will be the following day will be anticipated by Eurodollar futures prices. *See supra* n.5, at 8 ("Eurodollar futures prices directly reflect, and are a mirror of, the yield curve. This is intuitive if one considers that a Eurodollar futures contract represents a 3-month investment entered into N days in the future. And, if Eurodollar futures did not reflect IFRs, an arbitrage opportunity would present itself.").

April 2008 was a natural experiment showing that movements in LIBOR cause movements in Eurodollar futures. Natural experiments are a common method to establish causal relationships in economics and finance.[9] Just before and "following the BBA's announcement [on April 16, 2008 TAC ¶ 575] that it would investigate the authenticity of LIBOR reporting" [TAC ¶ 621] LIBOR and Eurodollar futures moved sharply. By April 18, 2008, LIBOR was at 2.9075% and Eurodollar futures closed at 97 (*i.e.*, essentially 100 minus LIBOR). This is direct, visual evidence that the prices moved in tandem, given the unusual market conditions at the time.

There are many highly plausible reasons why Eurodollar futures would have anticipated the moves in LIBOR starting on April 15, 2008 Chicago time. Among them are the following: (1) Following Scott Peng's report on LIBOR which came out on April 10, 2008 [TAC ¶ 515], Defendants became aware that the Wall Street Journal was going to publish the article on April 16, 2008; (2) Defendants were aware in advance that the BBA was going to announce an investigation into LIBOR's authenticity given the media scrutiny; (3) Defendants were communicating amongst themselves about what LIBOR levels they were going to report and these same Defendants traded Eurodollar futures and communicated with brokers about their intentions. <u>These reasons are all supported by documentary evidence that Defendants produced in discovery and that will be included in a proposed amended complaint.</u>[10]

---

[9] *See generally* M. Rosenzweig and K. Wolpin, *Natural "Natural Experiments" in Economics*, 38 J. Econ. Lit. 827 (2000).

[10] 

The plausibility of the proposition that Defendants' unlawful conduct caused the anticipatory futures markets to move before the once a day LIBOR posting came out, is demonstrated by general evidence in the case and the consensus view in the finance literature. For example, the evidence shows that a group of Defendants coordinated to raise their LIBOR submissions upward in response to the scrutiny.[11] In addition, when asked why its LIBOR submission was moving up in mid-April 2008, "HBOS spokesman Shane O'Riordain said that the bank had changed the rate to reflect similar moves in futures markets." *See* TAC ¶ 515 (citing C. Mollenkamp, *Libor Surges After Scrutiny Does, Too*, Wall Street Journal, Apr. 18, 2008). The article is appended here as Exhibit 6.

The Court compounded this fundamental causation error by applying an "eyeball" approach to the rest of the price moves during April 2008 in Figure 21. *See LIBOR VI*, 2016 WL 7378980 at *22, Slip Op. at 59 ("Even putting aside the movements over these three days, the movements throughout April 2008 belie the Exchange-Based Plaintiffs' claim of a causal relationship."). In contrast to the massive price moves that allow for the natural experiment in mid-April 2008, care should have been given to eyeballing the rest of the price moves to try to estimate the statistical relation between LIBOR and Eurodollar futures. This is because, in part, while LIBOR is static, the remaining days to maturity of the Eurodollar futures contracts change each day. In addition, when one Eurodollar futures contract matures, the next maturity becomes the nearby contract, leading to a big jump in the days to maturity of the nearby contract. For these and many other reasons, eyeballing the relation between Eurodollar futures and LIBOR is not a well-accepted statistical approach. There is also no need for this. Plaintiffs have measured this relationship and found that in fact, with a high degree of statistical significance, "Eurodollar futures prices move in tandem with LIBOR". *See Id.* at *22, Slip Op. at 60. Plaintiffs' highly sophisticated regression analysis for class certification contradicts the Court's eyeball critique of the price moves.

II. **Academic Support For Figure 21**

The Court's requirement that Eurodollar futures price changes had to occur simultaneously (or after LIBOR) is contradicted by accepted academic views on causation in futures markets. Finance literature is full of examples where predictive markets, such as the stock market or the futures markets, anticipate developments in the markets and react to those expectations in advance of the actual developments, even though causation goes the other way. For instance, real activity causes movements in stock prices, but stock prices move before the announcement's real activity changes. *See* E. Fama, *Stock Returns, Real Activity, Inflation, and Money*, 71, No. 4 Am. Econ. Rev. 545 (1981). Fed funds futures prices predict the likely changes in Fed funds target rates, even

---

[11] [redacted]

though the causation runs from Fed funds to Fed funds futures. *See* J. Robertson and D. Thornton, *Using the Federal Funds Futures Rates to Predict Federal Reserve Actions*, The Review of the Federal Reserve Bank of St. Louis 45 (1997). Another example is that orange juice futures prices predict the forecasting errors in the temperature forecasts issued by the National Weather Service for the central Florida region. Clearly, temperature causes changes in orange juice prices as well as orange juice futures prices, but as Richard Roll shows, orange juice futures prices move first to anticipate the temperatures. *See* R. Roll, *Orange Juice and Weather*, 74, No. 5 Am. Econ. Rev. 861 (1984). Similarly, stock prices move *in advance* of tender offer announcements. *See* G. Jarrell and A. Poulsen, *Stock Trading before the Announcement of Tender Offers: Insider Trading or Market Anticipation?*, 5, No. 2 J. L. Econ. & Org. 225 (1989). Stock prices also rise and fall *in advance* of economic expansions and economic contractions.[12]

It is well known in financial economics that changes in derivatives prices frequently *lead* changes in the price of the instrument or commodity underlying the derivative contract. A classic example is stock index futures and the underlying stock index, such as the S&P 500 futures and the underlying S&P 500 index. Empirical evidence dating back decades demonstrates that futures prices generally respond *more quickly* to new information about future stock values than stock prices do themselves. H. Stoll and R. Whaley, *The Dynamics of Stock Index and Stock Index Futures Returns*, 25 J. Fin. & Quant. Analysis 441 (1990). The academic article that Plaintiffs cited in their efficient enforcer opposition brief, and which the Court appeared to overlook in *LIBOR VI*, stated that Eurodollar futures predict LIBOR better than surveys of economists and that "the futures rate on the contract expiring in one quarter provides an unbiased forecast of LIBOR at expiration . . . ." *See* ECF No. 1504 at 4 (citing C. Cole & W. Reichenstein, *Forecasting Interest Rates with Eurodollar Futures Rates*, 14 J. Fut. Mark. 37, 49 (1994)).

### III. Case Law Supports Allegations Of Close Relationship Between LIBOR and Eurodollar Futures

The academic literature discussed above is in accord with established case law on the relationship between futures and the underlying asset, which the Court did not cite. *See, e.g.*, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 489 (7th Cir. 2002); *Sanner v. Bd. of Trade of City of Chi.*, 62 F.3d 918, 930 (7th Cir. 1995) ("The cash and futures markets for soybeans are so closely related that a directive issued toward one promised to invariably impact the other."). Moreover, because Eurodollar futures *only* predict LIBOR (the price of futures at settlement) this case is not related to *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, No. 14 Md. 2548

---

[12] The literature on Granger Causality, a common statistical method for evaluating cause and effect in economics and finance, demonstrates that care must be taken in evaluating lead-lag relationships in financial markets for the purpose of establishing causation. As an example, using Granger Causality analyses, it is typically found that changes in stock prices precede and predict changes in dividends. This is because stock markets, like futures markets, are anticipatory and respond almost immediately to new information about value-relevant variables like future dividends. Therefore, when information arrives that leads market participants to believe that dividends will arrive in the future, stock prices will rise contemporaneously. Thus, in a statistical study of the relationship between dividends and stock prices, stock price changes will typically lead dividend changes, even though expected future dividends are the underlying economic determinant of stock prices. It is important to note, however, that the association between stock price changes and dividend changes provides evidence that dividends in fact are value relevant, and that dividends are determinants of stock prices. *See* J.D. Hamilton, Time Series Analysis 306 (1994).

(VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016) because gold futures have a physical settlement mechanism that does not settle to the price of the gold fix at issue in that case. *See LIBOR VI*, 2016 WL 7378980, at *5-6.[13]

### IV.  The Findings Of *LIBOR VI* Contradicted Previous Rulings

Further, Plaintiffs properly treated the close relationship between LIBOR and Eurodollar trading prices before settlement as a settled issue, at the pleading stage. This Court had already held that "the prices of Eurodollar futures contracts track (generally) the prices of three-month U.S. dollar time deposits in foreign banks." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 612, Slip Op. at 6 (S.D.N.Y. 2013). The Court also held "as a general matter, the prices in a given commodity's futures market and cash market will be closely correlated." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 712, Slip Op. at 114 (S.D.N.Y. 2013) (citing *Loeb Indus.,* 306 F.3d).[14] The Court's decision in *LIBOR VI* is in direct contrast to its previous pronouncements on an issue that Plaintiffs were not warned that it was reconsidering. Whereas the Court has held that futures and cash markets are "closely correlated" the Court now has ruled against a portion of Plaintiffs' class for allegedly lacking empirical evidence demonstrating this fact.

### V.  A *Twombly* Standard Was Not Applied To The Allegations

It was, moreover, an error to base an antitrust standing decision on a failure to provide empirical evidence at the pleading stage. Plaintiffs are not required to plead evidence in order to survive a motion to dismiss on efficient enforcer/speculative damages grounds. "No heightened pleading requirements apply in antitrust cases." *See Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)). "Thus, a motion to dismiss antitrust claims is governed by the familiar standard of Rule 12(b)(6)." *Id.* The *Gelboim* decision's frequent reference to the plausibility standard in its opinion makes clear that "plausibly alleges" is the correct standard governing antitrust standing. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). However, this Court in *LIBOR VI* does not mention plausibility in its discussion of the efficient enforcer factors after *fourteen* mentions of plausibility in its discussion of personal jurisdiction.

In fact, this Court had previously sustained Plaintiffs' claims of the close relationship between LIBOR and Eurodollar futures without such empirical evidence. *See supra*, n.14. The

---

[13] *See* CME "Gold" Contract Descriptions, *available at*: http://www.cmegroup.com/confluence/display/EPICSANDBOX/Gold (last visited Jan. 3, 2017) (discussing the physical delivery of gold at settlement, as opposed to pricing relative to the gold fix).

[14] *See also id.* at 715, Slip. Op. at 99 ("Prior to settlement, Eurodollar contracts trade 'based on what LIBOR is expected to be *in the future*,' and '[t]o the extent that LIBOR is mispriced in the present, expectations of what LIBOR will be in the future will also be skewed.'" (quoting Plaintiffs' allegations)); *id.* at 716, Slip. Op. at 101 ("[I]f LIBOR was set at an artificial level, the prices at which Eurodollar futures contracts *traded* and settled necessarily were, as well"); and *id.* at 716, Slip. Op. at 102 ("Finally, with regard to the fourth element (of a Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* "CEA" claim, causation) plaintiffs have adequately alleged that defendants' conduct caused Eurodollar futures contracts to *trade* and settle at artificial prices) (all emphasis supplied).

Second Circuit's decision in *Gelboim*, which occasioned reexamination of Plaintiffs' claims, did not make any suggestion that the threshold issue of efficient enforcer status required analysis of empirical data at the motion to dismiss stage. Rather, *Gelboim's* concerns about speculative damages centered wholly around the difficulties surrounding individually negotiated contracts and prices. *Id.* at 780. Defendants' opening brief on the efficient enforcer issue introduced no empirical evidence controverting Plaintiffs' allegations of the relationship between LIBOR and Eurodollar trade prices. *See* ECF No. 1481 at 25-27. Only on reply, when Plaintiffs had no opportunity to respond, did Defendants introduce a single day's trading prices, from October 8, 2008, to challenge the close relationship between LIBOR and Eurodollar futures trading prices. *See* ECF No. 1544 at 14.[15]

## VI. Damages Theories Were Inconsistently Applied Among The Various Plaintiff Groups

Finally, the Court further erred by applying internally inconsistent holdings to Plaintiffs (on-exchange traders of Eurodollar futures) and the OTC Plaintiffs (over-the-counter traders of interest rate swap contracts). These products "are intensely interconnected;" in fact, "[w]hen valuing swaps at their inception, the future path of floating rates are derived from position in Eurodollar futures contracts."[16] The Court's findings, however, overlook the relationship between these financial products and create radically different paths to recovery. As to swapholders, the Court held that "plaintiffs who entered into swaps during the suppression period may recover for any super-suppressed payments, netted against any less-suppressed payments." Yet, as to Eurodollar futures traders, the court cited *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005), for the proposition that, ". . . if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." This reasoning is clearly in error. Just like swapholders, Exchange-Based Plaintiffs' damages are not predicated upon the truth leaking out. All that is required is that there be day-to-day variation in the exact amount of manipulation. If LIBOR is suppressed by 50 basis points on day one and 49 basis points on day two, all traders who bought on day one and sold on day two would be damaged even with no leakage of truth. The Court then reasoned that "[t]herefore, a damages theory predicated on a direct link between an act of LIBOR suppression and an impact on Eurodollar futures trading prices in a particular amount is speculative." *See LIBOR VI*, 2016 WL 7378980 at *23, Slip Op. at 61.[17] However, Plaintiffs have alleged that they were harmed by a net impact of LIBOR manipulation. The average suppression of LIBOR plays no role in Plaintiffs' damages. As the Court found implicitly in its discussion of swapholders, and as Plaintiffs adequately alleged

---

[15] As Eurodollar futures incorporate information about LIBOR faster than LIBOR itself, it is no surprise that moves in interest rates would affect prices. This fact does not break the causal, statistical relationship between the two.

[16] *See* F. Fabozzi & S. Mann, The Handbook of Fixed Income Securities 1378 (8th ed. 2012).

[17] It should be noted that case law supports the position that *Dura* does not even apply in the futures context. *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-01 (S.D.N.Y. 2011) (holding that "*Dura*'s loss causation principles'" do not apply to manipulative conduct alleged under the CEA; loss causation is not an element of a CEA claim); *see also Kohen v. Pacific Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 475 (N.D. Ill. 2007), *aff'd* 571 F.3d 672, 679 (7th Cir. 2009) (rejecting invitation to extend *Dura* to the CEA context because "the elements of proof are different").

in the TAC, the manipulation of LIBOR was not static, but rather fluctuated enormously during the class period.

### VII. Conclusion

In sum, the Court's misapprehension of the significance of the data presented in Figure 21 and related allegations justifies Plaintiffs' request to move this Court to reconsider the portion of its order in *LIBOR VI* that dismisses portions of Plaintiffs' antitrust claims on speculative damages grounds. Further, fidelity to *Gelboim's* application of the "plausibly allege" standard requires reconsideration.

Respectfully submitted,

| | |
|---|---|
| /s/ Christopher Lovell | /s/ David E. Kovel |
| Christopher Lovell | David E. Kovel |
| LOVELL STEWART HALEBIAN JACOBSON LLP | KIRBY McINERNEY LLP |
| 61 Broadway, Suite 501 | 825 Third Avenue, 16th floor |
| New York, New York 10006 | New York, New York 10022 |
| Telephone: (212) 608-1900 | Telephone: (212) 371-6600 |
| Email: clovell@lshllp.com | Email: dkovel@kmllp.com |

*Interim Co-Lead Counsel for Exchange-Based Plaintiffs and the Proposed Class*

cc: All Counsel of Record (by Electronic Filing)