**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION | Master File No. 11 MD 2262 (NRB) |
| THIS DOCUMENT RELATES TO: EXCHANGED-BASED PLAINTIFFS' ACTION | |
| METZLER INVESTMENT GmbH, *et al.*, Plaintiffs, v. CREDIT SUISSE GROUP AG, *et al.*, Defendants. | No. 11 Civ. 2613 |

**EXCHANGE-BASED PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF PLAN OF DISTRIBUTION FOR SETTLEMENTS WITH DEFENDANTS BARCLAYS, CITI, DEUTSCHE BANK, AND HSBC**

# TABLE OF CONTENTS

I.   Preliminary Statement ..................................................................................................1

II.  The Proposed Plan Of Distribution Satisfies The Standards For Preliminary
     Approval ......................................................................................................................3

    A.   The Standards For Preliminary Approval Of A Plan Of Distribution ...........................3

    B.   The Plan Is Within The Range Of What May Possibly Be Found To Be Fair
        And Reasonable At The Final Approval Hearing.......................................................5

    C.   The Specific Methods Of Distribution In The Plan Are Similar To Those
        That Have Repeatedly Been Approved In Prior Cases ...................................................6

        1.   Payment Is Limited To Eligible Class Members .....................................................6

        2.   The Plan Requires That The Settlement Administrator Multiply
            Each Eligible Class Member's Purchases and Sales By The Applicable
            Amounts Of Artificiality In Order To Calculate The Net Losses From
            Artificiality Of Each Class Member ......................................................................7

        3.   The Plan Requires That Settlement Monies Be Distributed According
            To The Pro Rata Amount Of Adjusted Net Losses From Artificiality
            Of Each Settlement Class Member .......................................................................8

            a.   Pro Rata Distributions In This Manner Have Repeatedly Been
                Approved.........................................................................................................9

        4.   The Legal Risk Discounts And The Allocation Process.......................................10

        5.   The Plan Specifies Two Types Of Payment To Eligible Class Members
            That Are Not Based Upon The Net Loss From Artificiality ...............................15

            a.   The Plan Provides That 1.316% Of The Face Amount Of The Approved
                Settlements Will Be Paid Based On Adjusted Net Loss From Trading  ........15

            b.   Guaranteed Minimum Payment ...................................................................16

        6.   Legal Risk Discount For Offsets Of Gains From Outside The Futures
            Market ...............................................................................................................16

            a.   Prior Cases Have Made Adjustments For Hedgers or Swaps Dealers...........17

    D.   Important Additional Points Favoring Preliminary Approval .....................................18

i

1.    The Strong Policy Favoring Approval Of Class Action Settlements
Also Applies To Plans Of Distribution ................................................................19

2.    A Plan Of Distribution May Be Amended At Any Time ....................................19

3.    Approval Of The Plans Of Distribution Is Not Part Of The
Approval Of The Settlements ..............................................................................20

4.    Provision Of A Plan Of Distribution Is Not Required For Approval
Of A Settlement ..................................................................................................20

II.    Conclusion......................................................................................................................22

## Table of Authorities

**Cases**                                                                 **Pages**

*City of Providence v. Aeropostale, Inc.*,
   11 Civ. 7132(CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)............................................3, 9

*Charron v. Wiener*,
   731 F.3d 241 (2d Cir. 2013)............................................................................14, 15

*Clark v. Ecolab*,
   07 Civ. 8623, 2010 WL 1948198 (S.D.N.Y. May 11, 2010)....................................20

*Guippone v. BH S&B Holdings LLC*,
   09 Civ. 1029 (CM), 2016 WL 5811888 (S.D.N.Y. Sept. 23, 2016)........................20

*DeLeon v. Wells Fargo Bank, N.A.*,
   12 Civ. 4494, 2015 WL 2255394 (S.D.N.Y. May 11, 2015)....................................20

*In re "Agent Orange" Prod. Liab. Litig.*,
   818 F.2d 145 (2d Cir. 1987)...................................................................................21

*In re: Amaranth Natural Gas Commodities Litig.*,
   07 Civ. 6377 (S.D.NY. April 11, 2012).........................................................7, 9, 18

*In re Credit Default Swaps Antitrust Litig.*,
   No. 13 MD 2476 (DLC), 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ..............................3, 6

*In re: Crude Oil Commodity Futures Litig.*,
   11 Civ. 3600 (S.D.N.Y Jan. 21, 2016)............................................................ passim

*In re Currency Conversion Fee Antitrust Litig.*,
   01 MDL 1409, 2006 WL 3247396 (S.D.N.Y. Nov. 8, 2006)....................................4

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   No. 13 Civ. 7789 (S.D.N.Y. Sept. 8, 2017) .................................................4

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   279 F.R.D. 151 (S.D.N.Y. 2011) .....................................................................4

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   142 F.R.D. 588 (S.D.N.Y. 1992) ....................................................................5

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ..............................................................3, 5

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR I"*),
   935 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................10

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR II"*),
   962 F. Supp.2d 606 (S.D.N.Y. 2013)................................................................10

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR III"*),
   27 F. Supp. 3d 447 (S.D.N.Y. 2014)................................................................10

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR IV"*),
   No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct 20, 2015) ......................10

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR V"*),
   No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov 3, 2015) ........................11

*In re Libor-Based Financial Instruments Antitrust Litig.* (*"LIBOR VI"*),
   No. 11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016).......................11

*In re LIBOR-Based Financial Instruments Antitrust Litig,*
   11 MD 2262, 2016 WL 7625708 (S.D.N.Y. Dec. 21, 2016)................................4

*In re Lloyd's Am. Trust Fund Litig.,*
   No. 96 Civ. 1262(RWS), 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)................5

*In re Michael Milken and Assocs. Sec. Litig.,*
   150 F.R.D. 57 (S.D.N.Y. 1993) ......................................................................21

*In re NASDAQ Market-Makers Antitrust Litig.,*
   187 F.R.D. 465 (S.D.N.Y. 1998) ....................................................................21

*In re Natural Gas Commodity Litig.,*
   03 Civ. 6186 (S.D.N.Y. May 24, 2006)......................................................7, 9, 16

*In re Natural Gas Commodity Litig.,*
   03 Civ. 6186 (S.D.N.Y. June 7, 2010)....................................................16, 18, 19

*In re Optiver Commodities Litig.,*
   08 Civ. 6842 (S.D.N.Y. June 22, 2015)....................................................7, 9, 17

*In re PaineWebber Limited Partnerships Litig.,*
   171 F.R.D. 104 (S.D.N.Y. 1997) ....................................................................3, 4

*In re Platinum & Palladium Commodities Litig.,*
   10 Civ. 3617 (S.D.N.Y. Feb. 27, 2015) ....................................................6, 7, 9

*In re Platinum & Palladium Commodities Litig.*,
  No. 10 CV3617, 2014 WL 3500655 (S.D.N.Y. July 15, 2014)...............................15, 16, 18, 19

*In re Prudential Securities Inc. Limited Partnerships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) .............................................................................................4

*In re Sumitomo Copper Litig.*,
  96 Civ. 4584 (S.D.N.Y. Oct. 10, 1999) ......................................................................... passim

*In re Worldcom, Inc. Sec. Litig.*,
  02 CIV. 3288 (DLC), 2005 WL 3577135 (S.D.N.Y. Dec. 30, 2005).......................................19

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  676 F. Supp. 486 (S.D.N.Y. 1987)..........................................................................................17

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
  No. 08 Civ. 42 (JG) (VVP), 2015 WL 6964973 (E.D.N.Y. Nov. 10, 2015) .............................9

*Sarlie v. E.L. Bruce Co., Inc.*
  265 F.Supp. 371 (S.D.N.Y. 1967).............................................................................................2

*Strobl v. New York Mercantile Exchange*,
  582 F. Supp. 770 (S.D.N.Y. 1984)............................................................................................2

*Strobl v. New York Mercantile Exchange,*
  768 F.2d 22 (2d Cir. 1985)........................................................................................................2

*Sullivan v. DB Invs., Inc.,*
  667 F.3d 273 (3d Cir. 2011)....................................................................................................20

*Yang v. Focus Media Holding Ltd.*,
  No. 11 Civ. 9051, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ..........................................3, 9

**Other Authorities**

  Manual for Complex Litig. (4th)  (2004) ..................................................................................21

## I.      Preliminary Statement

Exchange-Based Plaintiffs ("Plaintiffs")[1] respectfully submit this memorandum and the accompanying Declarations[2] to demonstrate that their proposed Plan of Distribution ("Plan") satisfies the standards for preliminary approval of a distribution plan.  The Plan is attached as Exhibit 1 to the Jacobson Declaration.  The Plan sets forth the method of distribution of the proceeds from four Settlements which have been submitted for preliminary approval.[3] Plan, ¶1.

Consistent with the strong judicial policy favoring approval of settlements of class claims and plans of distribution (*see* "II.A" below), preliminary approval of the Plan and proposed settlements will do much good. It will provide the settling Defendants with peace and quiet the claims against them. It will provide compensation to potentially thousands of Eligible Class Members who allegedly were harmed by repeated violations of law.  It will spare this Court further work relating to the prosecution of such claims.

The specifics of the Plan are set forth in Section "C" below.  Briefly, a well-accepted measure of damages in claims for manipulation of futures market prices is the difference between a plaintiff's actual transaction price and the transaction price the plaintiff would have had in the

---

[1] Exchange-Based Plaintiffs are Metzler Asset Management GmbH (f/k/a Metzler Investment GmbH), FTC Futures Fund SICAV, FTC Futures Fund PCC Ltd., Atlantic Trading USA, LLC, 303030 Trading LLC, Gary Francis, and Nathaniel Haynes.  All references to "ECF No." herein refer to documents in the docket of the MDL Action, 11 MD 2262-NRB unless otherwise specified.

[2] "Jacobson Declaration" refers to the Declaration of Gary S. Jacobson, filed contemporaneously herewith. The "Feinberg Declaration" refers to the Declaration of Kenneth Feinberg, Esq., filed contemporaneously herewith.  All references to "Exhibit" or "Ex." are to the Jacobson Declaration unless otherwise noted.

[3] As set forth in Plaintiffs' pending preliminary approval motion [ECF No. 680], the Settlements include: (1) an Amendment to the Settlement Agreement reached between Plaintiffs and Barclays Bank plc ("Barclays") [ECF No. 680-3]; and three other settlement agreements reached between Plaintiffs and the following defendants, respectively: (2) Citigroup Inc., Citibank, N.A., and Citigroup Global Markets Inc. (collectively, "Citi") [ECF No. 680-4]; (3) Deutsche Bank AG, Deutsche Bank Securities Inc., and DB Group Services (UK) Ltd. (collectively, "Deutsche Bank") [ECF No. 680-5]; and (4) HSBC Bank plc ("HSBC") [ECF No. 680-6]. Barclays, Citi, Deutsche Bank and HSBC are hereinafter referred collectively as "Settling Defendants".  Unless otherwise defined, all Capitalized Terms in this memorandum have the same meaning as set forth in the respective Settlement Agreements.

absence of manipulation. *See Strobl v. New York Mercantile Exchange*, 582 F. Supp. 770, 779 (S.D.N.Y. 1984) (the damages were the differences between what was paid to purchase and what would have been paid but for the manipulation) *aff'd*, 768 F.2d 22 (2d Cir. 1985) ("*Strobl*").  The Plan would distribute more than 97% of the anticipated Net Settlement Funds to class members based upon Plaintiffs' contentions and their estimates of the amounts of "artificiality", *i.e.,* the differences between actual transaction prices and what those prices would have been in the absence of Defendants' alleged manipulation. *See* Plan ¶¶5, 6, 12, 14; see "C.1-3" below.  Consistent with *Strobl*, plans of distribution that were based upon this "amount of artificiality" metric have repeatedly been approved in prior class actions alleging manipulation of futures prices.  See "C" below.

Reasonable litigation risk adjustments have been made in the Plan's artificiality estimates to take account of the rulings by this Court and strengths and weaknesses of the claims.  See "C.6" below (*e.g.,* 60 percent discount during Periods 1 and 2, other than for efficient enforcers); Plan ¶¶15, 19.  Such adjustments are supported by an allocation mediation process that was supervised as to form by Kenneth Feinberg, Esq.  Feinberg Declaration *passim*.

Second, the Plan would distribute 1.316% of the face amount of the approved settlements based upon Class Members' Adjusted Net Loss from Trading on transactions opened and closed during (a) January 1, 2003 – August 8, 2007, and/or (b) May 18, 2010 – May 31, 2011. Plan ¶¶6 - 7.  Courts have recognized that the net loss from trading on transactions made during the pendency of a manipulation provide one measure of damages where determination of damages has been made difficult by defendant. *E.g., Sarlie v. E.L. Bruce Co., Inc.* 265 F.Supp. 371, 377-79 (S.D.N.Y. 1967).  Plans distributing a relatively small portion of the settlement fund based upon net loss from

trading during discrete portions of the class period, have been approved in prior class actions alleging manipulation of futures prices. See "C.5" below.

Third and finally, a miniscule portion of the anticipated Net Settlement Fund would be distributed based on a guaranteed minimum $20.00 check to each class member.  Plan ¶5; see "C.5.b" below.  The provision of a small guaranteed payment has been approved in plans of distribution used in class actions alleging manipulations of futures prices. *Id.*

Plans of distribution in cases alleging manipulation of futures prices have also previously been approved in the following circumstances.  The plans made, as here, a blended distribution consisting of paying the overwhelmingly predominant amount of the settlement funds based on artificiality, and a much smaller amount of the fund based upon net loss from trading and/or a guaranteed minimum payment.  See "II.B" below.

## II.     The Proposed Plan Of Distribution Satisfies The Standards For Preliminary Approval

### A.     The Standards For Preliminary Approval Of A Plan Of Distribution

In applying the standards for preliminary approval, courts are informed by the strong judicial policy favoring settlements of class action claims.  *In re PaineWebber Limited Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997).

At the final settlement approval hearing, the standard for approval of a plan of distribution is that it be found to be fair and reasonable.  *In re Credit Default Swaps Antitrust Litig.*, No. 13 MD 2476 (DLC), 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016).  Where it is formulated by "competent and experienced counsel," a plan of distribution "need only have a reasonable, rational basis" to be fair and reasonable.  *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012) (Buchwald, J.) *accord Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051, 2014 WL 4401280, at *9 (S.D.N.Y. Sept. 4, 2014); *City of Providence v. Aeropostale, Inc.*, 11 Civ. 7132(CM), 2014

WL 1883494, at *10 (S.D.N.Y. May 9, 2014); *see also In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011).

The standard for preliminary approval of the Plan on this motion is lower than the above quoted standard for final approval of the Plan.  The standard for **preliminary** approval of a **settlement agreement** is lower than that for final approval of a settlement agreement.  At preliminary approval, a settlement agreement need only "appear[] to be the product of serious, informed, non-collusive negotiations, ha[ve] no obvious deficiencies, . . . not improperly grant preferential treatment to class representatives or segments of the class and fall[] within the range of possible approval" so as to warrant sending notice. *In re LIBOR-Based Financial Instruments Antitrust Litig,* 11 MD 2262, 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (citation omitted).[4]

Similarly, the standard for preliminary approval of a plan of distribution is the **same** as that for preliminary approval of a settlement agreement.  *In re Prudential Securities Inc. Limited Partnerships Litig*., 163 F.R.D. 200, 209 (S.D.N.Y. 1995).  Accordingly, the standard for preliminary approval of the Plan is that it must be within the range of what may "possibly" be found to be fair and reasonable at the final settlement hearing.  *Compare, LIBOR,* 2016 WL 762578 at *2.

Plaintiffs respectfully submit as follows. The Plan fully satisfies the standards for preliminary approval.  The Plan has been formulated by competent and experienced counsel. The Plan's employment of payment methods that were repeatedly approved in prior futures contract

---

[4] *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13 Civ. 7789, Slip Op. at 3 (S.D.N.Y. Sept. 8, 2017) [ECF No. 866] (granting preliminary approval of settlement and approving Class Lead Counsel's proposed Plan of Distribution of Settlement Funds and proposed notice plan to the Settlement Classes); *In re Currency Conversion Fee Antitrust Litig*., 01 MDL 1409, 2006 WL 3247396, at *5 (S.D.N.Y. Nov. 8, 2006); *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 132 (S.D.N.Y.), *aff'd,* 117 F.3d 721 (2d Cir. 1997).

price manipulation cases has, at least, a rational basis.  The Plan would do so based on the actual transactions of traders of Eurodollar futures and options on Eurodollar futures (hereafter, "Eurodollar futures"), and consistent with the strengths, weaknesses, and legal risks of the claims. *See infra.*

### B.   The Plan Is Within The Range Of What May Possibly Be Found To Be Fair And Reasonable At The Final Approval Hearing

Plaintiffs have contended as follows.  Defendants manipulated daily London Interbank Offered Rate ("LIBOR") fixings to artificial levels which manipulated prices of Eurodollar futures contracts to artificial levels.  Plaintiffs' expert economist[5] has made reasonable estimates of the amounts of artificiality, if any, in Defendants' LIBOR fixes and prices of Eurodollar futures.  By applying the estimates of artificiality of Eurodollar futures to the purchases and sales made by each Eligible Class Member, Plaintiffs may estimate the approximate amount of harm to each Eligible Class Members.

The Plan proposes to distribute settlement monies in accordance with Plaintiffs' contentions that produced the Settlements, subject to reasonable legal risk adjustments based upon this Court's prior rulings and other strengths and weaknesses of the settled claims.  Plans of distribution that reasonably seek to allocate the settlement funds based on the varying strengths and weaknesses of the claims and amounts of impact, have long been found to be fair and reasonable.[6]

---

[5] Plaintiffs' expert economist is H. Nejat Seyhun, Ph.D. ("Professor Seyhun"), the Jerome B. & Eilene M. York Professor of Business Administration at the University of Michigan's Ross School of Business.

[6] *See also In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012) (Buchwald, J) (citing *In re Lloyd's Am. Trust Fund Litig.,* No. 96 Civ. 1262(RWS), 2002 WL 31663577, at *18 (S.D.N.Y. Nov. 26, 2002) ("[c]lass action settlement benefits may be allocated by counsel in any reasonable or rational manner because allocation formulas reflect the comparative strengths and values of different categories of the claim") *see also In re Gulf Oil/Cities Serv. Tender Offer Litig*., 142 F.R.D. 588, 595-96 (S.D.N.Y. 1992) (plan of allocation that distributes greater part of settlement proceeds to those most injured is reasonable).

In seeking to distribute the monies consistent with the varying strengths and weaknesses of the claims and the varying amounts of impact, Plaintiffs have followed a similar structure (with appropriate adjustments) to that which was included in approved plans of allocation of settlement proceeds in class actions alleging manipulation of futures contract prices. *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y Jan. 21, 2016) (Forrest, J.) [ECF Nos. 399, ¶22; 287-5, ¶¶5-6] (Jacobson Decl., Exs. 9-10), (Court-approved plan of allocation allocated 90% of net settlement monies to days during class period where plaintiffs' expert found price artificiality and allocated 10% of settlement monies to portion of class period where no price artificiality was found and paying claims based on net losses); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y. Feb. 27, 2015) (Pauley, J.) [ECF Nos. 293, ¶22; 141-1, p. 102 of 118, ¶¶2-3] (Jacobson Decl., Exs. 13-14) (same).

Based on Class Counsel's experience in prior cases and their experience of six-plus years in this litigation, such structure will distribute settlement monies fairly and reasonably, as well as in an efficient manner.  Thus, the Plan also serves "[a] principal goal of a plan of distribution [which] must be the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund." *In re Credit Default Swaps Antitrust Litig.*, No. 13 MD 2476 (DLC), 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016).

## C.   The Specific Methods Of Distribution In The Plan Are Similar To Those That Have Repeatedly Been Approved In Prior Cases.

### 1.   Payment Is Limited To Eligible Class Members

The Plan provides that payment will be made only to Eligible Class Members.  Plan, ¶4, *passim*.  Thereby, the Plan effectively will require that class members submit a verified proof of claim which requires that each class member supply an adequate list of their purchases and sales

of Eurodollar futures contracts.  This same requirement has repeatedly been included in plans of allocation that were approved in prior commodity futures class actions in this District.[7]

> ### 2.   The Plan Requires That The Settlement Administrator Multiply Each Eligible Class Member's Purchases And Sales By The Applicable Amounts Of Artificiality In Order To Calculate The Net Losses From Artificiality Of Each Class Member

The Plan requires the Settlement Administrator to multiply each Eligible Class Member's purchases and sales by the estimated amounts of artificiality applicable to those purchases and sales.  Plan, ¶¶14-19.  These amounts of artificiality have been determined by Plaintiffs' expert economist, and will be posted on the Settlement website.[8]  Class members will be directed to the Settlement website and may estimate their losses (or gains) by performing such multiplication themselves and taking the additional steps described hereafter.

This type of multiplication has been required in plans of distribution of settlement proceeds in class actions alleging manipulation of futures prices that have been approved in this District.[9]

---

[7] *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y. Jan. 1, 2016) (Forrest, J.) [ECF Nos. 339, ¶22; 287-5] (Jacobson Decl., Exs. 9-10); *In re Optiver Commodities Litig.*, 08 Civ. 6842 (S.D.N.Y. June 22, 2015) (Preska, J.) [ECF Nos. 93, ¶19; 72-7] (Jacobson Decl., Exs. 11-12); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y. Feb. 27, 2015) (Pauley, J.) [ECF Nos. 293, ¶22;; 141-1, pp. 101-118] (Jacobson Decl., Exs. 13-14); *In re: Amaranth Natural Gas Commodities Litig.*, 07 Civ. 6377 (S.D.N.Y. April 11, 2012) (Scheindlin, J.) [ECF Nos. 404, ¶19; 413, pp. 6-7] (Jacobson Decl., Exs. 15-16); *In re Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. May 24, 2006) (Marrero, J.) [ECF Nos. 446; 618] (Jacobson Decl., Exs. 17-18); *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y. Oct. 10, 1999) (Pollack, J.) [ECF Nos. 183; 349] (Jacobson Decl., Exs. 19-20).

[8] Plaintiffs will submit a proposed Notice Plan after preliminary approval of the Settlement.  Assuming the Court preliminarily approves the Settlements and Proposed Plan of Distribution, the Notice Plan will detail what information will be available to Settlement Class Members to assess the likelihood of recovery from the Settlements.  In addition, Plaintiffs are working with Professor Seyhun and A.B. Data to create a web-based options calculator that will enable Settlement Class Members to assess how their options on Eurodollar Futures positions were affected by Defendants' alleged manipulation of LIBOR on each day of the Settlement Class Period.

[9] *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y. Jan. 1, 2016) (Forrest, J.) [ECF Nos. 339, ¶22; 287-5, ¶¶2-3, 5, 8-11] (Jacobson Decl., Exs. 9-10); *In re Optiver Commodities Litig.*, 08 Civ. 6842 (S.D.N.Y. June 22, 2015) (Preska, J.) [ECF Nos. 93, ¶19; 72-7, ¶¶2-5] (Jacobson Decl., Exs. 11-12); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y. Feb. 27, 2015) (Pauley, J.) [ECF Nos. 293, ¶22; 141-1, pp. 101-104] (Jacobson Decl., Exs. 13-14); *In re: Amaranth Natural Gas Commodities Litig.*, 07 Civ. 6377 (S.D.N.Y. April 11, 2012) (Scheindlin, J.) [ECF No. 413, pp. 6-7] (Jacobson Decl., Ex. 15-16); *In re Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. May 24, 2006) (Marrero, J.) [ECF No. 618, pp. 7-10] (Jacobson Decl., Ex. 17-18); *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y. Oct. 10, 1999) (Pollack, J.) [ECF No, 349] (Jacobson Decl., Ex. 19-20).

After performing this multiplication, the Settlement Administrator is required to discount the amounts of artificiality for certain days to determine the Daily Total Gains from Artificiality and the Daily Total Losses from Artificiality.  Plan, ¶¶15, 19; *see* "C.4" below (explaining the amounts of the discounts).  These discounts give effect to rulings by this Court that dismissed claims in respect of those days or otherwise affects such days.

The Plan requires that, after performing these calculations, the Settlement Administrator shall sum each Eligible Class Member's Daily Total Losses from artificiality as well as their Daily Total Gains from Artificiality.  Plan, ¶¶14-18.  These addition processes produce the Total Gains from Artificiality, and the Total Losses from Artificiality for each Eligible Class Member. The Settlement Administrator is then required to subtract each Eligible Class Member's Total Gains from Artificiality from their Total Losses from Artifiicality.  *Id.* at ¶15(d).  These calculations will produce the Net Loss from Artificiality for each Eligible Class Member.  *Id.* The Settlement Administrator is then required to make an adjustment to the Net Loss from Artificiality for the legal risks of offsets from outside the futures market for certain Eligible Class Members.  *Id.* at ¶19; *see* "C.6" below (describing these offsets).  The resulting number, even if there is no "hedging" adjustment, is referred to as the Adjusted Net Loss from Artificiality.  *Id* at 20*.*

### 3.   The Plan Requires That Settlement Monies Be Distributed According To The Pro Rata Amount Of Adjusted Net Losses From Artificiality Of Each Settlement Class Member

After the Settlement Administrator has taken the above steps, the Plan requires the Settlement Administrator to sum the total Adjusted Net Losses from Artificiality of all Eligible Class Members who have positive Adjusted Net Losses from Artificiality.  *See* Plan, ¶15.  The Plan specifies that settlement monies will be distributed to Eligible Class Members based upon the pro rata share of the Adjusted Net Loss from Artificiality that such Eligible Class Member has.  *Id*

at ¶12.  For example, suppose an Eligible Class Member has positive Adjusted Net Losses from Artificiality amounting to 1% of the sum total of Adjusted Net Losses from Artificiality of all Eligible Class Members which have positive Adjusted Net Losses from Artificiality. That Eligible Class Member will receive 1% of the settlement monies paid pursuant to the Adjusted Net Loss from Artificiality metric. Plan ¶12.  If an Eligible Class Member does not have a positive Adjusted Net Loss from Artificiality, then the Eligible Class Member has a gain.  Such an Eligible Class Member would receive no payment under the Plan through the Adjusted Net Loss from Artificiality metric.  *Id.*; *but see* "C.5.a" & "C.5.b" below (limited other compensation is available).

### a.    Pro Rata Distributions In This Manner Have Repeatedly Been Approved

Courts routinely approve pro rata distributions. *Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051 (CM) (GWG), 2014 WL 4401280, at *10 (S.D.N.Y. Sept. 4, 2014) ("Pro-rata distribution of settlement funds based on investment loss is clearly a reasonable approach." (citation omitted)).  There is a clear rational basis for this proposal. *E.g.*, *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42 (JG) (VVP), 2015 WL 6964973, at *7 (E.D.N.Y. Nov. 10, 2015).[10]  In class actions alleging manipulations of futures price, distributions based upon the pro rata amount of the Adjusted Net Loss from Artificiality (which is sometimes as referred to as "net artificiality paid" and similar phrases) have been repeatedly approved.[11]

---

[10] *See also City of Providence v. Aeropostale, Inc.*, 11 Civ. 7132(CM), 2014 WL 1883494, at *10 (S.D.N.Y. May 9, 2014) (finally approving plan of allocation, prepared with the assistance of consulting damages expert, providing for distribution on a *pro rata basis* based upon each Class Member's "Recognized Loss," as calculated by the formulas tied to the amount of alleged artificial inflation in the share prices)

[11] *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y. Jan. 1, 2016) (Forrest, J.) [ECF Nos. 339, ¶22; 287-5, ¶¶2-3, 5, 8-11] (Jacobson Decl., Exs. 9-10); *In re Optiver Commodities Litig.*, 08 Civ. 6842 (S.D.N.Y. June 22, 2015) (Preska, J.) [ECF Nos. 93, ¶19; 72-7, ¶¶2-5] (Jacobson Decl., Exs. 11-12); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y. Feb. 27, 2015) (Pauley, J.) [ECF Nos. 293, ¶22; 141-1, pp. 101-104] (Jacobson Decl., Exs. 13-14); *In re: Amaranth Natural Gas Commodities Litig.*, 07 Civ. 6377 (S.D.N.Y. April 11, 2012) (Scheindlin, J.) [ECF No. 413, pp. 6-7] (Jacobson Decl., Ex. 15-16); *In re Natural Gas Commodity Litig.*, 03

### 4.      The Legal Risk Discounts And The Distribution Process

In determining the applicable amount of artificiality for each day, the Settlement Administrator will adjust the artificiality estimates for certain dates.   Plan, ¶¶15(a), 19.   This adjustment will be made in order to reflect the legal risks applicable to those days.   The effect of these discounts will be to reduce the dollar amounts of the resulting losses or gains that are produced by the purchases and sales on these days.   The reason that the legal risk discounts are applied to the amount of artificiality is as follows.   Most class members are likely to have transactions on dates with legal risk discounts as well as on dates without legal risk discounts. Thus, applying the legal risk discounts at the artificiality level, will financially expresses the strengths and weaknesses of the claims in an efficient manner within each Eligible Class Member's Net Loss from Artificiality.

During the pendency of this action, government orders finding manipulation by Defendants began to be announced and continue to be announced through this year.   This Court has devoted extensive time and effort to ruling on Defendants' motions to dismiss, and Plaintiffs have moved to amend the complaint to keep pace with the government orders.   *In re LIBOR-Based Financial Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666 (S.D.N.Y. 2013) [ECF No. 286]; *In re LIBOR-Based Financial Instruments Antitrust Litig.   ("LIBOR II")*, 962 F. Supp.2d 606 (S.D.N.Y. 2013) [ECF No. 389]; *In re LIBOR-Based Financial Instruments Antitrust Litig. ("LIBOR III")*, 27 F. Supp. 3d 447 (S.D.N.Y. 2014) [ECF No. 568]; *In re LIBOR-Based Financial Instruments Antitrust Litig.   ("LIBOR IV")*, No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct 20, 2015) [ECF No. 1222]; *In re LIBOR-Based Financial Instruments Antitrust Litig.   ("LIBOR*

---

Civ. 6186 (S.D.N.Y. May 24, 2006) (Marrero, J.) [ECF No. 618, pp. 7-10] (Jacobson Decl., Ex. 17-18); *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y. Oct. 10, 1999) (Pollack, J.) [ECF No, 349] (Jacobson Decl., Ex. 19-20).

*V"*), No. 11 MDL 2262, 2015 WL 6696407 (S.D.N.Y. Nov 3, 2015) [ECF No. 1234]; *In re LIBOR-Based Financial Instruments Antitrust Litig. ("LIBOR VI")*, No. 11 MDL 2262, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) [ECF No. 1676]; *In re LIBOR-Based Financial Instruments Antitrust Litig.*, No. 11 MDL 2262, Mem. & Order (S.D.N.Y. Apr. 20, 2017) [ECF No. 1859].

As a result of this Court's decisions, Plaintiffs contend that the status of their claims is as follows.

**The Commodity Exchange Act ("CEA") Claims.**  The CEA claims during what has been called Period 1 and Period 2 (after August 8, 2007 and prior to April 15, 2009) have been dismissed on statute of limitations grounds.  *LIBOR I*, at \*\*711-712.  The CEA claims for transactions from April 15, 2009 to May 17, 2010 have been sustained against motions to dismiss.  *LIBOR I*, 935 F. Supp. 2d at 695, Slip Op. at 47-50, 712-713; *LIBOR II*, 962 F. Supp.2d at 609 n. 1, Slip Op. at 1 n.1; *LIBOR III*, 27 F. Supp. 3d at 471, Slip Op. at 40-42; *LIBOR IV*, 2015 WL 6243526, at \*9-11, Slip Op. at 23-27.

Plaintiffs' claims for transactions between January 1, 2005 and August 8, 2007 involve so-called trader-based manipulation or TBM.  These claims have been sustained against the statute of limitations arguments.  *LIBOR III*, 27 F.Supp.3d at 487.  The Court has specifically upheld these claims for thirteen dates: September 29, 2005, November 28, 2005, April 7, 2006, June 30, 2006, August 17, 2006, September 1, 2006, October 26, 2006, November 29, 2006, December 22, 2006, February 28, 2007, March 1, 2007, July 30, 2007, and August 6, 2007.  *Compare LIBOR III*, 27 F. Supp. 3d 447, 462-66 [ECF No. 568] and N.9, *with In re LIBOR-Based Financial Instruments Antitrust Litigation*, No. 11 MDL 2262 at p. 6 (S.D.N.Y. Apr. 20, 2017) [ECF No. 1859] (Memorandum and Order).  The court rejected various dates of TBM.  *LIBOR III*, 27 F.Supp.3d at 462-64; *LIBOR IV*, 2015 WL 6243526 at \*40.  Plaintiffs contend that their claims for 54 additional

11

dates[12] satisfy the Court's standards for pleading the TBM claims. *See* April 20, 2017 Decision, p. 5 ("where a CEA trader-based manipulation claim against a particular defendant has been previously upheld, it is not necessary for the plaintiffs to amend the complaint to add additional examples of such a claim.").

**Sherman Antitrust Act Claims.** This Court has upheld Plaintiffs' antitrust claims against dismissal on standing or efficient enforcer grounds only as to Plaintiffs' Efficient Enforcer Transactions. *LIBOR VI* at *15-24. The Efficient Enforcer Transactions are "[t]he only Exchange-Based plaintiffs with a non-speculative theory are those who, before the suppression period started, shorted contracts that were held to settlement during the suppression period." *LIBOR VI* at *23. The verified proof of claim will specifically ask each class member whether they made Efficient Enforcer Transactions. If the class member answers "yes," then they the class member will be required to list the sale and purchase dates comprising each Efficient Enforcer Transaction.

Originally, this Court dismissed Plaintiffs' antitrust claims on standing grounds. *LIBOR VI*, at *1. Those antitrust claims provided additional claims for relief on behalf of persons who transacted during Periods 1 and 2 (again, this is between August 9, 2007 and April 14, 2009). But Plaintiffs contend that the Court will review that ruling after an appropriate record is made on the class certification motion or later. April 20, 2017 Decision, ECF No. 1859, p. 11 ("Given the current stage of the litigation, however, we will utilize Judge Caproni's approach and evaluate at the class certification stage based on a more fulsome record the effect of defendants' alleged

---

[12] 8/2/2005, 8/3/2005, 9/5/2005, 9/28/2005, 11/14/2005, 2/1/2006, 2/2/2006, 2/3/2006, 2/7/2006, 2/8/2006, 2/9/2006, 2/14/2006, 2/15/2006, 2/16/2006, 2/17/2006, 2/22/2006, 3/13/2006, 3/16/2006, 3/17/2006, 5/9/2006, 5/10/2006, 6/01/2006, 6/13/2006, 8/15/2006, 8/16/2006, 8/18/2006, 9/13/2006, 9/14/2006, 9/15/2006, 9/18/2006, 9/26/2006, 9/27/2006, 9/28/2006, 10/4/2006, 10/10/2006, 10/31/2006, 11/14/2006, 11/15/2006, 11/28/2006, 12/1/2006, 12/14/2006, 12/18/2006, 12/19/2006, 12/20/2006, 12/21/2006, 2/27/2007, 2/28/2007, 3/5/2007, 3/19/2007, 3/28/2007, 3/29/2007, 4/9/2007, 5/24/2007, 6/18/2007.

manipulation on traded futures contracts.").  Thus, Plaintiffs contend that the antitrust claims have not been dismissed for the Periods 1 and 2.

**Leave to Amend.**  Plaintiffs sought leave to amend to include claims during the period January 1, 2003-December 31, 2004, and May 18, 2010-May 31, 2011.  ECF No. 1159.  The Court denied leave to amend based, in essence, on futility grounds.

> In the PTAC, plaintiffs seek to extend the Class Period backwards and forwards: persistent suppression and trader-based claims would now extend until May 31, 2011, while trader-based claims would begin in January 1, 2003. However, plaintiffs provide no basis for extending the class period with respect to trader-based claims: they have not properly pleaded any trader-based claims pre-dating January 1, 2005 or post-dating August 2007, and therefore such extensions of the class period are futile. Further, claims related to persistent suppression after May 2010 are time-barred pursuant to the CEA's two-year statute of limitations.

*See* ECF No. 1380 at 29-30.

In light of the foregoing, Court appointed class counsel determined to conduct a distribution process before a nationally recognized mediator, Kenneth Feinberg, Esq.  See Feinberg Decl. ¶2.  Separate allocation counsel represented each of the following interests during such process:

| | |
|---|---|
| Period 0 (January 1, 2005-August 8, 2007) | Motley Rice LLC |
| Efficient Enforcer Transactions | Cafferty Clobes Meriwether & Sprengel LLP |
| Periods 1 and 2 (August 9, 2007-April 14, 2009) | Berger & Montague P.C |
| Period 3 (April 15, 2009-May 17, 2010) | Cohen Milstein Sellers & Toll PLLC |
| January 1, 2003-December 31, 2004 and May 18, 2010-May 31, 2011 | Miller Law LLC |

At the end of this process, the allocation mediation resulted in a unanimous determination that the appropriate legal risks discounts were as follows.

| | |
|---|---|
| Period 0, 13 transactions upheld by this Court | 0% legal risk discount |
| Period 3, all transactions upheld by this Court | 0% legal risk discount |
| Efficient Enforcer Transactions | 0% legal risk discount |

| | |
|---|---|
| Period 0 transactions not approved by the Court but which Plaintiffs contend satisfy the Court's pleading standards (see fn. 12). | 10% legal risk discount |
| Period 0, the dates on which TBM claims were rejected | 60% legal risk discount |
| Periods 1 and 2 (other than Efficient Enforcer Transactions) | 60% legal risk discount |

In *Charron v. Wiener*, 731 F.3d 241, 253-254 (2d Cir. 2013) the Second Circuit Court of Appeals explicitly recognized the differences in legal risks among some members of the class, and observed that differences in the exact positioning among members of the class will exist in almost all settlements.  The Court held "that it was not unfair for the settlement's distribution formula to reflect this."  *Id*. at 253-54.  "[W]e find that a fundamental conflict did not exist between the members of the class, and that the Class Counsel's representation was adequate under Rule 23(a)(4). It was therefore not necessary to divide the class into subclasses with separate representation."  *Id*. at 254.

Importantly, this Court earlier indicated approval of the use of allocation counsel with regard to the statute of limitations discounts.

> [G]iven that plaintiffs have now selected attorneys to act as counsel and fiduciaries to what you call Segment I and Segment II, this Court sees no obstacle to those lawyers negotiating the likelihood of success on appeal, as counsel routinely do in negotiating settlements and apportioning the settlement between the two segments of plaintiffs.

Transcript of February 5, 2015 Oral Argument at 5-6 (ECF No. 1047, filed on February 23, 2015 in No. 11 MD 2262).

Since the Court's earlier comments, there have been new rulings on the dismissals of portions of the antitrust claims.  This led to the addition of counsel for the Efficient Enforcer Transactions.  The Court has also made additional rulings recited above relating to the TBM claims.  This led to the addition of counsel for the TBM claims.  Finally, there is now the settlement

14

class period which includes pre-January 1, 2005 and post-May 17, 2010 transactions. This led to the addition of the allocation counsel for transactions during this period.

Although Class Counsel did not believe that the use of Allocation Counsel was necessary, Class Counsel believed that this was advisable. Accordingly, the separate representation and mediation process have been employed. Consistent with *Charron*, Class Counsel agree that the results of this process are, at least, reasonable and fair. Jacobson Declaration, ¶4.

### 5. The Plan Specifies Two Types Of Payment To Eligible Class Members That Are Not Based Upon The Adjusted Net Loss From Artificiality

#### a. The Plan Provides That 1.316% Of The Face Amount Of The Settlement Will Be Paid Based On Adjusted Net Loss From Trading

As frequently occurs, Defendants in this case negotiated for a longer period of release than the litigated class.[13] Specifically, Defendants added January 1, 2003-December 31, 2004, and from May 18, 2010-May 31, 2011. There is no artificiality payment to class members in respect of transactions during this period. Based on the claim that class members entered the market during the time when it was allegedly being manipulated, one outcome of the allocation process was that the Adjusted Net Loss from Trading method should be employed. Plan ¶¶6-11. Specifically, an amount equal to 1.316% of the face amount of the settlements that are finally approved will be paid based on the net losses of each Eligible Class Member from transactions which were opened and closed during (a) January 1, 2003 - August 8, 2007, and/or (b) from May 18, 2010 - May 31, 2011. Plan, ¶¶ 6-7, 10. (If all four settlements are approved, the face amount will be $151,875,000.)

---

[13] This also occurred in prior class actions alleging manipulation of commodity futures prices. *E.g.*, *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y.) (Pauley, J.) *compare* ECF No. 141-1, p. 5 *with* ECF No. 218, ¶308 (Jacobson Decl., Ex. 14)

Plans of allocations approved in class actions alleging manipulation of futures prices have included a component that compensated Eligible Class Members based upon net losses during discrete periods in which the detection of artificiality was difficult.  *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y.) (Forrest, J.) [ECF No. 287-5, ¶¶4, 6, 12-15] (Jacobson Decl., Ex. 10); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y.) (Pauley, J.) [ECF No. 141-1, pp. 105-108] (Jacobson Decl., Ex. 14); *In re Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. May 24, 2006) (Marrero, J.) [ECF No. 618, pp. 9-15] (Jacobson Decl., Ex. 18); *see In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y. Oct. 10, 1999) (Pollack, J.) [ECF No, 349] (Jacobson Decl., Ex. 20).

### b.      Guaranteed Minimum Payment

The Plan specifies that each Eligible Class Member will receive a guaranteed minimum payment of at least $20.00.  Plan ¶5.  The estimated number of claimants is approximately 15,000. The face amount of the proposed settlements is $151,875,000.00.  Benefits of the minimum payment are to provide compensation, and to ensure, in the settlement context, that each Eligible Class Member receives consideration in exchange for its release.  Plans of allocation with minimum payment provisions have been previously approved.  *E.g., In re Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. June 7, 2010) (Marrero, J.) [ECF No. 618, p. 15, Section V] (Jacobson Decl., Ex. 18).

Any amount due to Eligible Class Members based upon the Net Loss from Artificiality metric and the Net Loss from Trading metric will be added to the $20.00 guaranteed payment to each Eligible Class Member.

### 6.      Legal Risk Discount For Offsets Of Gains From Outside The Futures Market

Finally, there were arguments and legal risks in this case that the loss experienced by class members in Eurodollar futures, should be further netted against gains experienced in other markets. *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486 (S.D.N.Y. 1987) (no offset if it would be inequitable or unfair to do so). Plaintiffs have contended that such deduction is inequitable and unfair for multiple reasons. In this context, the allocation mediation process included representation by separate counsel concerning the legal risks that gains in other markets should be offset against losses on Eurodollar futures. Finkelstein Thompson argued for the position that there should be no offset of gains. Louis F. Burke, P.C. argued for the position that there should be offsets of gains.

The outcome of this process was as follows. First, after the Net Loss from Artificiality is calculated, and after the Net Loss from Trading is calculated, there should be a discount of 10% for Eligible Class Members who were hedgers but not swaps dealers. Plan, ¶¶ 9, 20. Second, for Eligible Class Members who were swaps dealers, there should be a deduction of 65%. *Id.* Each Eligible Class Member will be required to answer in their proof of claim the question about whether they were a hedger or swaps dealer with regard to their Eurodollar futures and options transactions. By signing the proof of claim, each Eligible Class Member will authorize the Settlement Administrator to make various inquiries to verify the information in the proof of claim.

### a. Prior Cases Have Made Adjustments For Hedgers And Swaps Dealers

Prior class actions alleging commodity futures manipulation have approved plans of allocation that included separate discounts in the amount of the payments to swap dealers and hedgers. *In re: Crude Oil Commodity Futures Litig.*, 11 Civ. 3600 (S.D.N.Y.) [ECF No. 287-5, ¶¶8, 12] (Jacobson, Decl. Ex. 10) (50% hedging deduction and 91% swaps-dealer deduction); *In re Optiver Commodities Litig.*, 08 Civ. 6842 (S.D.N.Y.) [ECF No. 72-7, ¶6] (Jacobson, Decl. Ex.

17

12) (same); *In re Platinum & Palladium Commodities Litig.*, 10 Civ. 3617 (S.D.N.Y.) [ECF No. 141-1, pp. 103, 105 ¶¶5, 10] (Jacobson, Decl. Ex. 14) (same); *In re: Amaranth Natural Gas Commodities Litig.*, 07-cv-6377 (S.D.N.Y.) [ECF No. 413, ¶6] (Jacobson, Decl. Ex. 16) (57.75% hedging deduction and 91% swaps-dealer deduction); *In re Natural Gas Commodity Litig.,* 03 Civ. 6186 (S.D.N.Y.) [ECF No. 618, section IV.C] (Jacobson Decl., Ex. 18) (61% hedging deduction and 97.5% swaps-dealer deduction); *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y.) [ECF No. 349, plan of allocation, p. 2] (Jacobson, Decl. Ex. 20) (20% hedging deduction).

At the very least, the Plan's recognition of these partial discounts, which is similar to the recognition of partial discounts in prior cases, is within the range of what may possibly be found to be reasonable at the final approval stage.  To be sure, no two cases are exactly alike.  A key inquiry is whether, in the circumstances of each case, offsets from other markets would lead to unjust enrichment of the defendants or be inequitable in all circumstances.  Answering this inquiry depends on all the circumstances.  Plaintiffs contend that Defendants controlled the LIBOR setting process as well as each LIBOR fix.  Plaintiffs further contend that Eurodollar futures are actually a derivative asset of LIBOR *i.e.*, Defendants controlled the final settlement price of Eurodollar futures.  This type of extensive control has not been present in numerous prior cases.   On the other hand, hedgers still face risks of offsets.  Swaps dealers faced greater risks.  Swaps dealers focus on interest rate swaps.  They have books of trading.  They may, where the swaps are based on LIBOR, use the Eurodollar futures market to seek to offset their gains or losses on swaps with losses or gains on Eurodollar futures.

### D.    Important Additional Points Favoring Preliminary Approval

 In addition to the foregoing point-by-point explanations of the support for each aspect of the Plan, there are multiple circumstances which further support preliminary approval.

### 1.   The Strong Policy Favoring Approval Of Class Action Settlements Also Applies To Plans Of Distribution

The Court's consideration of the method of distribution of settlement proceeds is informed "by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *PaineWebber*, 171 F.R.D. at 132 (citation omitted). The strong judicial policy favoring settlements may be implemented here without making any binary or irrevocable choices regarding the specifics of the plan. See "2" below. On the contrary, the Plan is, contractually, not part of the final approval of the settlements. See "3" below. Nor, in settlements like this one, is a plan of distribution even required for approval of the settlement. See "4" below.

### 2.   A Plan Of Distribution May Be Amended At Any Time

The law is unclear as to how much the Court may amend a **settlement agreement** at final approval, and still approve same. But the law is very clear that the Court on its own initiative or at the request of class members or even class counsel, may amend the plan of distribution at any time, including after the final judgment. *In re Worldcom, Inc. Sec. Litig.*, 02 CIV. 3288 (DLC), 2005 WL 3577135, at *1 (S.D.N.Y. Dec. 30, 2005) (supplemental plan of allocation approved, after final judgment, over objections that certain class members would then not share in settlement proceeds); *See In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617, 2014 WL 3500655, at *3 (S.D.N.Y. July 15, 2014) (Pauley, J.) stating that the plan of allocation was "subject to revision by this court"); *In re Amaranth Natural Gas Commodities Litig.*, 07 Civ. 6377 (S.D.N.Y. May 23, 2012) [ECF No. 413 ¶ 6] (Jacobson Decl., Ex. 16) (modifying final judgment to reflect plan of allocation); *In re Natural Gas Commodity Litig.*, 03 Civ. 6186 (S.D.N.Y. June 7, 2010), [ECF No. 618 ] (Jacobson Decl., Ex. 18)(order establishing modified plan of allocation); *In re Sumitomo Copper Litig.*, 96 Civ. 4584 (S.D.N.Y. May 1, 2002) [ECF No. 349] (Jacobson Decl., Ex. 20) (order establishing plan of allocation).

19

Here, the Plan specifically provides that it may be amended at any time by the Court on its own initiative.  Plan, ¶23.  Also, the Plan may be amended upon motion by Class counsel provided that notice and an opportunity to object to any such amendment is supplied to all Eligible Class Members.  *Id.* at ¶24.

### 3.   Approval Of The Plans Of Distribution Is Not Part Of The Approval Of The Settlements

Each of the four settlement agreements at issue here explicitly provides that their approval should be considered separate and apart from any issues related to the plan of distribution.  *See* Barclays Settlement Agreement ¶ 18.3 [ECF No. 680-3]; Citi Settlement Agreement ¶¶ 5(C), 10(iii); Deutsche Bank Settlement Agreement ¶¶ 5(C), 10(iii); and HSBC Settlement Agreement ¶¶ 5(C), 10(iii).  Courts have emphasized that settlements and settlement approvals are a matter of contract.  "Courts should give proper deference to the private consensual decision of the parties ... [and] should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation ..."  *Guippone v. BH S&B Holdings LLC*, 09 Civ. 1029 (CM), 2016 WL 5811888, at *5 (S.D.N.Y. Sept. 23, 2016) (citation omitted); *DeLeon v. Wells Fargo Bank, N.A.*, 12 Civ. 4494, 2015 WL 2255394, at *3 (S.D.N.Y. May 11, 2015) (same); *Clark v. Ecolab*, 07 Civ. 8623, 2010 WL 1948198, at *4 (S.D.N.Y. May 11, 2010) (same); *see also Sullivan v. DB Invs., Inc.,* 667 F.3d 273, 325 n.58 (3d Cir. 2011) (*en banc*) (a settlement agreement is a bi-lateral agreement between the parties who mutually agree that the Defendants will achieve peace to quiet the litigation in consideration for money or other benefits provided to the plaintiffs).  Accordingly, any concerns about the Plan should not adversely affect preliminary approval of the settlement. *See* "4" below.

### 4.   Provision Of A Plan Of Distribution Is Not Required For Approval Of A Settlement

Settlements of class action claims have been approved and final judgment entered before a plan of distribution was adopted.  *See e.g., In re NASDAQ Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 480 (S.D.N.Y. 1998) ("it is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval") (citing *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988) ("There is . . . no absolute requirement that such a [distribution] plan be formulated prior to notification of the class….The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case.  This can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement."); *In re Michael Milken and Assocs. Sec. Litig.*, 150 F.R.D. 57, 67 (S.D.N.Y. 1993) ("Nor is there any impediment to approval of the [settlement] because the actual amounts to [certain class members] will be subject to further allocation procedures."); Manual for Complex Litig. (4th) §21.312 (2004) ("Often,…the details of allocation and distribution are not established until after the settlement is approved.").

Plaintiffs have stated that they desire to provide the Plan to class members with the notice of the Settlements.  But the provisions of the Plan will **not** in any way "affect the obligations of Defendants under the settlement agreement[s]" here.  *Compare* "3" above *with In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d at 170.  On the contrary, in order for Defendants to obtain peace and quiet this litigation against them, the settlement contracts expressly separate settlement approval from approval of the plan of distribution.  *See* "3" immediately above.  Thus, there is no requirement that this particular Plan be provided to class members prior to final approval.

21

Nonetheless, Class Counsel have consistently maintained that it is fair to class members to receive notice of the Plan in this case (as in prior similar cases). This will allow class members to evaluate this information.

## III.    Conclusion

This Court should preliminarily approve the Plan.

Dated: December 15, 2017

**LOVELL STEWART HALEBIAN JACOBSON LLP**

By: */s/ Christopher Lovell*
Christopher Lovell
Gary S. Jacobson
Jody R. Krisiloff
61 Broadway, Suite 501
New York, NY 10006
Telephone: (212) 608-1900
clovell@lshllp.com
gsjacobson@lshllp.com
jkrisiloff@lshllp.com

*Interim Co-Lead Class Counsel for the Exchange-Based Plaintiffs*

**KIRBY McINERNEY LLP**

David E. Kovel
Karen Lerner
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 371-6600
dkovel@kmllp.com
klerner@kmllp.com
telrod@kmllp.com

*Interim Co-Lead Class Counsel for the Exchange-Based Plaintiffs*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE LIBOR-BASED FINANICAL
INSTRUMENTS ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
EXCHANGE-BASED PLAINTIFF ACTION

MDL No. 2262
No. 1:11-MD-02262-NRB

**Errata for the Exchange-Based Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Plan of Distribution for Settlements with Defendants Barclays, Citi, Deutsche Bank, and HSBC**

| Page No. | Original | Change To | Reason for Change |
|---|---|---|---|
| 2 | - | Other than for efficient enforcers | Corrected for accuracy |
| 2 | August 7, 2007 | August 8, 2007 | Corrected for accuracy |
| 8 | - | These addition processes produce the Total Gains from Artificiality, and the Total Losses from Artificiality for each Eligible Class Member. | Added for clarity |
| 8 | their Total Daily Losses | their Total Losses | Corrected for accuracy |
| 8 | *Id.* at ¶¶19-21; | *Id.* at ¶19; | Corrected for accuracy |
| 8 | *Id.* | *Id* at 20. | Corrected for accuracy |
| 8 | *See* Plan, ¶13 | *See* Plan, ¶15 | Corrected for accuracy |
| 8-9 | *Id.* | *Id* at ¶12. | Corrected for accuracy |
| 11 | August 7, 2007 | August 8, 2007 | Corrected for accuracy |
| 11 | August 7, 2007 | August 8, 2007 | Corrected for accuracy |
| 12 | 53 additional dates | 54 additional dates | Corrected for accuracy |
| 12 | August 7, 2007 | August 9, 2007 | Corrected for accuracy |

| 12 | 8/2/2005, 9/28/2005, 9/29/2005, 11/14/2005, 11/22/2005, 11/28/2005, 2/1/2006, 6/1/2006, 9/1/2006, 12/1/2006, 2/2/2006, 2/14/2006, 2/15/2006, 2/16/2006, 2/17/2006, 2/22/2006, 2/3/2006, 3/13/2006, 3/16/2006, 4/7/2006, 6/30/2006, 2/7/2006, 4/7/2006, 2/8/2006, 8/15/2006, 8/16/2006, 8/17/2006, 8/18/2006, 9/1/2006, 2/9/2006, 9/13/2006, 9/14/2006, 9/15/2006, 2/10/2006, 10/26/2006, 11/29/2006, 12/14/2006, 12/18/2006, 12/19/2006, 12/20/2006, 12/21/2006, 12/22/2006, 12/27/2006, 2/28/2007, 3/1/2007, 3/5/2007, 3/19/2007, 3/29/2007, 5/24/2007, 6/8/2007, 7/30/2007, 8/6/2007, 5/19/2009 | 8/2/2005, 8/3/2005, 9/5/2005, 9/28/2005, 11/14/2005, 2/1/2006, 2/2/2006, 2/3/2006, 2/7/2006, 2/8/2006, 2/9/2006, 2/14/2006, 2/15/2006, 2/16/2006, 2/17/2006, 2/22/2006, 3/13/2006, 3/16/2006, 3/17/2006, 5/9/2006, 5/10/2006, 6/01/2006, 6/13/2006, 8/15/2006, 8/16/2006, 8/18/2006, 9/13/2006, 9/14/2006, 9/15/2006, 9/18/2006, 9/26/2006, 9/27/2006, 9/28/2006, 10/4/2006, 10/10/2006, 10/31/2006, 11/14/2006, 11/15/2006, 11/28/2006, 12/1/2006, 12/14/2006, 12/18/2006, 12/19/2006, 12/20/2006, 12/21/2006, 2/27/2007, 2/28/2007, 3/5/2007, 3/19/2007, 3/28/2007, 3/29/2007, 4/9/2007, 5/24/2007, 6/18/2007. | Corrected for accuracy |
| 13 | conduct an distribution | conduct a distribution | Typo |
| 13 | August 7, 2007 | August 8, 2007 | Corrected for accuracy |
| 13 | August 8, 2007 | August 9, 2007 | Corrected for accuracy |
| 15 | August 7, 2007 | August 8, 2007 | Corrected for accuracy |
| 16 | number of class members | number of claimants | Corrected for accuracy |
| 22 | Signature section flush left | Signature section moved to right | Typo |