

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

IN RE LIBOR-BASED FINANCIAL INSTRUMENTS          **MEMORANDUM AND ORDER**
ANTITRUST LITIGATION

----------------------------------------X          11 MDL 2262 (NRB)

THIS DOCUMENT RELATES TO: ALL CASES

----------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


        Pursuant to the July 5, 2022 scheduling order, the parties

are currently engaged in discovery relating to two upstream issues:

(1) the alleged existence of a 16-bank conspiracy to persistently

suppress LIBOR, and (2) the effect of the Second Circuit's decision

in United States v. Connolly, 24 F. 4th 821 (2d Cir. 2022).[1]   See

ECF No. 3425.   To date, defendants have collectively produced over

---

[1] In Connolly, the Second Circuit reversed the defendants' convictions for
conspiracy to commit wire fraud and bank fraud, concluding that the Government
failed to prove that the trader-influenced LIBOR submissions were false on the
Government's theory that "there was only one true interest rate that [each bank]
could submit."   24 F.4th at 836, 843.   The Second Circuit explained: "The
precise hypothetical question to which the LIBOR submitters were responding was
at what interest rate 'could' [the bank] borrow a typical amount of cash if it
were to seek interbank offers and to accept.   If the rate submitted is one
that the bank could request, be offered, and accept, the submission,
irrespective of its motivation, would not be false."   Id. at 835 (emphasis
added).

On April 4, 2022, the Court instructed the parties to focus their initial
discovery efforts on the effect of Connolly as well as the existence of a 16-
bank conspiracy to persistently suppress LIBOR, given the potential impact of
the anticipated summary judgment motions related to those issues.   See ECF No.
3386 at 1.   Once discovery and motion practice related to the two upstream
issues and OTC class certification are complete, the parties will, if necessary,
turn to whether plaintiffs suffered injuries as a result of the alleged LIBOR
suppression, whether plaintiffs had notice of and relied on an allegedly
inaccurate LIBOR, and any other remaining issues (the "downstream issues").
See ECF No. 3425 at 7.

3.4 million documents, spanning 15.9 million pages and 88,000 audio files, from over 500 custodians, generally from a period of August 2007 to May 2010. See ECF Nos. 3557 at 2; 3559 at 1. For the most part, these documents were previously produced to various government regulators, including the Department of Justice, Securities and Exchange Commission, Commodity Futures Trading Commission, and New York Department of Financial Services, in connection with their investigations into parallel allegations of LIBOR manipulation at issue here.[2] See ECF Nos. 3549 at 1, 3559 at 1, 5.

On October 6, 2022, the Court received two applications to compel the production of additional documents. See ECF Nos. 3547, 3549. In the first application, the Direct Action Plaintiffs' (the "DAPs") seek an order compelling all defendants to produce documents from an additional 17-month time period of June 2010 through October 2011 that relate to the two upstream issues. See ECF No. 3547. In the second application, all plaintiffs seek an order compelling 11 bank defendants to produce additional documents relating to the two upstream issues that are responsive

---

[2] The Exchange-Based, OTC, and Lender plaintiffs previously acknowledged that the regulatory investigations were "based on the same conduct underlying plaintiffs' civil claims" and "directly relate to whether the Panel Banks engaged in unlawful manipulation of LIBOR and the quantum of that manipulation." ECF No. 1415 at 2, 4. The DAPs have also described the regulatory productions as "undeniably relevant to [their] claims because they go to such core issues as who was involved in LIBOR manipulation, over what time period, by what means, to what extent, and the like." ECF No. 1410 at 1. Defendants state that the government regulators provided input into the search terms that were used for their regulatory productions, which "were constructed to identify documents related to the LIBOR-setting process and the suppression of LIBOR." ECF No. 3559 at 5.

to more than 100 additional search terms and/or are from more than 40 additional custodians.[3]  See ECF No. 3549.  On December 15, 2022, the Court requested additional information necessary to conduct a Rule 26(b)(1) analysis of the second application, see ECF No. 3603, which was provided by the parties on January 12, 2023 and January 19, 2023, see ECF Nos. 3624, 3626, 3632.[4]

For the reasons stated below, the first application for documents from June 2010 through October 2011 is denied in its entirety, and the second application for additional search terms and custodians is granted in part and denied in part.

## BACKGROUND

The Court assumes familiarity with the factual allegations in this MDL, and only provides the background necessary to resolve the instant applications.

### A. DAPs' Application to Compel Documents from June 2010 through October 2011

In the first application of October 6, 2022, the DAPs acknowledge that the Court previously denied certain DAPs' requests

---

[3] The 11 bank defendants from whom plaintiffs seek relief on this application are: Bank of America, Citibank, Deutsche Bank AG, HSBC, JPMorgan, Norinchukin, Portigon AG, Royal Bank of Canada, Royal Bank of Scotland, Société Générale, and UBS AG.  See ECF Nos. 3549, 3626.  Plaintiffs' application does not seek any relief with respect to the other five bank defendants—Barclays, Lloyds, Credit Suisse, Rabobank, and MUFG—all of whom negotiated agreements with plaintiffs on this application.  See ECF Nos. 3559 at 1 n.1, 3567, 3571, 3597, 3648.

[4] As plaintiffs have sufficiently described the motions they wish to bring and the reasons therefore in their applications of October 6, 2022 and their supplemental submissions of January 12, 2023 and defendants have responded, formal motions would be superfluous.  See ECF Nos. 3547, 3549, 3624, 3626, 3632.

for leave to amend their complaints to extend the end of the alleged suppression period from May 2010 to October 2011. See ECF 3457 at 1 (citing In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 11 MDL 2262 (NRB), 2019 WL 1331830, at *18 (S.D.N.Y. Mar. 25, 2019) ("LIBOR VIII")). Nevertheless, the DAPs argue that an order compelling all defendants to collect and produce all non-privileged, responsive documents relating to the two upstream issues from all of their custodians for the additional 17-month period of June 2010 to October 2011 is warranted because they have discovered new evidence showing defendants suppressed LIBOR after May 2010. See id.

The DAPs specifically cite to: (i) two reports from the Federal Bureau of Investigation ("FBI") used as exhibits in the Connolly trial which reference recorded conversations from June 28, 2011 of a Deutsche Bank trader discussing banks' reluctance to "move LIBOR submissions up to the correct levels" and from November 23, 2010 of a Deutsche Bank trader stating that there is a "strong incentive" among all USD LIBOR setters to keep LIBOR low, see ECF Nos. 3547-1, 3547-2; (ii) an August 2011 research note stating that banks continue to submit lower LIBOR rates than what they are paying in the market, see ECF No. 3547-3; and (iii) an economic diagram seemingly created by the DAPs that is based on a figure previously used in another plaintiff's complaint to allegedly "show[] the magnitude of suppression when compared to an

alternative benchmark—the Eurodollar Deposit Rate published by the Federal Reserve," <u>see</u> ECF No. 3547 at 4.[5]  Based on this "new evidence," the DAPs assert that documents from the additional 17-month period would show the existence of a conspiracy to suppress LIBOR through 2011, establish that defendants knowingly submitted false answers to the LIBOR question, and be relevant to the parties' expert economists' models by clarifying whether June 2010 through October 2011 was a "clean period" that can be used as a comparison to the alleged suppression period.  <u>See id.</u> at 2.

Defendants filed a response to the DAP's application on October 13, 2022.  <u>See</u> ECF No. 3557.  In their response, defendants argue that the "new evidence" identified by the DAPs is "woefully insufficient" to justify the unduly burdensome expansion of the discovery period by an additional 17 months, which defendants estimate would result in the production of approximately 1.7 million documents spanning 8 million pages.  <u>Id.</u> at 1, 2.[6]

**B. Plaintiffs' Application to Compel Additional Search Terms and Custodians**

In the second application of October 6, 2022, all plaintiffs seek an order compelling 11 bank defendants to collect and produce

---

[5] The Court notes that one of the experts proffered by the Lender Plaintiffs on their class certification motion utilized this so-called new evidence in his expert report. <u>See</u> <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 299 F. Supp. 3d 430, 557 (S.D.N.Y. 2018) ("<u>LIBOR VII</u>").

[6] Without the Court's permission and contrary to the parties' purported agreement, the DAPs filed a reply in support of their application on October 18, 2022, <u>see</u> ECF No. 3561, which defendants asked the Court to disregard, <u>see</u> ECF No. 3564. Even if the Court considered the DAPs' reply, it would not change the result.

all non-privileged, responsive documents relating to the two upstream issues that hit on additional search terms and/or are from additional custodians. <u>See</u> ECF No. 3549. Plaintiffs argue that their requested additional search terms target common gaps in defendants' productions across all cases, which they group into six categories:

1) "Defendants' suppression of LIBOR, in order to show that they collusively set their LIBOR contributions at rates that were not truthful answers to the LIBOR question;"

2) "Defendants' efforts through interbank brokers to facilitate, monitor, and police their coordinated persistent suppression of LIBOR;"

3) "Thomson Reuters' efforts to carry out so-called 'tolerance checks' that Defendants used to monitor and enforce their coordinated persistent suppression of LIBOR;"

4) "the roles of the British Bankers Association ('BBA') and related committees, including, but not limited to, the Foreign Exchange and Money Markets Committee ('FXMMC'), in the Defendants' coordinated persistent suppression of LIBOR;"

5) "the role of the Bank of England ('BOE') in the Defendants' coordinated persistent suppression of LIBOR;" and

6) "communications with the Federal Reserve Bank of New York ('NY Fed') regarding Defendants' persistent suppression of LIBOR."

<u>Id.</u> at 1-2. Plaintiffs claim that, through their thorough review of defendants' productions, they have "identified numerous

relevant terms that the Defendants did not search" in each of these categories.  Id. at 6.[7]

With respect to custodians, in their original submission, plaintiffs identified categories of custodians whose files were not searched, including actual LIBOR submitters, bank employees who communicated with employees of other banks about anticipated LIBOR submissions, and high-level executives who allegedly issued directives to suppress LIBOR.  Id. at 7.  However, plaintiffs failed to identify those custodians by name and title.  Id.

Defendants filed a response to plaintiffs' application on October 13, 2022.  See ECF No. 3559.  In their response, defendants argued that documents responsive to plaintiffs' requests have already been captured by the broad search terms used by defendants, and that plaintiffs have not identified any specific gaps in their productions beyond conclusory allegations of insufficiency.  See id. at 1-3.  Specifically, defendants highlight that all 62

---

[7] Plaintiffs argue that, to the extent defendants express concerns about burden, they have offered defendants multiple strategies to reduce costs, including allowing them to de-duplicate documents hitting on the new search terms that have already been produced, to produce all documents that hit on the proposed search terms while maintaining the ability to claw back documents without waiving any privilege, and to narrow the proposed search terms by using hit-count reports and responsiveness samples.  See ECF No. 3549 at 3.  At the outset, the Court notes that de-duplication would be expected in the normal course and rejects the suggestion that defendants should be compelled to produce documents before conducting a review for privilege and confidential supervisory information ("CSI") between banks and their regulators.  See infra Section (B)(1)(ii).  Such an order would unfairly advantage plaintiffs who would very likely see privileged communications, could expose defendants to significant regulatory consequences if CSI is disclosed, and could result in even more litigation expenditures arising from subsequent disputes over claw back requests.

exhibits attached to plaintiffs' application do "not include a single relevant, document that does not contain the term 'LIBOR,'" which was used as a standalone search term by almost all defendants.[8]  Id. at 8; see also ECF No. 3624 at 4.  In addition, defendants claim that the production of additional documents would be unduly burdensome and disproportionate to the needs of the case, id. at 4-12, particularly with respect to communications with the Federal Reserve and Bank of England given those communications "also raise potential bank examination privilege," id. at 8 n.10.[9]

## C. The Court's Request for Additional Information on Plaintiffs' Application for Search Terms and Custodians

After reviewing the applications and defendants' responses, on December 15, 2022, the Court requested additional information from the parties necessary to conduct a Rule 26(b)(1) analysis of plaintiffs' application for additional search terms and custodians.  See ECF No. 3603.  Among other requests, the Court directed the parties to provide: the search terms used by each defendant; the search terms plaintiffs seek to compel; the custodians plaintiffs seek to compel and defendants' position with

---

[8] UBS is the only defendant from whom plaintiffs seek relief that did not use "LIBOR" as a standalone search term.  See ECF No. 3624 at 4.  Instead, UBS produced documents from 57 custodians which were responsive to 222 search terms, many of which include the term "LIBOR."  See ECF No. 3632 at 4.

[9] Plaintiffs also filed a reply in support of the second application on October 18, 2022, see ECF No. 3562, which defendants similarly asked the Court to disregard, see ECF No. 3564.  Likewise, here, plaintiffs' reply does not alter the Court's decision as all additional information needed to conduct a 26(b)(1) analysis was gleaned from the parties' supplemental submissions of January 12, 2023 and January 19, 2023.  See ECF Nos. 3624, 3626, 3632.

respect to each custodian request; a list of significant documents not produced by defendants along with the requested search terms that would have resulted in their production; descriptions of each defendant's respective ability to run search terms across their original collections;[10] and the number of documents and pages produced by each defendant.  See id. at 3-4.

On January 12, 2023 and January 19, 2023, the parties responded to the Court's December 15, 2022 requests.  See ECF Nos. 3624, 3626, 3632.  In their submissions, plaintiffs requested more than 100 additional search terms, see ECF No. 3624, and more than 40 additional custodians, see ECF No. 3626.  The Court recognizes the very substantial effort that went into the responses to the Court's December 15, 2022 requests.

## LEGAL STANDARD

"A district court has wide latitude to determine the scope of discovery."  In re Agent Orange Prod. Liab. Litig., 517 F.3d 76, 103 (2d Cir. 2008); accord EM Ltd. v. Republic of Argentina, 695 F.3d 201, 207 (2d Cir. 2012), aff'd sub nom.  Republic of Argentina v. NML Cap., Ltd., 573 U.S. 134 (2014).  Discovery is generally limited to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case,

---

[10] In their response, defendants noted that ordering them to produce additional search terms would result in many defendants needing to re-collect documents and essentially re-do their document reviews as the "original workspaces used for review and production of documents no longer exist, as a result of changing e-discovery processes and technology."  See ECF No. 3559 at 12.

considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).  "The burden of demonstrating relevance is on the party seeking discovery." Trilegiant Corp. v. Sitel Corp., 275 F.R.D. 428, 431 (S.D.N.Y. 2011) (internal citations omitted).  "Once relevance has been shown, it is up to the responding party to justify curtailing discovery." Id.

Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). However, discovery requests must be "properly tailored," Martinez v. Robinson, No. 99 Civ. 11911 (DAB) (JCF), 2002 WL 424680, at *2 (S.D.N.Y. Mar. 19, 2002), as "[p]roportionality focuses on the marginal utility of the discovery sought," Vaigasi v. Solow Mgmt. Corp., No. 11 Civ. 5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016).  "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." Id. (internal citation omitted).

With these legal standards in mind, the Court turns to the specific discovery requests.

**DISCUSSION**

**A. DAPs' Application to Compel Documents from June 2010 through October 2011**

The Court denies the DAPs' application, finding that a 17-month extension of the discovery period is wholly disproportionate to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Indeed, granting the DAPs' request would extend the discovery period well beyond the relevant time period asserted in the DAPs' complaints. See ECF No. 3547 at 1; see also Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB) (HBP), 2008 WL 4452134, at *5 (S.D.N.Y. Oct. 2, 2008) (denying discovery request for documents outside of relevant time period in complaint).

"To justify discovery requests for documents generated outside the time period alleged in the [the DAPs'] Complaint[s], the [DAPs] must demonstrate the relevance of the potential discovery to the claims it has asserted for the [August 2007 to May 2010] time period." United States ex rel. Bilotta v. Novartis Pharms. Corp., No. 11 Civ. 0071 (PGG), 2015 WL 13649823, at *4 (S.D.N.Y. July 29, 2015). Here, the DAPs argue that they have identified "new evidence" showing that defendants suppressed LIBOR through October 2011 and drawing into question whether June 2010 through October 2011 can be used as a "clean period" in the expert

11

economists' models.   See ECF No. 3547 at 1.   The Court is not
persuaded.

     As an initial matter, the three recently-discovered documents
cited by the DAPs are of limited relevance as they constitute mere
speculation about banks' LIBOR submission practices by bank
employees who were not directly involved in the LIBOR submission
process.   See ECF Nos. 3547-1, 3547-2, 3547-3.   Even if the DAPs
presented more persuasive evidence of LIBOR suppression after May
2010, however, it is still not clear how that evidence would affect
the merits of the DAPs' claims, which are limited to August 2007
through May 2010.   See In re Weatherford Intern. Sec. Litig., No.
11 Civ. 1646 (LAK) (JCF), 2013 WL 5788687, at *3 (S.D.N.Y. Oct.
28, 2013) ("[P]ointing to one example of potentially discoverable
material does not transform an overbroad request into one that is
properly tailored.") (internal quotations and citation omitted).

     Without clear relevance to the DAPs' causes of action, the
DAPs' request is therefore only arguably relevant to establishing
a "clean period" in furtherance of their expert economists' models,
which they argue will "show that LIBOR was lower than it would
have been but for Defendants' conduct."   See ECF No. 3547 at 2.
Simply put, the DAPs desire to establish a "clean period" does not
justify requiring defendants to review presumably millions of
documents from a 17-month period from hundreds of custodians.
While "additional years' worth of information [may] increase[] the

likelihood that relevant trends and fluctuations will become clear," <u>Novartis Pharms. Corp.</u>, 2015 WL 13649823, at *4, "discovery is not boundless, and a court may place limits on discovery demands that are unreasonably cumulative or duplicative, or in cases where the burden or expense of the proposed discovery outweighs its likely benefit." <u>Kingsway Fin. Servs., Inc.</u>, 2008 WL 4452134, at *4 (internal quotations and citations omitted).  Accordingly, the DAPs' application is denied in its entirety.

**B. Plaintiffs' Application to Compel Additional Search Terms and Custodians**

The Court next turns to plaintiffs' application to compel the production of documents that are responsive to more than 100 additional search terms and/or are from more than 40 additional custodians.  <u>See</u> ECF No. 3549.

**1. Search Term Requests**

As noted, in their application of October 6, 2022, plaintiffs bucketed their search term requests into the following six categories:

1) "Defendants' suppression of LIBOR, in order to show that they collusively set their LIBOR contributions at rates that were not truthful answers to the LIBOR question;"

2) "Defendants' efforts through interbank brokers to facilitate, monitor, and police their coordinated persistent suppression of LIBOR;"

3) "Thomson Reuters' efforts to carry out so-called 'tolerance checks' that Defendants used to monitor and

enforce their coordinated persistent suppression of LIBOR;"

4) "the roles of the British Bankers Association ('BBA') and related committees, including, but not limited to, the Foreign Exchange and Money Markets Committee ('FXMMC'), in the Defendants' coordinated persistent suppression of LIBOR;"

5) "the role of the Bank of England ('BOE') in the Defendants' coordinated persistent suppression of LIBOR;" and

6) "communications with the Federal Reserve Bank of New York ('NY Fed') regarding Defendants' persistent suppression of LIBOR."

Id. at 1-2.  To begin, the Court rejects plaintiffs' request for additional documents related to categories three (Thomson Reuters), five (Bank of England), and six (Federal Reserve Bank of New York).  Then, the Court considers plaintiffs' specific search term requests related to categories one (LIBOR suppression), two (use of interbank brokers), and four (use of the BBA and related committees) as well as plaintiffs' custodian requests.

### i.   Category Three (Thomson Reuters)

The Court finds that the requests related to Thomson Reuters are neither relevant nor proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1).  Despite having already received productions from non-party Thomson Reuters and four bank defendants that ran either "Thomson Reuters" or "Reuter*" as a search term, see ECF Nos. 1537, 3624 at 48, plaintiffs cite no hard evidence supporting their suggestion that Thomson Reuters'

"efforts to carry out so-called 'tolerance checks'" were nefarious, see ECF No. 3549 at 2; ECF No. 3626-2 at 22.  Indeed, plaintiffs' support for their allegation is limited to: (i) a transcript of a call between John Ewan from the BBA and Miles Storey from Barclays, in which Storey states that he received a call from Thomson Reuters to confirm that he is "happy" with his LIBOR submission, see ECF No. 3549-33 at 6; and (ii) bare-bones call logs produced by Thomson Reuters which merely provide for each call the date, the name of the bank, the revision to the bank's LIBOR rate, and the number of queries made per bank, see ECF No. 3549-34.[11]  The call logs do not contain the names of the call participants, identify who initiated each call, or memorialize any conversation that occurred on the call.  See id.

Contrary to plaintiffs' arguments, none of these documents show that "Defendants required Thomson Reuters to perform so-called 'tolerance' checks on each Defendant's submissions before publication" or that the purpose of Thomson Reuters' calls with the defendant banks was to "improve alignment with the other Panel Banks."  See ECF No. 3549 at 10.  Rather, it is far more likely that, to the extent that Thomson Reuters did contact LIBOR

---

[11] Plaintiffs cite an additional document in support of their theory that does not reference Thomson Reuters.  See ECF No. 3549 at 10 (citing ECF No. 3549-31).  The Court rejects plaintiffs' suggestion that it should make the logical leap of assuming that, when a Rabobank submitter states in this document that the BBA would call if his submission was out of line with other banks, he was actually "referring to Thomson Reuters acting as agent of the BBA."  ECF No. 3549 at 10 n.22.

submitters, it did so in order to confirm that they did not make any mistakes when submitting their LIBOR rates.   Indeed, plaintiffs' further argument, supported only by a news article from 2012, that "Thomson Reuters alerted the BBA on a regular basis about LIBOR manipulation" undermines its claim that Thomson Reuters acted on behalf of defendants to forward the alleged conspiracy to manipulate LIBOR.   See id. (citing ECF No. 3549-35). In fact, the cited news article states that the reason Thomson Reuters would occasionally contact LIBOR submitters was to "check[] [] implausible rates"—not to encourage banks to modify their submissions to align with others.   ECF No. 3549-35 at 5. Accordingly, the Court denies plaintiffs' application to obtain additional documents related to category three.

> ### ii.   Categories Five (Bank of England) and Six (Federal Reserve Bank of New York)

The Court next finds that categories five and six, targeting communications with the Bank of England and Federal Reserve Bank of New York, raise specific issues of privilege, which make their proposed review unduly burdensome and disproportionate to the needs of the case.   See Fed. R. Civ. P. 26(b)(1).   Indeed, "agency opinions and recommendations and banks' responses thereto" are protected by a "qualified bank examination privilege," which "arises out of the practical need for openness and honesty between bank examiners and the banks they regulate, and is intended to

protect the integrity of the regulatory process by privileging such communications." Sharkey v. J.P. Morgan Chase & Co., No. 10 Civ. 3824 (RWS), 2013 WL 2254553, at *1 (S.D.N.Y. May 22, 2013); see also Wultz v. Bank of China Ltd., 61 F. Supp. 3d 272, 282 (S.D.N.Y. 2013) (collecting cases); 12 C.F.R. 261.2(b) (defining "confidential supervisory information").  Because this privilege "belongs to the regulatory authority and not to the banks that it regulates," Bank of China v. St. Paul Mercury Ins. Co., No. 03 Civ. 9797 (RWS), 2004 WL 2624673, at *4 (S.D.N.Y. Nov. 18, 2004), as modified on reconsideration sub nom., 2005 WL 580502 (S.D.N.Y. Mar. 10, 2005), the regulator "must be allowed the opportunity to assert the privilege and the opportunity to defend its assertion," Wultz, 61 F. Supp. 3d at 282.

While a court may ultimately "override the privilege if the requesting party demonstrates 'good cause,'" id., the Court finds that the asserted need for these documents does not outweigh the burden and delays that will necessarily arise from the multi-layered review of documents that fall into these categories—particularly in light of the 3.4 million documents that have already been produced by defendants.  The Court also recognizes that, apart from these established privilege issues, any effort to take third-party discovery would presumably face additional hurdles.  As such, plaintiffs' requests related to categories five and six are also denied.

### iii.  Categories One (Suppression of LIBOR), Two (Use of Interbank Brokers), and Four (Use of BBA and Related Committees)

Defendants do not dispute the general relevance of plaintiffs' remaining requests for documents related to defendants' alleged suppression of LIBOR, alleged use of interbank brokers to further their conspiracy, and alleged use of the BBA and related committees as forums to further their conspiracy. See ECF No. 3559 at 1, 8.  Nor does the Court.[12]  However, in the context of a request for additional discovery, plaintiffs must point to "<u>specific</u> information that is relevant to their claims and would be found solely in the unproduced documents." <u>Alaska Elec. Pension Fund v. Bank of Am. Corp.</u>, No. 14 Civ. 7126 (JMF), 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) (citing <u>Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.</u>, 297 F.R.D. 99, 104 (S.D.N.Y. 2013) (granting additional discovery because plaintiffs "provided sufficient justification for expanding search terms" by "highlight[ing] both general categories and concrete examples of documents . . . that are relevant but would not be discovered" by the current search") (emphasis in original)).  Only then can the Court consider the "marginal utility" of each of plaintiffs' search term requests when weighing proportionality in light of

---

[12]  To the extent that plaintiffs seek documents related to the alleged suppression of LIBOR in order to show that banks "collusively set their LIBOR contributions at rates that were not <u>truthful</u> answers to the LIBOR question," ECF No. 3549 at 1 (emphasis added), the Court notes that that the concept of truthfulness must be understood in light of <u>Connolly</u>, 24 F.4th at 837.

defendants' already voluminous productions.   _Vaigasi_, 2016 WL 616386, at *14.

Here, however, plaintiffs have failed to establish the unique relevance of most of their search term requests, despite being given multiple opportunities to do so.  As noted, after plaintiffs submitted their initial application along with 62 exhibits that did not "include a single relevant document that does not contain the term 'LIBOR,'" ECF No. 3559 at 8, the Court directed plaintiffs to provide a list of significant documents not produced by defendants and the additional search terms that would have resulted in their production, ECF No. 3603 at 3.  While plaintiffs did provide a chart of documents, that chart's usefulness in evaluating the relative importance of many of plaintiffs' search term requests is limited.

As an initial matter, many of the documents identified by plaintiffs: (i) appear to have been sent and received by individuals that defendants did not collect documents from, making their exclusion a custodians issue, rather than a search terms issue, _see e.g._, ECF No. 3626-2 at 2, 5, 6; (ii) were produced by at least some defendants, making their proposed production by other defendants cumulative, _see e.g._, _id._ at 2, 23, 24, 26-33; or (iii) may not actually exist as their identification is based solely on second-hand references to those communications, meaning those communications may have occurred in-person, by phone, or not

19

at all, see e.g., id. at 8-21.  For the limited number of documents

that do not fall into those categories, plaintiffs have failed to

specify precisely which of their search term requests would have

led to the production of each of the documents they identified.

Id. at 1-37.  As such, the Court continues to struggle to decipher

which requested search terms would have resulted in the identified

documents' production.  It is still simply not clear to the Court

that all of the identified documents would not have been produced

through the use of a few, broad search terms like "LIBOR,"

"interbank," and "BBA," and that more than 100 additional search

terms are truly needed.[13]

Accordingly, the Court denies all of plaintiffs' search term

requests, which it deems unreasonably cumulative and duplicative

and therefore lacking in "marginal utility," except for the search

terms listed in Appendix 1 to this memorandum and order.  See In

re Commodity Exch., Inc., Gold Futures & Options Trading Litig.,

14 MD 2548 (VEC), 2021 WL 2481835, at *2 (S.D.N.Y. June 17, 2021);

Treppel v. Biovail Corp., 249 F.R.D. 111, 117 (S.D.N.Y. 2008).

With respect to the search term requests granted by the Court, the

---

[13] In addition, only one of the documents plaintiffs identified as related to
defendants' efforts to collusively suppress LIBOR even arguably involves
communications between multiple bank defendants.  See ECF No. 3626-2 at 1-12;
see also ECF No. 3559 at 6 ("It is telling that Plaintiffs have not identified
in their Motion a single document containing any evidence—direct or
circumstantial—of a panel-wide conspiracy to suppress LIBOR.").  In that single
document, the Bloomberg chat of an RBS employee, who was not a custodian, was
"shared" with Credit Suisse and Deutsche Bank employees, according to
plaintiffs.  ECF No. 3626-2 at 2.  As such, it is not clear to the Court that,
even there, a direct communication between bank defendants occurred.

Court exercises its discretion and concludes that their relevance outweighs their burden to a degree that warrants them being used by the defendants listed in Appendix 1.[14]  The Court understands that all of the granted search term requests have already been used or substantially used by some defendants, and those defendants, which have been omitted from Appendix 1, are not directed to re-run those search terms.  Nevertheless, the Court concludes that the granted search term requests are so highly relevant to plaintiffs' allegations that the defendants that have not used those terms should do so now.

## 2. Custodian Requests

The Court next turns to plaintiffs' application for documents from more than 40 additional custodians from nine defendants.  See ECF No. 3626-3.[15]  In evaluating each custodian request, the Court

---

[14] The Court understands that this order will require certain defendants that ran search terms but no longer have access to their original document collections to re-collect documents from their original custodians.  See ECF Nos. 3559 at 12, 3632 at 2-3.  The Court has considered the additional burden imposed by this order on those defendants, but ultimately does not believe that the defendants that failed to preserve their original collections should get a pass from participating in this stage of discovery.  The Court further understands that two defendants, Bank of America and Citibank, conducted document-by-document reviews of certain custodians' documents without the application of any search terms.  See ECF No. 3632 at 5-6.  Bank of America and Citibank thus need not apply any additional search terms to those custodians' documents.  See id. at 6.  With respect to Portigon, the Court understands that search terms were applied before any documents were collected from custodians.  See id. at 6.  Therefore, Portigon should re-collect and review documents hitting on the additional search terms from its custodians.  To the extent feasible, defendants are permitted to de-duplicate documents that have already been reviewed against documents that hit on the additional search terms.

[15] Plaintiffs do not seek any additional custodians from Portigon and Société Générale.  See ECF No. 3626-3 at 1 n.1.

has considered whether plaintiffs have met their burden in showing
that the requested custodian is "likely to have non-cumulative
relevant documents." Assured Guar. Mun. Corp. v. UBS Real Est.
Sec. Inc., No. 12 Civ. 1579 (HB) (JCF), 2013 WL 1195545, at *3
(S.D.N.Y. Mar. 25, 2013) (denying custodian requests as
cumulative); see also Mortg. Resol. Servicing, LLC v. JPMorgan
Chase Bank, N.A., No. 15 Civ. 293 (LTS) (JCF), 2017 WL 2305398, at
*2 (S.D.N.Y. May 18, 2017) ("[A] party seeking to compel another
party to search the files of additional custodians bears the burden
of establishing the relevance of the documents it seeks from those
custodians."). As with plaintiffs' search term requests, the Court
is then "obligat[ed] to balance its utility against its cost."
Coventry Cap. US LLC v. EEA Life Settlements, Inc., No. 17 Civ.
7417 (VM), 2021 WL 961750, at *2 (S.D.N.Y. Mar. 15, 2021).

   The Court grants plaintiffs' requests for custodians that:
(i) were directly involved in the LIBOR submission process (Yasmine
Nahouli and Ignacio Rodrigo, NatWest/Royal Bank of Scotland);
(ii) were directly involved in alleged efforts to manipulate LIBOR
(Andrew Rivas, Deutsche Bank; Kevin Liddy, NatWest/Royal Bank of
Scotland; Reto Stadelmann, UBS); (iii) had alleged unique and
substantial communications about accusations of LIBOR suppression,
including with other panel banks or at BBA meetings (Michael
Kirkwood, Citibank; Dyfrig John, HSBC; Harry Samuel, Royal Bank of
Canada; Johnny Cameron and Brian Crowe, NatWest/Royal Bank of

Scotland); or (iv) were involved in an internal audit related to LIBOR (Chris Riley, Norinchukin).  For all of these custodians, plaintiffs have demonstrated that "the discovery sought is of sufficient importance to justify the burden and cost that discovery will impose on the responding party."  Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon, No. 14 Civ. 9372 (GBD) (HBP), 2018 WL 2215510, at *12 (S.D.N.Y. May 15, 2018).

However, the Court denies plaintiffs' requests for custodians: (i) whose stated relevance is based on their involvement in internal investigations that did not concern allegations of LIBOR suppression (William Broeksmit and Jonathan Kahlberg, Deutsche Bank); (ii) who were not involved in the LIBOR setting process but nevertheless received or communicated information about anticipated LIBOR rates (Kevin McBunch, Thomas McGee, Brian Wichnern, and John Widmeier, Bank of America; Robbie Anderson, Olivier Pouzoulet, and Tim Townsend, NatWest/Royal Bank of Scotland); (iii) who merely expressed or received an opinion about LIBOR (Peter Kretzmer, James Tedrake, and Joseph Randazzo, Bank of America; Darren Gebler and Mark Zarb, JPMorgan; Michael Andrew, Jeff Kulkarni, and John Retter, NatWest/Royal Bank of Scotland); (iv) who were so far removed from the LIBOR submission process that they are unlikely to possess unique information, such as junior team members, high-level executives, employees from unrelated departments, and a member of one panel bank's press

communications team (Joanna Bushby, Bank of America; Jeffrey
French, Citibank; David Folkerts-Landau, Deutsche Bank; Mark
Garvin and Achilles Macris, JPMorgan; Clark Foran, NatWest/Royal
Bank of Canada); (v) whose stated relevance raises specific issues
of privilege (Stuart Gulliver, HSBC); or (vi) whose documents are
likely to be highly cumulative of documents from other custodians
(Heinz Srocke, James Forese, and Francisco Fernandez De Ybarra,
Citibank; Knut Pohlen, Deutsche Bank; Gary Lomas, Norinchukin;
Fred Goodwin and John Hourican, NatWest/Royal Bank of Scotland).
None of these proposed custodians were directly involved in the
LIBOR submission process, and plaintiffs' reasoning for their
inclusion does not sufficiently show that a search of their
documents "would provide unique, relevant and noncumulative
evidence." Coventry Cap. US LLC v. EEA Life Settlements Inc., No.
17 Civ. 7417 (VM) (SLC), 2020 WL 7383940, at *7 (S.D.N.Y. Dec. 16,
2020). Accordingly, "requiring a search of the files of these
custodians cannot be justified given the minimal marginal value of
the information sought." Assured Guar. Mun. Corp., 2013 WL
1195545, at *5; see also Mortg. Resol. Servicing, LLC, 2017 WL
2305398, at *3 ("Even if the plaintiffs had cleared the hurdle of
showing that the proposed additional custodians had some unique
relevant information, discovery of their files would not be
warranted because the cost and burden would be disproportionate.").

The Court also denies plaintiffs' remaining custodian requests (Paul Glands and Colin Harrison, JPMorgan) as moot, given defendants have since agreed to produce the requested custodians' responsive documents.  See ECF No. 3632-1 at 11.  To the extent plaintiffs seek a broader production for these custodians than what has currently been produced by defendants, that request is denied as disproportionate to the needs of the case.

Lastly, in the absence of a showing that any documents were improperly withheld, the Court declines to order defendants to produce their entire regulatory productions, from which the Court understands defendants have already produced responsive documents. See ECF Nos. 3626 at 2, 3626-3 at 1 n.1.  The Court does not find that the simple fact that a custodian's files were made available to regulators makes every document in that custodian's files relevant.

Accordingly, plaintiffs' application to compel additional search terms and custodians is granted in part and denied in part.

CONCLUSION

For the foregoing reasons, the DAPs' application for an order compelling the production of documents from June 2010 through October 2011 is denied in its entirety, and plaintiffs' application for an order compelling the production of documents responsive to more than 100 additional search terms and/or from more than 40 additional custodians is granted in part and denied in part.

Complete lists of the search term and custodian requests that are granted as to certain defendants are provided in the appendices. The Clerk of Court is respectfully instructed to terminate the motions pending at ECF Nos. 3547 and 3549.

**SO ORDERED.**

Dated:     New York, New York
           April 10, 2023

                                    NAOMI REICE BUCHWALD
                            UNITED STATES DISTRICT JUDGE

**APPENDICES**

## A. Appendix 1: Granted Search Term Requests

| Search Term | Defendant(s) Ordered to Run Search Term[16] |
|---|---|
| BBA* | UBS |
| British bankers association | Citibank<br>HSBC<br>Portigon<br>UBS |
| Collu* | Bank of America<br>Deutsche Bank<br>Portigon<br>Royal Bank of Canada<br>NatWest/Royal Bank of Scotland<br>Société Générale |
| Err /5 (lo* or hi* or side) | Bank of America<br>Portigon<br>Royal Bank of Canada<br>Société Générale<br>UBS |
| Fix* | Bank of America<br>Portigon<br>UBS |
| (Interbank or inter*bank) and (loan* or lend* or borrow* or bid* or offer*) | Deutsche Bank<br>HSBC<br>JPMorgan<br>UBS |
| Middle /5 (keep* or line* or remain* or stay* or within) | Bank of America<br>Deutsche Bank<br>Norinchukin<br>Portigon<br>Royal Bank of Canada<br>NatWest/Royal Bank of Scotland<br>Société Générale<br>UBS |

---

[16] Bank of America and Citibank need not run any additional search terms across the documents of its custodians whose responsive documents were produced without the application of search terms.  See supra footnote 14.

27

| | |
|---|---|
| Outlier* /7 (libor* or submi* or set* or fix* or rate* or level* or pack* or mov*) | Bank of America<br>Royal Bank of Canada<br>Portigon |
| Pack /7 (stay* or remain* or keep* or part* or in* or middle* or within or mov* or stand* or out*) | Bank of America<br>HSBC<br>Norinchukin<br>Portigon<br>Royal Bank of Canada<br>NatWest/Royal Bank of Scotland |
| Perceiv* /5 (strong or weak or fix* or level* or libor* or market* or rate* or set* or submi*) | Bank of America<br>Portigon<br>Royal Bank of Canada<br>Société Générale<br>UBS |
| Perception /5 (strong or weak or press or market or public or client* or customer* or "out there") | Bank of America<br>HSBC<br>JPMorgan<br>Portigon<br>Royal Bank of Canada<br>Société Générale<br>UBS |
| Reputation | Bank of America<br>Deutsche Bank<br>Norinchukin<br>Portigon<br>Royal Bank of Canada<br>NatWest/Royal Bank of Scotland<br>Société Générale<br>UBS |
| "Too high" and (libor* or submi* or set* or fix* or rate* or level* or mov* or err*) | Bank of America<br>Deutsche Bank<br>Portigon<br>Royal Bank of Canada |
| "Too low" and (libor* or submi* or set* or fix* or rate* or level* or mov* or err*) | Bank of America<br>Deutsche Bank<br>Portigon<br>Royal Bank of Canada |

**B. Appendix 2: Granted Custodian Requests**

| Custodian | Defendant Ordered to Produce Documents from Custodian |
|---|---|
| Michael Kirkwood | Citibank |
| Andrew Rivas | Deutsche Bank |
| Dyfrig John | HSBC |
| Chris Riley | Norinchukin |
| Harry Samuel | Royal Bank of Canada |
| Yasmine Nahouli | NatWest/Royal Bank of Scotland |
| Ignacio Rodrigo | NatWest/Royal Bank of Scotland |
| Johnny Cameron | NatWest/Royal Bank of Scotland |
| Brian Crowe | NatWest/Royal Bank of Scotland |
| Kevin Liddy | NatWest/Royal Bank of Scotland |
| Reto Stadelmann | UBS |